IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARETHA SIMMONS, et al. | ) | Case No. 1:14-cv-09042 |
| | ) | |
| Plaintiffs, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AS A SANCTION FOR
PERJURY AND DISCOVERY VIOLATIONS**

## INTRODUCTION

There has been an extremely troubling development in this litigation, one that bears heavily on the upcoming trial. Since February 2, 2018, the City's lawyers have abruptly produced to Plaintiffs approximately 2,000 pages of previously undisclosed documents, much of which relates to a very serious Complaint Register pending since at least January 2016. It turns out that two of the Defendant Officers were long ago stripped of their police powers (a circumstance Plaintiffs should have learned about no later than their depositions had the Defendants answered duty-related questions truthfully) over misconduct bearing striking similarity to the allegations in this case.

The eve of trial production reveals that the City has determined that certain of the Defendants created false reports and lied under oath by concocting a story about arresting a man named Emmanuel Williams for guns and drugs in a way that closely matches their false story about the Simmons family. The production also confirms that those Defendants falsely testified under oath at their depositions in this case in a way that prevented Plaintiffs from learning details of the other incident, as well as prevented Plaintiffs from learning that those Defendants had been stripped of their police powers nearly two years ago, months before their depositions. In fact, the City has now determined that those Defendants violated the extremely serious, credibility-killing (if not career-killing, given that officers have to testify in court) CPD Rule 14 against making false statements and has recommended their termination from the police force.

Plaintiffs served extensive discovery requests that plainly required Defendants to provide all of this information. In short summary, the City's belated production contains the following information:

1. In November 2013, months after falsely claiming that they entered Plaintiffs' house using a key they found on Alonzo McFadden and then discovered guns and drugs in the house, Defendants O'Keefe and Wrigley concocted a nearly identical story when they arrested Emmanuel Williams and falsely claimed that they recovered a key on him and used that key to enter an apartment where they

    discovered guns and drugs. In Mr. Williams's case, however, they were caught on video, and the video showed that they were lying.

2. By no later than January 2016, the City opened a CR regarding the Williams incident.

3. Defendants O'Keefe and Wrigley were stripped of their police powers nearly two years ago, in April 2016, pending resolution of the Williams CR. This was memorialized in memoranda and in documents entitled Notification of Duty Restrictions. In the meantime, the officers testified under oath at their depositions in this case in July 2016 that they were active officers who had never been disciplined.

4. Approximately eight months ago, the Chicago Police Department's Bureau of Internal Affairs determined that O'Keefe and Wrigley submitted a false report about their arrest of Mr. Williams and then lied under oath at his criminal trial. As a result, BIA has recommended that O'Keefe and Wrigley be fired. The BIA also determined that Defendant Kinnane committed misconduct in connection with his testimony at Mr. Williams's criminal trial and has recommended that he be suspended for ten days.

All of the above information was responsive to Plaintiffs' document requests, but none was provided until the evening of February 2. Perhaps most troubling of all, the City's present explanation appears to be an attempt to try deflect blame to Plaintiffs' counsel for supposedly failing to ask the proper questions and make the proper inquiries. Such a contention is indefensible. The problem is the system set up by the City of Chicago for complying with discovery. That system does not function properly, and the City has not yet gotten the message that it needs to change.

In the case at bar, Defendants' discovery failures and false testimony have impacted Plaintiffs' discovery and their expert reports, causing prejudice to Plaintiffs and to the judicial system in a way that cannot be cured in the two weeks remaining before trial starts. Under these circumstances, the Court should enter a default judgment on liability.

## FACTUAL BACKGROUND

### A. Overview of Plaintiffs' claims

Plaintiffs allege that the Defendants used excessive force in executing a search warrant, including by pushing Aretha Simmons into a concrete wall and a radiator, and by needlessly pointing

guns at her mom and three-year old daughter. Dkt. 263 at 1. The Plaintiffs deny having any relationship with Alonzo McFadden, who was a subject of the warrant and who was arrested outside of their house. *Id.* Defendants, on the other hand, deny using any force against Plaintiffs, *id.* at 5-6, and they seek to link McFadden to the Simmons family, going so far as to claim that they recovered a key to the Simmons house from McFadden and used that key to enter the house. *Id.* at 3. The Court's Order on the parties' motions *in limine* allows the Defendants to introduce evidence about "taking Mr. McFadden into custody and what was (and was not) on his person." *Id.* at 8. The credibility of the witnesses, and the parties in particular, will be extremely important for the jury's determination as to whether the Plaintiffs' constitutional rights were violated.

