# Exhibit 2

**INVESTIGATIONS DIVISION**  05 MAY 2017
Area North Investigations  CL No. 1080515

INVESTIGATION

    The undersigned was assigned this investigation via the normal channels of this command on 18 MAY 2016 and acknowledged receipt on 19 MAY 2016. The incident under investigation in this case was originally brought to the attention of the Department due to civil suit (15 CV 9354) being filed naming the City of Chicago and Department members; Police Officer John O'KEEFE #18418, Police Officer John WRIGLEY #7179, Police Officer Justin M. HOMER #10979, Police Officer Steven L. HEFEL #13074, Police Officer Michael LAURIE #15108, Police Officer Michael SUING #17006 and Sergeant Brian KINNANE #1120. The plaintiff, (Emmanuel WILLIAMS) alleged in the civil suit that the above listed officers falsely arrested him and charged him with numerous drug and weapons related charges, generated false police reports documenting the incident and gave false testimony in court (Attachment 1, 2, 7)

    The original log investigation (Log No. 1078961) was initially assigned to Sergeant Davina WARD, who prior to conducting the investigation, was promoted to Lieutenant and subsequently left the unit. Sergeant WARD obtained the Arrest Report of Emmanuel WILLIAMS, which confirmed the arrest of WILLIAMS by the officers named in the civil suit. The case was then reassigned to Sergeant Joseph PIONKE #2039, who conducted the initial stages of the investigation. Sergeant PIONKE obtained the CLEAR record of the charges and court disposition of the criminal case against WILLIAMS. This further confirmed that WILLIAMS was arrested and charged with numerous counts of weapons and narcotics violations. It also confirmed that a finding of NOT GUILTY was entered as the final disposition in the criminal case. Sergeant PIONKE made several attempts at contact with the attorney for the plaintiff, Torreya HAMILTON, in order to determine if the plaintiff would cooperate with the investigation. After a telephonic conversation with Torreya HAMILTON, Sergeant PIONKE learned that a video of the arrest of Emmanuel WILLIAMS existed and was used in the criminal trial of Emmanuel WILLIAMS to impeach the testimony of the arresting officers. The video was obtained from a security camera from private residence adjacent to the building located at 5800 S. Artesian Ave. After several attempts to obtain the video, Sergeant PIONKE was able to obtain a copy of the video from Assistant Corporation Counsel Julian JOHNSON. Sergeant PIONKE also conducted a search of the Cook County Courts database for the status of the case and discovered that the case against Emmanuel WILLIAMS had in fact been dismissed and a finding of "NOT GUILTY" was entered into the court record. (Attachments 8 -20)

    On 29 MAR 2016, Sergeant PIONKE contacted the Assistant States Attorney's office in order to ascertain if the video played a role in the "NOT GUILTY" finding in the Emmanuel WILLIAMS trial. Sergeant PIONKE spoke with ASA CLANCY who related to Sergeant PIONKE that she was not involved in the case and was unable to determine the role the video played in the case and related that she would look into the matter and re-contact Sergeant PIONKE with what she discovered. On 06 APR 2016, Sergeant PIONKE received a voicemail message from ASA CLANCY informing him that the issue was being handled by ASA Ken GOFF of the Professional Standards Unit of the Cook County State's Attorney's Office. On 06 April 2016, Sergeant PIONKE telephonically contacted ASA GOFF to discuss the issue of the video. ASA GOFF related that in fact the video of the arrest did not match the reports generated/submitted and the testimony of the arresting officers. ASA GOFF further related that the Professional Standards Unit would be reviewing the case for potential litigation against the accused officers. Based on the developments in the case Sergeant PIONKE requested that the investigation be

Confidential - Subject to Protective Order Entered in 14 C 9042      CITY-BG-022791

**INVESTIGATIONS DIVISION**
**Area North Investigations**

05 MAY 2017
CL No. 1080515

reassigned to the Confidential Investigations Section due to the potential of criminal charges being filed against the officers. The investigation was reassigned to Sergeant TIMOTHY WOLF of the Confidential Investigations Section for investigation. (Attachment 21-28)

It was determined by Commander Brendan DEENIHAN #449 of this command, that the Bureau of Internal Affairs would not wait until the State's Attorney's office filed perjury charges against the officers to go forward with an administrative investigation relative to the allegations of false reports. In anticipation of the perjury charges, the initial case was to remain with the Confidential Investigations Section. Commander DEENIHAN initiated a subsequent log number based on the allegations of false reports and had the parallel case assigned to the General Investigations Section. The undersigned was assigned the administrative case. The undersigned obtained a copy of the video along with much of the documentation generated by Sergeant PIONKE for the original investigation. The undersigned also reviewed the Arrest Report and the Original Case Incident Report and viewed the aforementioned video of the arrest. It is clearly evident that the video contradicts the actions and role of Emmanuel WILLIAMS as cited in the reports generated by the accused officers. (Attachments 1-5, 8-27)

The undersigned reviewed the progress reports of Sergeant WOLF and discovered that the video was given to the defense attorney for Emmanuel WILLIAMS by an individual named Anthony PRESS. Mr. PRESS testified in court that he obtained the video from two brothers (Pedro MOTA and Luis MOTA) who at the time resided at the residence located at 5808 S. Artesian Ave. Sergeant WOLF'S attempts at contacting Pedro MOTA met with negative results. Sergeant WOLF was able to telephonically contact Luis MOTA who related that he and his brother no longer resided at 5808 S. Artesian. Luis MOTA did not know the exact whereabouts of Pedro MOTA and did not have any contact information for him. Luis MOTA confirmed that the surveillance equipment did belong to his brother Pedro MOTA but he believed that Pedro MOTA no longer had the equipment in his possession. Luis MOTA related to Sergeant WOLF that he did not feel comfortable continuing the conversation without advice of counsel and requested that he be allowed to re-contact Sergeant WOLF at a later time. Sergeant WOLF provided Luis MOTA with his contact information via voicemail. The undersigned contacted Sergeant WOLF, who at the time had been promoted to the rank of lieutenant and was assigned to the 007th District. The purpose of the call was to ascertain if any further developments had transpired with any of the MOTA brothers since no further reports were generated by WOLF. Lieutenant WOLF related that after the telephonic conversation with Luis MOTA, he never heard from him again and never had success in contacting Pedro MOTA. (Attachments 35-37)

The undersigned thoroughly reviewed the video on numerous occasions to ensure that the undersigned had a clear perception of the actions of all the individuals in the video. It should be noted that the video is grainy and appears to be in night-vision format. The time stamp begins at (7:30 p.m.) which is one hour ahead of the time that the incident actually started. This discrepancy can be attributed to day light savings due to the time of the year (NOVEMBER). The copies provided to the undersigned in the file, which were provided to Sergeant PIONKE by Assistant Corporation Counsel Julian JOHNSON, are on two compact discs and are most likely copied off of the thumb drive that Anthony PRESS gave to the MOTA brothers to store the video on. Due to its grainy quality, the undersigned submitted the copies of the video to the Regional Computer Forensics Laboratory (RCFL) in

