# Exhibit 5

JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
1—4

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3   ARETHA SIMMONS, for herself )
     and on behalf of DAVIANNA   )
 4   SIMMONS, a minor, EMILY     )
     SIMMONS and KEITH SIMMONS,  )
 5                               )
            Plaintiffs,          )
 6                               )
     v.                          ) Case No. 14 C 9042
 7                               )
     THE CITY OF CHICAGO; CHICAGO)
 8   POLICE OFFICERS ANTHONY M.  )
     BABICZ (Star 12652); J.L.   )
 9   CWICK; STEVEN J. HEFEL      )
     (Star 13074); SGT. BRIAN J. )
10   KINANNE (Star 1120);        )
     MICHAEL R. LAURIE (Star     )
11   15108); JOHN D. O'KEEFE     )
     (Star 18418); JOHN E.       )
12   WRIGLEY (Star 7179); P.D.   )
     YOUNG (Star 16017); AS-YET  )
13   UNKNOWN CHICAGO POLICE      )
     OFFICERS,                   )
14                               )
            Defendants.          )
15
16        The deposition of JOHN E. WRIGLEY, taken
17   before David J. Demski, Certified Shorthand
18   Reporter, and Notary Public, pursuant to the
19   provisions of the Rules of Civil Procedure of the
20   State of Illinois and the Rules of the Supreme Court
21   thereof, pertaining to the taking of depositions
22   for the purpose of discovery, at the law office of
23   Al Hofeld, Jr., 1525 East 53rd Street, Suite 832,
24   Chicago, Illinois, at 1:00 p.m. on Tuesday,
25   July 19, 2016.
```

**Page 2**

```
 1   APPEARANCES:
 2        LAW OFFICES OF AL HOFELD, JR. LLC
          BY: MR. AL HOFELD, JR.
 3           MS. HANAN VAN DRIL
          1525 East 53rd Street - Suite 832
 4        Chicago, Illinois 60615
          (773)241-5844 - (773)241-5845 (facsimile)
 5
 6           Appearing on behalf of the Plaintiffs
 7        HICKEY, O'CONNOR & BATTLE, LLP
          BY: MR. KENNETH BATTLE
 8        20 North Clark Street - Suite 1600
          Chicago, Illinois 60602
          (312)422-9432 - (312)578-8070 (facsimile)
 9
10           Appearing on behalf of the Defendants
11        CITY OF CHICAGO - ASSISTANT CORPORATION COUNSEL
          BY: MR. MATTHEW DIXON
12        30 North LaSalle Street - Suite 900
          Chicago, Illinois 60602
          (312)744-3283 - (312)744-6566 (facsimile)
13
14           On behalf of the Defendants
15              I N D E X
16   WITNESS                          PAGE
17   JOHN E. WRIGLEY
18   Examination by Mr. Hofeld           3
     Examination by Mr. Dixon          164
19
20            E X H I B I T S
21   DX-1 CR                          132
     DX-2 Lawsuits                    132
22
     (Exhibits are not attached to transcript)
23
24
25
```

**Page 3**

```
 1            JOHN E. WRIGLEY
 2   having been first duly sworn by the court reporter,
 3   was examined and testified on his oath as follows:
 4            EXAMINATION
 5   BY MR. HOFELD:
 6      Q    Officer, would you kindly state and spell
 7   your full name, please?
 8      A    Yes. John, J-o-h-n, middle name is Eric,
 9   E-r-i-c, the last name is Wrigley, W-r-i-g-l-e-y.
10      Q    Thank you.  By whom are you currently
11   employed?
12      A    City of Chicago.
13      Q    As a Chicago police officer?
14      A    Yes, sir.
15      Q    What's your current official position and
16   title and rank, if any?
17      A    Police officer assigned to District 19.
18      Q    You understand that you're here for a
19   deposition today because you're a defendant named
20   in this case, correct?
21      A    Yes.
22      Q    You're represented by an attorney, namely
23   Mr. Ken Battle, present here today?
24      A    Yes.
25      Q    How many times have you given a
```

**Page 4**

```
 1   deposition in a civil case?
 2      A    Twice.
 3      Q    When was the last time?
 4      A    It was -- I don't remember the exact year.
 5   It was in St. Louis, Missouri.
 6      Q    In that case were you named as a
 7   defendant in your capacity as a police officer?
 8      A    No.  It was a deposition involving a
 9   juvenile where the attorney asked for some type of
10   deposition hearing involving a juvenile in regards
11   to his criminal case.
12      Q    In the other case in which you gave a
13   deposition, was it as a defendant police officer?
14      A    No.  It was a similar situation, I don't
15   remember the details of it though.
16      Q    In those two cases were you a witness?
17      A    I was the arresting -- one of the
18   arresting officers I believe.
19      Q    In both cases you were the arresting
20   officer in one of them?
21      A    I was at least the involved officer.  I
22   believe one of them I was the arresting officer.  I
23   can't remember, it's been several years ago.
24      Q    Let me, then, refresh your recollection
25   on the ground rules for a deposition.  The court
```



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
5–8

Page 5

1  reporter needs full verbal responses, such as yes
2  or no, not colloquial answers like yeah or uh-huh,
3  because we don't know what those mean on the
4  record. You and I should also try to be careful
5  not to talk over or to interrupt each other, so I
6  will wait until you finish your answer before I
7  begin the next question. If you would please wait
8  until I finish the question before beginning your
9  answer, that will also help us maintain a clear
10  record. If you don't understand a question at any
11  point just let me know and I'll try to rephrase it
12  until you do. If you need to take a break at any
13  point, we can certainly do that. We just need to
14  have any question that's pending answered before we
15  take the break. After I ask you some questions,
16  other attorneys present will have a chance to ask
17  you some questions if they choose. From time to
18  time, attorneys who are not asking the questions
19  may make objections to a question that's asked. As
20  I'm sure you know, those objections are made to
21  preserve issues for a later ruling by the judge,
22  not to stop you from answering or to coach or shape
23  your testimony. So even though an objection is
24  made, you're still required to answer the question
25  unless your attorney specifically instructs you not

Page 6

1  to. Do you understand that instruction?
2      A   Yes, sir.
3      Q   I'm sure you understand that you're
4  testifying understand oath today, just as though
5  you were testifying in a courtroom in the presence
6  of a judge and jury, correct?
7      A   Yes, sir.
8      Q   Do you understand all of these
9  instructions?
10      A   Yes.
11      Q   Are you on any medication this afternoon
12  that might affect your ability to truthfully answer
13  my questions?
14      A   No.
15      Q   Did you grow up in the city of Chicago?
16      A   I did not.
17      Q   Where are you from originally?
18      A   Central Illinois. A town called Decatur,
19  Illinois.
20      Q   Sure, I know it well. Born and raised in
21  Decatur?
22      A   Yes.
23      Q   Where did you attend high school?
24      A   St. Theresa High School in Decatur,
25  Illinois.

Page 7

1      Q   What year did you graduate?
2      A   1987.
3      Q   Did you attend college?
4      A   I did.
5      Q   Did you graduate from college?
6      A   I did.
7      Q   Which college did you graduate from?
8      A   Millikin University.
9      Q   Could you spell it for me, please?
10      A   M-i-l-l-i-k-i-n.
11      Q   Where is Millikin University located?
12  Pardon me for not knowing.
13      A   That's Decatur, Illinois.
14      Q   It is?
15      A   Yes.
16      Q   What year did you graduate?
17      A   That was 1991.
18      Q   What was your major?
19      A   Management information systems.
20      Q   You went through the Chicago Police
21  Academy, yes?
22      A   I did, yes.
23      Q   In what year did you enter the Chicago
24  Police Academy?
25      A   That was -- I'm sorry. July 29, 2002.

Page 8

1      Q   July 29, 2002 is when you entered?
2      A   Yes. That was the date of appointment.
3      Q   I'm sorry. What was that, the date of?
4      A   Appointment.
5      Q   Appointment. When did you graduate from
6  the police academy?
7      A   I don't remember the exact date, but I
8  figure it was March of 2003, somewhere around there.
9      Q   Sure. So you worked for approximately
10  eleven years between graduating from college and
11  entering the Chicago Police Academy, is that
12  correct?
13      A   Yes.
14      Q   What was the last job that you held prior
15  to entering the Chicago Police Academy in 2002?
16      A   It would have been with the Collinsville
17  Police Department, Collinsville, Illinois.
18      Q   What was the last position you held with
19  the Collinsville Police Department?
20      A   Police officer.
21      Q   When did you become a police officer for
22  the Collinsville Police Department?
23      A   I have to work backwards. I'm sorry.
24      Q   Take your time.
25      A   I want to say late 2000. I could be off a



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
9–12

Page 9

1  few months, but somewhere around there.
2     Q    Did you graduate from some police academy
3  somewhere in order to become a Collinsville police
4  officer?
5     A    At that point in time I had been through
6  two academies.
7     Q    Which academies did you go through and
8  when?
9     A    In 1994 I entered and graduated -- well, I
10  entered into the academy at the Land of Lincoln, it
11  no longer exists anymore, in Springfield, Illinois.
12  I don't think it exists anymore.
13     Q    Okay, that's fine.
14     A    And then in 1997 I entered the St. Louis
15  City Police Department academy and those were the
16  two academies before.
17     Q    Thank you.  Were you in these academies
18  full time?
19     A    I was, yes.
20     Q    So you entered the Land of Lincoln Police
21  Academy in 1994.  Did you graduate in '95?
22     A    It was a ten-week academy.  I think it was
23  around Thanksgiving, so I think it was early '95
24  when I graduated from there.
25     Q    Thank you.  And you entered the St. Louis

Page 10

1  City Police Department academy in 1997?
2     A    In '97, yes.
3     Q    So does that mean you graduated in 1998?
4     A    I don't -- I want to say it was late '97
5  also that I entered the St. Louis police academy.
6  So, yes, '98 probably was -- they have a six-month
7  academy.  So early '98 is when I graduated from
8  there.
9     Q    Thank you.
10     A    I'm guessing.
11     Q    Then am I correct -- well, between
12  graduating from the Land of Lincoln Police Academy,
13  in or about early 1995, and entering St. Louis City
14  Police Department Academy in 1997, what was your
15  employment?
16     A    When I entered the Land of Lincoln Police
17  Academy I was hired by the Macon County Sheriff's
18  Department and that's in Decatur, Illinois.
19     Q    After graduating from the Land of Lincoln
20  Police Academy in early '95, you were a Macon
21  County Sheriff?
22     A    I was actually deputized before I entered
23  into the academy and part of their training was the
24  academy itself.
25     Q    Fair enough.  And then did you serve as a

Page 11

1  Macon Count sheriff after you graduated from that
2  academy?
3     A    I did, yes.
4     Q    Did you hold that position until you
5  entered the St. Louis City Police Department
6  academy in 1997?
7     A    That's correct.
8     Q    After graduating from the St. Louis City
9  Police Department Academy in 1998, early 1998, what
10  position did you take?
11     A    Police officer with the city of St. Louis.
12     Q    Until what time did you hold that
13  position?
14     A    I briefly went to the city of
15  Edwardsville.
16     Q    As a police officer?
17     A    As a police officer right after for -- it
18  was, like, three months and then Collinsville gave
19  me a call and I went there.  I'm a little unclear on
20  what the exact dates were, but it's somewhere in the
21  year 2000 that I left the city of St. Louis.  First
22  went to the city of Edwardsville for a few months
23  and, then, finally, I was hired by the city of
24  Collinsville.
25     Q    All of that happened within the same

Page 12

1  year, approximately 2000?
2     A    Yeah.  I mean -- yeah.  To the best of my
3  memory.
4     Q    Understood.
5     A    It was right around there.
6     Q    Then between graduating from college in
7  1991 and entering the Land of Lincoln Police
8  Academy in 1994 where did you work?
9     A    I worked as a program -- computer program
10  engineer and manager at Archer Daniels Midland
11  Company.  That's based in Decatur, Illinois.
12     Q    Were you there -- you were there for the
13  entire three years or so?
14     A    Yeah.  I started that job after graduating
15  from college and then held that job until I was a
16  deputy sheriff for the Macon County Sheriff's
17  Department.
18     Q    Thank you.
19     A    A lot of work history there.  Sorry about
20  that.
21     Q    No.  Listen, the older we get the more --
22     A    You're not saying I'm old, are you?
23     Q    No.  I say we.  Please notice I said we,
24  including myself very much so.  Okay.  You were a
25  Collinsville police officer for approximately two



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
13–16

Page 13

1  years before entering the Chicago academy?
2      A    I want to say a year and a half, close to
3  two years. Yeah, somewhere around there.
4      Q    Since graduating from the police academy,
5  the Chicago Police Academy that is, have you worked
6  continuously as a Chicago police officer?
7      A  Yes, sir.
8      Q    Since that time have you worked for any
9  other municipalities as a police officer?
10      A   Since the Chicago Police Academy?
11      Q    Yes. Since you graduated from the
12  Chicago Police Academy?
13      A   No.
14      Q    Apart from your high school and college
15  degrees, do you hold any other educational degrees
16  or certificates?
17      A   Not educational, no.
18      Q    Do you hold any other professional
19  licenses or certifications of any kind?
20      A   Nothing that's probably valid anymore.
21  But I was a range instructor for the Sheriff's
22  Department and went through several schools and
23  instructed in how to be a range instructor.
24      Q    Range instructor?
25      A  Yes.

Page 14

1      Q    Meaning firing range?
2      A  Firing range, yes.
3      Q    When were you licensed as a range
4  instructor, during what period of time?
5      A   I believe it was between '95 and -- 1995
6  and 1997. About a year after I became a -- a year
7  after I joined the Sheriff's Department.
8      Q    When you began working as a Chicago
9  police officer upon graduating from the academy,
10  what was your first assignment?
11      A   To the 10th District.
12      Q    As a patrol officer?
13      A  Yes.
14      Q    For how long did you hold that position
15  or that assignment?
16      A   As a patrol officer within the 10th
17  District I was detailed to the tact team and then --
18      Q    Did you say tact?
19      A   Tactical team. One of the tactical teams,
20  yes.
21      Q    I want to make sure, thanks. Did that
22  occur immediately?
23      A   No.
24      Q    When were you detailed to the tactical
25  team?

Page 15

1      A   It was approximately two years after I was
2  in the 10th District, maybe a little bit sooner than
3  that.
4      Q    So about 2000 and -- pardon me. I'm just
5  trying to get a look at the timeline. So that
6  would have been about --
7      A   I think it was late 2005.
8      Q    Late 2005?
9      A   Yeah, that I was assigned to the tactical
10  team in the 10th District.
11      Q    What was the next assignment -- the very
12  next assignment that you held?
13      A   I held that for several years and then I
14  accepted an assignment for the Area Four Gun Team.
15      Q    Area Four Gun Team. When did you accept
16  that assignment?
17      A   Oh, boy --
18      Q    Approximately, like what year?
19      A   Maybe 2010.
20      Q    You held that assignment for how long?
21      A   Well, until they changed names to the Area
22  Central Gun Team.
23      Q    Do you recall when that occurred?
24      A   I think it consolidated the areas and the
25  districts maybe 2013, three years ago. I can be off

Page 16

1  on that and I apologize if I am.
2      Q    It's quite all right. Are you still
3  assigned to the Area Central Gun Team?
4      A   No.
5      Q    What was the very next assignment that
6  you had after you were a member of the Area Central
7  Gun Team?
8      A   I bid into the 19th District and that's my
9  current assignment.
10      Q    Patrol officer?
11      A   I'm on the tactical team there now.
12      Q    Briefly, when you became a member of the
13  tactical team in the 10th District in late 2005,
14  what were your day-to-day duties?
15      A    It was, generally speaking, working in
16  plain clothes in a ten member team with one sergeant
17  as the immediate supervisor concentrating on the
18  hotspots that the district commander would define.
19  Hotspots meaning usually related to gang activity,
20  narcotic activity, and sometimes an excessive amount
21  of robberies or thefts.
22      Q    When you became -- let me ask you about
23  this one now. As a member of the tactical team in
24  the 19th District, currently what are your duties
25  day-to-day?



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
17–20

Page 17

1    A   Very similar duties.
2    Q   When you became a member of the Area Four
3  Gun Team in 2010 what were your duties then?
4    A   As it was defined back then, again plain
5  clothes team with one sergeant as immediate
6  supervisor who reported directly to the deputy chief
7  of the area.  Our goal was to identify gang activity
8  and more specifically gangs that dealt with guns and
9  sometimes that crossed into narcotics too.
10   Q   Sure.  When the Area Four Gun Team
11  changed names, and maybe geography to some extent,
12  and became the Area Central Gun Team did your
13  duties change?
14   A   No.  They were basically still the same.
15  Sometimes our day-to-day operations were changed
16  depending on who was the superintendent, who was the
17  deputy chief, and the goals that they would have for
18  the specific teams underneath them.
19   Q   What was the change of geography when the
20  area central -- Area Four Gun Team became the Area
21  Central Gun Team?
22   A   The biggest change that we had was we lost
23  responsibility of the 11th District and I gained
24  more responsibility of some of the south side
25  districts.

Page 18

1    Q   Do you remember any of the south side
2  districts that you gained responsibility for?
3    A   Spent a lot of time in the 3rd District
4  which was very unfamiliar to me at the time.  The
5  8th District and parts of the 9th District and every
6  once in a while in the 7th District.
7    Q   The seventh?
8    A   Yeah.  That wasn't in our area, but we
9  would go over there when it flared up a lot.
10   Q   Sure.  In August of 2013, at that point
11  you were a member of the Area Four Gun Team or had
12  it changed to the Area Central Gun Team by that
13  point?
14   A   That's a good question.  I don't remember
15  the exact change, the date of the change.
16   Q   Do you remember what year the change
17  occurred?
18   A   I was only guessing -- I believe I guessed
19  2015 and I could be wrong about that too.
20   Q   I forgot.  You said -- what year did you
21  guess?  I'm sorry.
22   A   I think 2013 is what I guessed.
23   Q   In August of 2013 who is your immediate
24  supervisor?
25   A   Sgt. Kinnane.

Page 19

1    Q   He was the team leader of the Area
2  Central Gun Team?
3    A   I believe at that point in time he was
4  area central.  You know, I could -- by looking at
5  the beat number on the report I could refresh my
6  memory, but I believe it was.
7    Q   What was the beat number for the Area
8  Central Gun Team that you were a member of?
9    A   Well, that changed a couple of times also
10  actually.  There was a lot of change around that
11  time.  The Area Four Gun Team was 40 -- I believe
12  41 -- oh, boy, 41 George something or 44 George
13  something and then area central became 41
14  something-something.  Sorry about that.
15   Q   No, don't be sorry at all.  I appreciate
16  your respect for accuracy and precision.  Which
17  document would you need to see?
18   A   The arrest report would have our beat
19  number down under the arresting officers.  I believe
20  it's star number and then it has a beat number.
21   Q   I see.  Don't take my word for it, I'll
22  direct your attention.  But I see for yourself, I
23  see 4171B?
24   A   Yeah.  That would be an area central beat
25  tag.

Page 20

1    Q   Did you supervise anybody in August of
2  2015?
3    A   Was I a supervisor?
4    Q   Yes.
5    A   No.
6    Q   Who were the members of your Area Central
7  Gun Team in August of 2015, to the best of your
8  recollection?
9    A   Myself, obviously, Officer O'Keefe was my
10  immediate partner.  Officer Hefel, Officer Laurie,
11  officer Suing, Officer Homer, Officer Babicz,
12  Sgt. Kinnane.  That might have been it at that point
13  in time.
14   Q   Sure.  Officer, let me ask you a couple
15  of questions about your physical -- how tall are
16  you in feet and inches today?
17   A   About six-two.
18   Q   What's your approximate weight today?
19   A   About 195.
20   Q   Did you weigh about the same in August of
21  2013?
22   A   I would say, generally speaking, yes.
23   Q   How old were you as of August 29, 2013,
24  what was your age?