Plaintiffs are also pursuing a *Monell* claim (set to be tried first, starting on February 21, 2018), "alleging that the City had policies of failing to supervise police officers; [and] failing to investigate and discipline officers for misconduct." Dkt. 263 at 1-2.

As described below, the documents and information that Defendants withheld are highly relevant to proving that Plaintiffs' constitutional rights were violated and to proving Plaintiffs' *Monell* claim.

### B. Defendants withheld highly relevant documents and information

By no later than January 2016, the Chicago Police Department instituted investigations against Defendants Hefel, Homer, Kinnane, Laurie, O'Keefe, Suing, and Wrigley regarding a CR stemming from a civil lawsuit filed by Emmanuel Williams. *See* Ex. 1 (CITY-BG-022836-022838) (listing complaint notification date as January 21, 2016). Williams was arrested on drug and gun charges, and the Williams CR contains allegations that are strikingly similar to Plaintiffs' allegations in this case. Most notably, the police report documenting Williams's arrest says in relevant part that: O'Keefe observed Williams engaging in drug transactions using a garbage can to store the drugs; Wrigley then saw Williams enter an apartment using a key; after Williams left that apartment,

3

O'Keefe saw him put a gun in the same garbage can he was using to store the drugs; Wrigley then recovered guns and drugs from the garbage can, **as well as a key from Williams, which he used to enter Williams's apartment to discover more guns and more drugs.** Ex. 2 at CITY-BG-22795-22796. Video evidence that surfaced after the arrest, however, conclusively established that the officers' version of the events was a lie, including the report that they recovered a key from Williams and used it to enter an apartment where they found guns and drugs.

On April 15, 2016, months before they were deposed in this case, Defendant officers John O'Keefe and John Wrigley were stripped of their police powers as a result of the Williams CR. Ex. 3 (4/15/2016 Notification of Duty Restrictions for O'Keefe and Wrigley). They both signed notifications acknowledging this fact, and those forms explained, among other things, that they could not carry a "firearm or any other weapon," and that they were "not to exercise the power of arrest or any other police power." *Id.* The notifications informing O'Keefe and Wrigley that they had been stripped of their police powers make clear that the department was taking that action in response to a CR, and in fact lists the CR number. *Id.* (showing Complaint Log No. 1078961).

Subsequently, based at least in part on the video evidence, the Bureau of Internal Affairs ("BIA") determined that Wrigley "submitted a false report" when he wrote that he "recovered a set of keys belonging to apartment 1E at 5800 S. Artesian Ave. from Emmanuel Williams subsequent to a custodial search," Ex. 4 at CITY-BG-022813-022814, and that he subsequently "made a false statement during sworn testimony" in Emmanuel's criminal trial when he offered the same testimony about recovering a key. *Id.* at CITY-BG-022814. Based on those false statements and many others, the BIA recommended in May 2017 that Wrigley be fired. *Id.* at CITY-BG-022816.

The BIA similarly found that O'Keefe committed misconduct for the same false statements, and that he too made a number of false statements during his testimony at Williams's criminal trial,

4

including testimony about Wrigley recovering a key from Williams. *Id.* at CITY-BG-022821-022822. The BIA has also recommended that O'Keefe be fired. *Id.* at CITY-BG-022827.

Finally, the BIA determined that Kinnane made multiple false statements during sworn testimony at Williams's criminal trial, and recommended a ten-day suspension for his misconduct. *Id.* at CITY-BG-022828.