**INVESTIGATIONS DIVISION**
Area North Investigations

05 MAY 2017
CL No. 1080515

the hopes that the video quality could be improved. The RCFL was able to slow the video speed down, which slightly improved the video but the quality enhancement was not discernable. The undersigned also requested the RCFL confirm if the video was edited or in any way manipulated. The determination by the RCFL Forensic Audio, Video, and Image Analysis Unit was that "the video shows no visible artifacts or breaks in the timeline that would indicate editing or alteration." (Attachments 29, 50)

**NOTE:** For the sake of clarity, based on the investigation and gathered evidence, the following individuals having been identified in the video and will be referenced in the ensuing narrative by name, as follows:

- *The individual driving the vehicle and parking next to curb: Emmanuel WILLIAMS*

- *The individual standing on the southwest corner adjacent to the fence: Demond SPEIGHT*

- *Driver of unmarked Department vehicle and 1st Arresting Officer: Police Officer John O'KEEFE #18418*

- *Passenger of unmarked Department Vehicle and 2nd Arresting Officer: Police Officer John WRIGLEY #7179*

- *Driver of assisting unit: Police Officer Justin HOMER #10979*

- *Passenger of assisting unit: Police Officer Michael SUING #17006*

As stated earlier, the video begins at the time stamp of 07:30 p.m. and continues until time stamp 09:00 p.m. The approximately 1 and ½ hour long video shows what appears to be unknown individuals involved in activity consistent with hand-to-hand narcotics transactions near the southwest corner of 5800 S. Artesian Ave. At 07:38:38 time stamp, Demond SPEIGHT is seen walking northbound on Artesian Ave. and approaching the unknown individuals. Demond SPEIGHT then takes a position on the southwest corner of 58th Street and Artesian Ave and remains standing near the wrought iron fence. Approximately 10 minutes into the video, at 07:40:11 time stamp, a vehicle drives northbound on Artesian Ave. onto camera view and parks along the curb on the west side of the street in front of the building at 5800 South. Emmanuel WILLIAMS exits the driver's side door and walks westbound across the sidewalk and enters through the wrought iron gate, into the front yard of the building at 5800 South. An unknown individual who had been seated on the curb on the east side of the Artesian Ave. is seen following WILLIAMS into the front yard through the gate. As they enter the front yard, the unknown individuals on the corner can still be seen involved in activity consistent with hand-to-hand narcotics transactions. The unknown individuals that were involved in the hand-to-hand transactions as well as Demond SPEIGHT remained near the corner of the intersection.

Approximately 2 minutes later, at 07:42:10 time stamp, WILLIAMS and the unknown individual reappear onto camera view, exiting the front yard. Shortly after returning, WILLIAMS is seen walking towards the vehicle and subsequently entering his vehicle, while the unknown individual, who followed him into the yard, is seen running across the street and continuing northeast bound out of camera view. As WILLIAMS approaches and enters his vehicle, an unmarked Chicago Police Department vehicle comes

**INVESTIGATIONS DIVISION**  
**Area North Investigations**

05 MAY 2017  
CL No. 1080515

into camera view at 07:42:18 time stamp, it stops and double parks just in front of and adjacent to WILLIAMS' vehicle. P/O O'KEEFE exits the driver's side door and P/O WRIGLEY exits the front passenger side door of the unmarked Department vehicle. As O'KEEFE and WRIGLEY exit the Department vehicle, the unknown individuals involved in the hand-to-hand transactions begin dispersing and walking away from the corner. P/O' O'KEEFE approaches and detains WILLIAMS, who was standing curb side near the front of his vehicle, while P/O WRIGLEY walked over towards the southwest corner and approaches and detains SPEIGHT. WRIGLEY then walks SPEIGHT toward WILLIAMS' vehicle, where O'KEEFE is seen already conducting a pat down/search of WILLIAMS. WRIGLEY then begins to pat down/search SPEIGHT. Both WILLIAMS and SPEIGHT are seen with their hands either up in the air or on the hood of the vehicle while being patted down/searched.

At 07:44:20 time stamp, while P/O WRIGLEY stands guard over WILLIAMS and SPEIGHT, P/O O'KEEFE approaches the driver' side door, opens it and shines his flashlight into the vehicle. O'KEEFE then closes the door, walks towards the wrought iron fence in front of 5800 South and searches the area with his flashlight. At 07:45:50 time stamp, O'KEEFE walks back towards the vehicle and opens the driver's side door and this time enters the vehicle at the driver's seat and searches inside the vehicle. At 07:46:45 time stamp, after completing this search of the vehicle, O'KEEFE approaches WRIGLEY and begins a short conversation with him. At 07:46:53 time stamp, WRIGLEY walks away from O'KEEFE, walks northbound on Artesian Ave. towards 58th Street, then westbound on 58th Street, off camera view. P/O O'KEEFE stays with WILLIAMS and SPEIGHT, who are still standing in front of WILLIAMS' vehicle with their hands on the hood. WILLIAMS and SPEIGHT remain with their hands on the hood with P/O O'KEEFE standing behind them or pacing back and forth near the area until 07:57:20 time stamp. At that point P/O O'KEEFE opens the driver's side door of WILLIAMS' vehicle for the third time and begins another search of the vehicle from the driver's side front seat area. P/O O'KEEFE conducted the search until 08:00:15 time stamp. At approximately 08:02:00 time stamp, P/O O'KEEFE is approached by a citizen who appears to request that he move his Department vehicle in order for her vehicle to pass by. P/O O'KEEFE then entered his vehicle and moved near the intersection of 58th Street and Artesian Ave. At 08:02:25 time stamp, as P/O O'KEEFE exited the vehicle, P/O WRIGLEY reappeared on the video walking eastbound on 58th Street and approached O'KEEFE. At 08:03:10 time stamp, after a brief conversation with O'KEEFE, WRIGLEY again walked away westbound on 58th Street off of camera view. At 08:04:20 time stamp, O'KEEFE walked toward the wrought iron fence in front of the building and begins searching the area until 08:04:50 time stamp.