25   A   Forty-three, forty-two.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
21–24

Page 21

1    Q    What's your date of birth?
2    A    August 9th, 1969.  So, yeah, 42.  Sorry.
3    Q    Just make sure we're both doing the right
4    math.  It may sound silly, but did you wear your
5    hair any differently in August of 2013 than you do
6    today?
7    A    No.
8    Q    Since you been a Chicago police officer,
9    have you always been a member of the Fraternal
10   Order of Police Chicago Lodge No. 7?
11   A    Yes.
12   Q    Have you ever served in the military?
13   A    No.
14   Q    In the United States military?
15   A    No.
16   Q    Do you recall being present at 930 North
17   Keystone on August 29, 2013?
18   A    I do.
19   Q    By the way, did you review any documents
20   in preparation for your deposition today?
21   A    I did.
22   Q    Which documents did you review?
23   A    Case report, arrest report, and the
24   testimony within the criminal trial as it pertains
25   to my testimony.

Page 22

1    Q    Case report, arrest report.  Your
2    testimony at a criminal trial?
3    A    Yes.
4    Q    Did I miss anything that you said?
5    A    No.  I think that's it.
6    Q    Did you review any other documents
7    besides those three in preparation for your
8    deposition today?
9    A    Not today.  I may have looked at the
10   inventories at one point in time, I don't remember
11   when.
12   Q    Did you look at any documents related to
13   930 North Keystone on August 29th, 2013 after you
14   learned that this lawsuit had been filed?
15   A    Do you mean other than the --
16   Q    Other than what you just mentioned?
17   A    Not that I recall, no.
18   Q    When you say you may have reviewed
19   inventories, were you referring to shortly after
20   August 29, 2013?
21   A    No.  Fairly recently.
22   Q    So you may have reviewed inventories
23   recently.  Besides those four documents that you
24   named, case report, arrest report, your testimony,
25   and inventories, do you recall reviewing any other

Page 23

1    document related in any way to the search at
2    930 North Keystone on August 29, 2013?
3    A    No, not that I recall.
4    Q    Were you an author of the case report?
5    A    No.
6    Q    Or of the arrest report?
7    A    No.
8    Q    Or of the inventory or inventories?
9    A    Inventories I believe.  I'd have to go
10   through each one to see which ones I'm tagged on,
11   but yes.
12   Q    Fair enough.  We'll take a look at some
13   in just a little while.  Let's get back to
14   August 29, 2013.  You indicated you were present at
15   930 North Keystone on that day.  Why were you
16   there?
17   A    It was a narcotic gun investigation search
18   warrant originally that led to a search warrant.
19   Q    Were you executing a search warrant at
20   930 North Keystone on that date?
21   A    We did, yes.
22   Q    When you say we, who are you referring to
23   besides yourself?
24   A    The members of our team and other
25   officers.

Page 24

1    Q    Do you recall the names of the other
2    officers who were present with you at 930 North
3    Keystone on that date?
4    A    I don't.  I know there are other officers,
5    but I don't recall the names.
6    Q    Do you recall whether --
7       MR. BATTLE:  For point of clarification,
8    AI.  Are you speaking of his teammates as well?
9    Because I think you guys might have missed each
10   other on that question.
11       MR. HOFELD:  Okay, thanks.
12   BY MR. HOFELD:
13   Q    I was trying to ask if there are any
14   other officers at all besides you?
15   A    Oh, I thought you meant other than our
16   team.  I'm sorry.
17   Q    No, that's quite all right.  Thanks, Ken,
18   for the clarification.  I meant any other officers
19   at all besides yourself?
20   A    Yes.  I do remember other officers.  Sorry
21   about that.
22   Q    That's quite all right.  Who were the
23   other officers by name?
24   A    Officer O'Keefe, Officer Hefel, Officer
25   Laurie, Officer Suing, Officer Homer, Officer



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
25—28

Page 25

1  Babicz, Sgt. Kinnane.  And again I apologize, there
2  were other officers who lent a hand that day, I
3  don't recall their names.
4     Q    Those officers who lent a hand, they were
5  not members of your team?
6     A   No.
7     Q    Did you enter the house, the residence at
8  930 North Keystone that day?
9     A   I did.
10    Q    What did you do inside?
11    A   I had communication with the people inside
12  of the residence and photographed recovered items
13  and recovered items within.
14    Q    Did you participate -- did you personally
15  participate in the physical search of the
16  residence?
17    A   I don't remember searching anything.  If I
18  did, I just don't remember.
19    Q    When you entered -- well, let me ask you.
20  I think you conducted some surveillance
21  pre-execution of the search warrant?
22    A   That's right.
23    Q    On that same day?
24    A   Yes.
25    Q    Do you recall the approximate time that

Page 26

1  the warrant was executed?
2     A   I'm sorry.  No, I don't remember.
3     Q    That's fine.  It's been three years, you
4  do a lot of searches, everything happened quickly.
5  I get it.  Do you recall if it was morning,
6  afternoon, or evening?
7     A   It was afternoon.  I just don't recall the
8  exact time.
9     Q    Sure, no problem.  When did the
10  surveillance take place relative to the search, the
11  execution of the search warrant?
12    A   It was before the search warrant.  You
13  know, I don't know exactly.  I would say within the
14  hour before the search warrant.
15    Q    Before the search warrant was executed?
16    A   That's correct.
17    Q    Did you play any part in applying for or
18  obtaining the search warrant that was obtained to
19  search the residence at 930 North Keystone?
20    A   The search warrant itself?
21    Q    Yes.
22    A   I believe it was authored by Officer
23  O'Keefe.  He would have been the main author.  I
24  don't believe I helped in authoring the search
25  warrant itself.

Page 27

1     Q    Did you provide information that you
2  obtained from your surveillance to Officer O'Keefe
3  that was then used to apply for the warrant?
4     A   That day?
5     Q    Yes.
6     A   No.  The warrant itself was signed off
7  before my surveillance.
8     Q    When you surveilled the residence on that
9  date, August 29, 2013, the same day that the
10  warrant was executed, was that the first and only
11  time that you conducted surveillance of this
12  residence or have you conducted surveillance
13  previously on other days?
14    A   I believe we had conducted surveillances,
15  I don't remember how many times.  I don't remember
16  exactly what days they were.
17    Q    Did anyone conduct surveillance with you?
18    A   On that day you're talking about?
19    Q    Yes.  Let's talk about August 29, 2013?
20    A   On the day of the search warrant I did the
21  surveillance by myself.
22    Q    On previous days, if you did surveil on
23  previous days did anyone surveil with you?
24    A   I don't remember exactly what the
25  surveillance entailed.  I don't remember

Page 28

1  exactly -- it could have been as simple as just a
2  drive by the house.  It could have been securing
3  myself somewhere in the neighborhood of watching, or
4  it could have been Officer O'Keefe or someone else
5  from our team.  Any one of those situations could
6  have existed, but I don't know if they did.
7     Q    Sure.  On the date that the warrant was
8  executed, August 29, 2013, how did you conduct the
9  surveillance that day?
10    A   In what manner you mean?
11    Q    Yes.
12    A   I was on foot.
13    Q    Walked it?  Did you simply walk by the
14  residence or were you sequestered somewhere or --
15    A   No.  I remember hiding myself down the
16  block. I was not -- it was not my intention to be
17  visible.
18    Q    Okay, got it.  Then when it came to
19  executing the warrant did you drive to 930 North
20  Keystone or nearby?
21    A   We did.  Yes.
22    Q    And your partner was Officer O'Keefe?
23    A   That's my primary partner.  Yes.
24    Q    Your primary partner?
25    A   Yes.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
29–32

Page 29

1    Q   Did Officer O'Keefe ride with you in the
2   car that you took to get to the residence to
3   execute the warrant?
4    A   I don't remember, to be honest with you.
5   I remember there being multiple cars, but I don't
6   remember who was in what car.
7    Q   Do you remember if you were a driver or a
8   passenger?
9    A   I don't remember.
10    Q   Do you remember where the vehicle that
11   you arrived in was parked?
12    A   I would say, generally speaking, on the
13   street, but I don't remember the exact position of
14   it.
15    Q   You don't remember if it was the same
16   block at 930 North Keystone?
17    A   I would say yes, it was the same block.
18    Q   Once the car was parked, once the car
19   that you arrived in was parked, did you proceed on
20   foot toward the residence?
21    A   Yes.
22    Q   With other officers?
23    A   Yes.
24    Q   How many other officers approached the
25   residence with you?

Page 30

1    A   Well, we spotted the target of the search
2   warrant itself who was outside so that was our
3   primary focus I remember -- at least that was my
4   primary focus.  And then the house, itself, and then
5   that's when we saw the female on the porch.  I would
6   say, I don't know, just guessing, maybe ten
7   officers, maybe even a little bit more, a little bit
8   less.  As far as approaching the house itself you're
9   talking about?
10    Q   That's what I'm asking you about right
11   now, the first approach to the house?
12    A   Yes.  It was a little convoluted, a little
13   bit fluid because of the target being outside.
14    Q   Was there an expectation that he would be
15   found inside?
16    A   I don't think we knew -- I didn't have any
17   expectation myself, whether or not he'd be inside or
18   outside.
19    Q   Were you and other officers provided with
20   information that he would be inside the house,
21   likely be inside the house?
22    A   I believe that we had information that he
23   was dealing drugs or using the house to deal drugs,
24   yes.  So the expectation would have been, you know,
25   outside or inside at that point in time.  Conducted

Page 31

1   the surveillance I saw him outside, but I still had
2   no expectation whether or not he'd be inside or
3   outside of the house.
4    Q   When you conducted the surveillance did
5   you at any point observe him inside the house?
6    A   Not inside, but I saw him go inside the
7   house.
8    Q   That was my next question.  How many
9   times did you see him go inside the house?
10    A   Once.
11    Q   Did you ever see him exit the house?
12    A   Yes.
13    Q   How many times?
14    A   Once.
15    Q   When he was in the house, when you saw
16   him go in and then later saw him come out, how long
17   was he inside?
18    A   It was a matter of minutes.  I don't
19   remember exactly how long it was.
20    Q   You may not remember, but was it -- are
21   we talking less than sixty minutes?
22    A   Yes.  I would say definitely less than
23   sixty minutes.
24    Q   Less than thirty minutes?
25    A   Yes.

Page 32

1    Q   Less than fifteen?
2    A   Yes.
3    Q   Less than ten?
4    A   Yes.
5    Q   Less than five minutes?
6    A   I don't know or don't remember.
7    Q   Sure.  You arrived.  The car was parked.
8   You got out of the car.  You approached with
9   approximately ten officers.  Did you detain the
10   male subject?  Were you the officer who detained
11   the male subject out in front of the house?
12    A   You're referring to the target of our
13   search warrant?
14    Q   Yes, I am.
15    A   No.
16    Q   Did you assist somehow in detaining and
17   arresting that person?
18    A   Not physically, no.
19    Q   I'm sorry.  Did you assist in some other
20   way besides physically?
21    A   I may have or Officer O'Keefe may have
22   said that's our target or something along those
23   lines.
24    Q   And then you might have done something?
25    A   That's the only thing I could remember



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
33—36

Page 33

1  possibly doing, that's him or that's our target,
2  that's the one we're looking for.
3      Q    Do you recall where this person was
4  detained relative to the house, relative to the
5  location of the house?
6      A    I mean, generally speaking, on the
7  sidewalk in front of the house.
8      Q    Directly in front or on the sidewalk in
9  one direction or the other?
10     A    I don't remember.  If it was one
11  direction, it wasn't very far.
12     Q    Do you recall who the officer was who
13  physically detained and arrested him?
14     A    I believe it was either Officer Laurie
15  or Officer Hefel.
16     Q    Was there one or more than one officers
17  would physically detained and arrested him, do you
18  recall?
19     A    I mean it could have been both, you know.
20  I don't remember -- as far as specifically what
21  officer did as far as the arrest or what you would
22  label as an arrest activity, I don't remember.
23     Q    Do you remember -- fair enough, I know.
24  I'm going to ask you a lot of detail questions, I
25  have a lot more to ask.  We'll just do the best we

Page 34

1  can.  Do you recall which officer physically placed
2  the handcuffs on the subject, the male subject?
3      A    I don't.  I'm sorry.
4      Q    I think you said that the female who was
5  detained and arrested was also outside somewhere,
6  is that correct?
7      A    I'm assuming you're saying at the moment
8  of the approach for the search warrant?
9      Q    Yes, I am.
10     A    Yes.
11     Q    Where do you recall her being?
12     A    I remember her being on the front porch.
13     Q    When you say her, was she standing or was
14  she seated?
15     A    I remember her being seated.
16     Q    Did one or more officers -- strike that.
17  Did you observe anything else about her as you
18  approached the house?
19     A    Other than being a female seated?
20     Q    Yes.
21     A    At the initial time I saw her, no.  I
22  didn't notice anything else.
23     Q    Did you notice her doing anything?
24     A    As we approached?
25     Q    Yes.

Page 35

1      A    Yes.
2      Q    What did you see her doing?
3      A    She grabbed a silver purse that was
4  located on a chair also located on that porch, same
5  porch.
6      Q    A second chair on the porch?
7      A    Yes.
8      Q    Grabbed a silver purse and did what with
9  it, if anything?
10     A    I would describe it as just grasping and
11  holding onto it.
12     Q    Did she open it?
13     A    I don't remember seeing her open it.
14     Q    Did she take it inside?
15     A    Inside the residence?
16     Q    Yes.
17     A    No, not that I saw.
18     Q    Did she make some attempt to put it under
19  the chair or hide it, conceal it in any way?
20     A    No.
21     Q    Did it have a strap, that silver purse,
22  like a shoulder strap, or was it just a handheld
23  purse?
24     A    I don't remember if it had a strap or not.
25     Q    What was the size of the purse?

Page 36

1      A    I would describe it as a medium size
2  purse.  I don't know.
3      Q    Was it like the size -- I mean was it
4  like a coin purse or was it like a large handbag
5  purse or something else?  How would you describe
6  it?
7      A    No.  I wouldn't describe it as coin purse.
8  I wouldn't describe it as an extra-large handbag
9  purse.  I would just simply describe it as a medium
10  size purse.
11     Q    You don't remember whether or not it had
12  any strap, any shoulder strap?
13     A    I don't remember.  I'm sorry.
14     Q    So then you wouldn't remember whether or
15  not she picked it up and put the purse on herself,
16  meaning she put the shoulder strap on one of her
17  shoulders?
18     A    No.  I don't remember seeing that.
19     Q    You said grasping, holding.  Was she like
20  holding it to her chest, holding the purse to her
21  chest or what do you recall?
22     A    I remember basically grasping it, holding
23  it close to her body, and then she sat back down.
24     Q    To her chest, to her stomach?  To what
25  part of her body?



JOHN E. WRIGLEY                                   July 19, 2016
SIMMONS vs CITY OF CHICAGO                              37–40

Page 37

1   A   Yeah, midbody, chest to some degree maybe.
2   Q   And she was just sitting -- and then she
3   was sitting in the chair holding it and not doing
4   anything else with it besides holding it, is that
5   correct?
6   A   To the best of my knowledge or memory,
7   yes, just holding it.
8   Q   And then did one or more officers then go
9   to the porch to detain her?
10  A   Yes. Officer Suing and Officer O'Keefe
11  and myself were the first ones on the porch or to be
12  near the porch I should say.
13  Q   The other officers, the other of the ten
14  or so officers who approached the house on foot
15  with you, where were they when you, Officer Suing,
16  and Officer O'Keefe, reached the porch?
17  A   I don't remember exactly. In that
18  vicinity, not on the porch itself.
19  Q   Had they gone ahead of you into the
20  house?
21  A   Not at that point in time, no.
22  Q   So they were behind you, is that correct?
23  A   Maybe behind or to the side, you know. I
24  don't know.
25  Q   Did you -- Officer Wrigley, did you pause

Page 38

1   or stop on the porch before going into the
2   residence?
3   A   Yes.
4   Q   What did you do -- let me strike that.
5   Let me withdraw the question. Let me ask you this.
6   Why did you pause or stop on the porch of the
7   residence before going in?
8   A   Basically because of the encounter with
9   Ms. Simmons.
10  Q   Officer Wrigley, what do you recall
11  happening during that encounter?
12      MR. BATTLE: Other than what he's already
13      testified to?
14      THE WITNESS: I remember Officer Suing
15      making first contact with her and basically
16      taking the purse away from her.
17  BY MR. HOFELD:
18  Q   What happened next?
19  A   Either Officer Suing handed the purse to
20  Officer O'Keefe or he sat it back down on the other
21  chair and Officer O'Keefe obtained it at that point
22  in time. I don't remember exactly how that
23  transpired.
24  Q   Then what do you remember happening next?
25  A   Officer O'Keefe looked inside the purse

Page 39

1   and basically stated that there was a gun inside the
2   purse.
3   Q   Who did he make that statement to?
4   A   Just to let anyone in the vicinity to know
5   that there's a gun involved now.
6   Q   I'm sorry?
7   A   Just to let anyone -- like it wasn't
8   towards any person's direction. It was just a
9   general statement to say, hey, we have a gun now.
10  As an extra precaution. Does that make sense?
11  Q   Absolutely. Was that the gun that
12  was -- was that gun the subject of the warrant?
13  A   I --
14  Q   The gun that was found in the purse?
15  A   I think it was named in the warrant. I
16  can't remember for sure. I'd have to look at the
17  search warrant itself.
18  Q   That's fine. Then after Officer O'Keefe
19  made that statement what was the very next thing
20  that you recall happening there on the porch?
21  A   At one point in time Ms. Simmons was
22  detained. I don't remember exactly who or when it
23  was, it would have been a short period of time
24  though. And then I remember at one point in time
25  while looking into the purse myself and eventually

Page 40

1   recovering those items.
2   Q   Do you remember while you were standing
3   there on the porch and these events were happening
4   you looked into the purse?
5   A   That's correct. This all transpired on
6   the porch itself.
7   Q   What did you see in the purse?
8   A   I saw the gun that Officer O'Keefe
9   referred to. It was a semiautomatic black handgun,
10  and then I saw suspect narcotics and suspect
11  cannabis inside the purse also.
12  Q   What kind of narcotics?
13  A   I believe it was a white powder which I
14  believe at the time I looked at it to be heroin.
15  Q   Okay. Then what's the very next thing
16  that you recall happening after you looked inside
17  the purse yourself?
18  A   At one point in time I took those items in
19  my possession.
20  Q   Right there on the porch you did that?
21  A   I did.
22  Q   Referring to the purse and the items that
23  were found in the purse?
24  A   That's correct, the entire package.
25  Q   Got it. Then following that, what's the



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
41–44

Page 41

1  very next thing that you recall observing or that
2  occurred?
3      A   I remember -- I don't remember the order
4  this happened, but at one point in time I believe it
5  was Officer Laurie stated he had found keys on the
6  target himself.  And I remember at one point in time
7  securing the purse with the narcotics and the gun in
8  a trunk of one of the vehicles that we had arrived
9  in.
10     Q   Did you leave the porch to go secure the
11 package in the trunk of one of the vehicles or is
12 that something you did later after the warrant was
13 executed?
14     A   It was before we entered in the house, so
15 yes.
16     Q   It was before you entered?
17     A   Yes.
18     Q   Did you go to the car, put the package in
19 the trunk -- did you go by yourself to the car?
20     A   I don't remember.  Possibly.  I don't
21 remember if somebody came with me or not.
22     Q   Do you recall where you were in relation
23 to the house when you noticed that Ms. Simmons was
24 grasping or holding the purse?
25     A   We were approaching the front porch when I

Page 42

1  observed that.
2      Q   Were you already in the front yard or
3  were you in the street or were you on the sidewalk,
4  if you recall?
5      A   I don't recall exactly if I was in the
6  front yard or just outside of the front yard when
7  that happened, one of the two.
8      Q   Fair enough.  So how long did she -- how
9  long was she holding the purse before Officer Suing
10 took it away from her?
11     A   It wasn't very long at all.  A matter of
12 seconds.