C. **O'Keefe and Wrigley concealed the fact that they had been stripped of their police powers**

Three months after being stripped of their police powers, O'Keefe and Wrigley were deposed in this case. During their depositions, they lied about their assignments and discipline history, and actively concealed the fact that they had been stripped of their police powers. The following colloquy occurred during Wrigley's July 19, 2016 deposition:

> Q. Are you still a member of the Area Central Gun Team?
>
> A. No.
>
> Q. What was the very next assignment that you had after you were a member of the Area Central Gun Team?
>
> A. I bid into the 19th District and that's my current assignment.
>
> Q. Patrol officer?
>
> A. **I'm on the tactical team there now.**
>
> Q. Briefly, when you became a member of the tactical team in the 10th District in late 2005, what were your day-to-day duties?
>
> A. It was, generally speaking, working in plain clothes in a ten member team with one sergeant as the immediate supervisor concentrating on the hotspots that the district commander would define. Hotspots meaning usually related to gang activity, narcotic activity, and sometimes an excessive amount of robberies or thefts.
>
> Q. When you became -- let me ask you about this one now. As a member of the 19th District, currently what are your duties day-to-day?

A. **Very similar duties.**

Ex. 5 (Wrigley Dep.) at 16:2-17:1 (emphasis added).

That was false testimony. As of April 2016, Wrigley had been stripped of police powers. He was not allowed to carry a gun or any other weapon, arrest people, or exercise any other police powers. He was certainly not, as he claimed under oath, operating as a plain clothes member of a tactical team operating in City hot spots with "very similar duties" to the ones he had before his police powers were stripped. Indeed, a memorandum first produced on February 5, 2018 confirms that the department reassigned both him and O'Keefe in April 2016, *see* Ex. 6 at CITY-AS-023497-023498, and Wrigley himself twice confirmed to the Bureau of Internal Affairs that he had been detailed to Unit 376 since April of 2016. Ex. 7 (City-AS-23416, Wrigley Oct. 2016 audio recording) at approximately 4 minute seven second mark; City-AS-23419, Wrigley Dec. 2016 audio recording) at approximately 3 minute 50 second mark). Unit 376 is the Alternate Response Section,[1] and it "operates the 311 call center and provides security to the OEMC Facility." Ex. 8 (March 29, 2009 Arbitration Award describing Unit 376). Needless to say, Unit 376 is not a tactical unit.

Wrigley also testified that the only discipline he ever received in connection with any CRs was a handful of unpaid days off work, and that no supervisor ever reprimanded him or warned him about any CR filed against him. Ex. 5 (Wrigley Dep.) at 151:9-153:1. Again, that was not true. Months before that testimony, Wrigley's police powers had been stripped as the result of a CR against him. No reasonable officer would think that being stripped of his police powers was not a disciplinary action. And these Defendants had to be aware that Plaintiffs' counsel knew nothing about these circumstances, because no questions were asked about this particular CR or the resulting consequences during their depositions.

---

[1] *See* directives.crimeisdown.com/diff/efaff1a7e94a8ad642c793993e0d6701c1d276fd/directives/data/a7a57be2-129add9f-15f12-9add-9fea37e07625ed82.html (last visited 2/7/2018).

6

Similar exchanges occurred during Officer O'Keefe's July 13, 2016 deposition. When first asked whether he was currently assigned or primarily assigned to any district, he simply answered "no" rather than explaining that his police powers had been stripped. Ex. 9 (O'Keefe Dep.) at 14:6-14:11. That answer was incomplete and misleading at best. He then later testified that he was assigned to Unit 312, which covered to the South Side. *Id.* at 16:20-17:3. That answer, too, was incomplete and misleading, and O'Keefe knew it. In October 2016, when BIA asked him during an interview what his unit of assignment was, the same question posed at the deposition, he gave a different answer, acknowledging to the investigators that he had been assigned to Unit 376 since late April 2016. (Ex. 10 (City-AS-23417, O'Keefe October 2016 BIA audio recording) at approximately 6 minute 47 second mark through 7 minute 6 second mark). O'Keefe's testimony was particularly misleading because Plaintiffs had not been provided with the documents showing that he had been stripped of his police powers months before.