At 08:06:19 time stamp, an unmarked Department vehicle appears on camera driving westbound on 58th Street coming from east of Artesian Ave. and stops just west of the intersection. P/O HOMER exits the driver's side door and approaches O'KEEFE and engages him in conversation. At 08:06:55 time stamp, P/O SUING exits the passenger side front and approaches O'KEEFE and HOMER. As SUING approaches, HOMER walks westbound on 58th Street and off of camera view. At 08:07:02 time stamp, SUING has a very brief conversation with O'KEEFE and then O'KEEFE walks back towards WILLIAMS and SPEIGHT, who are still standing with their hands on the hood of WILLIAMS' vehicle. As O'KEEFE walks back towards WILLIAMS and SPEIGHT, SUING walks westbound towards the wrought iron fence near the corner and HOMER can be seen walking back on camera for a second or two, SUING and

Confidential - Subject to Protective Order Entered in 14 C 9042

CITY-BG-022794

INVESTIGATIONS DIVISION  
Area North Investigations

05 MAY 2017  
CL No. 1080515

HOMER appear to say something to each other and then HOMER walks westbound again. SUING then walks back to his vehicle and enters the vehicle through the passenger side front door. At 08:07:55 time stamp, O'KEEFE begins walking WILLIAMS and SPEIGHT towards the back of his vehicle. At 08:09:00 time stamp, SUING exits his vehicle, walks back towards O'KEEFE and assists O'KEEFE in un-cuffing WILLIAMS and SPEIGHT from each other and cuffing them separately. At 08:10:00 time stamp, O'KEEFE and SUING escort WILLIAMS and SPEIGHT towards SUING'S vehicle and place them both in the back seat of SUING'S vehicle. At 08:11:22 time stamp, P/O SUING approaches the wrought iron fence at the corner where the 58th Street side and the Artesian Ave. sides of the fence converge. P/O SUING can be seen moving what appears to be a garbage can and using his flashlight to illuminate in and around the can. SUING continues to search the general area of the front yard from outside the fence for approximately 2 to 3 minutes as O'KEEFE looks on while standing near the passenger side of his vehicle. At 08:13:01 time stamp, P/O SUING returns to the garbage can again, searches around it and then at 08:12:25 seconds walks westbound on 58th Street and off camera. At 08:20:12 time stamp, P/O WRIGLEY reappears in camera view, this time he enters the front yard walking eastbound from the direction of the building and walks northbound briefly through the front yard while illuminating it with his flashlight and then walks off camera towards the building. The remainder of the video continues uneventful, with the officers reappearing intermittently until the recording is terminated at 09:00:01 time stamp. (Attachments 81-86)

During the course of this investigation, the undersigned reviewed the video, the Emmanuel WILLIAMS Arrest Report, the Original Case Incident Report and the testimony of Sergeant Brian KINNANE, Police officer John O'KEEFE and Police Officer John WRIGLEY, independently and at times simultaneously. The undersigned discovered numerous inconsistencies with the events that transpired in the video and the account of the arrest as documented in the Arrest report, the Original Case Incident Report and the testimony of Sergeant KINNANE, P/O O'KEEFE and P/O WRIGLEY. (Attachments 8, 9, 31-34, 81-86)

In the Original Case Incident Report, P/O O'KEEFE and P/O WRIGLEY related the following in essence and not verbatim: At approximately 1834 hours, P/O O'KEEFE established surveillance near the corner of 5800 S. Artesian Ave. From his surveillance location, P/O O'KEEFE observed Demond SPEIGHT standing at 5800 S. Artesian Ave. P/O O'KEEFE heard SPEIGHT shouting at vehicular and pedestrian traffic, terms used to solicit business for narcotics transactions. P/O O'KEEFE also observed Emmanuel WILLIAMS conduct two (2) separate hand-to-hand narcotic related transactions with male Hispanics. In each transaction, P/O O'KEEFE observed WILLIAMS accept USC from the male Hispanic and then walk over to a garbage can located in the front yard of 5800 S. Artesian. WILLIAMS would go underneath the garbage can up, retrieve a plastic bag from underneath the can and then extract an item from the plastic bag, place the bag back underneath the can and then tender said item to the male Hispanic. After said transactions, O'KEEFE observed WILLIAMS walk westbound on 58th Street and enter a front door at 2443 W. 58th Street. P/O O'KEEFE then instructed P/O WRIGLEY to set up a secondary surveillance location to observe where in the building WILLIAMS was going and what he was doing. O'KEEFE then observed WILLIAMS return from the building and engage in a third hand-to-hand transaction with a male black. In this transaction, WILLIAMS accepted USC from the male black, reached underneath the

same garbage can, retrieved a plastic bag from underneath it, obtain an item from the plastic bag, return the plastic bag underneath the garbage can and tender the item to the male black. After conducting the third transaction, WILLIAMS went back to the building and was observed by WRIGLEY apparently using a key to enter Apartment 1E. Shortly after, WRIGLEY observed WILLIAMS exiting the apartment and notified O'KEEFE. O'KEEFE then observed WILLIAMS reach into his waistband, retrieve a blue-steel revolver and place it under the same garbage can. At that point, O'KEEFE and WRIGLEY broke surveillance and detained both offenders. O'KEEFE directed WRIGLEY to the location of the garbage can, from under which WRIGLEY recovered heroin, cannabis and a handgun. WILLIAMS was then given his Miranda warnings and placed into custody. It was ascertained that WILLIAMS resided at 5723 S. Artesian Ave. and that Apartment 1E was unoccupied and devoid of furniture. WRIGLEY then recovered keys from WILLIAMS' person which unlocked the door to Apartment 1E and a subsequent search was conducted with the assistance of other arriving officers. The search culminated in the recovery of significantly more heroin, cannabis and a submachine gun loaded with live rounds. At some point, Sergeant Brian KINNANE arrived on the scene, re-Mirandized WILLIAMS and interviewed him. During the interview, WILLIAMS admitted to being the owner of all of the recovered narcotics and both guns. WILLIAMS and SPEIGHT were then transported to the 001st District for processing. (Attachment 9)

The Arrest Report, in essence and not verbatim reiterated the same basic information of the incident as did the Original Case Incident Report. (Attachments 8, 9)

The witness, P/O Justin HOMER #10979, was served with Administrative Proceedings Rights and requested to report to the offices of the Bureau of Internal Affairs on 22 JUL 2016 for a formal statement. In his statement, P/O HOMER related the following in essence and not verbatim: He and his partner, P/O Michael SUING #17006 were contacted by either P/O O'KEEFE or P/O WRIGLEY to come to the area of 5800 S. Artesian Ave. to assist in a narcotics investigation. Upon arrival, they were apprised of the situation and P/O HOMER relocated to meet with P/O WRIGLEY near the entrance to the building at 2443 W. 58th Street, while P/O SUING remained behind to assist P/O O'KEEFE. P/O HOMER entered apartment 1E and during the subsequent search discovered a machine gun on the kitchen counter. At some point, P/O SUING arrived at the apartment and assisted in the search. P/O HOMER could not recall who transported the offenders into the station. P/O HOMER was not certain, but he believes that he saw Sergeant KINNANE on the scene of the investigation at some point. (Attachments 39, 44)