13     Q   Like three, four, five seconds?
14     A   I don't know.  It seemed like it happened
15 very quick, but it wasn't very long at all.
16     Q   I know it's very hard to say.  I'm sure
17 you weren't looking at a stopwatch.  Would it be
18 fair to say ten seconds or less?
19     A   Possibly.
20     Q   Would five seconds -- could five seconds
21 or less be a fair statement?
22     A   Possibly.
23     Q   Let's see.  You mentioned that -- I'm
24 sorry.  Which officer or officers did you say
25 detained Ms. Simmons on the porch?

Page 43

1      A   I remember Officer Suing making first
2  contact with her.
3      Q   Right.  And I know you said that, I'm
4  sorry.  What I mean is you used the word detained.
5  You said she was detained and I'm assuming you
6  meant she was -- the handcuffs were placed on her?
7      A   Yes.
8      Q   Do you remember which officer placed the
9  handcuffs on her?
10     A   I don't.  I don't remember.
11     Q   Fair enough.  But was it yourself who put
12 the handicuffs on Aretha Simmons?
13     A   In all honesty, it could have been.  I
14 just don't remember.
15     Q   But you believe it was either Officer
16 O'Keefe, Officer Suing, or yourself?
17     A   I believe so.
18     Q   One of those three?
19     A   I believe so.  Again I just -- I don't
20 remember, but I believe so.
21     Q   Sure.  Then after you went to the car and
22 put the package into the trunk of the car, what did
23 you do next?
24     A   We basically with the discovery of the
25 keys, we basically formulate a plan to unlock the

Page 44

1  door and gain entry into the house after knocking
2  and announcing our presence.
3      Q   Did that happen before or after you went
4  to the car to put the package in the trunk?
5      A   I remember securing the evidence, securing
6  the evidence and then either being part of the
7  discussion or listening to the discussion of, okay,
8  now we need to enter into the house.
9      Q   So while you were detaining -- while you
10 and Officer Suing and Officer O'Keefe were
11 detaining Ms. Simmons on the front porch and
12 looking at the purse and so on, where were the
13 other members of your team?
14     A   Some of the members were dealing with the
15 target himself and obviously making sure there was
16 nothing dangerous on him.  And I would say the other
17 officers were probably -- I don't remember exactly
18 where they were located, but just diligent and
19 waiting for the next move.
20     Q   Had any of them gone into the house?
21     A   Not that I'm aware of.
22     Q   Were any of them in the backyard or the
23 back of the house?
24     A   Possibly, but I wasn't aware of who or
25 where exactly they would be located.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
45–48

Page 45

1  Q   If they didn't -- I know that there were
2  at least one, maybe two officers, who had detained
3  the male subject, Laurie and or Hefel, and then you
4  and Officer O'Keefe ensuing were dealing with
5  Mrs. Simmons on the front porch, that's five.
6  And that would seem to leave -- well, that would
7  seem to leave Officers Babicz, Homer, Laurie,
8  Sgt. Kinnane and possibly either Hefel or Laurie,
9  depending on who was actually arresting the male
10 subject, that would seem to leave them out so they
11 were doing something else.  Do you recall whether
12 they were just sort of standing in the front yard
13 waiting for -- waiting to figure out what to do
14 next?
15      MR. BATTLE:  Objection -- I'm sorry.  I
16 thought you were finished.
17 BY MR. HOFELD:
18 Q   Or were they in some other location?
19      MR. BATTLE:  Object to the form of the
20 question.  Go ahead and answer if you
21 understand what he's asking you.
22      THE WITNESS:  I don't remember
23 exactly -- excuse me if I don't understand your
24 question.  I don't remember exactly the
25 positioning of all the officers on the scene at

Page 46

1  that point in time.  I do know that we
2  were -- it was my impression that we were
3  securing what we had found outside, the target
4  and the evidence, and then after that was
5  secured and we knew that was in place, a plan
6  was formulated as to entering the house itself.
7  BY MR. HOFELD:
8  Q   Did officers attempt -- strike that.
9  While you were detaining -- while you and the other
10 two officers were detaining the female on the porch
11 and while one or two officers were detaining the
12 male subject on about the sidewalk, did the other
13 officers attempt to enter the house?
14 A   No, not that I saw.
15 Q   Do you have an understanding as to why
16 they didn't make haste to enter the house to
17 execute the warrant at that point?
18 A   Are you asking why they didn't enter the
19 house?
20 Q   I'm asking you if you know why?
21 A   In a search warrant such as this, the lead
22 officers be would be the affiant officer and his
23 partner, that would be Officer O'Keefe and myself.
24 Q   Yes.
25 A   So it's been our practice in the past and

Page 47

1  it was our practice at this search warrant that they
2  would take our lead.  In other words, I think they
3  probably observed that we were dealing with
4  something outside the house and they were just
5  waiting for us to make the call of what the next
6  move would be.
7  Q   Do you recall yourself or anybody else
8  checking to see if the front door was already open?
9  A   Open as far as being open or unlocked?
10 Q   Either.
11 A   I don't know if anyone checked it to see
12 if the door was open or unlocked.  I remember the
13 door being shut, but I don't know whether the
14 officers did it.
15 Q   Do you recall that there was a screen
16 door of some kind and a security door?
17 A   I remember a security door.  I don't
18 remember there was a screen door or not, there may
19 have been.
20 Q   But you don't recall seeing either one of
21 those doors open?
22 A   Not when I was there, no.  On the porch
23 itself detaining, recovering, at that point in time,
24 no, they were shut.
25 Q   And nobody checked to see if either door

Page 48

1  was unlocked?
2  A   I don't know if someone did that or not.
3  Q   Did you do that?
4  A   I don't remember.  I may have got --
5  obtained the keys.  I don't remember if I'm the one
6  that unlocked the door or if someone else did.
7  Q   But I mean before you had the keys and
8  while things were unfolding on the front porch with
9  the female, I'm just wondering if anybody tried to
10 check the door to see if it was unlocked or try to
11 enter?
12 A   They may have.  They may have checked to
13 see if the door was locked or not, I don't know.  I
14 didn't see anyone do it, I don't know.
15 Q   And you didn't do it yourself?
16 A   At which -- I mean right before entry I
17 may have, but I just don't remember.  I remember the
18 plan was we had keys to the house, we don't have to
19 break anything, so let's do that.
20 Q   Was the male subject detained before the
21 female was?
22 A   It was a fluid situation, but I would say,
23 generally speaking, yes.
24 Q   And the keys -- it's your testimony that
25 the keys were found on his person, is that correct?



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
49–52

Page 49

1    A   That's correct.  The keys that were to the
2  front door of the residence were on his person.
3    Q   Which officer was it who used those keys
4  to open the front door of the residence?
5    A   I don't remember.  It may have been
6  myself, I just don't remember.
7    Q   How did you or other officers know that
8  the keys that the male subject had on his person
9  included a key or keys that fit the door of the
10  930 North Keystone residence?
11    A   During my surveillance I saw him enter the
12  house through the front door and when he did that he
13  used a set of keys that he obtained from his pocket.
14  And I remember when a set of keys were found on him,
15  upon his detention, either I stated or it was known
16  at that point in time that he had keys to the
17  residence that I had observed during my
18  surveillance.
19    Q   When you approached -- when you
20  approached the front porch on foot and then when
21  you were on the front porch with Ms. Simmons and
22  the other officers, did she resist arrest in any
23  way?
24    A   No.
25    Q   Did she appear to be aggressive or

Page 50

1  dangerous towards officers in any way?
2    A   Not in my opinion.
3    Q   She didn't open the purse?  You didn't
4  see her open the purse, did you?
5    A   I didn't.
6    Q   Do you know if any of the other officers
7  saw her open the purse?
8    A   I don't know.
9    Q   Did she refuse to follow officer
10  instructions at any point?
11    A   Not my instructions, no.
12    Q   Did you overhear her refusing to follow
13  any other officers' instructions?
14    A   I didn't observe that.
15    Q   Officer, do you recall there being a
16  briefing of some kind earlier that day among the
17  officers who were going to execute the warrant to
18  discuss the plan for execution?
19    A   Yes.
20    Q   Where did that occur?
21    A   I remember being outside, but I don't
22  remember exactly where.
23    Q   Was it in the vicinity of 930 North
24  Keystone?
25    A   I believe it was.

Page 51

1    Q   Was it the members of the Area Central
2  Gun Team who were present and participated in the
3  briefing?
4    A   It was and I believe the other officers
5  were also there.
6    Q   The patrol officers?
7    A   I believe so, yes.
8    Q   Was that Officer Muzupappa, was that one
9  of the officers do you recall?  One of the patrol
10  officers, you don't recall?
11    A   I don't know him personally.  The name
12  sounds familiar now that you say it, but I don't
13  recall the name.
14    Q   Who conducted the briefing, who conduct
15  or gave the briefing?
16    A   I don't remember.  It could have been a
17  combination between Officer O'Keefe and I.  I would
18  make the assumption that Officer O'Keefe did most of
19  the briefings.  He was the affiant of the search
20  warrant, but I don't recall for sure.
21    Q   Do you recall anything that he said
22  during that briefing?
23    A   I don't.  Again I would assume it was any
24  type of intelligence or any type of information
25  gathered about the residents and including my

Page 52

1  surveillance that had occurred just before, but I
2  don't remember exactly what was said.
3    Q   Do you recall whether there was
4  information shared in the briefing indicating that
5  any of the plaintiffs might be armed or dangerous?
6    A   Plaintiffs meaning?
7    Q   I mean plaintiffs in this lawsuit.  So
8  not the male subject who was detained, but Aretha
9  Simmons who was on the front porch, or Emily
10  Simmons, Keith Simmons, or Davianna Simmons?
11    A   I don't remember their names being
12  mentioned as far as being dangerous or having a
13  weapon, no.
14    Q   Do you recall whether there was any
15  information presented at the briefing indicating
16  that any of the residents of 930 North Keystone
17  might be armed or dangerous or potentially
18  dangerous to officers?
19    A   I don't recall that, no.
20    Q   You don't recall that being said?
21    A   Not in regards to their names.
22    Q   Do you recall there being a discussion
23  that McFadden may well be armed and dangerous?
24    A   Yes.
25    Q   Was there anybody else mentioned that



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
53–56

Page 53

1 who -- was there anybody else mentioned with
2 indications that he or she or they might be armed
3 and dangerous?
4    A   I don't remember, there may have.  I just
5 don't remember.
6    Q   Am I correct in understanding that you
7 left the front porch to go to one of the vehicles
8 to put the package that had been recovered into the
9 trunk?
10    A   That's correct.
11    Q   When you left -- in the moment when you
12 left the front porch who was still present?  Who
13 was present on the porch?
14    A   I don't remember.  I don't remember.
15    Q   Do you recall -- do you recall whether
16 Officer Suing and O'Keefe were still on the porch?
17    A   I don't remember.
18    Q   Do you recall when Ms. Simmons was --
19 when the handicuffs were placed on the female,
20 Aretha Simmons, on the front porch, was she
21 standing or was she sitting?
22    A   When she was handcuffed itself?
23    Q   Yes.
24    A   I would make the assumption she was
25 standing.

Page 54

1    Q   Why would you make that assumption?
2    A   It's just easier to handcuff someone when
3 they're standing.
4    Q   When she was finished being handcuffed,
5 did she remain standing or did she sit or do you
6 remember?
7    A   I don't remember for sure.
8    Q   Do you recall seeing either Officer Suing
9 or Officer O'Keefe push Ms. Simmons from a standing
10 position to a seated position in one of the chairs
11 immediately after she was handcuffed?
12    A   I didn't see that, no.
13    Q   You didn't see that.  Were you -- I
14 should have asked you this before, but did you see
15 her be handcuffed before you left to go to the car
16 to place the package in the trunk?
17    A   Again I don't remember who handcuffed her,
18 it may have been myself.  I just don't remember that
19 action.  I'm sorry.
20    Q   That's okay.  But did you observe -- did
21 you yourself with your own eyes observe her being
22 handcuffed?
23    A   I don't remember the physical image of her
24 being handcuffed, either by myself or someone else.
25 I just don't remember that.

Page 55

1    Q   So you don't recall, or do you, whether
2 she was handcuffed, whether she was already
3 handcuffed when you left to go to the car to place
4 the package in the trunk?
5    A   I recall her being handcuffed when I went
6 to secure the items, yes.
7    Q   Did you -- I have to ask you.  Did you
8 push Aretha Simmons from a standing position to a
9 seated position in one of the chairs on the front
10 porch after she was handcuffed?
11    A   I did not.
12    Q   Did you see either Officer Suing or
13 Officer O'Keefe push or slam Ms. Simmons' body or
14 face into the cement rising wall of the front door
15 after she was handcuffed and seated?
16    A   I didn't see that, no.
17    Q   You didn't do that yourself, correct?
18    A   Absolutely not.
19    Q   Do you recall that there was a low-rise
20 cement wall that lined the front porch?
21    A   I think -- yeah.  I think I do recall some
22 type of -- I don't know, masonry embankment material
23 on the wall.
24    Q   Sure, sure.
25    A   I'm sorry.

Page 56

1    Q   No, no, no.  You didn't see any officer
2 push or slam her body or face into the cement wall,
3 did you?
4    A   I did not see that, no.
5    Q   Do you recall seeing any officer pat
6 Ms. Simmons down as she was arrested?
7    A   No, I don't remember seeing that either.
8    Q   Did you pat her down?
9    A   I didn't, no.
10    Q   When you and other officers first
11 approached the house on foot did you have your gun
12 drawn?
13    A   No.
14    Q   Did other officers have their guns drawn?
15    A   They may have, I just don't remember.
16    Q   What kind of gun were you carrying that
17 date?
18    A   The exact gun?
19    Q   Sure.
20    A   Sig Sauer model P220.
21    Q   I apologize for my ignorance.  Is that a
22 handgun?
23    A   Yes, that is.  A semiautomatic handgun.
24    Q   After you put the package into the trunk
25 of one of the cars and came back toward the



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
57—60

Page 57

1  residence, where were the keys at that point that
2  would have been recovered from Mr. McFadden?  Did
3  you have possession of the keys?
4      A   I don't remember.  I don't remember if I
5  took possession of the keys or Officer O'Keefe or
6  someone else.  I will make the assumption it was
7  either I or Officer O'Keefe, but I don't know for
8  sure.
9      Q   You said officers sort of huddled and
10  discussed what the next step would be?
11      A   At one point in time it was determined the
12  front door was locked.  We wanted to knock and
13  announce our presence and then the plan was to use
14  the keys to enter the house and we got no response.
15      Q   And then so did you -- your testimony is
16  that you first knocked and announced on the front
17  door?
18      A   Yes.
19      Q   Did you get a response?
20      A   No.
21      Q   Did you then -- did officers then try the
22  keys to see if any of them opened the front door?
23      A   I remember -- and again this may have been
24  me and it may not have been me.  I remember we
25  found -- someone found the key that actually worked

Page 58

1  on the lock and engaged that key and unlocked the
2  door.
3      Q   How many keys were on this keychain?
4      A   I remember it being several, but I don't
5  remember the exact count.
6      Q   Were you the one who went through each
7  keys until you found one that fit?  Were you the
8  one who was trying the key in the lock?
9      A   I may have been.  It may have been me, I
10  just don't remember.
11      Q   So some officer tried -- one of the
12  officers tried various keys on the keychain until
13  one of them opened the door, is that correct?
14      A   A key was found that engaged the lock and
15  it worked and, yes, the door was -- the door was
16  unlocked before we made entry.
17      Q   Do you recall entering the house?
18      A   I do.
19      Q   You did enter the house?
20      A   At one point, yes.
21      Q   Did you enter the house immediately after
22  the door was unlocked with the key or did you --
23  were you doing something else before you entered?
24      A   No.  I remember hanging back and I don't
25  remember if I was staying in there with Ms. Simmons

Page 59

1  and let everyone else clear the house first.  But I
2  remember basically the house was either cleared or
3  about to be cleared when I entered the house.
4      Q   Either cleared or about to be cleared?
5      A   I'm sorry.  Of any type of threat or we
6  accounted for every person who was inside the house.
7      Q   When you say cleared or about to be
8  cleared, did you mean cleared or nearly cleared?
9      A   At one point in time, yeah, it was -- at
10  one point -- at those points in time that's when I
11  entered the house.
12      Q   I just -- when you said about to be
13  cleared, I wasn't sure if you meant that officers
14  were about to begin clearing the house or if you
15  meant that the house was nearly cleared?
16      A   I would say --
17      Q   By the time you entered?
18      A   I would say -- a more exact response would
19  be nearly cleared, almost cleared, or to the point
20  of being cleared.
21      Q   Got it, thank you.  And you don't
22  remember why you hung back and didn't enter
23  immediately?
24      A   Yeah, I don't remember exactly.  It could
25  be the fact that I had the keys, it could be the

Page 60

1  fact that I was watching Ms. Simmons.  I don't
2  remember exactly.  A lot of -- I remember a lot of
3  times in our search warrants the evidence, I was the
4  designated evidence officer.  The other officer just
5  kinda like hangs back and he's in charge of the
6  evidence.
7      Q   Do you recall whether you were the
8  designated evidence officer for this particular
9  search?
10      A   I was.
11      Q   You were?
12      A   Yes.
13      Q   What does that mean when a member of the
14  team is a designated evidence officer?  What were
15  your duties, what did you do?
16      A   Typically speaking, that means I was in
17  charge of whenever someone discovers any item that
18  was contraband or evidence of what we were looking,
19  they would announce that with the radio, the
20  designated evidence officer would photograph that
21  item close to the approximate condition that it was
22  found in and then also recover that item and keep
23  that in their possession.
24      Q   Got it.  Is that what you did on
25  August 29, 2013 at 930 North Keystone?



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
61—64

Page 61

1    A    That is what I did, yes.
2    Q    Now, when you hung back where were you
3  physically?  Did you remain on the porch just
4  outside the front door?
5    A    I remember being in the vicinity of the
6  front door itself.  It could have been right on the
7  porch, it could have been right on the doorway.
8    Q    I'm sorry.  Did you say right in the
9  doorway?
10   A    Somewhere around the doorway.  Yes.
11   Q    So then other officers entered the
12  residency ahead of you, correct?
13   A    That's correct.
14   Q    Do you recall which officers entered
15  ahead of you?
16   A    No.  I remember Officer O'Keefe entering
17  ahead of me, I remember Officer Homer, Officer
18  Babicz, I believe Hefel and Laurie also and then
19  Sgt. Kinnane.
20   Q    I apologize, I did get everybody.  You
21  said O'Keefe, Homer, Kinnane.  Did you say Laurie?
22   A    I believe he -- I don't remember for sure,
23  but I believe he entered before me.
24   Q    Did you say Hefel?
25   A    I could be mistaken about Laurie and Hefel

Page 62

1  though.
2    Q    Why do you say that?
3    A    I just -- I don't have a physical image of
4  them going ahead of me into the house.  It may have
5  occurred, but recalling the incident, I just don't
6  have that physical image in my mind.
7    Q    Understood.  Do you have the physical
8  image of Sgt. Kinnane going ahead of you?
9    A    I believe he went ahead of me, yes.
10   Q    Do you have a physical image of Officer
11  Homer going ahead of you?
12   A    Yes.
13   Q    How about Officer O'Keefe?
14   A    Yes.
15   Q    That's five officers that we talked about
16  so far.  Do you recall any others going ahead of
17  you into the house or entering the house ahead of
18  you?
19   A    I don't recall.  It could have happened, I
20  just don't recall.
21   Q    Besides yourself, was there any other
22  officer or officers who hung back and did not go
23  into the house immediately?
24   A    I believe it was, yes.
25   Q    Who would that have been or who do you

Page 63

1  recall that being?
2    A    I don't remember the names.
3    Q    Do you recall where those officers were
4  and what they were doing if they weren't entering
5  the house?
6    A    No, I don't remember.  I know there was
7  somebody who's with the target and there were -- I
8  remember another officer being in the vicinity of
9  the front yard or just outside the front yard.