O'Keefe was also asked directly whether he had ever been disciplined as a result of a civilian complaint filed against him. Ex. 9 (O'Keefe Dep.) at 125:15-125:18. His answer, "no," was not true. *See id.* As stated above, O'Keefe's police powers had been stripped months before as a result of the Williams CR.

### D. Defendants were required to produce all of the documents and information they withheld

Numerous discovery requests called for the Defendants to produce the above-described discovery. For example, Plaintiffs requested:

> "the entire IPRA and IAD Complaint Register File" for each defendant officer in Request for Production 29;
>
> "any and all documents related to any supervisory or administrative review of investigative findings and any disciplinary recommendations in IPRA and IAD Complaint Register Files for each of the defendant CPD officers" in Request 30;

7

> "the complete personnel file of each of the Individual Police Defendants" Request 32, which enumerated examples of responsive materials such as "complaint and disciplinary records, job assignments and details" in Request 32;
>
> "all documents relating to CPD's review of the performance of the Individual Police Defendants" in Request 37; and
>
> "[a]ny and all records of any disciplinary complaints and investigations (including Summary Punishment), whether or not acted upon formally or informally, including the entire Complaint Register files (IAD and IPRA records) disciplinary histories and summaries for each of the Individual Police Defendants at any time during their employment with CPD" in Request 42.

*See*, *e.g.*, Ex. 11 (City's Amended Responses to Requests for Production).

In response to the requests for the personnel file and evaluations, the City lodged certain objections as to the definitions of the terms used, but then agreed to produce responsive "personnel file" documents. *See id.* at City Amended Responses to Requests, 32 and 37. Additionally, in its January 14, 2016 minute Order, the Court directed the City to produce Defendant Officers' personnel files. Dkt. 114. Following the recent revelations, Plaintiffs requested that the City provide the officers' current Personnel Files. In response, the City produced documents entitled "Personnel Files" for the officers on February 6, 2018. Those purported Personnel Files, however, do not contain the notifications or any references or documents whatsoever stating that these officers were stripped of their police powers. The City is now taking the position that these notifications are not the kind of document that the CPD typically places or stores in an employee's personnel files. Ex. 12 (D. Noland 2/5/2018 Letter). Presumably those notifications went into some employee file somewhere, so perhaps the debate about "Personnel Files" is a semantic problem, but at a minimum, one would expect that the City would update what it calls the Personnel File to reflect that an officer has been stripped of his duties in connection with dishonesty.

Leaving aside any apparent confusion about what the Court contemplated when it ordered the production of Personnel Files, the Defendants were still required to produce the documents

8

showing that the officers were stripped of their police powers. Among other requests, Plaintiffs' above-cited document request for personnel files defines that term broadly enough so that it encompasses this type of notification, regardless of where it is physically stored.

In response to the document requests for CR files, the City cited an agreement with Plaintiffs to produce certain "face sheets" and other summary documents of the Complaint history from which Plaintiffs could select specific CR files to be produced in their entirety. *See*, *e.g.*, City Responses to Requests 29, 30, 42. By way of background, to manage discovery in the case, Plaintiffs and City agreed that written discovery of the Defendant Officers' CRs would proceed in two stages. Under the agreement, City was to first produce the face sheets for all of the Defendant Officers' CRs. Next, after reviewing the face sheets for relevance to the facts and claims in this case, plaintiffs were to decide which full CR investigative files they needed and would make those requests to the City. That agreement, which was memorialized before the Court, required the City to produce *all* "face sheets" for all of defendant officers' CR files, and in fact the City represented to the Court and to Plaintiffs that it had done so. *See* Dkt. No. 122 at 4 ¶ 3 (joint status reporting stating that "City produced all face sheets for all defendant officers.").

Based on the face sheets that the City produced, and in particular the April 26, 2016 representation that the City had produced all face sheets from the Defendant Officers, Plaintiffs made decisions regarding which full CR files to request. The City's productions were not complete, however, as the face sheets produced by April 21, 2016 did not include the Williams CR numbers.