The witness, P/O Michael SUING #17006, was served with Administrative Proceedings Rights and requested to report to the offices of the Bureau of Internal Affairs on 28 JUL 2016 for a formal statement. In his statement, P/O SUING related the following in essence and not verbatim: He and his partner, P/O Justin HOMER #10979 were contacted by either P/O O'KEEFE or P/O WRIGLEY to come to the area of 5800 S. Artesian Ave. to assist in a narcotics investigation. P/O SUING acknowledged that he was the passenger in the vehicle. Upon arrival, they were apprised of the situation and P/O HOMER relocated to meet with P/O WRIGLEY near the entrance to the building at 2443 W. 58th Street, while P/O SUING remained behind to assist P/O O'KEEFE. At some point, P/O SUING relocated to the apartment and assisted in the search. During the search, P/O SUING recovered a significant amount of narcotics. P/O SUING could not recall who transported the offenders into the station, but believes that it was P/O O'KEEFE and P/O WRIGLEY due to the Arrest Report. P/O SUING was not certain, but he

Confidential - Subject to Protective Order Entered in 14 C 9042                CITY-BG-022796

**INVESTIGATIONS DIVISION**  
**Area North Investigations**

05 MAY 2017  
CL No. 1080515

believes that he saw Sergeant KINNANE on the scene of the investigation at some point. (Attachments 38, 46)

In his testimony (Pages 2-15 of transcripts) on 22 DEC 2014, during the criminal trial of Emmanuel WILLIAMS, Sergeant KINNANE #1120 stated that he received notification at approximately 1845-1846 hours on 18 NOV 2013 from P/O O'KEEFE of a narcotic arrest in the area of 5800 S. Artesian Ave. He further testified that he arrived on the scene of the arrest a few minutes after receiving the notification. KINNANE claimed that upon arrival, he was apprised of the situation by P/O O'KEEFE. After the conversation with O'KEEFE, Sergeant KINNANE observed WILLIAMS seated by himself in the back seat of the Chevrolet Impala. Sergeant KINNANE then went to the Impala, entered the front passenger seat, gave WILLIAMS his Miranda warnings and took an oral admission from WILLIAMS, in which WILLIAMS acknowledged ownership of the recovered narcotics and guns. (Attachment 34)

During the investigation, the undersigned reviewed the video numerous times. Throughout the duration of the video, at no time are Emmanuel WILLIAMS or Demond SPEIGHT separated and seated in different vehicles. Furthermore, Sergeant KINNANE is never observed in the video approaching the Chevy Impala or the Crown Victoria or entering either vehicle. This is a significant discrepancy based on the fact that Sergeant KINNANE testified in court that shortly after arrival on the scene, he gave Emmanuel WILLIAMS his Miranda warnings and interviewed WILLIAMS who then admitted to ownership of the recovered narcotics and guns to KINNANE inside the Chevy Impala. (Attachments 34, 81-86)

The accused, Sergeant Brian KINNANE #1120, was served with Administrative Proceedings Rights and notification of Charges/Allegations and requested to report to the offices of the Bureau of Internal Affairs for a formal statement on 08 SEP 2016. In his statement, Sergeant KINNANE related the following in essence and not verbatim: Sergeant KINNANE acknowledged that his testimony regarding the chronology of events relative to his role was inaccurate. KINNANE contended that his testimony was not intentionally inaccurate but due to "sloppy and unprepared" preparation. KINNANE further explained that he actually received the notification from P/O O'KEEFE via a telephone call at approximately 1900 hours rather than between 1845-1846 hours. KINNANE also related that he did not arrive with-in a few minutes of receiving the call from O'KEEFE, but rather 20-25 minutes later. Sergeant KINNANE further related that while on the scene he heard gun shots in the area and responded to the direction from which the shots were coming and canvassed the area with other responding units. KINNANE further contended that his perception of time was off when relating the chronology in court and that he did not interact with WILLIAMS until approximately 2015 hours. Sergeant KINNANE took full responsibility for failing to properly prepare to testify in court. (Attachments 48, 51)

At the conclusion of his statement, Sergeant KINNANE provided the undersigned with his cellular telephone bill to corroborate the time of the call from P/O O'KEEFE. Line item 124 of the bill indicates that a call came from P/O O'KEEFE'S telephone number at 1901 hours. P/O O'KEEFE'S telephone number was verified by the undersigned via an Accurint search. The undersigned conducted a PCAD event query and discovered that in fact a call of "Shots Fired" was called in at 1943 hours at 5700 S. Artesian Ave. The undersigned also reviewed the Arrest Report, which indicated that Emmanuel WILLIAMS was transported by Beat 4171B (WRIGLEY & O'KEEFE) at 2045 hours. Therefore, it can be

Confidential - Subject to Protective Order Entered in 14 C 9042          CITY-BG-022797

INVESTIGATIONS DIVISION  
Area North Investigations

05 MAY 2017  
CL No. 1080515

reasonably ascertained that the inconsistencies in Sergeant KINNANE'S testimony and the timeline of events as depicted in the video can be attributed to Sergeant KINNANE'S lack of preparation for testimony in the WILLIAMS case. (Attachments 8, 53, 54, 55)

In his testimony (Pages 6-62 of the transcripts) (Attachment 31) on 24 NOV 2014, P/O John O'KEEFE #18418 related the following in essence and not verbatim:

### DIRECT-EXAMINATION BY ASA CONDON

- On 18 NOV 2013, P/O O'KEEFE and his partner P/O John WRIGLEY #7179 drove passed the intersection of 58th Street and Artesian Ave. shortly before 1835 hours and observed activity consistent with narcotics sales.

- At approximately 1835 hours, P/O O'KEEFE set up surveillance approximately 150 feet northeast of that intersection.

- During approximately 10 minutes of surveillance, P/O O'KEEFE heard arrestee Demond SPEIGHT soliciting business for the purpose of selling narcotics and observed arrestee Emmanuel WILLIAMS engage in three (3) hand-to-hand narcotics transactions.

- During the hand-to-hand transactions, O'KEEFE observed WILLIAMS go underneath a garbage can located inside the fence of the building at 5800 S. Artesian Ave. and retrieve what was later identified as narcotics.

- P/O O'KEEFE was presented with a photograph (People's Exhibit #2; Attachment 66) of the front of the building and requested by Assistant State's Attorney CONDON to identify the location of the garbage can and complied by writing a "G" on said photograph on the front of the wrought iron fence, where the fence running north/south along Artesian Ave. meets the fence running east/west along 58th Street.

- P/O O'KEEFE also observed WILLIAMS enter the building located at 5800 S. Artesian Ave. on multiple occasions and subsequently instructed P/O WRIGLEY to set up a secondary surveillance location in order to ascertain where WILLIAMS was going inside the building.

- After observing WILLIAMS return on one occasion, O'KEEFE observed WILLIAMS retrieve a handgun from his waistband and conceal it underneath the same garbage can from which WILLIAMS was observed retrieving the narcotics tendered in the hand-to-hand transactions.

- After observing WILLIAMS conceal the handgun, O'KEEFE informed WRIGLEY about the gun, they broke surveillance and WRIGLEY picked O'KEEFE up in the vehicle.

- O'KEEFE testified that he was picked up by WRIGLEY; after which, they "traveled northbound in the east alley of Artesian to the north alley of 59th street then west to Artesian and back north to 5800."