10   Q    Is that a plain clothes officer?
11   A    I don't remember.  It could have been one
12  of the uniform officers.
13   Q    Did any of the officers -- any of the
14  officer or officers remain with you?  Do you recall
15  anybody who remained with you instead of going into
16  the residence?
17   A    I mean in the vicinity of the outside was
18  anyone standing -- I don't remember anyone standing
19  next to me, but it may have occurred.  I just don't
20  remember.
21   Q    Were you standing -- were you standing
22  with Ms. Simmons?
23   A    I remember Ms. Simmons was still outside
24  when the entry was made, yes.
25   Q    Was part of the reason that you were

Page 64

1  hanging back because you were the officer who was
2  remaining with her?
3    A    It could have been, yes.
4    Q    Did you observe any other officer who was
5  remaining with her, so as to make sure that she
6  didn't get up and run down the street?
7    A    Yeah.  I remember other officers being
8  outside, I just don't remember who they were.  And
9  again I would describe it as in the same vicinity,
10  maybe not standing directly next to me, but in the
11  same vicinity.
12      MR. HOFELD:  Do you mind if we take a five
13    minute break?
14      (Recess.)
15  BY MR. HOFELD:
16   Q    So at some point, then, Officer Wrigley,
17  did you enter the house yourself?
18   A    I did, yes.
19   Q    How long was that after the other
20  officers went in ahead of you approximately?
21   A    It wasn't very long.  A matter of minutes,
22  but not very long at all.
23   Q    More or less than five minutes would you
24  estimate?
25   A    Yeah.  I mean, like I said, it was near



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
65–68

Page 65

1  the time that the house was either cleared or we had
2  accountable the people in the house or very near to
3  that ending point.
4    Q   So approximately five minutes?
5    A   Maybe. Maybe less.
6    Q   Then when you entered, did anyone enter
7  with you?
8    A   I don't remember at one point -- I don't
9  remember. I mean I think I may have been in and out
10 a couple different times in that short period of
11 time. At one point in time Ms. Simmons was brought
12 inside the house.
13   Q   I'm trying to ask --
14   A   With me. My point -- I'm trying to answer
15 your question.
16   Q   Okay, sure. I appreciate that. I'm
17 trying to ask when you -- I'm trying to ask about
18 the time that you first entered the house after you
19 hung back a little bit. At that point when you
20 first entered did anybody enter with you?
21   A   I don't remember.
22   Q   If you recall?
23   A   I don't remember.
24   Q   Is it possible -- let's see. Did you
25 bring Ms. Simmons, Aretha Simmons, the woman

Page 66

1  arrested on the porch, did you bring her inside?
2    A   I did, yes. I remember bringing her
3  inside.
4    Q   You do, okay. Might you have brought her
5  inside the very first time that you entered the
6  house?
7    A   I don't think so. Just because I -- just
8  knowing me and making the assumption that I would
9  want to make sure that everything was okay before I
10 would bring her inside to the house, as far as
11 everything is secured, you know, everybody's good,
12 we're all good, that's good, and everything's
13 secured basically.
14   Q   You said you were in and out. Do you
15 recall how many different times you went in and
16 then came out again for some reason?
17   A   No. It could have been just the simple
18 act of just poking my head in and asking if
19 everything's okay. I don't remember exactly.
20   Q   At some point did you go in the house,
21 enter the house and stay for several minutes?
22   A   Yes, yes.
23   Q   You don't recall -- do you recall how
24 many different times you were in and out before you
25 went in and stayed?

Page 67

1    A   Again I was kinda just lingering around
2  the front door and then at one point in time when
3  everything was secured, I felt like everything's
4  secured in my opinion and from the confirmation of
5  the officers, Ms. Simmons was brought into the house
6  by me and I basically stayed inside the house at
7  that point in time.
8    Q   Got it, appreciate that. When you say
9  you went in and out, that was just to stick your
10 head in and back out again?
11   A   It was probably just to assess the
12 situation, make sure everything was going okay, in
13 the act of clearing the house or accounting for
14 everyone inside the house.
15   Q   Now, Ms. Simmons -- as you probably know,
16 Ms. Simmons alleges that the officer who brought
17 her inside the house pushed her, physically pushed
18 her through the front door. Do you recall doing
19 that to Ms. Simmons?
20   A   No, not at all.
21   Q   Do you recall seeing any other officer do
22 that to Ms. Simmons?
23   A   No.
24   Q   She also alleges that just after she was
25 pushed through the front door, that an officer

Page 68

1  grabbed her with both hands, both arms on the upper
2  part of her body and shook her forcefully. Did you
3  do that to Ms. Simmons?
4    A   No.
5    Q   She also alleges at that point that an
6  officer slammed her body several times, three or
7  four times on the wall inside the vestibule or
8  foyer of the house, just inside the front door.
9  Did you do that to Ms. Simmons?
10   A   No.
11   Q   She also alleges that at that time an
12 officer pushed her into the steel radiator in the
13 foyer, just inside the front door, three to four
14 times, holding her and slamming her. Did you do
15 that to Ms. Simmons?
16   A   No, not at all.
17   Q   Do you recall a steel radiator being
18 there in the foyer inside the front door?
19   A   I don't even recall a radiator.
20   Q   You don't recall it?
21   A   No.
22   Q   Did you see any other officer do that to
23 Ms. Simmons?
24   A   No.
25   Q   When you did bring her into the house she



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
69–72

Page 69

1  was handcuffed?
2    A   Yes.
3    Q   When you brought her into the house was
4  she trailing behind you or were you behind her, do
5  you recall?
6    A   No.  I believe -- I believe that she was
7  in front of me.
8    Q   Were you holding her?  Was some part of
9  her body holding some part of her body?
10   A   I don't think so, no.
11   Q   You had asked her to go in the house and
12  she complied?
13   A   Yes, uh-huh.  Absolutely.
14   Q   Did she then -- you and she, then,
15  entered the house together with you right behind
16  her, correct?
17   A   Correct.
18   Q   Officer, if you could look at Exhibit 1,
19  it's been marked previously as defendant officer
20  exhibit one.  See where it is here.  Here it is, I
21  got it, I got it.  Here you go.  Let me direct your
22  attention within Exhibit 1 to Simmons 19 through 21
23  and you see the numbers at the bottom right of the
24  pages?
25   A   Can you show me the pages?

Page 70

1    Q   Yes.  19 is the first one, Simmons 19?
2    A   The diagram itself?
3    Q   Yes.
4    A   I got it.
5    Q   Have you seen this diagram before?
6    A   I have, yes.
7    Q   Do you recognize this as a hand drawn
8  floor plan of the house, of the inside of the house
9  at 930 Keystone, as it appeared to you and other
10  officers on your team on or about August 29, 2013?
11   A   Yes.
12   Q   Did you draw -- did you make this sketch
13  of the floor plan?
14   A   I did not.
15   Q   Do you know who did?
16   A   I do not.
17   Q   Let me direct your attention to the first
18  page of the floor plan, Simmons 19.  Are you able
19  to tell -- are you able to look at this and recall
20  where the front door was located?
21   A   Yes.  It looks to be cut off on the copy,
22  but yes.
23   Q   Is the front door where the number one
24  circle appears?
25   A   That's where I believe it to be.  Yes.

Page 71

1    Q   So you recall that's where you entered
2  with Ms. Simmons, correct?
3    A   Yes.
4    Q   And then there's that little foyer area?
5    A   Yes.
6    Q   After you step inside through the front
7  door, there's a little foyer to the right or some
8  stairs up and down?
9    A   Yes.
10   Q   And then to the left is the entrance into
11  the inside of the house, correct?
12   A   Correct.
13   Q   The first room you enter when you enter
14  the house is what's labeled the front room here, is
15  that correct?
16   A   Correct.
17   Q   When you and Ms. Simmons -- when you
18  brought Ms. Simmons into the house what did you do
19  with her?
20   A   Just asked her to step inside the house.
21   Q   Did you ask her to remain in a certain
22  location inside the house?
23   A   Yes.  At that point in time a female and a
24  child was in the front room and I asked her to join
25  them in the front room.

Page 72

1    Q   Was the female and the child that you saw
2  in the front room when you entered with Aretha
3  Simmons, were they seated on the couch in the front
4  room?
5    A   They may have been.  I remember at one
6  point in time them being seated.  At that point in
7  time I don't recall.
8    Q   Might they have been walking toward the
9  front room or toward the couch in the front room
10  when you first entered with Aretha Simmons?
11   A   I remember them being in the front room
12  when she entered.
13   Q   When you entered -- when you and Ms.
14  Aretha Simmons entered the front room from the
15  foyer, after entering the house, and you saw a
16  female and I think you said a child?
17   A   Yes.
18   Q   Did you see anybody else besides the two
19  of them?
20   A   Officers.
21   Q   Where were the officers?
22   A   I remember seeing Sgt. Kinnane.
23   Q   Kinnane?
24   A   Kinanne.  I'm sorry.  And there may have
25  been one or two other officers, but I don't remember



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
73—76

Page 73

1  who.
2     Q    Might Officer Hefel have been one of
3  those one or two other officers that you saw?
4     A    I don't remember.
5     Q    Where were they when you first saw them,
6  after first entering that front room?
7     A    When you say they, who are you --
8     Q    The officers?
9     A    Just in the vicinity.  I believe the
10 dining room and front room are connected without a
11 door and it may have been just in that general
12 vicinity right there.
13    Q    Either the dining room or the front room?
14    A    Correct.
15    Q    Were they close in proximity to the woman
16 and the child?
17    A    When you say they who -- are you talking
18 about other officers?
19    Q    Yes, that's who I mean?
20    A    I don't remember the proximity in relation
21 to the child or the female at that point in time.  I
22 just remember seeing Sgt. Kinnane and someone else.
23    Q    Can you physically describe the female
24 who was with the child when you saw the two of them
25 upon entry?

Page 74

1     A    A physical description?
2     Q    Yes.
3     A    Black female, maybe forties or fifties.
4     Q    Build?  Remember build?
5     A    I would say medium build.
6     Q    Height?
7     A    Medium height.
8     Q    Do you recall her name?
9     A    Aretha maybe?  I might have that mistaken,
10 sorry.
11    Q    No, that's quite all right.
12    A    Sorry.
13    Q    No, it's nothing to be sorry about.  Do
14 you recall the child -- how young was the child or
15 how old did the child look to you?
16    A    I remember young, not baby.  Maybe toddler
17 or just slightly older.  I don't remember for sure.
18    Q    What did you see happen next?  Once you
19 entered with Ms. Simmons, you saw the female and
20 the child in the front room or the vicinity of the
21 front room.  You saw Officer Kinnane and a couple
22 of other officers in the front room or the dining
23 room or in the vicinity of those rooms.  What's the
24 next recollection that you have?
25    A    I remember the child being scared to the

Page 75

1  point of crying and I remember the female being
2  agitated, aggressive.  That would be the best way to
3  describe it.
4     Q    Sure.  When you say that the female was
5  agitated and aggressive, do you recall anything
6  that she said or that she was saying?
7     A    Not exactly, no.  She was saying
8  something, but I just don't remember what it was.
9     Q    Do you recall the drift or do you have a
10 general impression of what she was saying?
11    A    It wasn't friendly.  That's the best way I
12 can put it.  I'm sorry.
13    Q    That's okay.  Who was she saying it to,
14 do you recall?
15    A    No, I don't remember who.  I mean my
16 impression was just any officer who was in the
17 vicinity.
18    Q    She wasn't saying it specifically to
19 Sgt. Kinnane?
20    A    Maybe, but I don't remember.
21    Q    You mentioned she was aggressive.  Was
22 she acting physically aggressive toward officers?
23    A    No.  Just in her body language and in her
24 speech.
25    Q    If you recall, what was it about her body

Page 76

1  language that was aggressive or appeared aggressive
2  to you?
3     A    Just facial expressions, the way she was
4  standing.  Just appeared to be in a very agitated
5  state.
6     Q    But she wasn't making body movements that
7  suggested that she might be a threat to officers,
8  was she?
9     A    No.  I didn't see that.
10    Q    The child you said was scared and I think
11 you said you saw the child crying.  Is that
12 correct?
13    A    That's correct.
14    Q    Was something happening when you walked
15 in?  Was there something that was happening that
16 appeared to be causing the child to be scared and
17 crying?
18    A    Nothing other than, you know, these
19 strange men are in her house that she's familiar
20 with.
21    Q    What's the next thing that you recall
22 happening?
23    A    I remember bringing in or asking Ms.
24 Simmons to come in and basically trying to calm the
25 situation down in regards to the female and to the



Page 77

1  child.
2      Q    Sure.
3      A    And I was hoping bringing in Ms. Simmons
4  would accomplish that.
5      Q    You were bringing in Ms. Simmons from the
6  outside you mean?
7      A    Yes.
8      Q    What did you or any other officers do to
9  try to calm the child or the older female?
10     A    Well, my assessment was the older female
11 was very agitated at the police and I don't blame
12 her, we're in her house. My assessment was the
13 child was very upset because the police were in her
14 house, these strange men. My hope was bringing Ms.
15 Simmons to help calm the child because I didn't
16 think the female was going to be able to do that,
17 the older female. And just basically bringing
18 everyone together and assure them that nothing was
19 going to happen to them.
20     Q    Did you have any sense of why the older
21 female was agitated?
22     A    Yeah. She appeared to be intoxicated.
23     Q    Well, was that the only reason why she
24 was agitated?
25     A    I think she was mad that the police were

Page 78

1  in her house and she didn't know why.
2      Q    So you must have known before bringing
3  Ms. Simmons into the house that the older female
4  and or the child were agitated or upset?
5      A    I could hear, absolutely. Yeah, I could
6  hear. And I may have even at one point in time
7  asked Ms. Simmons is the baby yours or is the child
8  yours and then she responded yes.
9      Q    So you heard noises from inside the house
10 while you were on the porch with Ms. Simmons, is
11 that correct?
12     A    Yeah. My -- the noise that stuck out to
13 me was the crying child.
14     Q    You heard the crying from outside -- I'm
15 sorry. I didn't mean to interrupt you. Are you
16 saying that when you were on the porch and you
17 heard noise inside, the noise you heard was the
18 crying child?
19     A    When they were brought into the front
20 room. I remember seeing the child and hearing the
21 crying as she was brought in and that was upsetting
22 to me and that was -- my main concern was, okay, we
23 need to calm these people down, we need to calm the
24 situation down.
25     Q    Sure, sure. I appreciate that. But is

Page 79

1  it -- I'm trying to understand. Is that that you
2  decided to bring Ms. Simmons into the house from
3  the porch because you heard the child crying on the
4  inside first?
5      A    That was one of the reasons, yes.
6      Q    When you were still outside with Ms.
7  Simmons, did you also hear the older female saying
8  things from your vantage point?
9      A    I could hear that from the front door,
10 yes.
11     Q    Did you hear anything specific that she
12 said, the older female?
13     A    No. I don't remember specifically what
14 she was saying.
15     Q    Was the child saying anything or just
16 crying?
17     A    I just remember the crying.
18     Q    So you then thought it would be a good
19 idea to bring Ms. Simmons in from the porch to the
20 inside?
21     A    Absolutely. I mean I figured if the child
22 saw her mother and she was okay that would help with
23 the situation.
24     Q    What was Aretha Simmons who you brought
25 in from the porch to the inside --

Page 80

1      A    That's -- I'm sorry. That's her first
2  name, Aretha.
3      Q    That's okay, it's no problem. It's no
4  big deal, just as long as we understand the person
5  we're talking about. When you brought her inside
6  and into the front room what was she doing or
7  saying? Was she upset too?
8      A    No. I mean I think she was more concerned
9  that she was in a situation that she was in, as far
10 as in police custody at that point in time.
11     Q    Sure.
12     A    And also with the knowledge of what
13 possibly could be happening.
14     Q    Okay.
15     A    In regards to evidence recovered and along
16 the lines of that sense. It seemed she was more
17 concerned -- she seemed to have a look of concern on
18 her face and shock that this had occurred.
19     Q    Sure. Do you recall anything specific
20 that she actually said?
21     A    Not at that point, no.
22     Q    Do you recall her saying something to you
23 or other officers as you entered the residence into
24 the front room?
25     A    No. I probably even said -- may have



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
81–84

Page 81

1 said, you know, let's calm your baby down. Let's
2 take care of that, let's do that.
3     Q    You do recall asking her on the front
4 porch if the child who you heard screaming inside
5 was hers?
6     A    At one point in time I remember asking
7 her. I don't -- in the fluidity of the situation I
8 don't remember exactly, but at one point in time I
9 did, yes.
10     Q    And then did you do anything else to try
11 to calm the child besides bringing in Aretha
12 Simmons from the porch into the house in the front
13 room?
14     A    I may have. I -- you know, there's not so
15 much you can do as a police officer wearing all this
16 stuff, you know, to a child and it's happened
17 before. It's they're just scared, you know, and I
18 understand it, I completely understand it. The best
19 thing at that point in time is try to calm them with
20 the people they're familiar with and that was my
21 goal at that point in time. And again I didn't
22 think that the older female was doing a very good
23 job of putting the child first and that was the
24 reason why I thought Ms. Simmons could help in that,
25 even given her situation.

Page 82

1     Q    I'm trying to understand. Did you have
2 some -- you had some sense before you decided to
3 bring Ms. Simmons in, Aretha Simmons that is, that
4 the older female wasn't doing a good job of calming
5 the child?
6     A    Her focus was more on -- it appeared to be
7 on the police officers and the police for being in
8 her house --
9     Q    Right.
10     A    And it wasn't trying to assure the child
11 that everything was okay, which in my opinion also
12 probably led to the child being more upset than
13 normal because there was no one calming the child
14 down that she was familiar with.
15     Q    But you must have heard -- you must have
16 heard or seen the older female before you decided
17 to bring Ms. Simmons into the house to calm the
18 child down?
19     A    I at least heard her and, yeah, I probably
20 was observing at the same time.
21     Q    Let's see. Did other officers -- do you
22 recall other officers doing anything to calm -- to
23 try to calm the child down?
24     A    I do. I remember Sgt. Kinnane trying to
25 talk to the child, you know.

Page 83

1     Q    Do you recall what he said?
2     A    No, I don't. Just I remember being in a
3 very concerned and caring way its okay, everything's
4 okay.
5     Q    I'm sorry. Could you -- Sgt. Kinnane was
6 talking in a very concerning way?
7     A    I remember him also trying to calm the
8 child down.
9     Q    You don't remember what he said?
10     A    I don't.
11     Q    Do you remember any other officer try to
12 calm the child down?
13     A    It may have happened, but I don't
14 remember.
15     Q    When you entered the house and you
16 saw -- when you first entered the house with
17 Ms. Simmons into the front room and you saw
18 Sgt. Kinnane and a couple of the other officers,
19 did any of the officers have their guns drawn?
20     A    I'm sorry. Can you repeat the question
21 again?
22     Q    Sure. Did any of the officers have their
23 guns drawn?
24     A    When they entered the house?
25     Q    No, sorry. When you entered the house

Page 84

1 with Aretha Simmons and stepped into the front room
2 and you saw the older female and the child and
3 Officer Kinnane and a couple of other officers, at
4 that point did any of the officers have their guns
5 drawn?
6     A    At that point I don't remember seeing any
7 of the guns drawn. Now, there may have been an
8 officer that had a rifle. Obviously there's no way
9 to holster a rifle, but I don't remember at what
10 point I saw that.
11     Q    But somebody had a rifle in the house?
12     A    I believe so, yes.
13     Q    By somebody, I mean one of the officers.
14     A    Yes.
15     Q    Do you remember -- was that on the first
16 floor or the second floor or the basement?
17     A    I don't remember. I'm sorry.
18     Q    Was that the beginning or the end of the
19 execution of the warrant?
20     A    I mean I probably saw it multiple times.
21 I don't remember at what point I saw it.
22     Q    Besides the rifle, do you recall seeing
23 any other officer holding any other type of gun,
24 any weapon?