On February 27, 2017, after fact discovery had closed and one day before Plaintiffs' *Monell* expert disclosures were due, the City produced an updated, summary CR history for each of the Defendant Officers. At the very bottom of the histories for Kinnane, O'Keefe and Wrigley, the CR numbers themselves for the Emmanuel Williams CRs are added, along with the incident and complaint dates, but all other information – such as the type of complaint - is omitted or redacted.

9

Ex. 13 (CITY-AS-018166-67, CITY-AS-018171-72, and CITY-AS-018175). There was no way to tell from looking at the updated CR histories that this complaint so seriously implicated the Defendants' veracity.

In sum, the Defendants did not timely produce a "face sheet" for the Emmanuel Williams CR. Although Officer Suing, who was deposed shortly after O'Keefe and Wrigley, briefly referenced a statement he gave in connection with a Williams CR, neither he nor anyone else told Plaintiffs any details about that CR, including that it had already resulted in O'Keefe and Wrigley being stripped of their police powers. In any event, regardless of the parties' discussion on the production of "face sheets," the Defendants were separately required to produce the documents showing that Wrigley and O'Keefe had been stripped of their police powers, and they were required to provide truthful testimony under oath. Had they done any of those things, Plaintiffs would have certainly conducted substantial follow-up discovery on these issues.

## ARGUMENT

### I. Legal Standard

A default judgment is appropriate under Rule 26, Rule 37, and a court's inherent authority where a court finds "fault, bad faith, or willful noncompliance" with a party's failure to satisfy its discovery obligations. *See Robinson v. Champaign Unit 4 School Dist.*, 412 F. App'x. 873, 878, (7th Cir. 2011) (addressing Rule 26 sanctions); *see also Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 758 (7th Cir. 2005) ("district court may dismiss a case for discovery violations or bad faith conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court"). "These three measures of culpability are each wholly distinct from one another. 'Bad faith,' for instance, is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order. 'Fault,' by contrast, doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the

10

conduct—or lack thereof—which eventually culminated in the violation." *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992).

Although a sanction of dismissal or default judgment is rare, that relief is appropriate under a variety of circumstances. It is appropriate where, as here, a party engaged in "fraudulent conduct in the course of discovery and attempts to hide such behavior behind a cloak of further fraud and deceit," which "is an affront to the legal process." *Greviskes*, 417 F.3d at 759. A default judgment is appropriate when the parties commit perjury or similar misconduct. Although typical inconsistencies in testimony should be left for the jury to weigh witness credibility, "[a]s a fraud on the court, perjury may warrant the sanction of dismissal." *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008)[2]; *see also Malibu Media, LLC v. Tashiro*, 1:13-CV-00205-WTL, 2015 WL 2371597, at *38 (S.D. Ind. May 18, 2015) (default judgment appropriate where "Defendants spoiled evidence, committed perjury, and failed to discharge their duties to conduct discovery reasonably and in good faith"), report and recommendation adopted, 1:13-CV-205-WTL-MJD, 2015 WL 3649359 (S.D. Ind. June 11, 2015); *Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 961–62 (N.D. Ill. 2013) (dismissing case where plaintiffs committed perjury on material issues). Indeed, making false statements may justify a default judgment even if they are not made under oath, if the statements have a significant impact on the case. *See Banks v. Cook Cnty.*, No. 12 C 2341, 2014 WL 628256, at *7 (N.D. Ill. Feb. 18, 2014) (Kennelly, J.) ("Banks' false statements were not perjury strictly speaking, because they were not made under oath. That said, the wrongdoing was every bit as severe as false testimony would have been, because Banks made his false statements to the Court in an effort to convince it to order more testing.").

---

[2] Courts determining whether perjury has been committed may use the "the federal criminal context, [where] perjury is defined as 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Montano*, 535 F.3d at 564.

A default judgment is also warranted where a party's conduct amounts to "gross negligence" during discovery. *Marrocco*, 966 F.2d at 224. Moreover, although Plaintiffs submit that it is clear that Defendants Wrigley and O'Keefe committed perjury, the Court need not find that any of the Defendants acted in bad faith to issue severe sanctions because Rule 26 and 37 sanctions do not require subjective bad faith, and neither does 28 U.S.C. §1927. *See, e.g., Greviskes*, 417 F.3d at 758 (dismissal appropriate "for discovery violations *or* bad faith conduct in litigation under Federal Rule of Civil Procedure 37") (emphasis added); *Marrocco*, 966 F.2d at 224 (directed verdict appropriate when party is at "fault," which "only describes the reasonableness of the conduct---or lack thereof---which eventually culminated in the violation").