Confidential - Subject to Protective Order Entered in 14 C 9042    CITY-BG-022798

**INVESTIGATIONS DIVISION**  05 MAY 2017
**Area North Investigations**  CL No. 1080515

- Upon arriving at the intersection, O'KEEFE and WRIGLEY detained WILLIAMS and SPEIGHT. O'KEEFE then directed WRIGLEY to the garbage can, WILLIAMS and SPEIGHT were then taken into custody and WRIGLEY searched WILLIAMS and retrieved a set of keys from his pocket.

- Assistance was requested from other team members and Sergeant KINNANE, P/O HOMER and P/O SUING arrived to assist.

- P/O WRIGLEY, P/O HOMER and P/O SUING ultimately conducted a search of Apartment 1E and recovered another gun and additional heroin and cannabis.

- O'KEEFE further testified that it took approximately 10 minutes from first observing the hand-to-hand transactions until they took WILLIAMS and SPEIGHT into custody.

**CROSS-EXAMINATION BY DEFENSE ATTORNEY ADAMS**

- O'KEEFE confirmed the location of the garbage can in People's Exhibit #2; (Attachment 66).

- Confirmed that the location of the garbage can in Defense Exhibit #19; (Attachment 66) (although a different garbage can) was in the same location as the garbage can from under which WRIGLEY recovered the gun, heroin and cannabis.

- Confirmed that surveillance began around 1834 to 1835 hours.

- Confirmed that surveillance took approximately 10 minutes.

- Confirmed that surveillance location was 150 feet from intersection.

- Explained the Hand-to-hand transactions; gave a detailed description of how WILLIAMS went to the garbage can, crouched down, reached through the wrought iron fence, lifted the garbage can and retrieved the narcotics from underneath the garbage can.

- Described Demond SPEIGHT'S solicitation of business.

- Related calling for assist with-in seconds of the arrest; HOMER and SUING showing up with-in minutes of the assist request.

- Related taking WILLIAMS and SPEIGHT into custody, handcuffing them and reading them the Miranda warnings and Officer WRIGLEY recovering the keys from WILLIAMS' pants pocket.

Confidential - Subject to Protective Order Entered in 14 C 9042    CITY-BG-022799

INVESTIGATIONS DIVISION 05 MAY 2017
Area North Investigations CL No. 1080515

In his testimony (Pages 46-73 of the transcripts) (Attachment 32) on 16 DEC 2014, P/O John O'KEEFE #18418 related the following in essence and not verbatim:

### CROSS EXAMINATION BY DEFENSE ATTORNEY ADAMS

- After being presented with a photograph of the front yard and fence area (Defense Exhibit #4; Attachment 66), P/O O'KEEFE was asked by ADAMS to write the letter "G" on the photograph to identify the location of the garbage can from which he observed WILLIAMS go under to conceal the gun and retrieve narcotics. O'KEEFE complied and wrote the letter "G" on the front of the wrought iron fence, where the fence running north/south along Artesian Ave. meets the fence running east/west along 58th Street.

- Again, asked and related that he observed WILLIAMS remove a handgun from waistband and conceal it underneath garbage can.

- Again, asked about what happened after breaking surveillance and this time testifies that he was picked up by WRIGLEY; After which, they "traveled southbound in the east alley of Artesian to the north alley of 58th street then west to Artesian and back north to 5800."

- Related that it took less than a minute to break surveillance, meet up with WRIGLEY and drive back to 58th Street and Artesian Ave.

- After being asked about WILLIAMS' vehicle, O'KEEFE related that; he did not see a vehicle belonging to WILLIAMS, he did not search a vehicle belonging to WILLIAMS and he did not see WILLIAMS go to his vehicle.

In his testimony (Pages 5-46 of the transcripts) (Attachment 32) on 16 DEC 2014, P/O John WRIGLEY #7179 related the following in essence and not verbatim:

### DIRECT-EXAMINATION BY ASA CONDON

- On 18 NOV 2013, P/O WRIGLEY and his partner P/O John O'KEEFE #18418 drove passed the intersection of 58th Street and Artesian Ave. at approximately 1830 hours and observed activity consistent with narcotics sales.

- WRIGLEY dropped off O'KEEFE in the 5700 block of south Artesian and continued approximately 1 block north.

- O'KEEFE relayed to him via radio that he was observing hand-to-hand transactions and subsequently asked him to set-up a secondary location.

- Identified WILLIAMS as the subject he observed going into Apartment 1E at 2443 W. 58th Street.

- After O'KEEFE notified him that he observed WILLIAMS with a gun; WRIGLEY broke surveillance, picked up O'KEEFE, they traveled southbound in the east alley of Artesian Ave. then northbound to 58th Street and Artesian Ave.

Confidential - Subject to Protective Order Entered in 14 C 9042 CITY-BG-022800

INVESTIGATIONS DIVISION  
Area North Investigations

05 MAY 2017  
CL No. 1080515

- Upon arrival, they detained WILLIAMS and SPEIGHT, handcuffed them together and conducted a cursory search of their clothing for weapons.

- O'KEEFE then directed WRIGLEY to the garbage can that O'KEEFE observed WILLIAMS retrieving the items from underneath during the hand-to-hand transactions and where he observed WILLIAMS conceal the handgun. WRIGLEY then retrieved from underneath the garbage can a Smith & Wesson revolver, packets of heroin and baggies of cannabis.

- After locating the gun and narcotics, O'KEEFE and WRIGLEY took WILLIAMS and SPEIGHT into custody.

- P/O HOMER and P/O SUING arrived just after WILLIAMS and SPEIGHT were taken into custody.

- WRIGLEY then conducted a custodial search of WILLIAMS and recovered the keys from WILLIAMS' pocket that he observed WILLIAMS use to gain entry into Apartment 1E.

- WRIGLEY, HOMER and SUING then conducted a search of Apartment 1E and recovered another gun and additional narcotics.

### CROSS EXAMINATION BY DEFENSE ATTORNEY ADAMS

- Confirms that O'KEEFE set-up surveillance at approximately 1830-1834 hours.

- Confirms reading Original Case Incident Report for accuracy.

- Confirms that with-in minutes of O'KEEFE setting up surveillance he was asked to set-up secondary surveillance.

- Confirms that it only took him under a minute to set-up secondary surveillance; Confirms that it took him approximately 6 to 7 minutes to set-up secondary surveillance after the initially dropping off P/O O'KEEFE.

- Relates that at was approximately 1 minute after setting up surveillance that he observed WILLIAMS walk westbound on 58th Street and enter building through door located at 2443 W. 58th Street and enter Apartment 1E using keys.

Confidential - Subject to Protective Order Entered in 14 C 9042    CITY-BG-022801

**INVESTIGATIONS DIVISION**  05 MAY 2017
**Area North Investigations**  CL No. 1080515

In his testimony (Pages 4-26 of the transcripts) (Attachment 33) on 17 DEC 2014, P/O John WRIGLEY #7179 related the following in essence and not verbatim:

### CROSS EXAMINATION BY DEFENSE ATTORNEY ADAMS

- After being shown a photograph (Defense Exhibit #19; Attachment 66) of the front yard area WRIGLEY confirms that the garbage can in the photograph is in the same proximate location as was the garbage can that he recovered the gun and narcotics from underneath on 18 NOV 2013.