25     A    I mean at the point that I entered with



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
85—88

Page 85

1  Ms. Simmons, are we narrowing it down to that point
2  in time?
3      Q   That's a fair clarification, I appreciate
4  it. Let's stick with that first, yes?
5      A   Not at that point in time.
6      Q   Is it that you don't remember whether at
7  that point in time officers had their guns drawn or
8  you have a definite recollection that, no, they did
9  not?
10     A   I know Sgt. Kinnane didn't. I don't
11 recall any other officer with his gun drawn at that
12 point in time.
13     Q   Later -- strike that. Do you recall at
14 any time while you were inside the house, do you
15 recall seeing any officer or officers with gun or
16 guns drawn besides the rifle that you referenced?
17     A   Not with guns drawn. I saw the guns that
18 were recovered inside the house.
19     Q   But besides an officer holding the rifle,
20 you have no other recollection of seeing any other
21 officer with a gun drawn inside the residence?
22     A   That's correct.
23     Q   I take it, then, that at no time did you
24 see any officer point a gun at the older female, is
25 that correct?

Page 86

1      A   That's correct.
2      Q   I take it, then, that at no time did you
3  see any officer point a gun at the little girl?
4      A   I didn't see that, no.
5      Q   Can we look at the diagram for a second
6  again --
7      A   First floor?
8      Q   Yeah. Thank you, officer. I'm going to
9  ask you when you brought Ms. Simmons into the house
10 was the -- do you see the door that's drawn?
11 There's a door -- you referenced this before.
12 There's a door between the front vestibule there
13 and the front room that's depicted in this
14 photograph. Do you see that?
15     A   I do.
16     Q   Was that door open when you brought
17 Ms. Simmons into the front door of the house into
18 the foyer?
19     A   I remember it being open, yes.
20     Q   You don't remember either way, whether it
21 was open or shut?
22     MR. BATTLE:  Objection, mischaracterizes
23 his testimony. Go ahead, say it again.
24     THE WITNESS:  I remember it being open.
25

Page 87

1  BY MR. HOFELD:
2      Q   You do, okay. When you then brought Ms.
3  Simmons through that door, from the foyer to the
4  front room, are you able to tell me with any more
5  precision approximately where you saw the older
6  female and the child? You know, were they in the
7  front room?
8      A   I remember seeing them in the front room
9  at that point.
10     Q   Do you remember what part of the front
11 room you saw them in?
12     A   I don't. I'm sorry.
13     Q   That's okay. You may not remember this,
14 I'm just going to ask it for the sake of the
15 record. The door that I asked you about a moment
16 ago, the door between the front foyer there and the
17 front room, do you recall whether there was
18 actually a swinging door on that doorway or was it
19 just an open doorway without a door?
20     A   I don't remember. I don't know -- I don't
21 know if this --
22     Q   That's fair.
23     A   This depiction is an error or not. I
24 don't -- I don't remember seeing a blocked door or
25 anything else in that doorway. It doesn't mean it

Page 88

1  doesn't exist, I just don't remember seeing that.
2      Q   Sure. Ms. Simmons, Aretha Simmons,
3  alleges that as she was being brought into the
4  house after being arrested, she saw an officer
5  pointing a gun at the little girl and she says
6  that -- she alleges and she will testify that when
7  she saw that as she was being brought into the
8  house, she asked or pleaded with the officer to
9  take the gun off of the baby, and I'm assuming
10 based on your testimony you don't recall her saying
11 that, is that correct?
12     A   That didn't happen.
13     Q   And she alleges that in response to her
14 saying that, the officer who was bringing her in
15 told her to, quote, unquote, "shut the fuck up",
16 and I'm assuming that you're going to tell me that
17 you didn't say that?
18     A   I didn't say that, I didn't hear that.
19 That is a complete fabrication of the truth.
20     Q   And she says it was at that point -- I've
21 already gone over this with you so I don't need to
22 do it again, but she says that it was at that point
23 that she was pushed into the radiator and so on and
24 so forth, but -- okay. Maybe we can talk about
25 what happened next. Do I recall correctly that you



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
89–92

Page 89

1  testified that once you brought Aretha Simmons into
2  the house she was seated on the couch, is that
3  correct?
4      A   At one point in time, yes.
5      Q   Once you brought her into the house,
6  where did she go or where did you instruct her to
7  go?
8      A   I think either I or someone else wanted
9  everyone just basically to sit down.
10     Q   On the couch in the front room?
11     A   I don't remember -- the couch, yes.
12     Q   In the front room, right?
13     A   Yeah.  I don't remember any other
14  furniture -- I remember the couch and that's about
15  the only thing I remember in the front room.
16     Q   Do you recall her being seated on the
17  couch along with the older female and the child?
18     A   Yes.
19     Q   You saw them seated on the couch?
20     A   Yes.  And the child was seated next to her
21  mother.
22     Q   In between the older female and the
23  mother?
24     A   I don't remember the exact position.  I
25  just remember seeing the baby, the child next to her

Page 90

1  mother and being relieved that her mother was in
2  there.
3      Q   Officer Wrigley, did you remain in the
4  front room there or did you -- after everybody was
5  seated or did you then go on to do something else?
6  Or what was your --
7      A   I remained in the front room the majority
8  of the time, until I was called to photograph and
9  recover evidence.
10     Q   Do you recall for approximately how long
11  you remained in that front room with the three
12  people seated on the couch?
13     A   It was the majority of the time we were
14  there.
15     Q   Besides yourself, was there another
16  officer or officers that remained in that front
17  room?
18     A   I remember Sgt. Kinnane being with me
19  for most of the time and there are -- I believe
20  also -- and then remember also O'Keefe being there
21  for part of the time and there could have been an
22  other officer.  I just don't recall.
23     Q   While you and Officer Kinnane and maybe
24  Officer O'Keefe were there present in that front
25  room with the older female, the child and Aretha

Page 91

1  Simmons, for the majority of the time your team was
2  at the house do you recall anything that was
3  discussed with any of the plaintiffs or --
4      A   In the beginning is -- the language being
5  used was -- the theme was let's calm down.  We're
6  not here to harm you, everything's okay, and stating
7  the reason why we're there, who the target was and
8  what we were looking for.
9      Q   Fair enough.  Do you recall hearing any
10  other officer -- I'm not asking you about now.  Do
11  you recall hearing any other officer tell any of
12  the plaintiffs to shut up or to shut the fuck up or
13  anything like that?
14     A   I don't remember that.
15     Q   Did you, yourself, participate in a
16  search, physically or personally, did you
17  participate in a search of the house that was done?
18     A   I don't remember searching anything in the
19  house.  Again my primary function was to photograph
20  and recover any items that were discovered, but I
21  don't remember searching, physically searching
22  anything.
23     Q   Fair enough.  Do you recall that a search
24  of the house was performed on that day?
25     A   Yes.

Page 92

1      Q   Do you recall if the entire house, all
2  floors, all rooms was searched?
3      A   It was my understanding that all rooms and
4  all floors were searched.
5      Q   Who were the officers who did the search
6  of the residence that day?
7      A   I remember Officer Suing, Officer Homer,
8  Officer Hefel, specifically recovering items from
9  them and there most likely were other officers.  I
10  just don't recall who searched what.
11     Q   Do you recall if Officer Babicz
12  participated in the search?
13     A   I remember seeing him inside the house.  I
14  don't recall whether or not -- well, I don't recall
15  him actually searching any particular item or room,
16  but I remember he was inside the house, yes.
17     Q   Do you recall seeing officers -- strike
18  that.  Do you recall Officer Suing searching any
19  particular part of the house?
20     A   I don't recall -- you know, I mean looking
21  back at it, I have the physical image of officers
22  searching and it may have been while I was
23  photographing an item, but I don't remember the
24  specific officers or specifically what they were
25  searching.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
93—96

Page 93

1    Q    So do you recall, and I have to ask you
2  this for the record.  Do you recall Officer Homer
3  searching any particular floor of the house or
4  particular room?
5    A    I don't remember specifically whether he
6  was searching.
7    Q    The same with Officer Hefel, do you
8  recall him searching any particular floor of the
9  house or --
10    A    I only remember the items that I
11  photographed and talking to the officer who
12  discovered those items.
13    Q    Do you remember who the officer or
14  officers were that discovered items during the
15  search?
16    A    I remember -- I believe it was Officer
17  Suing who discovered the firearms, maybe
18  Officer -- I'm sorry.  I don't remember specifically
19  who recovered the package or discovered the
20  packaging that we found also.  Maybe Officer Hefel,
21  but I don't remember without looking at the report.
22  I'm sorry.
23    Q    I understand from your testimony that you
24  were the member of the team who took photographs
25  that day?

Page 94

1    A    That's correct.
2    Q    At the property inside the residence, is
3  that correct?
4    A    Correct.
5    Q    Why don't we briefly look at some
6  photographs.  Do you recall if you took photographs
7  before, during, or after the search of the inside?
8    A    The case would have been all three
9  situations.  So photographs were taken before a
10  search was done.  Photographs was taken at the time
11  that something was recovered, and then photographs
12  were taken after the search was complete.
13    Q    Was that your standard practice in 2013?
14    A    Yes.
15    Q    We only have one set of the photos so I'm
16  just going to -- let me make sure these are in the
17  right order and then I'll show them to you.  Why
18  don't you just take a moment, look, familiarize
19  yourself, and I'll ask you a few questions.
20    A    Okay.
21    Q    Let's see -- can I have them for one
22  second?
23    A    Absolutely.
24    Q    The first one, for the record it's FCRL
25  1293.  Are you able to -- go ahead.

Page 95

1    A    This number that you just quoted, is that
2  a CPD number or is that your own number?
3    Q    That's I believe -- sure.  These photos
4  were produced to us by the city of Chicago in this
5  lawsuit.
6    A    Is this the number that they provided for
7  you?
8    Q    That's the number that they put
9  on -- yes, put on these documents.  That's correct.
10    A    I'm sorry.  I'm just trying to understand
11  what that number means.
12        MR. HOFELD:  Matt, do you remember what
13    FCRL stands for?
14        MR. DIXON:  FCRL stands for federal civil
15    rights litigation.  The number is so you can
16    keep track what what's been produced.
17  BY MR. HOFELD:
18    Q    Officer, my first question about that
19  FCRL 1293 is whether that photo was taken before or
20  after the search of the residence was conducted?
21    A    I believe this -- I'm sorry.  I can't -- I
22  don't know if this was before or after the search.
23  I believe this is the upstairs of the house though.
24    Q    You mean the second level, not the first
25  floor or ground level?

Page 96

1    A    The second level, yes.  So there's what I
2  refer to as the upstairs or second level, ground
3  level first floor, and then the basement.
4    Q    That's fine.  Because some of the
5  bungalows, the first level is sort of above ground?
6    A    Half floor, yeah, right.
7    Q    Go to the next one.  Are you able to tell
8  whether that photograph FCRL 1294 was taken before
9  or after the search was conducted?
10    A    Based on the photograph itself, no.  I
11  don't know if this was a before or after picture.
12    Q    Can I ask you about the next one which is
13  FCRL 1295.  Are you able to -- do you recognize
14  which part of the house this is or which level?
15    A    It appears to be the basement level.
16    Q    Do you recall being in the basement?
17    A    I do, yes.
18    Q    Do you recall being on the second level,
19  the upper level of the house?
20    A    Yes.
21    Q    Of course you told us you recall being on
22  the first floor?
23    A    Yes.
24    Q    Can you tell whether that photograph,
25  FCRL 1295, was taken before or after the search was



Page 97

1  completed?
2      A    Based on the photograph itself, I don't
3  know.
4      Q    Can you look at the next one?
5      A    Okay.
6      Q    FCRL 1296, was this photograph taken
7  before or after the search was completed?
8      A    This was taken during the search, upon
9  recovery -- upon our discovery of a shotgun.
10     Q    Did you observe the shotgun in the exact
11 location in which it was found or was it taken out
12 and then you observed it after it was taken out of
13 its location?
14     A    I don't know.  Typically, I would
15 photograph in the condition that I see it as the
16 officer -- after the officer discovers it or it may
17 be in a location that's approximate based on how it
18 was discovered and whether or not it's safe to
19 photograph it.
20     Q    Fair enough.  Can you look at the very
21 next picture, FCRL -- I'm sorry.  Is that 1297?
22     A    It is.
23     Q    Thank you.  This photograph was taken
24 during the search, is that correct?
25     A    Yes.

Page 98

1      Q    Does this photograph depict the handgun
2  in the location in which it was found, do you know?
3      A    I believe it was the approximate location
4  and obviously I believe this handgun was discovered
5  inside the sock itself.  So the purpose of this
6  picture was trying to photograph the evidence that
7  was recovered in an approximate location and
8  approximate condition of recovery, but not exactly.
9      Q    Do you recall or know where the sock
10 containing the handgun was found exactly?
11     A    Around the mattress.  I don't remember if
12 it was underneath it or between.
13     Q    But you're confident it was found
14 underneath the mattress or between two mattresses?
15     A    Not 100 percent, but in that approximate
16 location.
17     Q    Can you tell the surface or the substrate
18 is there that the gun is rested on?
19     A    That looks like a box spring mattress to
20 me, just my personal opinion based on the
21 photograph.
22     Q    We can look at the next one, FCRL 1298.
23 Is this -- do you know what's depicted in this
24 photograph?
25     A    Yes.  The purpose of this photograph was

Page 99

1  to depict that we in fact recovered keys that worked
2  in this front door lock from the target itself.
3      Q    Can you hand me that for a second?  I
4  just want to take a closer look at the photograph.
5  Thank you.  Does this depict the front door of the
6  residence in this photograph?
7      A    I believe so, yes.
8      Q    Do you recall at what point relative to
9  the search you took this photograph, was it before,
10 during, or after?
11     A    I believe this was after the search was
12 conducted.  Again it was just basically to
13 photograph the fact that there were keys that worked
14 and I even -- this is actually my hand and that the
15 key turned the lock.  I believe that was my purpose
16 in showing it.
17     Q    That's fine.  Just for the record, you
18 were just pointing to the photograph that's marked
19 FCRL 1299?
20     A    1299 and 12 -- I was pointing at both of
21 them, but yes, referring to my hand, 1299.
22     Q    That's what I meant, thanks.  So far,
23 were you -- the pictures that we looked at so far,
24 did you take all of the pictures we looked at so
25 far?

Page 100

1      A    I believe so, yes.
2      Q    I think we can look at the next picture,
3  please.
4      A    The next one.
5      Q    FCRL 1300.  Do you recall what this
6  picture depicts?
7      A    Yeah.  This is plastic bag -- clear
8  plastic bags that were discovered I believe on the
9  second floor, the upstairs of the house, in the
10 approximate condition that it was discovered.
11     Q    Do you recall which officer discovered
12 those items?
13     A    Without referring to my report, not
14 exactly, no.
15     Q    Do you recall where exactly those items
16 were discovered?  You said second floor, but I --
17     A    I believe it was on a table on the second
18 floor.
19     Q    Do you recall which room?
20     A    I don't remember.
21     Q    Or which table?
22     A    Not without referring to the reports.
23     Q    Was this -- this was taken during the
24 search, this photo?
25     A    Yes.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
101–104

Page 101

1    Q    If we can look at the next one.  What was
2    the purpose of this photograph, of the warrant?
3    A    Basically, by Chicago Police Department
4    general orders, one of the photographs has to be of
5    the warrant that was actually left behind.  So this
6    would have been one of the last photographs I
7    probably took and this was the warrant that is left
8    behind for the residents to keep.
9    Q    Okay, got it.  Can you take a look at the
10   next one?
11   A    Yes.
12   Q    Do you recognize this picture as being
13   the -- as depicting the front of the residence?
14   A    Yes.
15   Q    For the record, it's FCRL -- we're
16   referring to FCRL 1302.  The photograph depicting
17   the warrant that we were just discussing is marked
18   FCRL 1301?
19        MR. BATTLE:  Agreed.
20   BY MR. HOFELD:
21   Q    Do you remember if this photo of the
22   front of residence was taken before, during, or
23   after the warrant was executed, the search warrant
24   for the home?
25   A    I don't -- based on the photograph itself,

Page 102

1    I don't know at what point exactly this photograph
2    was taken.
3    Q    Next photograph, FCRL 1303.  Can you tell
4    when this photograph was taken relative to the
5    execution of the search warrant in the house?
6    A    To the best of my memory, this appears to
7    be the bedroom on the first floor, ground floor, and
8    I believe it's pre-search photograph, based on the
9    condition of the room.
10   Q    Let me ask about the very next one, FCRL
11   1304.  From looking at the photograph, can you tell
12   whether this photograph was taken before, during,
13   or after the search warrant was executed inside the
14   house?
15   A    I'm only going to guess and this is not
16   100-percent sure.  This is a pre-search photograph
17   and I'm only guessing that because these packages
18   are perfectly stacked on each other and that's the
19   only reasons why I'm saying that.
20   Q    Fair enough.  The next one, was this
21   photograph taken pre-search, post-search, or during
22   the search, can you tell?
23   A    I can't tell based on the photograph
24   itself if this was pre or post.
25   Q    The same question with respect to this

Page 103

1    photograph which is FCRL 1306?
2    A    No.  I can't tell if this is pre or
3    post-search of the residence.
4    Q    Do you recognize which level of the house
5    that is or that was?
6    A    Not 100 percent, no.  And this area is so
7    dark, you can't really tell what's what.
8    Q    Yes.
9    A    It's not a very good picture so --
10   Q    That's okay.  The next one, FCRL 1307.
11   Are you able to tell whether that photograph was
12   taken before, during, or after the search warrant
13   was executed inside the house?
14   A    Yeah.  I think this is a post-search
15   photograph of that room itself.
16   Q    Do you know which room that is or could
17   you tell me with reference to the floor plan, the
18   diagram?
19   A    Through the diagram?
20   Q    Yes.  If you need to look at it in order
21   to answer the question, feel free.  Here's
22   Simmons 19?
23   A    I believe it's this bedroom right here.
24   Q    For the record, let's see.  There are two
25   bedrooms on Simmons 19, depicted on Simmons 19, and

Page 104

1    you're referring to the one that's closest to the
2    bottom of the page?
3    A    To the right and closest to the bottom,
4    yeah.  I think this direction would be north, this
5    is the north side of the house.  So first floor,
6    further most north bedroom.
7    Q    Okay, that's great.  Just ask you how
8    about this -- the bedroom that's depicted on
9    photograph 1305, FCRL 1305, do you recognize which
10   bedroom this is or --
11   A    No.  The wallpaper looks very similar, but
12   I want to say it's this bedroom, but I'm not
13   100-percent sure about that.
14   Q    You want to say it's --
15   A    The second bedroom on the first floor, the
16   south bedroom, the south side of the residence.
17   Q    Sure.  Does this appear -- does this FCRL
18   1303, does that appear to be --
19   A    That appears to be the same.
20   Q    The same bedroom or another bedroom?
21   A    I think they're two separate bedrooms, but
22   I don't -- I think they're two separate bedrooms,
23   but I'm not 100 percent on that.
24   Q    FCRL 1303 and FCRL 1305 you think show
25   different bedrooms?



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
105–108

Page 105

1    A    Yes.
2    Q    How about -- can you look at the floor
3  plan and tell me which bedroom this photograph was
4  taken on, is that -- and for the record, FCRL 1304
5  is the photograph?
6    A    I don't remember which bedroom that was.
7  Obviously it's -- I would -- the child's bedroom,
8  but I don't remember exactly.
9    Q    You don't remember where the child's
10 bedroom was?
11   A    Yes.
12   Q    Do you remember if it was on the first
13 floor or the second floor.
14   A    I don't remember.  I'm sorry.
15   Q    Okay, that's fine.
16   A    I don't believe it was on the second floor
17 but --
18   Q    What makes you say that?
19   A    Just my memory, recollection of the second
20 floor.  It didn't look like it was lived in, if that
21 makes sense very much.  So -- and I don't remember
22 her -- you know, I don't remember the basement
23 having a bedroom so --
24   Q    Okay.
25   A    I mean it's just my lack of memory of

Page 106

1  knowing exactly which bedroom is which.