## II. Defendants' pattern of misconduct warrants a default judgment on liability

A. <u>Defendants committed misconduct during discovery in a way that prejudiced Plaintiffs</u>

Wrigley and O'Keefe committed perjury during their depositions, and the City was did not fulfill its discovery obligations in this case. Wrigley and O'Keefe both testified under oath about current assignments without mentioning that they had been stripped of their police powers months before their testimony, and Wrigley affirmatively stated that he was on a tactical team, conducting the same day-to-day activities he had always conducted. On February 3, 2018, Plaintiffs' counsel wrote to defense counsel and asked whether they agreed that Wrigley and O'Keefe committed perjury. During a telephone conference the following day, the City's lawyers declined to take a position on that question. Counsel for the individual defendants, who did not participate in that telephone call, later disagreed with Plaintiffs' accusation, explaining:

> It is our contention that the officers did not commit perjury. Within the Chicago Police Department, there is a distinction between unit of assignment and unit of detail. For example, an officer may be assigned to a particular unit, and detailed to another unit. To illustrate the point, a review of Bates 22777 from the CR is instructive. That summary report, and I believe all summary reports, note a unit of assignment and a unit of detail. In their depositions from July of 2016, the officers answered truthfully the questions asked of them. It is not considered discipline when department members are

12

> given duty restrictions due to an ongoing administrative investigation. As I understand it, officers can have duty restrictions for various reasons and various lengths of time. However, it is not an imposition of discipline.

Ex. 14 (2/4/2018 email from K. Battle to S. Rauscher). That explanation is not persuasive. As an initial matter, it ignores Wrigley's testimony that his day-to-day activities on the tactical unit were the same in April 2016 were the same as they had been since 2005. Although it makes a generic reference to the fact that officers are given duty restrictions for a number of reasons, it also ignores that these officers were not just given duty restrictions, but were stripped of all police powers because of a CR that ultimately led to a finding that they violated CPD Rule 14 by lying in police reports and under oath. No reasonable officer who had been stripped of police powers under those circumstances would think he or she had not been disciplined.

Moreover, no one has provided an adequate explanation as to why Plaintiffs were not previously provided with the documents created as far back as April 2016 showing that O'Keefe and Wrigley had been stripped of their police powers. Instead, the City appears to be taking the position that their failure to turn over the Williams CRs and the documents showing that O'Keefe and Wrigley were stripped of their police powers is Plaintiffs' fault for not asking particular questions that would have led them to discover the relevant documents and information. Ex. 12 (D. Noland 2/5/2018 letter). But discovery is not a guessing game, and Plaintiffs are not required to guess that Defendants are committing perjury. Plaintiffs issued substantial discovery requests and diligently pursued discovery that called for the documents and information at issue in this motion. The Court should reject the City's efforts to blame Plaintiffs for their discovery failings.

A default judgment is particularly appropriate here because the Defendants' misconduct and belated disclosures so close to trial have prejudiced the Plaintiffs. For example, had Plaintiffs learned in April 2016 that O'Keefe and Wrigley had been stripped of their police powers, they certainly would have questioned the officers about that fact and asked detailed questions about the allegations

13

in that case, and they would have requested all other relevant documents relating to that issue. They would have also had the opportunity to depose Emmanuel Williams and other witnesses from Mr. Williams's case, and to list those witnesses as witnesses in this case as well. Had they been provided with the Williams CR file earlier, they would have learned that O'Keefe and Wrigley had used an identical false story against Mr. Williams as they have been using against Plaintiffs, about recovering a key and using that key to enter a house where they discovered guns and drugs.