- After being shown a photograph (Defense Exhibit #4; Attachment 66) of the front yard area, the same photograph presented to P/O O'KEEFE on cross-examination by ADAMS on 16 DEC 2014, on which O'KEEFE wrote the letter "G" in red marker indicating the location of the garbage can; WRIGLEY confirms that the letter "G" in the photograph is in the same proximate location as was the garbage can that he recovered the gun and narcotics from underneath on 18 NOV 2013.

- Related that WILLIAMS and SPEIGHT were detained, handcuffed together and cursory searches ("Terry pat-downs") of WILLIAMS and SPEIGHT were conducted.

- Related that nothing was recovered at that time from either WILLIAMS or SPEIGHT

- Related being directed by O'KEEFE to the garbage can where he then recovered the gun and narcotics.

- Related that after the gun and narcotics were recovered, WILLIAMS and SPEIGHT were then taken into custody, cuffed separately and given Miranda warnings.

- Related that he then conducted a custodial search of WILLIAMS and recovered a set of keys from one of WILLIAMS' front pockets, which WRIGLEY later used to gain entry into Apartment 1E.

- After being presented with keys from inventory, WRIGLEY confirmed that they were keys that he recovered from WILLIAMS.

- Related that he did not walk towards apartment after the initial pre-custodial cursory search ("Terry pat-down") of WILLIAMS or prior to recovering keys as a result of the custodial search.

- Reconfirmed that the keys were recovered as a result of the custodial search and not the initial pre-custodial cursory search ("Terry pat-down") of WILLIAMS.

- Confirmed time of the initial detainment and time of transport as 1844 hours and 2045 hours respectively.

Confidential - Subject to Protective Order Entered in 14 C 9042    CITY-BG-022802

**INVESTIGATIONS DIVISION**  
**Area North Investigations**

05 MAY 2017  
CL No. 1080515

    The accused, Police Officer John WRIGLEY #7179, was served with Administrative Proceedings Rights and Notification of Charges/Allegations and requested to report to the offices of the Bureau of Internal Affairs for a formal statement on 17 OCT 2016. In his statement, P/O WRIGLEY related the following in essence and not verbatim: P/O WRIGLEY was provided with copies of the Original Case Incident Report and Arrest Report and acknowledged the account/narrative of the events of 18 NOV 2013 as articulated in both, as true and accurate. P/O WRIGLEY was also provided with copies of the transcript of the testimony he provided on 16 and 17 DEC 2014 in the Circuit Court of Cook County, Illinois. Throughout various points in the statement, the undersigned played the video of the incident that was presented by the defense to impeach both P/O WRIGLEY'S and P/O O'KEEFE'S testimony. (Attachment 8, 9, 31, 32, 33, 57, 61, 81-86)

    P/O WRIGLEY was asked to elaborate on the video and explain the discrepancies between the events as depicted in the video and the account of the events as documented in the reports submitted by P/O O'KEEFE and himself and the testimony given by both officers in court. P/O WRIGLEY contended that the time line that he and P/O O'KEEFE documented in their reports and testified to was inaccurate. P/O WRIGLEY related that the individual he observed enter the building through the entrance located at 2443 W. 58th Street was Emmanuel WILLIAMS and that Emmanuel WILLIAMS must have left and returned in a vehicle. P/O WRIGLEY contended that the observations of WILLIAMS occurred approximately 15-20 minutes prior to the beginning of the video at 1830 hours and that the discrepancies can be attributed to their inaccurate time-line estimations. (Attachments 8, 9, 31, 32, 33, 61, 81-86)

    P/O WRIGLEY contended that he is not seen on the video going to the garbage can and recovering the gun and narcotics because the garbage can was adjacent to the wall of the building just off-camera. In order to clarify this discrepancy, the undersigned reviewed P/O WRIGLEY'S testimony with him; specifically the part of the testimony in which P/O WRIGLEY was shown two photographs of the scene by Mr. ADAMS and asked to confirm the location of the garbage can. P/O WRIGLEY related that he testified that the garbage can in the photo (Defense Exhibit #19) was in the approximate location of the garbage can that he recovered the gun and narcotics from underneath. P/O WRIGLEY also related that he testified that the "G" written on the fence in the photo (People's Exhibit #2) to indicate the location of the garbage can was also in the approximate location of the garbage can that he recovered the gun and narcotics from underneath. (Attachment 8, 9, 31, 32, 33, 61, 81-86)

    In the case and arrest reports and his testimony, P/O WRIGLEY related that after recovering the gun and narcotics, he then returned to where WILLIAMS, SPEIGHT and O'KEEFE were standing and took WILLIAMS and SPEIGHT into custody, handcuffed them separately, Mirandized them and then conducted a custodial search of WILLIAMS during which he recovered the keys. The undersigned asked P/O WRIGLEY to explain as to why that chronology of events is not depicted in the video and why P/O WRIGLEY is never seen returning after the initial pat-down to take WILLIAMS and SPEIGHT into custody, or to conduct a custodial search or interact with them whatsoever. P/O WRIGLEY was unable, in numerous attempts, to come up with a viable explanation of that discrepancy. In one attempt, he contended that the reference to the recovery of the keys in the case report relative to the time line of events was inaccurate due to the specific placement of the sentence in the narrative. The undersigned

Confidential - Subject to Protective Order Entered in 14 C 9042    CITY-BG-022803

INVESTIGATIONS DIVISION  05 MAY 2017
Area North Investigations  CL No. 1080515

then referenced his testimony on 17 DEC 2014, in which P/O WRIGLEY gave a specific time-line of the events in which he related that he recovered the keys during the custodial search of WILLIAMS. P/O WRIGLEY began to give the undersigned inconsistent answers that not only contradicted his testimony but also contradicted the earlier answers given in his statement to the undersigned. Prior to the conclusion of his statement, P/O WRIGLEY did acknowledge that he did not place WILLIAMS under arrest and that the time line established in his reports and testimony of when the keys were recovered was also incorrect. (Attachment 8, 9, 31, 32, 33, 61, 81-86)

The accused, Police Officer John O'KEEFE #18418, was served with Administrative Proceedings Rights and Notification of Charges/Allegations and requested to report to the offices of the Bureau of Internal Affairs for a formal statement on 18 OCT 2016. In his statement, P/O O'KEEFE related the following in essence and not verbatim: P/O O'KEEFE was provided with copies of the Original Case Incident Report and Arrest Report and acknowledged the account/narrative of the events of 18 NOV 2013 as articulated in both, as true and accurate. P/O WRIGLEY was also provided with copies of the transcript of the testimony he provided on 24 NOV 2014 and 16 DEC 2014 in the Circuit Court of Cook County, Illinois. Throughout various points in the statement, the undersigned played the video of the incident that was presented by the defense to impeach both P/O WRIGLEY'S and P/O O'KEEFE'S testimony. (Attachment 8, 9, 31, 32, 33, 58, 62, 81-86)