2    Q    Sure.  Officer, how were you dressed that
3  day when you were at the house?
4    A    Plain clothes.
5    Q    When you say plain clothes, jeans?
6    A    I don't remember.
7    Q    Khakis or --
8    A    I usually like to wear cargo pants, but I
9  mean every once in a while I wear jeans.  I don't
10 remember exactly for sure.
11   Q    Would it be fair to say they were cargo
12 pants or jeans, one or the other?
13   A    Yes.
14   Q    Did you have on a T-shirt of some kind?
15   A    Probably.
16   Q    White, black?
17   A    I don't remember.
18   Q    What color or colors did you often wear
19 when you were conducting -- when you were executing
20 search warrants in 2015?
21   A    I just -- you know, like I said, jeans or
22 probably cargo pants, T-shirt or sweatshirt,
23 depending on the weather and then the black vest
24 carrier that held equipment and my safety vest.
25   Q    Were you wearing a bulletproof vest?

Page 107

1    A    Yes.
2    Q    Was any part of it visible?
3    A    The carrier was.
4    Q    Is it black?
5    A    Yes.
6    Q    And the black -- is it a black vest that
7  goes over the bulletproof vest?
8    A    It's what we call a carrier.  So the
9  bulletproof vest is actually two separate Kevlar
10 panels that are held on your body by what we call a
11 carrier.  Mine was black.  I believe I've had a
12 black carrier for most of my career and it also has
13 equipment and also the significations of Chicago
14 police on it.
15   Q    On the front?
16   A    And also on the back.  We started going to
17 the back signification at one point in time.  I
18 don't remember when that was.
19   Q    Okay, sure.  Were you wearing a hat of
20 any kind?
21   A    I don't remember.
22   Q    Was it your custom or practice to wear a
23 hat when you were executing search warrants in
24 2013?
25   A    Sometimes I would, sometimes wouldn't.

Page 108

1    Q    When you would what kind of hat?  Was it
2  a baseball cap or some other kind?
3    A    Sometimes.  Depending on the weather.
4    Q    Sure.  When you saw the older female in
5  the front room and then you remained in the front
6  room for most of the search, was she -- was the
7  older female refusing to follow any officer's
8  instructions?
9    A    If she did it was just very minimal.
10 Maybe she was asked to sit down and she didn't sit
11 down.  I mean that would be the extreme extent of
12 it.
13   Q    Did the child refuse to follow any
14 officer instructions?
15   A    I don't remember any officer giving the
16 child any type of instructions.
17   Q    Do you recall Mr. Simmons, Keith Simmons
18 coming home at some point, arriving at the house?
19   A    I do.
20   Q    Coming in from the outside?
21   A    Yes.
22   Q    Where were you?  Were you in the front
23 room when he came in?
24   A    I don't remember.  I might have been
25 photographing and recovering evidence at that point



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
109–112

Page 109

1 in time. Because the way I remember it is basically
2 coming to the front room and seeing him there.
3     Q   Do you remember talking with him?
4     A   I did, yes.
5     Q   Do you remember anything you said to him
6 or anything he said to you?
7     A   I believe Sgt. Kinnane and Officer O'Keefe
8 were talking to him. They did most of the talking
9 and I -- I remember brief things that I said or
10 asked him, yes.
11     Q   Can you tell me what those are?
12     A   They were in reference to the weapons that
13 were found. I remember him stating that they were
14 his and then I remember the conversation -- and I
15 don't remember if I asked this or Sgt. Kinnane or
16 Officer O'Keefe, are they registered or do you have
17 a firearm owners identification card and I believe
18 at that point he could not produce a FOID card, and
19 he also stated that they were not registered with
20 the city.
21     Q   They were not registered with the city?
22     A   Yes.
23     Q   Officer Wrigley, do you recall remarking
24 to any of the plaintiffs while you were in the
25 house that they had a lot of spiderwebs in the

Page 110

1 basement?
2     A   No, I don't remember saying that. I don't
3 remember anyone else saying that either.
4     Q   Do you recall searching the ceiling on
5 any of the floors?
6     A   I don't know.
7     Q   Do you recall searching in the closets?
8     A   I don't recall.
9     Q   Do you recall knocking a TV over?
10     A   No.
11     Q   Unintentionally or otherwise, do you
12 recall damaging any part of the house or any
13 personal property in the house during the course of
14 the search?
15     A   No.
16     Q   Do you recall damaging any doors?
17     A   Any doors?
18     Q   Yes.
19     A   No.
20     Q   Do you recall damaging any tables?
21     A   No.
22     Q   Do you recall damaging any chairs?
23     A   No.
24     Q   Do you recall damaging a desk?
25     A   No.

Page 111

1     Q   Do you recall damaging a headboard of a
2 bedframe?
3     A   No.
4     Q   Do you recall damaging a mattress?
5     A   No.
6     Q   Or a box spring mattress?
7     A   No.
8     Q   Or a stereo of any kind?
9     A   No.
10     Q   Or a radio?
11     A   No.
12     Q   Or a flat-screen TV?
13     A   No.
14     Q   Or any other property?
15     A   I don't remember any property being
16 damaged at all or any complaints of any property
17 being damaged.
18     Q   Do you recall damaging toys, children's
19 toys?
20     A   I'm sorry. You said toys?
21     Q   Yes.
22     A   No.
23     Q   Do you recall damaging an iPad?
24     A   No.
25     Q   Do you recall seeing any other officers

Page 112

1 damage any part of the house or any personal
2 property, including any of the specific items that
3 I mentioned?
4     A   No.
5     Q   Was there also like a digital metric
6 scale found in the house? Do you have any
7 recollection of that?
8     A   I believe so, yes.
9     Q   Did you personally find it?
10     A   Did I personally find it?
11     Q   Yes.
12     A   No, I didn't discover it.
13     Q   Do you know which officer discovered
14 that?
15     A   I think it was discovered with the
16 packaging, but again without referring to the report
17 I don't remember which officer it was, to be
18 completely 100-percent sure.
19     Q   During the course of the search, I
20 understand you didn't do a lot of searching or you
21 don't remember doing any searching, do you recall
22 finding U.S. currency at any point inside the
23 house?
24     A   No.
25     Q   Do you recall any officer telling you



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
113—116

Page 113

1  that they had found U.S. currency inside the house?
2    A    No.
3    Q    Do you recall inventorying any U.S.
4  currency?
5    A    Not from within the house and I don't
6  think we even inventoried -- the target was found
7  with U.S currency outside the house, but I don't
8  even think we inventoried that.
9    Q    What about was there any U.S. currency
10  found inside the silver purse that you recall?
11    A    Not that I recall.
12    Q    Or on the person of Aretha Simmons?
13    A    I don't remember.
14    Q    Do you recall during the course of the
15  search finding a bracelet or any rings or a gold
16  chain?
17    A    I didn't, no.
18    Q    None of the above?
19    A    None of the above.
20    Q    Do you recall any other -- do you recall
21  seeing or having knowledge that any officer
22  conducting the search found any of those items?
23    A    No.
24    Q    Do you recall having knowledge that any
25  other officer conducting any part of the search

Page 114

1  found U.S. currency?
2    A    No.
3    Q    Officer Wrigley, do you have any other
4  recollections of events or conversations from the
5  execution of the search warrant at 930 North
6  Keystone that you haven't already testified about?
7      MR. BATTLE:  Objection, vague and very
8    broad.  Go ahead and answer if you can.
9      THE WITNESS:  You're talking about the
10    totality of the entire circumstances?
11  BY MR. HOFELD:
12    Q    Yes, I am.
13    A    I do have other recollections of things we
14  did, yes.
15    Q    Can you share with me what those are?
16    A    They would be in relation to the target
17  himself.
18    Q    How about do you have recollections
19  involving any of the plaintiffs that you haven't
20  already testified about?
21    A    Again without hearing some type of
22  specific question to refresh that recollection, I'm
23  sure it exists.  It's just not prodded with a
24  question I guess.
25    Q    Do you have any recollection of anything

Page 115

1  that any plaintiff said to you that you haven't
2  already testified about?
3    A    Said to me personally?
4    Q    Yes.
5    A    I remember the father saying something to
6  the target about his character and that's about it.
7    Q    What do you recall him saying to you?
8    A    That he knew he was no good.
9    Q    Do you have any recollection of yourself
10  saying anything to any of the plaintiffs that you
11  haven't already alluded to?
12    A    No.  I mean that's just -- in that form of
13  that question specifically, no.  I -- I can't think
14  of anything else.
15    Q    Have you ever fired your gun at a person
16  while on duty as a Chicago police officer?
17    A    Yes.
18    Q    On how many occasions have you fired your
19  gun at a person while on duty as a Chicago police
20  officer?
21    A    One time.
22    Q    When was that?
23    A    February 21st, 2005.
24    Q    Can you tell me what happened on that
25  date?

Page 116

1    A    Generally speaking?
2    Q    Yes.
3    A    We were -- my partner and I conducted a
4  traffic stop investigation.  The subject was armed
5  with a firearm.  He began to fight.  Upon -- at one
6  point of the investigation he produced his firearm
7  with his right hand, fired several shots at my
8  direction, striking me twice, and I returned fire.
9    Q    I'm sorry.  What happened to the subject?
10  Did you strike the subject?
11    A    I shot.  Another two officers shot at him
12  too.  He was struck multiple times and the threat
13  ended and he was taken into custody and
14  hospitalized.
15    Q    Do you remember the approximate age of
16  this individual?
17    A    I believe he was in the his forties at the
18  time of the incident.
19    Q    Did he survive?
20    A    He did.
21    Q    Was he in the vehicle or outside of the
22  vehicle when he drew out the firearm?
23    A    He was outside the vehicle.
24    Q    Did you at any time on August 29, 2013
25  notice that Aretha Simmons' eye was bloodshot,



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
117–120

Page 117

1   red and or swollen?
2       A   I did, yes.
3       Q   When did you notice that?  When was the
4   first time you noticed that?
5       A   It was shortly after coming into contact
6   with her.  It may have been a time when I was with
7   her on the front porch.
8       Q   Was that before or after the handcuffs
9   had been placed on her?
10      A   It may have been after the handicuffs were
11  on her.
12      Q   Was that before or after -- was that
13  before or after you brought her into the house?
14      A   I think it was before.
15      Q   Was that before or after other officers
16  entered the house to execute the warrant and you
17  hung back for a few minutes?
18      A   It might have been around that same time
19  period.
20      Q   Did you ask her about -- did you ever ask
21  her about the eye injury?
22      A   I did.
23      Q   What do you recall her saying, if
24  anything?
25      A   I think I asked her is your eye okay or

Page 118

1   something along the lines.  She said yes.  I may
2   have asked her what happened or heard someone else
3   ask her what happened and she stated she got into a
4   fight with some girls.
5       Q   With some girls?
6       A   Yes.
7       Q   Did she say which girls she got into a
8   fight with?
9       A   If she did I don't remember.
10      Q   Did she say when she got into the fight?
11      A   The way I remember -- my recollection
12  is -- the impression I got, it was a few days before
13  the search warrant incident, but I may be wrong
14  about that.
15      Q   Did she say where the fight took place?
16      A   If she did I don't remember.
17      Q   Did she provide any details about the
18  fight, if you recall?
19      A   If she did I don't remember.
20      Q   Officer Wrigley, in 2013 do you recall
21  there being any CPS policy regarding --
22      MR. BATTLE:  Do you mean CPD?
23      MR. HOFELD:  Yes, thank you.  Let me start
24  again.
25

Page 119

1   BY MR. HOFELD:
2       Q   Do you recall there being in 2013 any CPD
3   policy regarding the use of force against minors?
4       MR. DIXON:  I object.  Just as a standing
5   objection for the record so I don't have to
6   interrupt, but the witness has not been
7   designated as an individual with knowledge of
8   particular official policies or practices and
9   he's not been designated as an expert either.
10      MR. BATTLE:  I'll join in the objection.
11      MR. HOFELD:  Sure.  And for the record,
12  let me be very clear that I'm asking the
13  witness about his personal knowledge and
14  nothing else and he's competent to testify as
15  to his personal knowledge of CPD policies
16  during the time that he's been a Chicago police
17  officer.
18      MR. DIXON:  So noted for the record.
19      MR. HOFELD:  And I acknowledge your
20  standing objection.  Do you want the court
21  reporter to read back the question or do you
22  want me to --
23      THE WITNESS:  Sure.  Or you can do it.
24      MR. HOFELD:  I don't know if I can
25  remember the question.

Page 120

1       (Record read.)
2       MR. BATTLE:  You can go ahead and answer
3   now.
4   BY MR. HOFELD:
5       Q   Let me just say and maybe this will help
6   you, let me just clarify.  When I say policy, I
7   mean any general order, special order, directive,
8   notices, rule, handbook, or regulations?
9       A   I don't remember seeing anything written
10  in regards to the exact wordage in relation to
11  minors in the use of force policy.  My understanding
12  of the use of force policy is in relation and in
13  regards to a threat level and immediate threats to
14  officers.
15      Q   Let me ask you this.  Do you recall
16  whether in 2013 there was any CPD policy to the
17  effect that one should avoid using force against
18  minors?
19      A   Again the policy as I understand it in
20  2013 and present day is in relation to a level of
21  threat and the response that is appropriate to that
22  level of threat.  I don't remember any exact wordage
23  as it applies to the word minor or inference of
24  minor.  Only to a level of threat and an appropriate
25  response of that threat.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
121–124

Page 121

1    Q   Understood, thank you.  Do you recall
2  any -- in the CPD use of force policy, do you
3  remember ever seeing any reference to children or
4  young children?
5    A   Not in those exact words.  Again it's my
6  understanding and my recollection that the use of
7  force policy only refers to a threat level and a
8  response that's appropriate to that threat level,
9  and the escalation of the threats and force that's
10  related to the threat.
11    Q   Similarly let me ask you.  Do you recall
12  any CPD policy as of 2013 that stated that an
13  officer should avoid using force against an adult
14  in the presence of that adult's young child or
15  young children?
16    A   I don't recall any type of exact wordage
17  as it refers to children and adult.  I only recall
18  and recollect use of force should be used as
19  appropriate to the threat level that's presented to
20  the officer.
21    Q   In 2013 was there a CPD policy regarding
22  the proper use or display of a weapon?
23    MR. BATTLE:  Do you understand the
24    question?
25    THE WITNESS:  I do.  I believe the

Page 122

1  question's a little broad to answer correctly.
2  I believe that the use of force policy mandates
3  proper use of a weapon as it relates to the
4  threat level, be it implied or specifically
5  stated.  That's how I understand the policy as
6  it was written in 2013 and now.
7  BY MR. HOFELD:
8    Q   How about if I asked you about the policy
9  prior to 2013, would you give the same answer?
10    A   I would.
11    Q   Tell me if I'm paraphrasing your answer
12  correctly or not.  Are you saying, in effect, that
13  an officer under CPD policy in 2013, it was proper
14  to display a weapon if the act of displaying the
15  weapon was equal to the level of threat presented
16  by the suspect or the offender?
17    A   You're correct in paraphrasing part of my
18  answer.  Another part of my answer was the question
19  I believe was too broad and the reason why is
20  because you also went to the paradigm of tactics and
21  proper tactics when doing police work, such as in
22  this specific case entering a house, that there was
23  going to be a danger of a weapon.  So it's a very
24  complicated question, what you're asking, that also
25  dictates a complicated answer.

Page 123

1    Q   Fair enough, I appreciate that.  Let me
2  ask you this about the specific scenario that you
3  and your team faced on August 29th, 2013, when you
4  contemplated entering and then entered 930 North
5  Keystone.  Knowing what you knew then about the
6  target and the threat level and so on, in that
7  circumstance, would it have been appropriate to
8  enter the residence at 930 North Keystone, would it
9  have been appropriate for officers to enter the
10  residence with guns drawn?
11    A   You're asking my personal belief or what I
12  believe?
13    Q   Yes.  I'm asking for your understanding
14  or belief based on your knowledge of CPD policy in
15  2013?
16    A   Based on the perceived threat level of a
17  firearm that was -- that we had that day and based
18  on the fact that we recovered a firearm before
19  entering the house, I believe personally and I
20  believe that it was appropriate that the officers
21  used the tactic of having a weapon at what I would
22  call ready stance entering the house.
23    Q   What do you mean by that, ready stance?
24    A   That could mean anywhere between having
25  your gun -- having your hand on your gun while

Page 124

1  holstered, to the point where it was un-holstered
2  and pointed in what I would consider a 45-degree
3  angle at the ready position.
4    Q   I'm sorry.  A 45 degree angle with
5  respect to what reference point?
6    A   To the plane of the officer standing and
7  the horizontal floor.
8    Q   You mean pointing the weapon out like
9  this?
10    A   At a 45-degree angle down.
11    Q   Pointing the weapon toward the ground?
12    A   That would be my personal opinion on that,
13  yes.  And that's probably my range of officer
14  training coming out on there.
15    Q   That's fine.
16    MR. HOFELD:  Officer Wrigley should be one
17    of your 30(b)(6) witnesses.
18  BY MR. HOFELD:
19    Q   I need to ask you about some CRs that
20  have been produced in discovery in this case.
21    MR. HOFELD:  Do you want to take a break?
22    I know this is -- whatever you want to do?
23    THE WITNESS:  Do you mind?  My wife just
24    called.
25    MR. HOFELD:  No, not at all.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
125–128

Page 125

1      (Recess.)
2  BY MR. HOFELD:
3      Q    Officer Wrigley, let me ask you, have you
4  ever been designated as a corporate witness on
5  behalf of the city of Chicago or the Chicago Police
6  Department?
7      A    I have not, no.
8      Q    Or a 30(b)(6) witness?
9      A    I'm sorry.  I don't even know what that
10  is.
11      Q    That's fine.  If you don't know, I think
12  that answers my question.  Have you ever testified
13  for or on behalf of the city of Chicago at any
14  time, apart from -- and I want to be clear.  I mean
15  apart from in your role as a Chicago police
16  officer, where you're testifying about specific
17  arrests or evidence or incident that you had some
18  involvement in or connection with?
19      MR. BATTLE:  Let me object to the form of
20      the question.  Do you understand where he's
21      going with that?
22      THE WITNESS:  Yes.
23      MR. BATTLE:  Okay.  Go ahead.
24      THE WITNESS:  I've never -- they've never
25      designated me as a witness on their behalf.

Page 126

1  BY MR. HOFELD:
2      Q    I want to direct your attention to
3  Exhibit 1 and within Exhibit 1 let me direct your
4  attention to Simmons 37?
5      A    Is that the page number?
6      Q    Yes, through Simmons 41?
7      A    Okay.
8      Q    Is this a document that you recognize?
9      A    It is.
10      Q    Have you reviewed this specific Area Four
11  Gun Team supplementary report before?
12      A    I have before this.
13      Q    Yes, you have?
14      A    I have reviewed it on occasion before this
15  date.  Is that your question?
16      Q    Yes, it is.  This particular report
17  not -- yeah, this particular report that relates to
18  Alonzo McFadden and Aretha Simmons?
19      A    Yes.
20      Q    Did you author any part of this report?
21      A    Up to 41, right?  That's what you're
22  saying, 37 through 41?
23      Q    Yes, that's my understanding of the pages
24  that constitute the report?
25      A    My answer is no.

Page 127

1      Q    Let me direct your attention to Simmons
2  40, just page four of five of the report.  Are you
3  there?
4      A    Yes.
5      Q    And then the last paragraph, let's see,
6  one, two, three, four?
7      A    The paragraph starting everything with
8  both offenders?
9      Q    Yes, that paragraph and I think it's the
10  fourth sentence, McFadden then allowed PO Wrigley
11  access to his cellular phone by giving him the code
12  to unlock the keys.  Upon unlocking the keys,
13  Wrigley found that there were photographs showing
14  offender McFadden seated on a chair on the porch of
15  the residence located at 930 North Keystone.  One
16  of the photographs also showed him being hugged by
17  Emily Simmons, Aretha Simmons' mother, and then
18  there's a quotation from Mr. McFadden?