And perhaps most importantly on the prejudice point, Plaintiffs' *Monell* expert reports from police practices expert Tim Longo rely on the proposition that the City had entirely ignored the hundreds of complaints filed against the officers involved in the incident with Plaintiffs. *See*, *e.g.*, Ex. 15 (Longo March 13, 2017 Report) at 32 ("The defendant police officers amassed some 245 complaints of misconduct throughout their careers, and more than 20 civil cases have been filed in which one or more of them have been named as defendants. Several of those claims have been settled or where otherwise resolved in favor of the plaintiffs. Not a single allegation against any of them has resulted in final discipline."). Mr. Longo's report would certainly have been different had he known that O'Keefe and Wrigley had been stripped of their police powers in April 2016.[3] The report and opinions of Stan Smith, Plaintiffs' statistical expert, would also have been significantly different. Dr. Smith's report and rebuttal include several tables organizing information from the Defendant Officers' CRs, including their sustained complaint rates and rates of discipline.

With just over two weeks until the trial in this case starts, it is too late for Plaintiffs to cure the prejudice caused by Defendants' late disclosures.

---

[3] In addition, the Court barred Plaintiffs from pursuing a *Monell* claim based on an alleged code of silence. As was true for the belatedly learned CR information at the recent Frugoli trial, this new evidence, which provides persuasive evidence that the officers involved in this incident are willing to, and do, lie for each other, would have been relevant information for Plaintiffs to oppose Defendants' efforts to dismiss Plaintiffs' code-of-silence allegation in their *Monell* claim.

14

B.  Defendants' misconduct is part of a much broader pattern in cases involving the City of Chicago

A default judgment on liability is the only appropriate sanction to help ensure that this type of behavior does not continue in the future, as it has in the past. *See* Ex. 16 (2/1/2018 Minute Order in *Valez v. Frugoli*, Case No. 13-5626 (N.D. Ill.) (Kendall, J., explaining that she intends to address motion for sanctions based on discovery violation that was exposed during trial); *see also Klinger v. City of Chicago*, 15-CV-1609, 2017 WL 736895, at *4 (N.D. Ill. Feb. 24, 2017) ("A number of other recent cases in this district also have addressed difficulties § 1983 plaintiffs have experienced with obtaining relevant discovery from the City of Chicago, *see, e.g., Colyer v. City of Chicago*, 2016 WL 25710 (N.D. Ill. Jan. 1, 2016), including specifically discovery related to an IPRA investigation, *see, e.g., Young v. City of Chicago*, 2017 WL 25170 (N.D. Ill. Jan. 3, 2017)"); *Colyer v. City of Chicago, Gildardo Sierra*, 12 C 04855, 2016 WL 25710, at *2 (N.D. Ill. Jan. 4, 2016) (new trial and attorneys' fees awarded when one City lawyer "intentionally withheld [highly relevant] information from the Court, from Plaintiffs, and even from his own co-counsel," and another City lawyer "failed to make a reasonable inquiry, as required by the discovery rules, to search for the" same information and documents); *Hadnott v. City of Chicago*, Case No. 07-6754 (N.D. Ill. May 22, 2015) (new trial for failure by City lawyers to timely produce highly relevant documents in civil rights case); *Walden v. City of Chicago*, 846 F. Supp. 2d 963, 980 (N.D. Ill. 2012) (new trial for unethical actions by lawyers for the City in a civil rights case).

## CONCLUSION

The City and its police officers committed misconduct in this case, and they are apparently not yet getting the message that the City's system for responding to discovery needs to change. This Court should not allow such behavior to continue, and it should instead grant Plaintiffs' motion for a default judgment on liability and any other or further relief that the Court deems just.

<u>/s/ Al Hofeld, Jr.</u>

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite 3120
Chicago, Illinois 60602
(773) 241-5844
al@alhofeldlaw.com
alhofeldlaw.com

<u>/s/ Scott Rauscher</u>
Jon Loevy
Scott Rauscher
Theresa Kleinhaus
Loevy & Loevy
311 N. Aberdeen St., Third Floor
Chicago, Illinois 60607
Telephone: (312) 243-5900
Email: tess@loevy.com
scott@loevy.com
jon@loevy.com

*Attorneys for Plaintiffs*