P/O O'KEEFE was asked to elaborate on the video and explain the discrepancies between the events as depicted in the video and the account of the events as documented in the reports submitted by P/O WRIGLEY and himself and the testimony given by both officers in court. P/O O'KEEFE contended that the time line that he and P/O WRIGLEY documented in their reports and testified to was inaccurate. P/O O'KEEFE related that the individual he observed conducting the hand-to-hand transactions was Emmanuel WILLIAMS and that Emmanuel WILLIAMS must have left and returned in a vehicle. P/O O'KEEFE contended that the observations of WILLIAMS occurred prior to the beginning of the video at 1830 hours and that the discrepancies can be attributed to their inaccurate time-line estimations. (Attachment 8, 9, 31, 32, 33, 62, 81-86)

P/O O'KEEFE contended that P/O WRIGLEY is not seen on the video going to the garbage can and recovering the gun and narcotics because the garbage can was adjacent to the wall of the building just off-camera. In order to clarify this discrepancy, the undersigned reviewed P/O O'KEEF'S testimony with him; specifically the part of the testimony in which P/O O'KEEFE was shown two photographs of the scene, one by ASA CONDON and one by Mr. ADAMS and asked to identify the location of the garbage can by writing the letter "G" on the photograph. As mentioned earlier in this report, P/O O'KEEFE had written the letter "G" on both People's Exhibit #2 and Defense Exhibit #4, on the front of the wrought iron fence, where the fence running north/south along Artesian Ave. meets the fence running east/west along 58th Street. P/O O'KEEFE related to the undersigned that location of the letter "G" that he wrote on the photographs was intended to indicate the approximate location of the garbage can from under which P/O WRIGLEY recovered the gun and narcotics from. (Attachment 31, 32, 62, 81-86)

Confidential - Subject to Protective Order Entered in 14 C 9042   CITY-BG-022804

| | |
|---|---|
| INVESTIGATIONS DIVISION | 05 MAY 2017 |
| Area North Investigations | CL No. 1080515 |

Based on his contention of the time-line discrepancy, the contention that the hand-to-hand transaction by WILLIAMS occurred prior to the start of the video at 1830 hours and that he and P/O WRIGLEY had already broken surveillance prior to 1830 hours, the undersigned asked P/O O'KEEFE to clarify where he and P/O WRIGLEY had gone after breaking surveillance. In their testimony and reports, P/O O'KEEFE and WRIGLEY had related that it took them approximately a minute to drive around the block and detain WILLIAMS and SPEIGHT. Yet the video and PCAD report both indicate that the detention of WILLIAMS and SPEIGHT occurred at 1844 hours. The undersigned asked P/O O'KEEFE where he and P/O WRIGLEY were from 1830 to 1844 hours. P/O O'KEEFE related that when they came around the corner at 59th and Artesian, they did not see WILLIAMS on the corner so they stopped, waited at 59th and Artesian and waited until they could see WILLIAMS again. P/O O'KEEFE related that they conducted further surveillance, at times using binoculars and broke surveillance once they observed WILLIAMS walking from the building. The undersigned asked P/O O'KEEFE why the details regarding not observing WILLIAMS on the corner and the need to conduct further surveillance near 59th and Artesian were not mentioned in their reports or in their testimony and only brought up during his statement to the undersigned. P/O O'KEEFE related that it was missing from their reports because their reports were a summary of the events and it he did not mention it in his testimony because he had forgotten those details during the trial. (Attachment 8, 9, 31, 32, 62, 81-86)

P/O O'KEEFE was shown the part of the video in which he initially detained WILLIAMS near his vehicle and subsequently searched WILLIAMS' vehicle. The undersigned then inquired as to why P/O O'KEEFE testified that he did not observe a vehicle belonging to WILLIAMS, did not observe WILLIAMS go to a vehicle or that he searched WILLIAMS' vehicle. P/O O'KEEFE related that he simply forgot that those events took place. (Attachment 8, 9, 31, 32, 62, 81-86)

During the course of the investigation, the undersigned attempted to obtain the photographs presented to P/O O'KEEFE and P/O WRIGLEY during testimony, specifically People's Exhibit #2, and Defense Exhibit #4 and #19. The undersigned made several telephone calls to the State's Attorney's Office and the Cook County Clerk's Office. The State's Attorney's office related that due to the fact that WILLIAMS was found not guilty, the need to impound the evidence was not necessary. They further related that the photographs may have been mixed up with the Defense exhibits and may be with the defense attorney Theodore Adams. The undersigned contacted Theodore ADAMS who in fact confirmed that he did take all of the photographs after the trial, but that he had turned them over to the civil attorney Torreya HAMILTON. The undersigned made telephonic contact with Mrs. HAMILTON who then e-mailed the aforementioned photographs to the undersigned. The photographs (People's Exhibit #2 and Defense Exhibit #4) confirm that P/O O'KEEFE wrote the letter "G" on the front of the fence that runs along Artesian Ave., near the corner where the fence that runs along 58th Street meets the fence that runs along Artesian Ave. Defense Exhibit #19 also confirmed that the garbage can depicted in the photograph is in the corner where the fence that runs along Artesian Ave. meets the fence that runs along 58th Street (Attachment 66). Both P/O WRIGLEY and P/O O'KEEFE acknowledged in their testimony that the garbage can illustrated in Defense Exhibit #19, although a different garbage can than the one observed on 18 NOV 2013, was in the same location.

Confidential - Subject to Protective Order Entered in 14 C 9042    CITY-BG-022805

| INVESTIGATIONS DIVISION | 05 MAY 2017 |
|---|---|
| Area North Investigations | CL No. 1080515 |

The accused, Police Officer John O'KEEFE #18418, was served with Administrative Proceedings Rights and notification of Charges/Allegations and requested to report to the offices of the Bureau of Internal Affairs for a formal statement on 15 DEC 2016. In his statement, P/O O'KEEFE related the following in essence and not verbatim: P/O O'KEEFE was provided with a copy of the transcript of the testimony he provided on 24 NOV 2014 and 16 DEC 2014 in the Circuit Court of Cook County, Illinois and was also allowed to listen to his first statement given to the undersigned on 18 OCT 2016. P/O O'KEEFE was asked to explain the discrepancy between his statement to the undersigned on 18 OCT 2016 relative to his contention that the garbage can was adjacent to the wall of the building and the location where he wrote the letter "G" on the fence in People's Exhibit #2, and Defense Exhibit #4 indicating that the garbage can was adjacent to the front fence running along Artesian Ave. P/O O'KEEFE related that he wrote the letter "G" on the front of the fence running along Artesian Ave. as a general location of where the garbage can was. P/O O'KEEFE further related that after reviewing the photographs, his testimony and hearing his first statement, he still believed that although he could not indicate the exact location of the garbage can, the garbage can was not where he wrote the letter "G" on the fence during his testimony and contended that the garbage can was in the general proximity. (Attachment 31, 32, 58, 62, 66, 70)