19      A    Yes.
20      Q    A couple of questions about this.  First,
21  did you inventory -- well, did you take possession
22  of and inventory Mr. McFadden's cell phone that's
23  referred to here?
24      A    It was, yes.
25      Q    Did you take any photographs -- strike

Page 128

1  that.  Did you save the photographs or images of
2  the photographs that you viewed on his phone
3  showing Mr. McFadden being hugged by Emily Simmons?
4      A    I don't -- I don't remember if those
5  images were saved or not.
6      Q    Or the image of him sitting on the front
7  porch.  Do you know if that image was saved in any
8  form?
9      A    The same answer.  I don't remember if that
10  image was saved or not.
11      Q    Do you know what became of the cell phone
12  after it was inventoried?
13      A    I don't.  I don't know if it was
14  inventoried as evidence or personal property and
15  then later returned to him or not and I have to take
16  a look at the inventory to find that out.
17      Q    Why do you think Mr. McFadden, who is in
18  custody at this point, voluntarily allowed you to
19  access his cell phone by giving you the code to
20  unlock it?
21      A    You want my personal opinion of why I
22  think he did that?
23      Q    Did he say why?
24      A    No.  I think he just -- in my opinion I
25  think he just wanted to give the impression that he



Page 129

1   was being cooperative at the very least.
2       Q    Maybe we should look briefly at some of
3   the inventories since -- see what we got here?
4       A    Are they part of this package too?
5       Q    I think so, Officer. I'm looking
6   through, I believe they are.
7       A    You know what? I got it.
8       Q    Maybe starting at Simmons 55 and
9   following?
10      A    Okay.
11      Q    We should go first maybe to -- maybe we
12  should look at Simmons 49 first, Simmons 49 and 50,
13  and you can let me know if you recognize this
14  document?
15      A    Okay.
16      Q    First of all, is this a type of document
17  that you recognize?
18      A    This is a -- how do I explain this. This
19  is a printout of inventories associated to the
20  record number of Henry William 429464. It's
21  produced -- in e-track it's produced -- you're able
22  to produce this document after everything has been
23  approved, completed, thereof.
24      Q    Got it. Is this a complete list of all
25  the items that were inventoried in connection with

Page 130

1   the search of 930 North Keystone?
2       A    It appears to be a list of everything I
3   can remember.
4       Q    Okay, that's fair. Would this
5   typically -- I mean maybe I should ask it this way.
6   Would this particular form that's generated after
7   everything's inventoried, would this typically be a
8   complete list?
9       A    I mean --
10      Q    Or no?
11      A    Well, I'm just basing it -- I'm assuming
12  that this search to produce this list was done on
13  the RD number which was Henry William 429464.
14      Q    I'm sorry. For the record, where are you
15  looking?
16      A    On the top of the page, on page 49. You
17  see incident number, record division number, Henry
18  William?
19      Q    Yes, I do.
20      A    That was the number that was entered to
21  produce this list and I am going to make the
22  assumption that it would give you a complete list of
23  every inventory that's associated with that RD
24  number, if the system works the way it's supposed to
25  work.

Page 131

1       Q    Okay, sure. Now can you turn to Simmons
2   55 and following. I guess we're talking about
3   Simmons 55 through Simmons 60 -- no. Sorry, hold
4   on. I jumped the gun. Simmons 59 -- 55 through
5   59.
6       A    Okay.
7       Q    Are these inventory sheets that you
8   completed after you took possession of items
9   recovered at the property address?
10      A    The inventories on the pages you refer to,
11  they do appear to be inventories that I --
12  inventory -- how do I say this. Records that I
13  produced using the clear system, yes. And it's a
14  printout of the information that I entered into the
15  computer system.
16      Q    The first one, Simmons 55?
17      A    Okay.
18      Q    Describes an orange colored purse and
19  contents. Do you know where or from whom that was
20  recovered?
21      A    That was -- if I remember right, this
22  was -- hang on just a second. I'm sorry. This was
23  personal property that Aretha Simmons wanted to take
24  with her. It's inventory that's personal property,
25  not as evidence.

Page 132

1       Q    Got it. I don't think I have any other
2   questions about the inventory sheets. Thank you.
3           MR. HOFELD: Can we mark the CR and the
4   complaint.
5           MS. VAN DRIL: We're marking Officer
6   Wrigley's CRs which are Bates stamped FCRL 282
7   through 312, out of plaintiff's officer Exhibit
8   18. Here's a copy for the witness and counsel.
9   And I'm marking the group of lawsuits that were
10  brought against Officer Wrigley and other
11  Chicago police officers as plaintiff Exhibit
12  19. A copy for counsel.
13          (Exhibits 18 and 19 marked
14           for identification.)
15  BY MR. HOFELD:
16      Q    I'm going to ask you about the CRs at
17  this time and then I'll ask you about the
18  complaints next. I'm going to use the FCRL page
19  numbers on the bottom right to direct your
20  attention, and let me first tell you that these
21  face sheets for CRs, that is the ones that are
22  collected in this exhibit number 18. These are
23  face sheets that were produced in this lawsuit by
24  the city of Chicago to the plaintiffs with the
25  representation that you are the accused officer or



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
133–136

Page 133

1 one of the accused officers in connection with each
2 CR here. Let me just -- let me refer your
3 attention first to FCRL 282. It's a face sheet for
4 an incident for a CR arising out of an incident
5 taking place on or about November 10th, 2006, at
6 232 South Racine, apparently a police facility
7 parking lot. The substance of this complaint is
8 that the accused, yourself, failed to secure his
9 weapon and that his weapon was taken from his
10 vehicle. Is this an incident that you recall?
11    A   Yes.
12    Q   Taking place on or about that date at
13 that location?
14    A   Yes.
15    Q   Can you tell me briefly what occurred?
16    A   My revolver, five-shot revolver, was taken
17 out of my car. Someone broke into it and took it
18 out of my car. I reported it stolen and, therefore,
19 they started a CR number.
20    Q   Who initiated the CR? I see Sgt. Michael
21 Rigoli?
22    A   So the incident occurred in the 12th
23 District and the report was made in the 12th
24 District. That's why you see police facility
25 parking lot, and I believe that was the sergeant who

Page 134

1 was the desk sergeant that night or something.
2    Q   Let's look at FCRL 284. A face sheet for
3 a CR arising -- for a CR where the complainant was
4 a Michael Smith and this is arising from an
5 incident on or about February 5th, 2007, unknown
6 location. Mr. Smith alleged in a letter that
7 Officers Olson, Wrigley, and Sarabia stopped and
8 detained him on what they said was a traffic stop.
9 He alleges that one of the officers ran a check on
10 the vehicle he was driving and told him that the
11 license plate didn't match the vehicle. That the
12 accused officers asked him for a gun or a drug spot
13 and when he was not able to do either, the
14 complainant alleges that the accused officers
15 staged a drug case on him. My first question is do
16 you recall being present for a stop of Mr. Michael
17 Smith on or about February 5th, 2007?
18    A   I remember the case, yes.
19    Q   What do you recall occurring?
20    A   Just briefly, it was a narcotics arrest,
21 where he was arrested for selling narcotics.
22    Q   So you deny his allegation that you and
23 other officers staged a drug case on him, is that
24 correct?
25    A   Yes, I deny that.

Page 135

1    Q   Let me direct your attention to FCRL 286,
2 a face sheet for a complaint by a Darlene Jones
3 based on an incident on or about December 27, 2007
4 at 1966 South Trumble Avenue in Chicago. The
5 allegation is that officer or officers planted
6 drugs on the victim. First, do you recall an
7 incident on or about this date when you were
8 present at 1966 South Trumble Avenue in Chicago?
9    A   I don't. I don't recall this incident.
10    Q   I assume that you also deny planting
11 drugs on this person?
12    A   Yes. I deny planting drugs on a person.
13    Q   Sure. Can we go to FCRL 288 which is a
14 face sheet for a complaint by a Francisa Clemons,
15 arising from an incident on or about July 27th,
16 2008 that took place at 3661 West Ogden, second
17 floor apartment, in Chicago. First of all, do you
18 recall being present for an incident that occurred
19 on or about that date at that address?
20    A   I'm sorry. I don't recall this incident.
21    Q   Is that because you have no personal
22 recollection or is that because you find that
23 you're not listed as an accused officer on this
24 particular face sheet?
25    A   Based on the information on this face

Page 136

1 sheet, I just don't recall this incident at all.
2 It's very little information. Basically it just
3 gives an address and a brief allegation.
4    Q   Right. This was a -- in July of 2008,
5 were you doing work in the 10th District?
6    A   July 2008 -- yes. I would have been in
7 the 10th District.
8    Q   Did you work in beat 1014 in July of
9 2008?
10    A   I believe in 2008 I was part of the
11 tactical team in the 10th District.
12    Q   Does that mean you did not work in beat
13 1014?
14    A   Well, I mean that means we worked all over
15 the district, wherever -- at the discretion of the
16 commander. As I stated previously, depending on
17 where the --
18    Q   The hotspots were?
19    A   Hotspots, yes. Thank you.
20    Q   You said all over the district. Would
21 that have included 1014, beat 1014?
22    A   It would have included that beat also,
23 yes.
24    Q   This complainant alleges that four
25 unknown male white plain clothes officers entered



Page 137

1  and searched her apartment without justification,
2  that one of the officers made her stand in the hall
3  and the other three ransacked her bedroom and
4  kitchen. That one of the officers yelled at her
5  13-year-old daughter, stating when you cry I get
6  suspicious, quote, unquote. I assume that you have
7  no recollection of any of those events, is that
8  correct?
9      A   I don't.
10     Q   I assume that you deny either -- I assume
11  that you deny doing or saying any of those things,
12  correct?
13     A   Yeah. I don't -- I don't remember doing
14  any of those things, no.
15     Q   Sure. And do you recall seeing any other
16  officers do or say any of those things?
17     A   I don't recall seeing anybody do or saying
18  any of those things.
19     Q   If I can direct your attention to FCRL
20  290, a face sheet for a complaint by a Debbie
21  Jackson, stemming from an incident on or about
22  April 15, 2010 at 1300 South Kedzie in Chicago. Do
23  you recall being present for any incident at that
24  address on or about that date?
25     A   No. I don't recall this incident either.

Page 138

1      Q   You were assigned to the 10th District at
2  this time?
3      A   I believe so, yes, still.
4      Q   I'm sorry?
5      A   Yes, I believe so.
6      Q   And were you sometimes assigned to beat
7  22 in April of 2010?
8      A   At times it was included in our area, yes.
9      Q   This person, this complainant, alleges
10  that the accused referred to her as, quote,
11  unquote, bitch, and stated something to the effect,
12  quote, unquote, "you ain't nothing," in the
13  presence of her nine-year-old son and six-year-old
14  daughter and that a cousin of the complainant was
15  falsely arrested for gambling. I assume that you
16  recall none of these events or statements, is that
17  correct?
18     A   I don't recall.
19     Q   You deny doing or saying any of these
20  things?
21     A   Yes.
22     Q   And you deny seeing any officer do or say
23  any of these things?
24     A   Yes.
25     Q   Can I direct your attention to FCRL 292,

Page 139

1  a face sheet for a complaint by a Pamela Herron,
2  stemming from an incident on or about August 5th,
3  2010 at 2261 South Springfield Avenue, second floor
4  apartment, in Chicago. Do you recall being present
5  at that address on or about that date for any
6  incident?
7      A   I'm sorry. I don't recall that incident
8  either.
9      Q   You were assigned to the 10th District at
10  this time, correct?
11     A   Yes.
12     Q   During August of 2010 did you sometime
13  patrol beat 1013?
14     A   Yes.
15     Q   The complainant alleges that the accused
16  officer or officers entered and searched her
17  residence without justification and that one of the
18  accused officers had his gun out. Do you have any
19  recollection of those events?
20     A   I do not, no.
21     Q   Do you deny that you did those things?
22     A   Yes.
23     Q   Do you deny that you observed any fellow
24  officer or officers doing those things?
25     A   Yes. I don't remember any of those.

Page 140

1      Q   Let's go to FCRL 294, a face sheet for a
2  CR by a Rubin Deavila, stemming from an incident
3  taking place on or about September 9, 2010 at 2407
4  South Drake Avenue, apartment -- first floor in
5  Chicago. Do you recall being present at that
6  address on or about that date for any incident that
7  took place?
8      A   I don't remember the incident.
9      Q   In September of 2010 you were assigned to
10  the 10th District?
11     A   Probably, yes.
12     Q   And patrolled beat 1024 at times?
13     A   That would have included one of the beats
14  in our area for sure.
15     Q   The allegation is that friends were -- a
16  few friends -- the complainant and friends and
17  relatives were sitting on their porch smoking
18  marijuana when officers approached with weapons
19  drawn and pointed. Officers handcuffed complainant
20  and his friend to the gate and entered and searched
21  their residence without a warrant and there's some
22  other -- there's a few other allegations here. Do
23  you recall any of these -- do you have any
24  recollection of any of these things occurring?
25     A   I don't.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

Page 141

1    Q    You deny that you did any of these
2  things?
3    A    I deny the allegations of any wrongdoing.
4  I don't remember the specifics of this case.
5    Q    Fair enough.  And you deny seeing any
6  other officer do any of these things, is that
7  correct?
8    A    That's correct.
9    Q    Look please at FCRL 296, a face sheet for
10  a complaint by a Cathy Franklin, arising from an
11  incident that took place on or about May 22, 2011,
12  at 3327 West Monroe, apartment second rear in
13  Chicago.  Do you recall being present at that
14  address on or about that date for any incident that
15  took place?
16    A    I don't recall the specifics of this
17  incident.
18    Q    You were assigned to district -- were you
19  assigned to District 11 in May of 2011?
20    A    I'm sorry?
21    Q    I'm sorry.  Were you assigned to district
22  eleven?
23    A    No.  This may have been once I was on the
24  gun team, either that or we were helping another
25  team out with a search warrant.  I'm only guessing,

Page 142

1  I don't know if that's true or not.  But, no, I was
2  never assigned to the 11th District at that point in
3  time.
4    Q    The allegation is that the accused
5  officer or officers entered her residence during a
6  birthday party, handcuffed male and female
7  relatives and damaged personal property during a
8  search.  Left a copy of a search warrant on the
9  plaintiff's refrigerator, stating that officers
10  were looking for a nephew who the complainant says
11  never resided with her, that accused officers
12  entered and searched her daughter's upstairs
13  apartment for which they did not have a search
14  warrant.  Do you recall any of those actions by
15  officers taking place?
16    A    I don't.
17    Q    Do you deny doing any of those things?
18    A    I deny any allegation of wrongdoing, but I
19  don't remember the specifics of this case.
20    Q    Do you deny seeing other officers do any
21  of these things?
22    A    No.
23    Q    You do deny that?
24    A    I do -- I'm sorry.  No, I don't remember
25  seeing any officers.

Page 143

1    Q    If you could turn to FCRL 298, a face
2  sheet for a complaint by a Jose Avila, stemming
3  from an incident taking place on or about June 16,
4  2011 at 1435 North Monitor Avenue in Chicago.  Do
5  you recall being present at that address on or
6  about that date for any incident that took place?
7    A    I don't remember the specifics about it,
8  no.
9    Q    This says it occurred -- the incident
10  occurred in District 25?
11    A    Yes.
12    Q    Were you -- did you work in District 25
13  in June of 2011?
14    A    No.  This is -- that's probably when I was
15  assigned to the Area Four Gun Team.
16    Q    I see.  The complaint is that accused
17  officers searched the residence without a warrant,
18  damaged his front door and his wife's bedroom set.
19  Accused officers removed $160 in United States
20  currency from his wife's purse and failed to
21  inventory or return it.  Do you have any
22  recollection of the events described here?
23    A    I don't, no.
24    Q    Do you deny doing any of these things?
25    A    I do, yes.

Page 144

1    Q    Do you deny that you saw other officers
2  do any of these things?
3    A    Yes, I do.
4    Q    Turn, please, to FCRL 300, face sheet for
5  a complaint by a Ron Nims, stemming from an
6  incident that took place August 27, 2011 at 1924
7  South Troy Street in Chicago.  Do you recall being
8  present at that address, apparently out in the
9  street, on or about that date for any incident that
10  occurred there?
11    A    I don't remember the specifics behind it.
12    Q    Were you assigned to district ten at that
13  point in time?
14    A    No.  This is -- I was on the gun team I
15  think.
16    Q    You were on the gun team --
17    A    Yes.
18    Q    As of August 2011.  The allegation here
19  is that the accused entered and searched the home
20  without justification, damaged drywall and cut the
21  lock off his bedroom door.  Do you recall any
22  incidents like that?
23    A    No, I don't recall that.
24    Q    Do you deny doing those things?
25    A    Yes.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
145–148

Page 145

1    Q    Do you deny seeing fellow officers do
2  those things?
3    A    Yes.
4    Q    Turn to FCRL 302, a face sheet for a
5  complaint by a Dwayne Shotwell, from an incident
6  taking place October 30th, 2011 at 1501 North
7  Laramie in Chicago, apparently out in the street.
8  Do you recall being present at that address on that
9  date for any incident that occurred?
10   A    I don't remember the specifics, no.
11   Q    This was -- apparently this incident
12  occurred in district twenty-five, beat 2533.  Would
13  this have been -- you were assigned to the gun team
14  at that point?
15   A    Yes.
16   Q    District twenty-five was within the area
17  that your gun team operated?
18   A    On occasion.
19   Q    The summary of the complaint here is that
20  the accused -- the complainant was stopped by the
21  accused officer or officers as he was driving and
22  stopped without justification.  Officers removed
23  him from his vehicle and an accused wearing a black
24  skull cap took him to the rear of the unmarked
25  police vehicles.  The reporting party also alleges

Page 146

1  this accused unzipped the reporting party's pants
2  and roughly searched his general area, causing
3  pain, and then released him.  Do you recall any of
4  these incidents described here?
5    A    No.
6    Q    Do you deny doing any of these things
7  described here?
8    A    Yes.
9    Q    You deny seeing other officers do any of
10  these things?
11   A    Yes.
12   Q    Let's go to FCRL 304, a face sheet for a
13  complaint by an Amy Burns for an incident dated
14  January 25th, 2012 at 2025 West Shakespeare Avenue,
15  apartment -- or coach house apartments in Chicago.
16  Do you recall being present at that address on that
17  date for any incident that occurred?
18   A    I do, yes.
19   Q    You do.  I'm sorry, you said you do?
20   A    Yes, I do remember this.
21   Q    What do you recall?
22   A    Just I remember being asked about this at
23  an investigation.  That's what I remember about it.
24   Q    Okay.  Do you recall what happened at the
25  address on the date in question?

Page 147

1    A    Not specifically.  I remember there was a
2  misunderstanding and I found out three years after
3  the fact she filed a complaint against me.  That's
4  basically what I remember from it.
5    Q    Okay, I see it.  She complained that she
6  dated you in the past and the dating relationship
7  ended and she told you to stay away from her
8  residence and on this particular date she saw you
9  outside her residence searching for a spare key I
10  guess is the claim.  Do you deny these allegations?
11   A    Yes.
12   Q    Let me ask you about FCRL 307 which is a
13  face sheet for a complaint by a Jermel Nash,
14  stemming from an incident dated June 27, 2012 at
15  4550 South Laporte Avenue in Chicago, apparently on
16  the sidewalk.  Do you recall an incident taking
17  place at that address on that date or do you recall
18  being present for an incident taking place on that
19  date at that address?
20   A    I don't remember the specifics behind it.
21   Q    Do you remember being there?
22   A    I remember doing search warrants in that
23  area, but I don't remember the specifics of being at
24  that address.
25   Q    The complaint is that the accused

Page 148

1  officers were unprofessional and, quote, unquote,
2  Klan members.  And that accused officers fabricated
3  an account of his arrest and arrested him without
4  justification.  Do you recall any of those things
5  occurring?