The accused, Police Officer John WRIGLEY #7179, was served with Administrative Proceedings Rights and notification of Charges/Allegations and requested to report to the offices of the Bureau of Internal Affairs for a formal statement on 16 DEC 2016. In his statement, P/O WRIGLEY related the following in essence and not verbatim:   P/O WRIGLEY was provided with a copy of the transcript of the testimony he provided on 16 DEC 2014 and 17 DEC 2014 in the Circuit Court of Cook County, Illinois, allowed to listen to his first statement given to the undersigned on 17 OCT 2016, watch the video of the incident and provided with photographs (Defense Exhibit #4 and Defense Exhibit #19). After perusing the above listed evidence, P/O WRIGLEY continued to contend that the garbage can was closer to the wall of the building rather than adjacent to the fence and that his testimony referred to the general proximity of the garbage can in the yard and not the exact location. (Attachments 32, 57, 61, 66, 73)

In conclusion, the central question of this investigation is whether P/O WRIGLEY and P/O O'KEEFE falsely arrested Emmanuel WILLIAMS and subsequently falsified reports and gave false testimony in court to corroborate the false arrest. P/O O'KEEFE and P/O WRIGLEY, as a defense to the inconsistencies in their account of the arrest of Emmanuel WILLIAMS and what is depicted in the video, expect that significant parts of their original narrative be dismissed and a new version of what occurred be accepted. P/O WRIGLEY and P/O O'KEEFE related in their Arrest Report and Original Case Incident Report that it was Emmanuel WILLIAMS that was observed by O'KEEFE as the individual conducting the hand-to-hand narcotics transactions. P/O O'KEEFE'S and P/O WRIGLEY'S accounts of the incident in court further contended that Emmanuel WILLIAMS was observed doing the following: conducting the hand-to-hand transactions, going underneath a garbage can to retrieve narcotics, going underneath the garbage can to conceal a gun and entering a vacant apartment, where additional narcotics and a weapon were also recovered.

Confidential - Subject to Protective Order Entered in 14 C 9042     CITY-BG-022806

**INVESTIGATIONS DIVISION**  
**Area North Investigations**

05 MAY 2017  
CL No. 1080515

    P/O O'KEEFE'S and P/O WRIGLEY'S initial account of the incident established a time-line that began at the scene of the incident at 1830 hours and continued until the time of transport at 2045 hours. It was based on this time-line that the Defense Attorney, Theodore ADAMS submitted a video into evidence in order to impeach the testimony and reports of P/O O'KEEFE and P/O WRIGLEY. The video begins at 1830 hours and continues until 2000 hours. Again, in their reports and testimony, P/O O'KEEFE and P/O WRIGLEY related that after the initial detention and protective pat-down of WILLIAMS and Co-Arrestee Demond SPEIGHT, O'KEEFE directed P/O WRIGLEY to the garbage can from under which O'KEEFE claims to have observed WILLIAMS retrieve the narcotics and conceal the handgun. After which, O'KEEFE and WRIGLEY contend that P/O WRIGLEY recovered the narcotics and handgun from underneath said garbage can. They claim WRIGLEY then returned to where WILLIAMS, SPEIGHT and O'KEEFE were and assisted in taking them into custody. Furthermore, they contend that they gave them their Miranda warnings and conducted a custodial search and recovered the keys to the apartment. At that point P/O WRIGLEY claims to have walked towards the entrance to the building where he observed WILLIAMS gain access to the apartment.

    The video contradicts their account of the incident in the following ways: Emmanuel WILLIAMS is not observed conducting any hand-to-hand transactions or going to a garbage can to retrieve or conceal anything. The video does show Emmanuel WILLIAMS arriving in a vehicle at approximately 1840 hours, entering the building on the Artesian Ave. side and then coming back out at approximately 1843 hours, at which point he was detained. What the video further illustrates is that P/O WRIGLEY, after the initial protective pat-down, does not go to a garbage can, does not retrieve anything and does not return to take Emmanuel WILLIAMS and SPEIGHT into custody and does not conduct a custodial search and recover keys.

    P/O O'KEEFE'S and P/O WRIGLEY'S contention to the undersigned in this investigation was that they were mistaken on the timeline of the incident. They related that the observations of WILLIAMS occurred earlier than 1830 hours and that WILLIAMS had left the scene and returned. In their testimony, they related that it took them approximately one minute, after breaking surveillance, to go around the block to detain WILLIAMS and SPEIGHT. This raised the question of their whereabouts for approximately 14 minutes, due to the video, Arrest report and PCAD record indicating that they detained WILLIAMS and SPEIGHT at 1844 hours. In his statement to the undersigned, P/O O'KEEFE related that after they broke surveillance, they went around the block, then upon coming onto Artesian Ave. near 59th Street, they did not observe WILLIAMS so they stopped, set up surveillance again, waited at the end of the block until regaining visual contact of WILLIAMS and then proceeded to 58th Street and Artesian Ave. In light of this explanation, the undersigned inquired as to why this detail was not mentioned in their reports or in their testimony. P/O O'KEEFE related it was not in their reports due to the reports being a summation of events. He further related that he simply forgot to mention it during testimony. P/O WRIGLEY made no mention in his statement to the undersigned of setting up a surveillance spot near 59th Street and Artesian Ave.

    P/O WRIGLEY contended in his statement to the undersigned, that he is not observed in the video going to the garbage can and retrieving the gun and narcotics due to the garbage can being adjacent to the wall of the building, which was not in the line of view of the surveillance camera. As

Page  
17

| | |
|---|---|
| **INVESTIGATIONS DIVISION** | **05 MAY 2017** |
| **Area North Investigations** | **CL No. 1080515** |

discussed earlier in this summary, P/O O'KEEFE and P/O WRIGLEY, during their testimony were presented with photographs by the Defense and the Assistant State's Attorney. Both officers indicated that the garbage can was adjacent to the front fence running along Artesian Ave. Both P/O O'KEEFE and P/O WRIGLEY were asked to explain this discrepancy by the undersigned and they related in their statements that they were only indicating the general proximity of the garbage can in the yard rather than the exact location. P/O WRIGLEY could not provide the undersigned with a viable and rational explanation as to why he is never observed in the video return after he claimed he recovered the gun and narcotics and take WILLIAMS into custody.

Based on the undersigned's investigation, the objective verifiable evidence and the statements of the involved parties, the undersigned finds that sufficient evidence exists to corroborate the allegations and recommends that the case against Police Officer John O'KEEFE #18418, Police Officer John WRIGLEY #7179, and Sergeant Brian KINNANE #1120 be **SUSTAINED**.

Confidential - Subject to Protective Order Entered in 14 C 9042     CITY-BG-022808