6    A    No, I don't recall those things occurring
7  and I deny being a Klan member.
8    Q    You deny that other officers said or did
9  those things?
10   A    Yes.  I deny that also.
11   Q    Finally, let me ask you about FCRL 312
12  which is a face sheet for a complaint by a Dorothy
13  Greenly.  The incident location was at 1046 North
14  Leclaire.
15   A    I'm sorry.  Which one is this?  Oh, okay.
16   Q    This is a face sheet for a complaint by a
17  Dorothy Greenly stemming from an incident on or
18  about November 30, 2004 at 1046 North Leclaire.  Do
19  you recall being present at that address on that
20  date for any incident that occurred?
21   A    Of 2004, I'm sorry.  I was trying to find
22  the year when this happened.  Is that date right?
23   Q    I'm looking at -- it says location of
24  incident and then --
25   A    I don't remember anything about this.



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
149–152

Page 149

1    Q   The complaint was that the -- that
2  several officers -- that she allowed several
3  officers into her residence looking for her
4  grandson and that she discovered $300 in currency,
5  U.S. currency, missing from her coat packet after
6  officers did the search.  Do you recall -- I assume
7  you deny taking $300 from this woman's house?
8    A   Yes.
9    Q   And that you deny seeing fellow officers
10 take $300 from this woman's house?
11   A   Yes.  I deny that.
12   Q   I need to ask you a few more questions
13 about the CRs, general questions.  Officer Wrigley,
14 have you ever had a sustained -- a finding of
15 sustained or profound against you in connection
16 with any civilian complaint filed with IPRA or OPS?
17   A   Yes.
18   Q   Can you tell me about that?
19   A   What do you want to know?
20   Q   Well, why don't you describe the incident
21 and the allegation and the complaint?
22   A   The two CR numbers that I had sustained
23 allegations on are -- actually the first two -- I'm
24 sorry.  Exhibit 19, am I referring to that?
25       MR. BATTLE:  Eighteen.

Page 150

1        THE WITNESS:  Okay.  The first one being
2    the accused failed to secure his weapon and
3    that his weapon was taken from his vehicle.
4    That was a sustained CR.
5  BY MR. HOFELD:
6    Q   That's FCRL 282?
7    A   Yes.
8    Q   What was the second one?
9    A   The second one was sustained -- I received
10 a sustained CR number in relation to log number
11 1005749 which is FCRL 000284.
12   Q   What was the particular finding that was
13 sustained?  What was the particular allegation or
14 finding that was sustained as to you?
15   A   For which one?  The first one or the
16 second?
17   Q   The second one?
18   A   The second one?
19   Q   Yes.  Thank you.
20   A   The second one was I believe the log
21 number was for unlawful arrest.  During the course
22 of investigation, IAD discovered that the vehicle
23 that we did not tow was a stolen vehicle and we did
24 not recover that vehicle.  So they found a sustained
25 CR number for I believe failure to act maybe and I

Page 151

1  could be completely wrong on that, for not towing
2  the vehicle.  However, on that -- the same CR number
3  for false arrest, that was either unfounded or not
4  sustained.
5    Q   Any other CRs that you're aware of where
6  there was a finding of sustained or founded as to
7  you?
8    A   Those are the only two.
9    Q   Have you ever been disciplined in any way
10 in connection with a CR filed against you?
11       MR. BATTLE:  Objection, asked and
12   answered.
13       MR. HOFELD:  The question is about
14   discipline.
15 BY MR. HOFELD:
16   Q   Have you ever been disciplined in any way
17 in connection with a CR filed against you?
18   A   I'm confused by the question.  Are
19 you -- specifically what do you -- do you want to
20 know what the specific discipline was?  I don't
21 understand the question I guess.  I'm sorry.
22   Q   That's okay.  The question is have you
23 ever been disciplined in connection with any CR,
24 including but not limited to the two we just
25 reviewed?

Page 152

1        MR. BATTLE:  The same objection.
2  BY MR. HOFELD:
3    Q   Where there was a finding of sustained?
4    A   There was a finding of sustained on two CV
5  numbers and I don't know, I guess the discipline was
6  days unpaid.
7    Q   For each one the discipline was unpaid
8  days?
9    A   That's correct.
10   Q   How many unpaid days?
11   A   I believe -- do you want for each one?
12   Q   Yes.
13   A   I believe the first one was one unpaid day
14 or two unpaid days and the second one was five
15 unpaid days.
16   Q   Those unpaid days, to the best of your
17 recollection, are the only form of discipline you
18 ever received in connection with any CR filed
19 against you, is that correct?
20   A   That's correct.
21   Q   Has any supervisor or superior of yours
22 ever reprimanded you in connection with any CR
23 filed against you?
24   A   No.
25   Q   Or warned you?



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
153–156

Page 153

1    A  No.

2    Q  Now we can take a look at the lawsuits,

3 civil, look at the complaints, Exhibit 19 in front

4 of you there.  I'm going to ask you about -- first,

5 I'm going to ask you about Reed versus Serabia and

6 Wrigley.  The allegation here -- well, first of

7 all, let me ask you -- well, the allegation by the

8 plaintiff here is that you and Officer Sarabia is

9 used excessive force against a plaintiff after

10 effectuating his arrest in 2007, and specifically

11 with respect to you it looks like the allegation

12 was -- I'm looking at paragraph 15, you struck the

13 plaintiff above the back of about the back of his

14 legs and above his body with a police baton while

15 standing on his back.  First of all, do you recall

16 any incident that occurred with Mr. Reed on or

17 about September 6th, 2007, in connection with his

18 arrest?

19    A  Just generally I recall it and most of it

20 is because we had to answer to this lawsuit.

21    Q  Generally, what occurred?  What took

22 place?

23    A  It was a narcotics arrest where we

24 recovered a firearm.

25    Q  Did you do any of the things that

Page 154

1 Mr. Reed alleges that you did?

2    A  No.

3    Q  In this complaint?

4    A  No.

5    Q  Did Officer Sarabia do any of the things

6 that Mr. Reed alleges in this complaint that he

7 did?  Did you see Officer Sarabia do any of those

8 things?

9    A  Just briefly looking at the complaint, no.

10    Q  If you recall, what was the outcome of

11 this lawsuit?

12    A  We were told that the city settled this, I

13 believe exact words for a very minimal amount, but I

14 don't remember what that amount was.

15    Q  Did you give a deposition in this case?

16    A  No.

17    Q  Do you recall signing an affidavit at any

18 time in connection with this case?

19    A  I don't remember.

20    Q  Let me ask you about Williams versus

21 Wrigley and others.  Mr. Williams' allegation was

22 that in this case, in this complaint, is that

23 officers approached and detained him when he was

24 returning to his car after visiting his girlfriend

25 at 58 South Artesian, that they arrested him,

Page 155

1 searched him without consent, then the officers

2 entered an apartment building located at 2443 West

3 58th Street, kicked in multiple doors there, found

4 guns and drugs, charged plaintiff with ten felony

5 criminal offenses for possession of the guns and

6 drugs and wrote false reports concerning the

7 circumstances that led to his arrest.  First of

8 all, do you recall any of the incidents in

9 connection with Mr. Emmanuel Williams?

10        MR. BATTLE:  Let me just object, for the

11    record, in that this is a pending litigation

12    matter, civil litigation.  To the extent any of

13    these questions are going to be asked that

14    would encroach upon Mr. Wrigley's attorney

15    client privilege, he will be asserting that

16    privilege.  But he is free to answer general

17    questions about the allegations such that were

18    just asked.  Go ahead.

19 BY MR. HOFELD:

20    Q  I'm not asking you about attorney client

21 communications.  I'm asking you what you recall

22 about the incidents that occurred or about

23 November 18, 2013?

24    A  Okay.

25    Q  Do you recall what occurred then?

Page 156

1    A  I remember the general -- the general

2 case, yes.

3    Q  What do you recall taking place on that

4 date?

5    A  It was a narcotics arrest where we

6 recovered weapons also.

7    Q  Did you do any of the things that

8 Mr. Williams alleges that you and other officers

9 did in this complaint?

10    A  No.

11    Q  Did you see other officers do any of the

12 things that Mr. Williams alleges in this complaint

13 that they did?

14    A  No.

15    Q  Have you given a deposition in this case?

16    A  No.

17    Q  Or signed an affidavit?

18    A  What do you mean -- I'm sorry.  I'm

19 confused.  An affidavit pertaining to what?

20    Q  Have you given any written statement in

21 the form of an affidavit in this case?

22    A  Oh, I'm sorry.  No, I haven't done that.

23    Q  Let my ask you about Howard Morgans case,

24 a high profile case in which Mr. Morgan alleged

25 that he was the subject of a traffic stop and



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
157–160

Page 157

1 arrested without cause, physically and forcefully
2 removed from his vehicle, dragged and tackled and
3 that defendant officers shot 20 to 24 rounds into
4 his body -- front, back, chest, abdomen, and
5 extremities. Let me ask you, first, can you tell
6 me briefly what happened with Mr. Morgan on
7 February 21st, 2005?
8     A    This is the incident I talked about
9 earlier about discharging my firearm, where I got
10 shot.
11     Q    I see, okay. Mr. Morgan was the driver
12 of the vehicle in the incident that you described
13 earlier?
14     A    Mr. Morgan, the one who shot me, yes.
15     Q    Okay, got it. What was the outcome of
16 this case, this civil case?
17     A    He was found guilty and sentenced to forty
18 years in prison.
19     Q    Mr. Morgan?
20     A    Yes.
21     Q    That's the criminal case?
22     A    This was dismissed in court.
23     Q    This case, the complaint we're looking
24 at?
25     A    After he was found guilty and sentenced to

Page 158

1 forty years it was dismissed.
2     Q    Did you give a deposition in this case?
3     A    I did not.
4     Q    Did you testify in the criminal case?
5     A    I did.
6     Q    Have you given a written statement in the
7 form of an affidavit or a declaration, either in
8 this case or in the criminal case against
9 Mr. Morgan?
10     A    No. Just -- no, I did not.
11     Q    Just oral testimony?
12     A    Just oral testimony, that's correct.
13     Q    Since becoming a Chicago police officer
14 in 2002, have you held any other part or full-time
15 jobs apart from your job as a Chicago police
16 officer?
17     A    Outside of -- I currently work at the FXW
18 school as a part-time security guard.
19     Q    FXW?
20     A    Frances Xavier Warde. The old St. Pat's
21 church on Desplaines.
22     Q    Are you employed by the school?
23     A    Yes.
24     Q    Or the --
25     A    It started out as a security company and

Page 159

1 then they wanted to get rid of the middleman so they
2 got rid of the security company and asked us to just
3 basically work beneath the general principal and
4 that's what I do now.
5     Q    Prior to that job as a security guard,
6 did you hold any other part or full-time employment
7 outside of the Chicago Police Department since
8 you've been a Chicago police officer?
9     A    No.
10     Q    How long have you been a security guard
11 with Frances --
12     A    Xavier Warde.
13     Q    What was the last part?
14     A    Warde. W-a-r-d-e.
15     Q    Thank you. How long have you been --
16     A    A little over a year now.
17     Q    To your knowledge, has anyone ever
18 complained about any of your conduct as a security
19 guard at the school?
20     A    No.
21     Q    You mentioned that you were a police
22 officer for the city of Edwardsville for about
23 three months?
24     A    Yes.
25     Q    Why so brief?

Page 160

1     A    I was actually waiting for the call from
2 the city of Collinsville and at the time I was in a
3 relationship with someone who lived on the -- I
4 don't know if you're familiar with St. Louis at all,
5 lived on the east side of the river. There's a very
6 distinct --
7     Q    In East Louis?
8     A    Well, in the suburbs -- East St. Louis is
9 a very small suburb and then there's Collinsville,
10 Edwardsville, Belleville. You know, there's all
11 kinds of suburbs on the east side --
12     Q    Right.
13     A    So the city of St. Louis didn't pay very
14 well and they were notorious in that area of not
15 paying very well and I sought employment in the
16 suburbs on the east side of the river and
17 Edwardsville and Collinsville was the -- the way
18 they ran their testing is there's five police
19 departments who come together and run one test and
20 they hire off the same list. So Edwardsville
21 actually called me first, and not knowing if
22 Collinsville would call me I took that job. But,
23 lo and behold, two or three months later
24 Collinsville called me and that was the job that I
25 preferred just because I had friends in



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
161–164

Page 161

1 Collinsville.  So that was the reason for the
2 brief --
3     Q    Okay, thank you.  Why did you decide to
4 become a Chicago police officer?
5     A    I've always been fascinated with the city
6 of Chicago, always enjoyed it.  And even as a
7 St. Louis city police officer, I just felt like
8 going up to the city of Chicago would give me more
9 diversity as far as the type of person who I would
10 encounter and type of community and also the type of
11 job experience I would have, so basically that's the
12 reason why.  I felt like there's more opportunity
13 for myself professionally and also I was very
14 interested in coming up to Chicago and living in
15 Chicago and serving the community in that way.
16     Q    Officer Wrigley, have you ever been a
17 party in any administrative proceedings before the
18 police board?
19     A    I'm sorry?
20     Q    Have you ever been a party or the subject
21 of any administrative proceeding before the police
22 board?
23     A    Not physically.  In writing, yes.
24     Q    What type of proceeding was that?
25     A    It was in regards to the second CR number

Page 162

1 that I had sustained.  We felt as though the initial
2 days off without pay given to us were unfair.  We
3 appealed, went though the process of appealing,
4 initially made it up to the board.  The board found
5 in our favor that it was too harsh and reduced the
6 days off.  That was the only time.
7     Q    Thank you.  Have you ever participate in
8 the Chicago Police Department's Personnel Concerns
9 Program?
10     A    No.
11     Q    Do you know what the Personnel Concerns
12 Program is?
13     A    I think so.  I don't think it exists
14 anymore, but I think I know what it is.
15     Q    What's your recollection of what it was?
16     A    Guys who receive too many complaints were
17 placed into a personnel concern where they had to
18 follow some type of program or extra supervision or
19 something.  That's -- my knowledge of it is very
20 limited.
21     Q    Have you participated in the department's
22 BIS or behavioral intervention system?
23     A    No.
24     Q    Do you recall what that program is or
25 was?

Page 163

1     A    I thought that was the same thing.  But,
2 no, I've never participated.
3     Q    It may have been.  What about the
4 behavioral alert system, did you ever participate
5 in that?
6     A    No.
7     Q    Or in early intervention counseling?
8     A    No.
9     Q    Have you ever been referred to any of
10 these programs?
11     A    No.
12     Q    Or has anyone ever suggested to you that
13 you should participate in any of these programs?
14     A    No.
15     Q    In the course of your career as a Chicago
16 police officer, have you ever witnessed a fellow
17 officer act in a manner toward a civilian or
18 another officer that you believed was contrary to
19 the officer's oath, to CPD policy, or to the law?
20     A    Not personally, no.
21     Q    In your career as a Chicago police
22 officer, have you ever intervened to stop or
23 request any other officer -- strike that.  Let me
24 start again.  In your career as a Chicago police
25 officer, have you ever intervened to stop or

Page 164

1 requested any fellow officer to stop acting in a
2 manner toward a civilian that you believed was
3 contrary to CPD policy, the officer's oath, or
4 contrary to law?
5     A    Not that I can recall.
6     Q    During your career as a Chicago police
7 officer, have you ever reported any fellow officer
8 for what you believe was misconduct or illegal
9 activity or any violation of CPD policy?
10     A    Not that I recall.
11         MR. HOFELD:  I don't think I have any
12     other questions at this time.
13         MR. BATTLE:  Matt.
14         MR. DIXON:  Very briefly.
15             EXAMINATION
16 BY MR. DIXON:
17     Q    Officer, the unpaid days that you took
18 for the sustained complaint registers, would those
19 be considered suspension from duty?
20     A    I'm sorry.  Considered what?
21     Q    The unpaid days that you took, would they
22 be considered suspensions from duty?
23     A    Yes.
24     Q    Would it be fair to say that if those
25 findings were, quote, unquote, sustained, you were



JOHN E. WRIGLEY
SIMMONS vs CITY OF CHICAGO

July 19, 2016
165–168

Page 165

1  found to have violated department rules, is that
2  correct?
3      A   Yes.
4      Q   So based on the fact that you were found
5  to have violated department rules and, thus,
6  suspended, would it be fair to say in your
7  experience that if you violate or found to have
8  violated department rules there will be discipline,
9  is that correct?
10       MR. HOFELD:  Objection.  Lack of
11  foundation.
12       MR. BATTLE:  Go ahead.  You can answer.
13       THE WITNESS:  That's been my experience.
14       MR. DIXON:  Nothing further.
15       MR. BATTLE:  Nothing.
16       MR. HOFELD:  I don't have anything
17  further.
18       MR. BATTLE:  Show signature is reserved.
19       (The deposition concluded at 6:30 p.m.)
20
21
22
23
24
25

Page 167

1          C E R T I F I C A T E
2      I, DAVID J. DEMSKI, Certified Shorthand
3  Reporter, in and for the County of Cook, State of
4  Illinois, do hereby certify that on the 19th day
5  of July, 2016, the deposition of the witness
6  JOHN E. WRIGLEY called by the defense, was taken
7  before me, reported stenographically and was
8  thereafter reduced to typewriting through
9  computer-aided transcription.
10      The said witness, JOHN E. WRIGLEY, was first
11  duly sworn to tell the truth, the whole truth, and
12  nothing but the truth and was examined upon oral
13  interrogatories.
14      I further certify that the foregoing is a true,
15  accurate, and complete record of the questions asked
16  of and answers made by the said witness, at the time
17  and place hereinabove referred to.
18      The signature of the witness was not waived by
19  agreement.
20      Witness my official signature as Notary Public,
21  in and for Cook County, Illinois on this 27th day of
22  February, 2017.
23                    David Demski
                  David J. Demski
24                CSR# 084-004386
25

Page 166

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4  ARETHA SIMMONS, et al.,  )
5          Plaintiffs,      )
6  v.                       )  Case No. 1:14-cv-09042
7  THE CITY OF CHICAGO,     )
8  et al.,                  )
9          Defendants.      )
10      I, JOHN E. WRIGLEY, having been first duly
11  sworn, on oath, say that I am the deponent in the
12  aforesaid deposition, that I have read the foregoing
13  transcript of my deposition taken August 11, 2016,
14  consisting of pages 1 through 167 inclusive, taken
15  at the aforesaid time and place and that the
16  foregoing is a true and correct transcript of my
17  testimony so given.
18      _____
19      JOHN E. WRIGLEY, Deponent
20  SUBSCRIBED AND SWORN TO
21  before me this ____ day
22  of _____ 2017.
23  _____
24    Notary Public
25

Page 168

1  Reference No.: 526425
2
3  Case:  SIMMONS vs CITY OF CHICAGO
4
     DECLARATION UNDER PENALTY OF PERJURY
5
      I declare under penalty of perjury that
6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11      _____
12      John E. Wrigley
13
14      NOTARIZATION OF CHANGES
15          (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)                Notary Public,
24
25  in and for the State of _____



800.211.DEPO (3376)
EsquireSolutions.com

Page 169

```
 1    Reference No.: 526425
      Case:  SIMMONS vs CITY OF CHICAGO
 2
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No._____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No._____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No._____Change to:_____
22    _____
23    Reason for change:_____
24
      SIGNATURE:_____DATE:_____
25    John E. Wrigley
```

Page 170

```
 1    Reference No.: 526425
      Case:  SIMMONS vs CITY OF CHICAGO
 2
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No._____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No._____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No._____Change to:_____
22    _____
23    Reason for change:_____
24
      SIGNATURE:_____DATE:_____
25    John E. Wrigley
```

