# Exhibit 9

JOHN D. O'KEEFE          July 13, 2016
SIMMONS vs CITY OF CHICAGO        1–4

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION
 3   ARETHA SIMMONS, for herself )
     and on behalf of DAVIANNA   )
 4   SIMMONS, a minor, EMILY     )
     SIMMONS and KEITH SIMMONS,  )
 5                               )
                                 )
 6        Plaintiffs,            )
                                 )
 7   v.                          ) Case No. 14 C 9042
                                 )
     THE CITY OF CHICAGO; CHICAGO)
 8   POLICE OFFICERS ANTHONY M.  )
     BABICZ (Star 12652); J.L.   )
 9   CWICK; STEVEN J. HEFEL      )
     (Star 13074); SGT. BRIAN J. )
10   KINANNE (Star 1120);        )
     MICHAEL R. LAURIE (Star     )
11   15108); JOHN D. O'KEEFE     )
     (Star 18418); JOHN E.       )
12   WRIGLEY (Star 7179); P.D.   )
     YOUNG (Star 16017); AS-YET  )
13   UNKNOWN CHICAGO POLICE      )
     OFFICERS,                   )
14                               )
                                 )
          Defendants.            )
15
16        The deposition of JOHN D. O'KEEFE, taken
17   before David J. Demski, Certified Shorthand
18   Reporter, and Notary Public, pursuant to the
19   provisions of the Rules of Civil Procedure of the
20   State of Illinois and the Rules of the Supreme Court
21   thereof, pertaining to the taking of depositions
22   for the purpose of discovery, at the law office of
23   Al Hofeld, Jr., 1525 East 53rd Street, Suite 832,
24   Chicago, Illinois, at 9:00 a.m. on Monday,
25   July 13, 2016.
```

---

**Page 2**

```
 1   APPEARANCES:
 2        LAW OFFICES OF AL HOFELD, JR. LLC
          BY: MR. AL HOFELD, JR.
 3            MS. HANAN VAN DRIL
          1525 East 53rd Street - Suite 832
 4        Chicago, Illinois 60615
          (773)241-5844 - (773)241-5845 (facsimile)
 5
          Appearing on behalf of the Plaintiffs
 6
          HICKEY, O'CONNOR & BATTLE, LLP
 7        BY: MR. KENNETH BATTLE
          20 North Clark Street - Suite 1600
 8        Chicago, Illinois 60602
          (312)422-9432 - (312)578-8070 (facsimile)
 9
          Appearing on behalf of the Defendants
10
          CITY OF CHICAGO - ASSISTANT CORPORATION COUNSEL
11        BY: MR. MATTHEW DIXON
          30 North LaSalle Street - Suite 900
12        Chicago, Illinois 60602
          (312)742-7042 - (312)744-6566 (facsimile)
13
          On behalf of the Defendants
14
15              I N D E X
16   WITNESS                          PAGE
17   JOHN D. O'KEEFE
18   Examination by Mr. Hofeld          3
     Examination by Mr. Dixon         174
19   Examination by Mr. Battle        176
     Reexamination by Mr. Hofeld      181
20
21          E X H I B I T S
22   DX-1  Search Warrants             28
     DX-2  IPRA Complaints            124
23   DX-3  IPRA Complaints            125
     DX-4  IPRA Complaints            149
24   DX-5  Photographs                170
25   (Exhibits are not attached to transcript.)
```

---

**Page 3**

```
 1              JOHN D. O'KEEFE
 2   having been first duly sworn by the court reporter,
 3   was examined and testified on his oath as follows:
 4              EXAMINATION
 5   BY MR. HOFELD:
 6   Q   Officer O'Keefe, good morning again.
 7   A   Good morning.
 8   Q   My name is Al Hofeld.  As you know, I
     represent the plaintiffs in this case.  I've got
10   quite a few questions today.  I'm going to try to
11   keep it as focused and brief as I can.
12        Would you kindly begin by stating and
13   spelling your full name?
14   A   John O'Keefe.  O apostrophe k-e-e-f-e.
15   Q   Is there a middle name?
16   A   Denis.  D-e-n-i-s.
17   Q   Thank you.  By whom are you currently
18   employed?
19   A   Chicago Police Department.
20   Q   What is your current position and title
21   or rank?
22   A   Police officer.
23   Q   Do you have any particular rank?
24   A   Police officer.
25   Q   How long have you been a Chicago police
```

---

**Page 4**

```
 1   officer?
 2   A   It will be fourteen years in October.
 3   Q   What year did you graduate from the
 4   police academy?
 5   A   2002.
 6   Q   That's the Chicago Police Academy?
 7   A   Correct.
 8   Q   You understand that you're here for a
 9   deposition today because you're a defendant in this
10   lawsuit, correct?
11   A   Correct.
12   Q   Are you represented by an attorney here
13   today?
14   A   Yes.
15   Q   Is that Mr. Ken Battle?
16   A   Yes.
17   Q   How many times have you given a
18   deposition in a civil case approximately?
19   A   At least three times.
20   Q   When was the last time?
21   A   Maybe two years ago.  I can't -- I don't
22   recall specifically how long ago, but approximately
23   two years ago I believe.
24   Q   Sure.  Do you recall which case that was?
25   A   Yes.  It was a case that just concluded in
```

---



Page 5

1   December.  I believe it was -- I can't remember the
2   plaintiff's name.  I'm sorry.
3       Q    That's okay.  Was there one plaintiff?
4       A    No.  It was a family.
5       Q    Do you remember any of the party names?
6       A    They all had the same last -- excuse me.
7   The majority of them had the same last name.  If you
8   give me a minute it'll come back to me.
9       Q    We may have an opportunity late in the
10  deposition to go over it.  Was that a case filed in
11  federal court?
12      A    It was.
13      Q    The court reporter, as I think you know,
14  needs full verbal responses, such as yes or no, not
15  nods of the head or colloquial answers like yeah or
16  uh-huh, because none of us know what those mean on
17  the record.  I think you know that.  You and I
18  should also be careful not to talk or interrupt
19  each other, so I'll wait until you finish your
20  answers before beginning the next question.  If you
21  would, please, wait until I finish the question
22  before starting your answer, that would help.
23  Obviously, if you don't understand a question at
24  any point, just let me know and I'll try and
25  rephrase it until you do.  If you need to take a

Page 6

1   break at any point, we can certainly do that,
2   provided there's not a question pending.  After I
3   ask you questions, your attorney Mr. Battle, then
4   Mr. Dixon, counsel for the city, will also have an
5   opportunity to ask you questions.  From time to
6   time the attorney or attorneys who are not asking
7   questions may voice an objection to a question.
8   Those objections are made to preserve issues for a
9   later ruling by the judge.  They're not intended to
10  stop you from answering.  So even though an
11  objection is made, you're still required to answer
12  the question unless your attorney specifically
13  instructs you not to.  Do you understand that?
14      A    Yes.
15      Q    Do you understand all of these
16  instructions so far?
17      A    Yes.
18      Q    Do you understand that you're testifying
19  under oath today, just as though you were
20  testifying before a judge and a jury?
21      A    Yes.
22      Q    Are you on any medication today that
23  might affect your ability to truthfully answer my
24  questions?
25      A    No.

Page 7

1       Q    Do you have any impairments or other
2   conditions that might affect your ability to
3   truthfully answer my questions today?
4       A    No.
5       Q    Where were you born and raised?
6       A    Chicago.
7       Q    Any particular neighborhood?
8       A    Beverly.
9       Q    Did you graduate from high school?
10      A    Yes.
11      Q    Which one?
12      A    Brother Rice.
13      Q    Did you attend college?
14      A    Yes.
15      Q    Did you graduate?
16      A    No.
17      Q    How far did you get?
18      A    I think I did about five, six years of
19  college.  Switching my degrees, so it was quite a
20  bit.
21      Q    Where did you attend college?
22      A    Marquette University and the University of
23  Arizona.
24      Q    Did you complete your junior year of
25  college?

Page 8

1       A    Yes.
2       Q    Did you begin your senior year of
3   college?
4       A    Yes.
5       Q    But you didn't complete your senior year?
6       A    No.
7       Q    Which college did you go to first,
8   Arizona or Marquette?
9       A    Marquette.
10      Q    When did you begin Marquette?
11      A    Ninety-five -- no.  It would have been
12  1994.
13      Q    And then when did you begin Arizona?
14      A    I believe it was in '96.
15      Q    Did you attend Arizona for two years?
16      A    I don't recall specifically how long.  It
17  was around there.
18      Q    Did you attend full time?
19      A    Both.
20      Q    You attended both universities full time?
21      A    I attended both full time.  And part time
22  at Arizona, yeah.
23      Q    And how about at Marquette?
24      A    Full time.
25      Q    How long did you attend Marquette before



Page 9

1    you --
2        A    One year.
3        Q    And why were you unable to complete
4    college?
5        A    I think at the time I was more interested
6    in working.
7        Q    Let me ask a little bit about your job
8    history before you entered the police academy.
9    What was the last job you held right before you
10   entered the academy?
11       A    I worked for the Cook County Sheriff's
12   Department.
13       Q    How long did you work for the Cook County
14   Sheriff's Department?
15       A    I believe it was approximately a year and
16   a half.
17       Q    What was your position or your positions
18   there?
19       A    I was a correction officer.
20       Q    In what facility or facilities did you
21   work?
22       A    The jail.
23       Q    The county jail?
24       A    Correct.
25       Q    Cook County Jail?

Page 10

1        A    Cook County Jail.
2        Q    Immediately prior to that job, what job
3    did you hold?
4        A    Immediately prior to --
5        Q    To working for the Cook County Sheriff's
6    Office, where were you employed?
7        A    I don't remember.  I'd been living in
8    Tucson.  So I was working for a company
9    that -- Mastro's company.  They ran a bar called
10   Maloney's.  I was working there, but I don't know if
11   that would've been right directly before I went to
12   the county or not.  I don't remember.
13       Q    What was the name of that?  I didn't
14   catch it.
15       A    It was Maloney's, was the name of it.
16       Q    Was that located in Chicago?
17       A    No.  It was in Tucson.
18       Q    What was your position there?
19       A    I was working -- I was in charge of
20   security.
21       Q    Prior to that job did you hold another
22   job immediately prior?
23           MR. BATTLE:  All you speaking of full-time
24       jobs or --
25

Page 11

1    BY MR. HOFELD:
2        Q    Any job?
3        A    Yes.  I worked at a group home in Tucson
4    at around the same time, a little bit before that.
5        Q    What was your position there?
6        A    I was part of a team of counselors.
7        Q    What year or years did you work for Cook
8    County?
9        A    I can't recall correctly.  It would have
10   been '01 to '02 -- '01 to '02.  So year -- the
11   entire year of '01 and I think parts of '02.  I
12   don't recall the specific dates.
13       Q    Sure.  Have you worked continuously for
14   the Chicago Police Department since graduating from
15   the academy?
16       A    Yes.
17       Q    Have you ever been employed as a police
18   officer for any municipality besides the City of
19   Chicago?
20       A    No.
21       Q    Have you ever worked for any security
22   firm or company?
23       A    During my employment with the Chicago
24   Police Department?
25       Q    At any time?

Page 12

1        A    I did work for a security company briefly,
2    but I don't even remember the name of it.
3        Q    When was that?
4        A    It was a summer job.  I don't remember.
5        Q    Were you a security guard?
6        A    Yes.
7        Q    Was that before or after you became a
8    police officer?
9        A    It was before.  I worked for different
10   security companies at times as part time during my
11   employment as a Chicago police officer.
12       Q    Sure.  How many different companies are
13   we talking about approximately?
14       A    I can name one, off the top of my head.
15   It was called Hudson Services.  I'm not even sure if
16   they're still in existence or not.
17       Q    For how long did you work for Hudson
18   Services?
19       A    On and off for a couple of years.
20       Q    Part time?
21       A    Yes.
22       Q    What years did you work for Hudson?
23       A    I can't say.  Anywhere from, like, '06 to
24   the 2010 or '11.  I don't remember the specific time
25   frame.



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
13–16

Page 13

1    Q    Fair enough.  Have you worked for any
2  other security -- private security firms or
3  companies?
4    A    I don't remember any specific ones.  I did
5  a couple part-time jobs, but I don't remember
6  what -- they weren't, like, formal security
7  companies.  No.
8    Q    What do you mean -- I'm sorry.  I'm
9  trying to understand your answer.  You said they
10  weren't formal security companies.  What did you
11  mean by that?
12    A    I was hired by a -- it was, like, a gasket
13  refractory located in the 11th and 15th Districts
14  for a time being while they were having an issue
15  with people stealing copper from the building,
16  pulling copper from the poles themselves.
17    Q    Okay.  Can you recall any other private
18  security companies or firms that you ever worked
19  for part time or full time?
20    A    I cannot recall any, no.  I've never
21  worked full time for a police security.
22    Q    Other than security companies or security
23  positions, have you held any other part or
24  full-time employment, any other type of part or
25  full-time employment since you've been a Chicago

Page 14

1  police officer?
2    A    No.
3    Q    Or during the time that you've been a
4  Chicago police officer?
5    A    No, not that I can recall.
6    Q    Are you assigned to any particular
7  district station currently?
8    A    No.
9    Q    Do you work primarily in any particular
10  district?
11    A    No.
12    Q    What about in 2013, were you assigned to
13  any particular geographical area in the city?
14    A    Yes.
15    Q    Which area was that?
16    A    2013 if I recall correctly.  We were
17  assigned to the Area Central Gun Team.  It would
18  have been after area four was moved.
19    Q    Area four was moved when approximately?
20    A    I think 2012, but I don't remember for
21  certain.
22    Q    Sure.  Were you at that time assigned to
23  a particular tactical unit or team of officers,
24  speaking again about 2013?
25    A    Yes.

Page 15

1    Q    What was the name of that unit?
2    A    Unit two-eleven.
3    Q    Let me just take a step back before we go
4  into the events of 2013 and ask you.  Besides the
5  Area Central Gun Team in 2013, to what other -- and
6  unit two-eleven, what other teams or units have you
7  been assigned to during the time that you've been a
8  Chicago police officer and I'm speaking about prior
9  to 2013?
10    A    The 10th District.
11    Q    Pardon my ignorance, but what part of the
12  city is that?
13    A    It's the west side.  It's Ogden and
14  Kedzie, just west of Kedzie on Ogden.
15    Q    What else?
16    A    I was briefly detailed to the 9th District
17  when I was a probation officer.
18    Q    Where is the 9th District?
19    A    It's the Deering district.  Now it's
20  located on Halsted and thirty -- wait a minute.
21  Thirty-third and Halsted maybe.  Is that --
22      MR. BATTLE:  Off the record.
23      (Off record.)
24  BY MR. HOFELD:
25    Q    What's the period of time we're talking

Page 16

1  about when you were a probation officer?
2    A    2002.  2002 to 2003.
3    Q    Is that your first position with the
4  police department after becoming an officer?
5    A    No.  I was in ten and then I was detailed
6  out because nine was short of officers, and then
7  back to ten.
8    Q    Got it.  Have you been assigned to any
9  other details, districts, teams or units, between
10  the time you became an officer and 2013?
11    A    I was briefly detailed from Ten to Unit
12  153, and then from Unit 153 to the unit two-eleven.
13    Q    When was that, your assignment to unit
14  153?
15    A    It was a detail and it was -- I don't
16  recall the specific year.  Maybe 2008 or 2009.
17    Q    Any other assignments that you can think
18  of right now?
19    A    No.
20    Q    Where are you assigned currently?
21    A    Three-twelve.
22    Q    Is that a unit number?
23    A    Yes.
24    Q    Does that unit number operate in a
25  particular geographical location?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
17—20

Page 17

1    A    Yes.
2    Q    Which one is that?  Which area is that?
3    A    The south side.
4    Q    Between your assignment to -- between
5    2013 and your assignment to unit 312, did you hold
6    any other -- were you assigned to any other units,
7    teams?
8    A    Between 2013 and -- I'm sorry.  Between
9    2013 and the present?
10   Q    Correct.
11   A    I was in unit three-eleven which is
12   basically the same as three-twelve.  It's just
13   the -- there's a central and a south, so I went from
14   central to south.
15   Q    What area does central cover?
16   A    The central portion of the city.  The
17   city's now divided up in three instead of five, so
18   it would be central districts.  If you want me to
19   name them I can.
20   Q    Does that encompass the loop?
21   A    Central?
22   Q    Yes.
23   A    Yes.
24   Q    Then how far west does it go?
25   A    It depends.  Central covers the 10th

Page 18

1    District now so it would go as far as Cicero.
2    Q    And then does it go south?  Does it go
3    south at all?
4    A    It does.  It would go to approximately
5    31st Street south in places, and then it would go to
6    even 55th Street south in places.
7    Q    Okay.  Now, when you were assigned to the
8    Area Central Gun Team in unit two-eleven in 2013,
9    was there a particular geographical area where you
10   conducted operations?
11   A    There was.
12   Q    What was that area?
13   A    If I recall correctly, then we were still
14   doing police work on the west side.  However, we
15   were trained -- we were in a transitional phase,
16   into working more so on the south side.
17   Q    On August 29th of 2013, were you part of
18   the Area Central Gun Team on that date?
19   A    Yes.
20   Q    Were you part of unit two-eleven on that
21   date?
22   A    Yes.
23   Q    Who were the other officers in your unit
24   as of that date, to the best of your ability, do
25   you recall?

Page 19

1    A    At the time we had two-eleven, it was
2    probably comprised of at least a hundred officers.
3    Q    On August 29th, 2013 who is your
4    immediate supervisor?
5    A    Sgt. Brian Kinnane.
6    Q    Was he your supervisor -- was he your
7    day-to-day immediate supervisor at that point in
8    time?
9    A    Yes, he was.
10   Q    Did you have any other immediate
11   supervisors during that year of 2013?
12   A    No.
13   Q    Did you supervise anyone?
14   A    No.
15   Q    Have you received any promotions since
16   you have been a police officer with the Chicago
17   Police Department?
18   A    No.
19   Q    Have you received any raises?
20   A    Yes.
21   Q    Are those cost-of-living increases or
22   have you received raises beyond cost-of-living
23   increases?
24   A    I think it's just step increases.
25   Q    Do you understand if the step increases

Page 20

1    are designed to keep pace with the cost of living
2    or were they intended to be merit raises of some
3    kind?
4         MR. BATTLE:  Do you understand the
5         question?
6         THE WITNESS:  I do.  I believe it's just
7         designed as far as how much time you've been
8         employed with the department you achieve step
9         increases.
10   BY MR. HOFELD:
11   Q    So there's seniority increases in salary?
12   A    Yes.
13   Q    Before we go much further, let me ask
14   you.  We talked a little bit about your
15   educational background.  I need to ask you do you
16   hold any -- apart from your graduation from the
17   police academy, do you hold any other professional
18   degrees, licenses, or certifications of any kind?
19   A    No.
20   Q    Have you ever had to fire your gun at a
21   person while on duty for the Chicago Police
22   Department?
23   A    Yes.
24   Q    Approximately how many times?
25   A    Do you mean how many instances or how many



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
21–24

Page 21
1 times was the weapon fired?
2    Q    Thank you.  I mean on how many instances?
3 In how many instances did you have to fire your
4 weapon at a person while on duty?
5    A    Once.
6    Q    When was that, if you recall?
7    A    It was a year ago this past spring.
8    Q    Briefly, without going into detail, what
9 type of incident?  What type of incident was it?
10    A    An individual with a firearm pointed it at
11 myself and my teammate.
12    Q    You fired your weapon in self-defense?
13    A    Correct.
14    Q    Was the individual injured?
15    A    Yes.
16    Q    Did the individual survive?
17    A    Yes.
18    Q    Did you subsequently arrest the
19 individual?
20    A    He was arrested.  Yes.
21    Q    Do you recall what his age was?
22    A    I believe he was in his thirties.
23    Q    I'd like to talk with you a little bit
24 about the events of August 29th, 2013 that occurred
25 at 930 North Keystone Avenue in Chicago.  Do you

Page 22
1 recall being there on that day?
2    A    Yes.
3    Q    By the way, did you review any documents
4 in preparation for your deposition today?
5    A    I did.
6    Q    Which documents did you review in
7 particular?
8    A    I reviewed my testimony from the criminal
9 proceedings from that case.
10    Q    Okay.
11    A    And I reviewed the supplemental report
12 that I authored in regards to that case.
13    Q    Did you say supplementary report?
14    A    Correct.
15    Q    That's the title of it?
16    A    Yes.
17    Q    Did you review any other documents in
18 preparation for your testimony today?
19    A    No.
20    Q    Briefly, then, what were you doing at
21 930 North Keystone on August 29th, 2013?
22    A    Executing a search warrant.
23    Q    Were you part of a unit of other officers
24 that were doing that?
25    A    Yes.

Page 23
1    Q    Do you remember the names of any of the
2 other officers who were present with you at
3 930 North Keystone on that date?
4    A    Yes.
5    Q    What were the names of any other
6 officers?
7    A    Officer John Wrigley, Sgt. Brian Kinnane,
8 Officer Steven Hefel, Officer Michael Laurie,
9 Officer Justin Homer.  There were two uniformed
10 officers from the 11th District, Officers Muzupappa
11 and Paul Young.  Officer Michael Suing also from our
12 team.
13    Q    Can you recall any other officers at this
14 time who were present with you on that date at
15 930 North Keystone?
16    A    If there were, I don't remember.
17    Q    Again the unit that you were a part of
18 with Officers Wrigley, Kinnane, Hefel, Laurie,
19 Homer, and Suing, that was unit two-eleven?
20    A    Correct.
21    Q    Do you recall ever being present at
22 930 North Keystone Avenue in Chicago on any other
23 day besides that one day in 2013?
24    A    Do you mean at the residence itself or on
25 that block?

Page 24
1    Q    I mean at the residence?
2    A    No, I don't.
3    Q    Thank you for the clarification.  Did you
4 enter the house that day at 930 North Keystone?
5    A    Yes.
6    Q    When you first approached the house, from
7 which direction did you come?
8         MR. BATTLE:  Can I ask for a
9 clarification?  In terms of during the drive or
10 walking up to the residence?
11 BY MR. HOFELD:
12    Q    Well, let me back up.  You drove to the
13 house and parked your car, is that correct?
14    A    Correct.
15    Q    Did you then approach the house on foot?
16    A    Yes.
17    Q    Where did you park your vehicle?
18    A    Somewhere on the street.
19    Q    On Keystone?
20    A    Yes.
21    Q    I'm sorry.  I didn't mean to interrupt.
22 Did you finish your answer?
23    A    Yes.  Our cars were parked somewhere on
24 the street.
25    Q    You then approached the front of the



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
25—28

Page 25

1  house on foot?
2      A   Yes.
3      Q   What other officers, if any, were
4  approaching the front of the house with you, and
5  this is when you first approached the house on
6  foot?
7      A   I recall myself and Officer Suing were two
8  of the first officers that were approaching the
9  house.
10      Q   Where was Officer Kinnane at that time,
11  if you recall?
12      A   I don't recall.
13      Q   When you approached the house on foot
14  what did you see?
15      A   At which point?
16      Q   You parked your car and then you were
17  walking towards the front of the house.  Do I have
18  that right?
19      A   Correct.
20      Q   Then as you were walking towards the
21  front of the house, was there any activity
22  immediately in front of the house or any person or
23  anything happening?
24      A   As I approached the house I observed the
25  listed subjects of my search warrant.  He was

Page 26

1  subsequently detained by other officers.  And as I
2  walked -- looked straight toward the porch of the
3  house I observed Aretha Simmons.
4      Q   Where was Ms. Simmons exactly?  Was she
5  on the porch?
6      A   Yes.
7      Q   Was she standing or sitting on the porch?
8      A   At first she was sitting.
9      Q   The gentleman who was arrested I think in
10  front of the house, that was McFadden, is that
11  correct?
12      A   Alonzo McFadden, correct.
13      Q   Alonzo McFadden.  Thank you.  Where was
14  he arrested relative to the house?  Was he arrested
15  directly in front of the house or down the block
16  from the house?  Do you recall where?
17      A   In front.
18      Q   Did you see him actually be arrested?
19      A   I saw that he was being detained and I
20  continued forward.
21      Q   Who detained Alonzo McFadden?
22      A   Officer Laurie.
23      Q   Your recollection is that he was detained
24  directly in front of the house?  Do I have that
25  right?

Page 27

1      A   I didn't say it was directly in front of
2  the house.  I know it was in front of the house.
3  I don't remember if it was directly or not.
4      Q   Okay.  It may have been down the block a
5  little ways in either direction?
6      A   It certainly wasn't down the block.  It
7  was in the vicinity of her residence, Ms. Simmons'
8  residence.
9      Q   Let me back up just a little bit.  Am I
10  correct that you personally performed some
11  surveillance of 930 North Keystone prior to
12  executing the search warrant?
13      A   Officer Wrigley performed the surveillance
14  of the residence, pre-execution surveillance of the
15  residence that day.
16      Q   But not yourself?
17      A   No.  I was part of the team that was
18  conducting the surveillance, but I myself was not
19  the surveillance officer.
20      Q   You weren't physically present with
21  Officer Wrigley when the surveillance was
22  occurring?
23      A   Correct.  I was not physically with him.
24      Q   If I recall correctly, you were the
25  officer who applied for the search warrant, is that

Page 28

1  right?
2      A   I'm the affiant of the search warrant,
3  yes.
4          (Deposition Exhibit No. 1 was
5           marked for identification.)
6  BY MR. HOFELD:
7      Q   Officer O'Keefe, I'm handing you what's
8  marked as Defendant Officer's Group Exhibit 1.
9  There are a lot of documents in this exhibit, some
10  of which I'll ask you about today.
11          At the moment I just want to ask
12  you about the first three pages of the exhibit and
13  you'll see the page numbers on the bottom, Simmons
14  13, Simmons 14, and Simmons 15.  Let me know when
15  you've had a chance to look at those pages?
16      A   I have.
17      Q   Do you recognize the pages Simmons 13
18  through 15?
19      A   I do.
20      Q   Can you identify this document, for the
21  record?
22      A   Search warrant and a search warrant
23  complaint.
24      Q   The search warrant at the top of Simmons
25  13 indicates that complainant, PO John O'Keefe,



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
29–32

Page 29

1  number 18418, unit two-eleven, was the complainant,
2  correct?
3      A   Yes.
4      Q   And that's you?
5      A   Yes.
6      Q   Then if you look at the bottom of Simmons
7  14, is that your signature?
8      A   My signature would be above Judge
9  Chevere's signature.
10     Q   Let me be more precise.  Three-quarters
11  of the way down the page there's a hand drawn
12  signature line with an X and next to the X there's
13  a signature followed by a number.  Is that your
14  signature and your star number?
15     A   That's correct.
16     Q   Same question with respect to the next
17  page, Simmons 15.  Two-thirds of the way down the
18  page there's a hand drawn signature line with an X,
19  followed by a signature and a number.  Is that your
20  signature and your star number?
21     A   Yes, it is.
22     Q   Did you write the complainant's statement
23  that begins toward the bottom of Simmons 14 and
24  continues on to Simmons 15?
25     A   Yes.

Page 30

1      Q   Before you arrived at 930 North Keystone
2  on August 29th, 2013 to execute the search warrant,
3  did you have any information that any of the
4  plaintiffs, namely Emily Simmons, Aretha Simmons,
5  Davianna Simmons, and Keith Simmons, were armed or
6  dangerous or potentially dangerous to officers who
7  would be entering the home to search?
8          MR. BATTLE:  I'm going to object to the
9  form of the question.  Do you understand it?
10         THE WITNESS:  I do.
11         MR. BATTLE:  Go ahead.
12         THE WITNESS:  No.
13  BY MR. HOFELD:
14     Q   Do you have any information that
15  indicated to you that any of the plaintiffs would
16  be hostile?
17     A   No.
18     Q   Or would resist arrest?
19     A   No.
20     Q   Or that they would refuse to follow
21  officer instructions?
22     A   No.
23     Q   Did you either give or participate in any
24  kind of briefing prior to the execution of the
25  search warrant for the officers who would be

Page 31

1  involved in executing the warrant?
2      A   Yes.
3      Q   Did you give that briefing?
4      A   I was -- it was myself and Officer Wrigley
5  that gave the briefing.  Yes.
6      Q   Where was the briefing given?
7      A   I don't remember where the last briefing
8  was for the warrant.
9      Q   Was the briefing given after you obtained
10  the warrant and before you reached 930 North
11  Keystone to execute it?
12     A   Yes.
13     Q   I'm sorry.  Was there more than one
14  briefing regarding what the operation would be at
15  930 North Keystone?
16     A   There was really only one briefing to
17  execute the search warrant.  The members of the team
18  knew that we would be -- earlier in the day there
19  was a team that would be executing the search
20  warrant.  But I wouldn't necessarily say it was a
21  briefing at the beginning of the day.
22     Q   Fair enough.  What word would you use to
23  describe the meeting about what was going to happen
24  at 930 North Keystone later that day?
25     A   Are you asking me what would have happened

Page 32

1  at the beginning of the day when I arrived to work
2  and myself and my teammates discussed the fact that
3  we'd be executing a search warrant at 930 North
4  Keystone?  That was really the -- that was the
5  extent of that.  And then there's a briefing prior
6  to the execution itself.
7      Q   Thank you.  In either of those
8  discussions, the one in the morning or as you
9  referred to it, the briefing in the afternoon
10  before the execution, did you present any
11  information to the other officers that indicated
12  that any of the plaintiffs were armed or dangerous
13  or potentially dangerous to the officers who were
14  going to be executing the warrant?
15     A   No.
16     Q   Did you present -- I should include
17  Officer Wrigley in that question as well.  Did
18  Officer Wrigley present any such information?
19     A   No.
20     Q   To the officers who would be taking part
21  in the execution of the warrant?
22     A   No.
23     Q   Did either you or Officer Wrigley present
24  to the other officers who were going to be taking
25  part in the execution of the warrant any



Page 33
1 information that indicated that the plaintiffs or
2 any of the plaintiffs would be hostile to the
3 officers when they entered the home to execute the
4 warrant?
5    A   No.
6    Q   Or that they would resist arrest or any
7 of them would resist arrest?
8    A   No.
9    Q   Or that any of them would refuse to
10 follow officers instructions?
11    A   No.
12    Q   Do you remember what was said, what was
13 stated by yourself and Officer Wrigley, during the
14 discussion in the morning on August 29th regarding
15 the execution of the warrant and then at the
16 briefing in the afternoon?
17    A   I don't remember the specifics.
18    Q   Do you remember anything about it?
19    A   I do.
20    Q   What do you remember?
21    A   I remember that we had an individual
22 listed in the search warrant and that the search
23 warrant was for a specific handgun, and that the
24 individual listed in the search warrant was also
25 known to be selling narcotics at 930 North Keystone.

Page 34
1    Q   Am I correct that the only -- the warrant
2 was for the search of the person of Mr. McFadden as
3 well as for the premises at 930 North Keystone,
4 correct?
5    A   That's correct.
6    Q   Did you have any other reason to search
7 the home, other than your information or belief
8 that Mr. McFadden resided in the home at 930 North
9 Keystone?
10    MR. BATTLE:  Do you understand the
11 question?
12    THE WITNESS:  I do.  So the reason why we
13 were executing the search warrant at 930 North
14 Keystone is that Mr. McFadden, based on my
15 information, was running a heroin operation
16 from that address and was in the possession of
17 a defaced 9 millimeter Glock semiautomatic
18 handgun.
19 BY MR. HOFELD:
20    Q   I appreciate that.  Let me just ask a
21 couple of clarifying questions.  Your information
22 was also that he resided there, is that correct?
23    A   My information was that he was -- had
24 access to and that he was -- I looked at it as he
25 established somewhat of a residency there.  That was

Page 35
1 based on information that I received.
2    Q   That information was from the
3 confidential informant?
4    A   Correct.
5    Q   So am I correct that you -- let me just
6 ask it simply.  Were there any other reasons why
7 you applied for a warrant to search the home at
8 930 North Keystone besides what you've already
9 testified to?
10    A   No.
11    Q   In other words, McFadden's activities and
12 your belief that he had some residency at the
13 930 North Keystone, there weren't any reasons
14 beyond that, correct?
15    A   No.
16    Q   We have a double negative there.  You're
17 agreeing with the statement I made?  You're
18 agreeing with me, right, on the last question?
19 So let me --
20    MR. BATTLE:  Why don't you clear the
21 record.
22    MR. HOFELD:  Yes.  Happy to.
23 BY MR. HOFELD:
24    Q   Do you agree that the reason that you
25 sought the warrant for the premises at 930 North

Page 36
1 Keystone was because of McFadden's activities and
2 because you believed that McFadden had established
3 some residency there, is that correct?
4    A   Yes.  Because of McFadden's activities,
5 and specifically the fact that he had been handling
6 this weapon at that address inside it and that my
7 information was that he was running a -- as I stated
8 before, running a heroin operation from that
9 specific address.  Yes.
10    Q   Understood.  All I'm trying to establish
11 is that McFadden was the only reason why you wanted
12 to search 930 North Keystone, right?
13    A   Yes.
14    Q   Okay, thank you.  And besides information
15 that you received from the informant, did you have
16 any other information -- strike that.  Did you have
17 any other source of information that McFadden
18 resided in the home besides what was given to you
19 by the informant?
20    A   Prior to execution?
21    Q   Yes.
22    A   Prior to the execution of the search
23 warrant, the day before I had driven by and seen
24 Mr. McFadden seated at the porch and our
25 pre-execution surveillance was able to fortify the



JOHN D. O'KEEFE                                                     July 13, 2016
SIMMONS vs CITY OF CHICAGO                                            37–40

Page 37

1   fact that he was, indeed, operating in front of that
2   address.
3           MR. HOFELD:  Can you read that answer
4       back, please.
5           (Record read.)
6   BY MR. HOFELD:
7       Q    You said you had driven by the night
8   before, is that correct?
9       A    Correct.
10      Q    Did you arrest Aretha Simmons on the
11  front porch?
12      A    Yes.
13      Q    How did that occur?  Can you narrate that
14  for me?
15      A    How -- which part?
16      Q    Her arrest?
17      A    As myself and my teammates approached, I
18  observed Ms. Simmons stand up out of her seat, grab
19  the purse that was a silver purse that was in the
20  chair across from her, which after Officer Wrigley
21  had notated to me that Mr. McFadden had been going
22  inside retrieving items and tendering them in what
23  he felt were narcotic transactions.  I observed her
24  grab that same purse, clutch it, looking directly at
25  me and sit back down in the chair she had been

Page 38

1   sitting.
2       Q    Your testimony -- I'm sorry.  Were you
3   finished?
4       A    Officer Suing then grabbed that purse and
5   set it down back in the chair where it originally
6   had been.  I opened that purse up and observed a
7   Glock model 26, 9 millimeter, semiautomatic pistol
8   with a defaced serial number and a plastic bag
9   containing 21 ziplock baggies of heroin and I
10  believe three bags of cannabis, if I recall
11  correctly.
12      Q    Do I understand you correctly that you
13  saw -- do I understand your testimony today
14  correctly to be that you saw her grab the purse and
15  clutch it and hold it and then when Officer Suing
16  approached he took it away from her?
17      A    Correct.
18      Q    Is that the testimony you gave at the
19  preliminary hearing for the charges against
20  Aretha Simmons?
21      A    I believe so.  Yes.
22      Q    Did you read the entire transcript of
23  your testimony for the criminal case against
24  Aretha Simmons?
25      A    I did.  I didn't read the Branch 48, the

Page 39

1   probable cause hearing.  I did read the criminal
2   case.
3       Q    You read the trial?
4       A    Correct.
5       Q    Your trial testimony?
6       A    Yes.
7       Q    And then was it after Officer Suing took
8   the purse from Ms. Simmons that you put the
9   handcuffs on her?
10      A    At some point handcuffs were put on her.
11      Q    Was it before or after?
12      A    It would have been after.
13      Q    Did you see Ms. Simmons reach into the
14  purse as you were approaching the front porch?
15      A    No.
16      Q    Did you see her reach in any direction
17  for anything as you were approaching the porch?
18      A    Other than the purse, no.
19      Q    Fair enough.  Did she look physically
20  dangerous to you in any way?
21      A    No.
22      Q    Did she refuse to comply with
23  instructions during your arrest of her?
24      A    No.
25      Q    Did she refuse to comply with your

Page 40

1   instructions after you handcuffed her?
2       A    No.
3       Q    Did she resist arrest in any way?
4       A    No.
5       Q    What happened immediately after you put
6   the handcuffs on Aretha Simmons, if you recall?
7       A    The warrant was executed.
8       Q    Did you --
9           MR. BATTLE:  Al, for a point of
10      clarification.  When you say after you put the
11      handcuffs on Aretha Simmons, are you assuming
12      that it is actually Mr. O'Keefe that put the
13      handcuffs on her or are you saying you
14      colloquial, speaking of the defendant?
15          MR. HOFELD:  Fair enough.  I thought we
16      addressed that, but let me just be clear and
17      we're all clear together.
18  BY MR. HOFELD:
19      Q    Officer O'Keefe, was it you personally
20  who placed the handcuffs on Ms. Simmons?
21      A    I don't remember if I placed the handcuffs
22  on her or not.
23      Q    If it wasn't you, the only other officer
24  that you recall being present in the immediate
25  vicinity was Officer Suing, is that correct?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
41—44

Page 41

1    A    Correct.
2    Q    So if it wasn't you, it would have been
3    Officer Suing who placed the handcuffs on
4    Aretha Simmons on the front porch?
5    A    It could have been, but I'm not going to
6    say that it was or was not.
7    Q    Fair enough.  All I'm trying to
8    establish, was it one or the other of the two of
9    you who placed the handcuffs on Aretha Simmons?
10    A    I believe it would have been one of us.
11    Q    Do you recall seeing any other officers
12    in the immediate vicinity, immediately before or at
13    the time the handcuffs were placed on
14    Aretha Simmons?
15    A    I remember officers were approaching, but
16    I don't know -- I don't remember which specifically
17    officers were closer than others.
18    Q    Were there any other officers besides you
19    and Officer Suing who were engaged with and
20    interacting with Aretha Simmons on the front porch
21    at the time that she was arrested?
22    A    No.
23    Q    If I understand you correctly so far, you
24    are not the first officer to enter the house, is
25    that correct?

Page 42

1    A    I don't remember if I was or not.  I don't
2    believe I was though.
3    Q    Do you recall which officers entered the
4    house ahead of you, before you?
5    A    I don't.
6    Q    Do you recall whether you knocked and
7    announced yourself before entering the house at
8    930 North Keystone?
9    A    I don't.
10    Q    You don't recall, one way or the other?
11    A    I remember announcing my office as I went
12    through the door which is customary in every single
13    search warrant.  However, I don't know who
14    knocked -- who was knocking on the door.
15    Q    Did someone knock on the door, do you
16    recall that occurring?
17    A    I don't recall.
18    Q    Did you knock on the door?
19    A    I don't remember.
20    Q    Do you remember if the door was open, the
21    front door?  I'm not talking about the screen door.
22    First of all, was there a screen door?  Do you
23    recall if there was a screen door and a front door?
24    A    I don't remember if there was a screen
25    door or not.  All I remember about the door was that

Page 43

1    at some point Officer Laurie showed me the keys that
2    Alonzo McFadden had in his pocket that opened that
3    door.  But I don't remember if it was the -- if
4    there was more than one door or not.
5    Q    Okay, sure.  You're talking about the
6    front door or the back door when you talk about the
7    keys?
8    A    It was the front door.
9    Q    When you and Officer Suing -- when you or
10    Officer Suing put the handcuffs on Aretha Simmons
11    on the front porch and then you turned to go into
12    the house, was the front door open or shut?
13    A    I don't remember.
14    Q    You said that when you first I
15    believe -- correct me if I'm wrong always, but I
16    believe that you said when you were walking on foot
17    up to the front porch, at first Aretha was seated
18    on one of the chairs on the front porch, is that
19    correct?
20    A    Correct.
21    Q    How many chairs did you observe on the
22    front porch?
23    A    Two.
24    Q    Do you recall when you arrested her or
25    Officer Suing put -- strike that.  Do you remember

Page 44

1    when the handcuffs were placed on her, either by
2    yourself or Officer Suing, was she seated or
3    standing at that point?
4    A    I don't remember.
5    Q    Do you recall when you or Officer Suing
6    finished placing the handcuffs on her, was she
7    seated or standing at that point?
8    A    I don't remember.
9    Q    Did you physically push Aretha Simmons
10    down after she'd been handcuffed, push her down
11    from a standing position to a seated position on
12    one of the chairs located on the porch?
13    A    No.
14    Q    Do you have a recollection, one way or
15    the other, of doing that or not doing that?
16    A    No, I did not do that.
17    Q    Did you push or slam her body or face
18    into the cement rising wall of the front porch
19    after the handcuffs had been placed on her?
20    A    No.
21    Q    Do you recall there being a cement rising
22    wall around the front porch?
23    A    I don't recall -- when you say a cement
24    rising wall, as if you mean there's -- there's the
25    porch and then kind of a wall that encloses it?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
45–48

1    Q    That's exactly what I mean.  A low rise
2   wall?
3    A    No.
4    Q    Maybe not --
5    A    I don't remember whether there was a wall
6   there or not.
7    Q    Fair enough.  Did you observe any of the
8   other officers who were present on the scene at 930
9   North Keystone push Ms. Simmons after she'd been
10  handcuffed, from a standing position to a seated
11  position, in one of the chairs located on the front
12  porch?
13   A    No.
14   Q    Did you see any of the other officers who
15  were present there on the scene push or slam her
16  body or face into the low rise cement wall of the
17  front porch?
18   A    No.
19   Q    Did you notice at any point, before,
20  during, or after you and the other officers
21  executed the search warrant, that one of Aretha
22  Simmons' eyes was red or bloodshot or swollen?
23   A    I did.  It was red.
24   Q    That is the white part of her eye was
25  red?

1    A    Correct.
2    Q    At what point in time or what point in
3   the sequence of events did you notice that?
4    A    As soon as I approached her.
5    Q    As you and Officer Suing were arresting
6   Ms. Simmons on the front porch, did you determine
7   if she was armed?
8    A    I did not determine if she was armed, no.
9    Q    In other words, did one of you pat her
10  down?
11   A    I don't believe so.
12   Q    Why not?
13   A    There was a female officer on the scene
14  that we had to do that.
15   Q    Was she present in the immediate vicinity
16  of the front porch?
17   A    At the time?
18   Q    At the time that you approached the front
19  porch on foot and arrested Ms. Simmons?
20   A    She was not far away.
21   Q    Did both you and Officer Suing enter the
22  house immediately after Aretha Simmons was
23  handcuffed on the front porch?
24   A    I don't remember.
25   Q    Do you recall if one of you stayed behind

1   with Ms. Simmons?
2    A    I don't remember.
3    Q    Do you recall whether you or Officer
4   Suing brought Aretha Simmons into the house with
5   you?
6    A    I don't remember.
7    Q    You don't have any recollection of that?
8    A    I recall Ms. Simmons being in the
9   house at one point after the search warrant team
10  had entered and the situation was the residence
11  was -- everything was cleared.  I remember her being
12  in there at one point, but I don't remember at which
13  specific -- which specific point she was brought in
14  and who brought her in.
15   Q    Okay, fair enough.  Thank you.  Am I
16  correct that you have some mental recollection of
17  Aretha Simmons being present, physically present in
18  the house, after or during the warrant execution,
19  is that correct?
20   A    Correct.
21   Q    Whereabouts in the house did you see her?
22   A    She was seated on the couch in the front.
23   Q    In the front room or the living room?
24   A    Yes.
25   Q    Let me just ask you.  If you look at --

1   there's some attachment -- there's some pages that
2   follow the warrant in group Exhibit 1.  I just want
3   to ask you, so after Simmons 15, do you see there's
4   a Simmons 16, it says search warrant data?  Do you
5   recognize this document or this type of document?
6    A    Yes.
7    Q    What is this document, please?
8    A    Simmons 16?
9    Q    Yes, correct.
10   A    This is the search warrant data sheet.
11   Q    Is this an attachment to the search
12  warrant?
13   A    I don't really know what you mean.
14   Q    Sure.  Was this page attached to the
15  search warrant when it was submitted to the court
16  or is this something that's generated and attached
17  subsequently to the court approving the search
18  warrant?
19   A    The court doesn't view this sheet.  This
20  is just a Chicago Police Department document.
21   Q    Okay.  Did you generate this sheet?
22   A    I did.  I believe I did.
23   Q    Does this sheet have any -- does this
24  search warrant data form have any purpose other
25  than just identifying the basic information about



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
49–52

Page 49

1  the warrant and who's going to execute it?
2      A    That's exactly what it does.
3      Q    I don't recall you mentioning -- when I
4  asked you who the other officers were who were in
5  your unit two-eleven on August 29th, 2013, I don't
6  recall you mentioning Officer Babicz.  Was he also
7  in your unit on that date?
8      A    He was.
9      Q    Let me just ask you.  The next page,
10 Simmons 17, is a continuation of Simmons 16, the
11 search warrant data form, correct?
12     A    Yes.
13     Q    What about Simmons -- let's see.  And so
14 is Simmons 18, is that correct?
15     A    Yes.
16     Q    Simmons 18 indicates the results of the
17 execution of the warrant, is that right?
18     A    It does.
19     Q    Let me ask you about Simmons 19.  Simmons
20 19, 20, and 21, do you recognize this document?
21     A    Yes.
22     Q    What is this document, please?
23     A    This is a sketch done of the residence.
24     Q    At 930 North Keystone?
25     A    Correct.

Page 50

1      Q    It's a sketch of the floor plan on all
2  three levels of 930 Keystone?
3      A    It appears so.  Yes.
4      Q    Did you make this sketch?
5      A    No.
6      Q    Do you know who made this sketch?
7      A    I'm not sure.
8      Q    Would it have been one of the officers
9  who was in unit two-eleven executing the warrant
10 that day?
11     A    Yes.
12     Q    Do you know was this sketch made after
13 the officers entered the home and executed the
14 warrant?
15     A    Yes.
16     Q    When you said a few moments ago that
17 Aretha Simmons -- you have a recollection of seeing
18 Aretha Simmons seated on the couch in the front
19 room or the living room.  Is that the same room
20 that's identified on Simmons 19 by the words front
21 room?  Is that the room you were referring to?
22     A    Yes, I believe so.
23     Q    When you saw her sitting there on the
24 couch what was she doing, if anything?
25     A    I don't believe she was doing anything.

Page 51

1      Q    She was still handcuffed at that point?
2      A    I don't remember -- yes, she would have
3  been.
4      Q    When she was handcuffed on the front
5  porch was she handcuffed in the front?  Were her
6  arms or wrists handcuffed in the front of her body
7  or the back?
8      A    I don't remember.
9      Q    I assume you don't have any recollection
10 of you, yourself, bringing Aretha into the house
11 after she was arrested on the front porch, is that
12 correct?
13     A    I don't remember doing it.  I'm not saying
14 that I didn't.  I don't remember.  I know that at
15 some point she was brought in.
16     Q    Okay, fair enough.  Now, did you at any
17 point physically push Aretha Simmons through the
18 front door at 930 North Keystone?
19     A    No.
20     Q    Did you push her at any point before,
21 during, or after the execution of the warrant at
22 930 North Keystone?
23     A    No.
24     Q    Did you physically grab her upper body
25 with both of your arms and shake her forcefully at

Page 52

1  any point during the execution of the warrant at
2  930 North Keystone?
3      A    No.
4      Q    Did you at any point during the execution
5  of the warrant slam her body, physically slam her
6  body on the wall in the vestibule of -- the front
7  vestibule of the house?
8      A    No.
9      Q    Did you at any point during the execution
10 of the warrant that day push Aretha Simmons
11 forcefully into a steel radiator in the foyer, the
12 front foyer inside the front door?
13     A    No.
14     Q    Do you recall anything that Aretha said
15 to you or other officers or anyone else when she
16 was inside the house?
17     A    I don't.
18     Q    I didn't ask you this.  I should have,
19 but didn't.  Do you recall anything that she said
20 to you or to Officer Suing or to anybody else on
21 the front porch when you approached and when you
22 arrested her?
23     A    I don't recall her saying anything
24 specifically.  I'm sure there were moments during
25 our interaction that we spoke, but I don't remember



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
53–56

Page 53

1 any -- there's nothing specific that I recall.
2    Q    Do you recall anything that you said to
3 her as you approached the front porch and when you
4 were on the front porch arresting her before you
5 went into the house?
6    A    I don't.
7    Q    Do you recall anything that Officer Suing
8 said to her at that point?
9    A    No.
10    Q    When you entered the home at 930 North
11 Keystone through the front door, do you recall what
12 was going on in the house at that instant, if
13 anything?
14    A    I remember entering and a woman
15 approaching us.
16    Q    Who was that woman?
17    A    I believe it was Emily Simmons.
18    Q    Were there other people in trail as she
19 was approaching you or was she all by herself or --
20    A    If I remember correctly, she had a young
21 girl with her.
22    Q    Did you see anybody else at the moment
23 when you saw -- did you see anybody else present
24 inside the home at the moment when you saw Emily
25 Simmons and the young girl with her?

Page 54

1    A    Other than police officers, no.
2    Q    Which police officers did you see when
3 you first entered the home?
4    A    We went in as a group.  So I don't
5 remember who was in front of me and who was behind
6 me so I don't remember any specific officers
7 offhand.
8    Q    When you entered -- after you and Officer
9 Suing -- strike that.  After you or Officer Suing
10 placed the handcuffs on Aretha Simmons did both of
11 you go into the house?
12    A    I don't remember.
13    Q    Were there other officers besides Officer
14 Suing who went into the house with you after Aretha
15 Simmons was handcuffed?
16    A    Yes.
17    Q    Do you remember who those officers were?
18    A    As far as the order of officers, I don't
19 remember what the order of officers were that went
20 in first.
21    Q    I'm not so much asking you about the
22 order, but I'm asking you if you can identify the
23 officers who went in through the front with you,
24 since you seem to have a recollection that there
25 were -- it was more than just yourself?

Page 55

1    A    Well, yes.  The members of the entry team
2 entered the residence altogether or I mean obviously
3 going in a stack, but I don't remember who was in
4 what order and I don't remember who specifically was
5 with me as we entered the house.
6    Q    I want to be clear.  Are you saying that
7 all of the members of the team?
8    A    No.
9    Q    Let me finish the question and then you
10 can answer, for the record.  My question was are
11 you saying that all of the members of the team went
12 in through the front door at about the same time as
13 you did?
14    A    No.
15    Q    When we say team, I'm referring to I
16 think unit two-eleven?
17    A    Let me be specific.  Unit two-eleven, as I
18 stated earlier, is comprised of a hundred police
19 officers.
20    Q    I'm sorry.  Fair enough.  Thank you for
21 reminding me of that.  Let me clarify the question.
22 What I mean is the entire group of officers who
23 were executing the warrant that day at 930 North
24 Keystone.  Is it your testimony that they all went
25 in together through the front door at about the

Page 56

1 same time along with you?
2    A    No, it's not.
3    Q    What is your testimony?
4    A    Is that there were officers that entered
5 and there were also officers that remained outside.
6    Q    Who were the officers that entered?
7    A    I entered, Officer Wrigley entered,
8 Sgt. Kinnane entered.  At some point Officer Suing
9 entered -- I don't remember -- Officer Hefel entered,
10 I don't remember if I mentioned that.
11    Q    Officer Hefel did enter?
12    A    Yes.  But I don't remember -- I may --
13 there might -- you know, may have been officers that
14 were part of the team that I forgot that entered,
15 but I do know that those officers did enter.
16    Q    Who were the officers who stayed behind,
17 who stayed outside?
18    A    I don't remember if -- I know Officer
19 Laurie was outside.  I don't remember who else would
20 have stayed outside.
21    Q    Did the officers you mentioned, Kinnane,
22 Wrigley, Suing, and Hefel, did they enter before
23 you?
24    A    I don't remember.  One or two may have
25 entered before me, but I don't remember who.



JOHN D. O'KEEFE                                          July 13, 2016
SIMMONS vs CITY OF CHICAGO                                    57—60

Page 57

1    Q    You don't remember if it was Kinnane who
2    entered before you?
3    A    I don't.
4    Q    Or Hefel?
5    A    I don't.
6    Q    When you were approaching the front porch
7    on foot at 930 North Keystone did you have your
8    weapon drawn?
9    A    I don't remember.
10   Q    Do you remember -- you had a weapon that
11   day, I take it?
12   A    Yes.
13   Q    What type of weapon were you carrying
14   that day?
15   A    A semiautomatic handgun.
16   Q    Did Officer Suing have his weapon drawn
17   as he was approaching the front porch at 930 North
18   Keystone?
19   A    I don't remember.
20   Q    You don't remember?
21   A    No.
22   Q    Did the other officers who were entering
23   the premises 930 North Keystone to execute the
24   warrant enter in about the same time as you,
25   Officers Kinnane, Wrigley, Suing, and Hefel, did

Page 58

1    they have their guns drawn as they were entering
2    the house?
3         MR. BATTLE:  As a point of clarification.
4    The last couple of questions you were talking
5    about approaching the house.  I just want to
6    make sure now we're talking about entering the
7    house?
8         MR. HOFELD:  Thank you.  I can --
9         MR. BATTLE:  Because when you were asking
10   about the guns drawn, you were saying
11   approaching the house.  I just want to make
12   sure we're all on the same page.
13        MR. HOFELD:  Sure.  That's fine, Ken.  I
14   can clarify it.
15   BY MR. HOFELD:
16   Q    Do you recall seeing whether any of the
17   officers -- strike that.  Let me just ask it as
18   simply as I can.  Did you see Officers Kinnane,
19   Wrigley, and Hefel approach the house on foot or
20   were they approaching simultaneously with you?
21   A    I believe all of us were approaching
22   simultaneously.
23   Q    Do you recall whether Officers Kinnane,
24   Wrigley, and Hefel had their weapons drawn as they
25   were approaching the house on foot?

Page 59

1    A    I don't recall whether they did or not.
2    Q    Do you recall whether they had their
3    weapons drawn as they were entering through the
4    front door?
5    A    I don't recall.
6    Q    By the way, do you have knowledge of any
7    officer entering the house from any other point
8    besides the front door?
9    A    I don't remember anyone entering from any
10   other point besides the front door.
11   Q    Was there a plan?  Did your team that was
12   going to execute the warrant have a plan for how
13   you were going to enter and execute the warrant and
14   was part of that plan to enter the back door or any
15   other point besides the front door?
16   A    No.
17   Q    There was no plan to enter at any other
18   part of the house besides the front door, is that
19   correct?
20   A    Correct.
21   Q    And the first part of that compound
22   question -- let me just ask you.  Did your team
23   have a plan for how it was going to enter the house
24   that day to execute the warrant?
25   A    Yes.

Page 60

1    Q    Was the plan -- do you recall if the plan
2    was to enter only through the front door?
3    A    It was.
4    Q    There were no plans -- to the best of
5    your ability to recall, there was no plans to enter
6    through the back or through any window or through
7    any other point other than the front door of the
8    house, is that correct?
9    A    Correct.
10   Q    When you entered the house and you
11   saw -- you saw an adult woman, right, and I think
12   you identified her as Emily Simmons, is that right?
13   A    I believe that was her name, yes.
14   Q    And you saw a little girl?
15   A    Yes.
16   Q    You also saw officers in the house, is
17   that right?
18   A    Correct.
19   Q    Where was Emily Simmons or what was she
20   doing when you first saw her?
21   A    She was walking from the rear of
22   the -- from somewhere --
23   Q    For the record, we'll look at the
24   hand drawn floor plan?
25   A    So she would have been walking from -- in



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
61–64

Page 61

1   general terms. I can't say specifically where she
2   was exactly at which point, but she was walking
3   toward the door from somewhere in the middle or the
4   rear of the house.
5       Q    Where is the front door in the diagram,
6   is that -- toward the bottom of the page?
7       A    I think this is the front door right here.
8       Q    So it's right by the page number of
9   Simmons 19?
10      A    Yes, yes.
11      Q    She was walking from -- she was walking
12  toward the front door?
13      A    It appears she was walking towards the
14  front of the house.
15      Q    Towards the front of the house?
16      A    Yes.
17      Q    Where was the little girl? Was the
18  little girl walking with her or was she somewhere
19  else?
20      A    No. The little girl was walking with her.
21      Q    And you said you also saw officers at
22  that point when you first entered the house,
23  correct?
24      A    Yes. The officers that would have been in
25  front of me.

Page 62

1       Q    I apologize if I already asked you, I
2   can't remember if I did. I can't remember what you
3   said. But who were the officers who you saw when
4   you first entered the house?
5       A    I don't remember who went in.
6       Q    You don't remember?
7       A    At whatever time.
8       Q    So you don't remember if Kinnane was one
9   of the officers that you saw when you first went in
10  the house?
11      A    No. And I don't want to make it sound
12  like those officers had already been there a while.
13  They were kind of entering as we were entering -- as
14  I was entering so --
15      Q    But they might have been ahead of you
16  though, correct?
17      A    A little bit.
18      Q    Officer Kinnane might have been one of
19  the officers who you saw when you first entered the
20  house, correct?
21      A    Yes. Sgt. Kinnane may or may not have
22  been.
23      Q    Sgt. Kinnane, thank you. And the same
24  with Officer Hefel, he may have entered ahead of
25  you a little bit and he may have been one of the

Page 63

1   officers who you saw when you first entered the
2   house, correct?
3       A    It's possible.
4       Q    Officer Wrigley may also have entered
5   ahead of you?
6       A    He may have.
7       Q    And he may have been one of the officers
8   you saw when you first entered?
9       A    He may have been.
10      Q    What about Officer Suing, is it possible
11  that he entered ahead of you?
12      A    I don't recall.
13      Q    You don't recall, one way or the other?
14      A    I don't.
15      Q    Is it possible that he may have been --
16  he may have entered ahead of you and may have been
17  one of the officers whom you saw when you first
18  entered?
19      A    It's possible.
20      Q    When you first entered and you saw Emily
21  Simmons and the little girl walking towards the
22  front of the house, which room were they in at that
23  point, if you recall? In other words, looking at
24  the hand drawn floor plan, were they in the front
25  room, the dining room, or some other place?

Page 64

1       A    It would have been the front room or the
2   dining room.
3       Q    When you first entered the house and you
4   saw Emily Simmons and the little girl walking
5   toward the front of house and you saw other
6   officers -- well, let me ask you this. Where were
7   the officers located, the officers whom you saw
8   when you first entered the house?
9       A    I don't recall specifically where the
10  officers were. We entered the house and like in
11  every search warrant the goal is to clear the house
12  and ensure that there's no immediate threats and to
13  secure the safety of ourselves and the occupants of
14  the residence.
15      Q    Sure. And clearing -- for the record,
16  clearing the house means what exactly?
17      A    Walking through each part of it.
18      Q    Looking for persons who might be
19  dangerous?
20      A    Correct.
21      Q    What do you do with the people when
22  you're clearing the house and securing it? What do
23  you do with the people whom you find who don't
24  appear to be dangerous?
25      A    In every -- in most situations in search



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
65–68

Page 65

1  warrants you clear the residence and the individual
2  occupants are asked to come into, like, a
3  centralized location and are -- just kind of sit
4  there while the -- and that's actually cleared by
5  officers prior to them sitting down.  So as in this
6  case, as in most cases, you would clear an area and
7  then those individuals come and sit in that area and
8  as there's a more formal search of the residence
9  is --
10     Q    I'm sorry?
11     A    There's -- a more formal search is
12  undertaken at that point.
13     Q    Understood.  What was the area where the
14  people who were found in the house were placed in
15  this instance while the search of the house
16  occurred?
17     A    Mrs. Simmons and her granddaughter sat in
18  the front room.
19     Q    Your recollection is that Aretha Simmons
20  also sat in the front room at some point or was
21  seated there at some point?
22     A    Yes.
23     Q    You just don't remember at what point she
24  was brought in, correct?
25     A    I don't.

Page 66

1     Q    Let me get back to -- I want to ask you
2  this question again because I'm not -- I think we
3  got off on a digression.  I'm not sure you answered
4  it.  Correct me if I'm wrong, but my question was
5  when you first entered the house and you saw Emily
6  Simmons and the little girl walking toward the
7  front of the house and you saw other officers, do
8  you have any recollection of where any of those
9  officers whom you saw were physically located?
10     A    No.
11     Q    You can reference the hand drawn floor
12  plan if you need to?
13     A    I don't.  All I know is that the first
14  room was in the process of being cleared.
15     Q    The officers were clearing that room?
16     A    The first -- this front room.  As you come
17  in this first room was being cleared.
18     Q    And --
19     A    Here it's detailed as the front room.
20     Q    Okay.  The front room is being cleared,
21  okay.  Were the officers in that room?
22     A    Yes.
23     Q    That's all I was trying to get at.  Did
24  you see any officers in the dining room?
25     A    I don't remember if I did or not.

Page 67

1     Q    How many officers did you see in the
2  front room?
3     A    I don't remember.
4     Q    Was it more than one?
5     A    I don't remember.
6     Q    You don't remember if it was -- it could
7  have been two or three or four?
8     A    It could have been.  I was fairly toward
9  the front.  So it wouldn't have been a whole lot,
10  but there would have been -- you know, there could
11  have been a few.
12     Q    Your information before you executed the
13  search warrant that day was that Alonzo -- as you
14  testified, Alanzo McFadden had established some
15  residency or access to this property, 930 North
16  Keystone, correct?
17     A    Correct.
18     Q    And your information was also that he had
19  a 9 millimeter Glock handgun with the serial number
20  erased and that he had been showing it at this
21  residence, 930 North Keystone, correct?
22     A    Yes.
23     Q    So you had some reason to think that that
24  weapon might be found inside the house, is that
25  correct?

Page 68

1     A    Correct.
2     Q    Was that weapon found?
3     A    It was.
4     Q    Where was it found?
5     A    On the porch.
6     Q    Is it your testimony that it was found in
7  the purse?  Was it contained in the purse?
8     A    Yes.
9     Q    That's the silver or gray purse?
10     A    It was the silver purse.  Yes.
11     Q    Did you have any information about who
12  resided in the property besides McFadden before you
13  executed the search warrant that day?
14     A    Only that it was his girlfriend's family's
15  house.
16     Q    Did you have information that his
17  girlfriend resided there?
18     A    Yes.
19     Q    Did you have information about who her
20  family members were that resided there?
21     A    No.
22     Q    Or how many of them there were?
23     A    No.
24     Q    When you first entered the house and you
25  saw the first room, the front room that is being



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
69—72

Page 69

1  cleared and you saw Emily Simmons and the little
2  girl and you saw one or more officers, did any of
3  the officers who you saw have their guns drawn?
4      A   I don't remember.
5      Q   You don't remember, one way or the other?
6      A   No.
7      Q   Did you see any officer or officers
8  pointing a gun at Emily Simmons?
9      A   No.
10     Q   You don't remember or --
11     A   I didn't see anybody point a gun at Emily
12 Simmons.
13     Q   Your testimony is you didn't see any
14 officer point a gun at Emily Simmons during the
15 entire time that officers were present at the house
16 that day, is that correct?
17     A   That's correct.
18     Q   Did you see any officer point any object
19 at Emily Simmons?
20     A   No.
21     Q   Did you see any officer or officers
22 pointing a gun at the little girl?
23     A   No.
24     Q   And your testimony is that you didn't see
25 any officer point any gun at the little girl at any

Page 70

1  time while the officers were present on the scene
2  at 930 North Keystone on that day, is that correct?
3      A   That's correct.
4      Q   Did you see any officer or officers point
5  any object at Davianna Simmons, the little girl,
6  while officers were executing the warrant that day?
7      A   No.
8      Q   Before you went to the house to execute
9  the warrant that day, did you make sure that your
10 weapon was loaded?
11     A   I just assumed it was.
12     Q   But what's your custom and practice when
13 you -- what was your custom and practice in 2013,
14 when you're going into a potentially dangerous home
15 to execute a search warrant?  Do you usually -- did
16 you usually make sure that your gun was loaded
17 before you went on the operation?
18     A   My gun is loaded all the time.  So --
19     Q   When you -- I'm sorry.  Did you finish?
20     A   My gun is loaded all the time.
21     Q   So it was loaded all the time in 2013?
22     A   Unless there's a specific place or
23 instance we're required not to have it loaded, then
24 it is loaded all the time.
25     Q   Before you executed the search warrant

Page 71

1  that day did you make sure that -- did you do
2  anything to make sure that your weapon was ready to
3  fire and that the safety or the safety valve or the
4  safety trigger was off so that it was ready to
5  fire?
6      A   The semiautomatic handgun that I carry
7  doesn't have that type of safety feature.  So it
8  was -- it's just loaded and with a round chamber.
9      Q   So it was loaded and ready to fire?
10     A   Correct.
11     Q   When you brought it with you to 930 North
12 Keystone that day?
13     A   Correct.
14         MR. HOFELD:  Do you mind if we take a
15     break for the restroom and so on?  You guys
16     probably --
17         MR. BATTLE:  Go ahead.
18         (Off record.)
19         MR. HOFELD:  Back on, please.
20 BY MR. HOFELD:
21     Q   When you first entered the home and you
22 saw Aretha -- I'm sorry.  You saw Emily Simmons and
23 the little girl walking toward the front of the
24 house, did they then sit down on the couch in the
25 front room?

Page 72

1      A   Yes.  At some point, yes.
2      Q   Let me ask you.  Before you arrived on
3  the scene at 930 North Keystone to execute the
4  search warrant that day, did you have any reason to
5  believe that there were other guns in the house
6  besides the 9 millimeter Glock with the defaced
7  serial number?
8      A   Only based on the experience that if an
9  individual is running a drug operation, we tend to
10 believe that there in many cases can be more than
11 one gun.
12     Q   Did you have any specific information
13 other than your general experience that indicated
14 to you that there were more than that
15 particular -- more than one gun at the house?
16     A   I don't remember.
17     Q   Is there any information in the warrant?
18     A   No.  The warrant is specific to that gun.
19     Q   Do you recall how you were dressed on
20 that particular day when you executed the search
21 warrant at 930 North Keystone?
22     A   I don't remember.
23     Q   Was it your custom and practice to dress
24 in a certain way when you were going on operations
25 to execute search warrants in 2013?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
73—76

Page 73

1    A    We were in civilian dress that day, but we
2  would have had -- I would have worn, like, a black
3  jersey that says Chicago police on it.
4    Q    Does it say Chicago police on the front
5  or the back or both?
6    A    There's a black star on the front and on
7  the back it says Chicago Police, if I recall
8  correctly.
9    Q    Might you have been wearing light blue
10  pants or light blue jeans on that day?
11   A    I don't remember.
12   Q    Might you have been wearing a bulletproof
13  vest on that date?
14   A    I was.
15   Q    How about a gray or tan baseball cap?
16   A    I don't believe I had a gray or tan
17  baseball cap.
18   Q    Might you have been wearing any baseball cap,
19  regardless of what the color?
20   A    I may have, yes.
21   Q    Did you sometimes wear a baseball cap
22  when you were going on operations to execute a
23  search warrant in 2013?
24   A    I don't remember.
25   Q    Have you ever worn a baseball cap when

Page 74

1  you've gone on those kinds of missions?
2    A    I don't remember if I have or not.
3    Q    When you say that you may have been
4  wearing a baseball cap, is that because you recall
5  other instances where you've worn a baseball cap?
6    A    When I would go to work there would be
7  times I'd have a baseball hat on.  Yes.
8    Q    What type of baseball cap was it?  Was it
9  for a particular team?
10   A    I'm sure there was a particular team, but
11  I don't remember what it would have been then.  I
12  don't remember.  I know I don't wear -- I know you
13  said khaki or grey and I don't recall having any
14  khaki or gray colored hats.
15   Q    Did you have multiple baseball
16  hats -- did you own multiple baseball hats in 2013?
17   A    Yes.
18   Q    How many approximately?
19   A    Probably at least ten.
20   Q    Are you a big fan of baseball?
21   A    Yeah.  I mean it wasn't just baseball.
22  I'm sure there's some football and hockey in there
23  too.
24   Q    Do you recall the colors of the baseball
25  caps that you owned in 2015?

Page 75

1    A    No, not all of them.
2    Q    Do you recall the colors of some of the
3  hats?
4    A    Yes.
5    Q    What are the colors that you recall?
6    A    I would have had black ones.  I think a
7  white -- White Sox one.  Other than that, I don't
8  remember.  I have quite a few.
9    Q    Do you have a particular way of wearing
10  your baseball caps?  In other words, do you wear
11  them frontways or backwards or both?
12   A    Both.
13   Q    When you first entered the house and you
14  saw Emily Simmons walking towards the front she
15  wasn't armed, was she?
16   A    No.
17   Q    Did she look physically dangerous or
18  potentially dangerous to you?
19   A    No.
20   Q    Did she look aggressive in any way?
21  Aggressive -- you know, did she look or was she
22  being aggressive in any way towards you or any of
23  the other officers?
24   A    I wouldn't say aggressive.
25   Q    What would you say?

Page 76

1    A    She was upset.  She appeared upset.
2    Q    Do you recall anything that she said on
3  that day, either in that instant or subsequently
4  during the search?
5    A    No.
6    Q    Did she refuse to comply with any officer
7  instructions?
8    A    I don't remember if she did, but I don't
9  believe she refused to comply.  I believe when I
10  looked at the reports and I remember the instant she
11  appeared extremely upset and she was yelling, but I
12  don't recall any -- anything really about her
13  refusing to comply with anything.
14   Q    This might seem like a silly set of
15  questions, but let me ask you about the little girl
16  who you saw when you first entered the house.  Did
17  she look -- I mean, she didn't have a weapon, did
18  she?
19   A    No.
20   Q    Did she look physically dangerous to you?
21   A    No.
22   Q    Or like she might be a threat or a
23  potential threat to you or any of the other
24  officers?
25   A    No.



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
77—80

Page 77

1    Q    Was she talking or acting in an
2  aggressive manner towards you or any of the other
3  officers when you observed her?
4    A    No.
5    Q    Did she refuse to comply with any officer
6  instructions?
7    A    No.
8    Q    Do you recall her speaking at all?
9    A    No.
10    Q    You mentioned that you recalled that
11  Emily Simmons was upset when you saw her.  Do you
12  have any recollection of what the little girl's
13  expression was on her face when you saw her after
14  entering the house?
15    A    No.
16    Q    When you entered the house, when you saw
17  Emily Simmons and the little girl coming toward the
18  front and you saw one or more officers, did you
19  hear any of the officers say anything to Emily
20  Simmons and the little girl?
21    A    All of us as we entered, myself included,
22  I could hear other officers shouting "Chicago police
23  search warrant."  So I recall myself saying that as
24  I saw Ms. Simmons approaching us so she knew who we
25  were and what was going on.

Page 78

1    Q    Okay, fair enough.  Do you recall you or
2  other officers saying anything else -- strike that.
3  Do you recall hearing the other officers say
4  anything else besides shouting Chicago police
5  search warrant?
6    A    I don't recall any specific words that
7  anyone else would have said.  No.
8    Q    Do you recall yourself saying anything
9  else to Emily Simmons and the little girl when you
10  first came in?
11    A    I don't remember.
12    Q    Do you recall did anybody tell -- any of
13  the officers saying to Emily Simmons, you know,
14  shouting to Emily Simmons shut up or shut the fuck
15  up or anything like that?
16    A    No.
17    Q    Did you hear any of the officers say
18  those words or words like that to Aretha Simmons
19  once she was in the house in the front room?
20    A    No.
21    Q    Did you hear any officers, including
22  yourself, say those words or any words like that at
23  any point while you were on the scene executing the
24  search warrant?
25    A    No.

Page 79

1    Q    Approximately how long did it take to
2  execute the warrant, the search warrant, for the
3  house once you entered?
4    A    I don't remember.
5    Q    Are we talking somewhere between five and
6  twenty minutes for a thorough search of the house?
7    A    No.  It would have been longer than that.
8    Q    Were you and the other officers on the
9  scene for some time after the house was thoroughly
10  searched?
11    A    No.
12    Q    What time did the search begin
13  approximately?
14    A    I'd have to refer to the paperwork.  I
15  don't remember.  It was sometime after six o'clock.
16    Q    Okay, fair enough.  Do you have any
17  recollection of what time it ended?
18    A    I don't.
19    Q    Was Mr. Simmons in the home when you
20  entered and searched?
21    A    He was not.
22    Q    At what time or at what point in the
23  sequence of events did Mr. Simmons enter the house,
24  if he did?
25    A    I believe we'd been there around half an

Page 80

1  hour and he showed up.
2    Q    Was the search still occurring when he
3  arrived at the house?
4    A    I believe so, yes.
5    Q    Officer O'Keefe, what did you do after
6  you entered the home, what did you personally do?
7    A    I don't remember where I went, but I
8  assisted in clearing the first floor.
9    Q    Do you remember specifically what you
10  did?  What does that mean, that you helped clear
11  the first floor?
12    A    As I stated earlier, each room was -- we
13  made sure that there was no one in each room of the
14  first floor.
15    Q    Did you go in each of the rooms of the
16  first floor?
17    A    No.  I don't remember which room I went
18  into, but I did go into some rooms.
19    Q    You went into some of the rooms of the
20  first floor, but not necessarily all of them?
21    A    Yes.  There was -- officers clear each
22  room.  So if there's an officer in front of me that
23  had already cleared one room, I would move on to the
24  kitchen or whatever other room.  So I don't remember
25  any of the specific rooms that I cleared.



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
81–84

---

Page 81

1    Q    Looking at the floor plan that's part of
2  Exhibit 1, you don't recall which specific room or
3  rooms on the first floor that you went in to clear,
4  is that correct?
5    A    That's correct. I remember walking
6  through and observing each room. I don't remember
7  which room I would have gone in and cleared, because
8  the whole residence was cleared fairly -- it took a
9  little bit of time to clear the upstairs and there's
10  a basement, but I remember going through the first
11  floor.
12    Q    Did you personally go through the
13  basement or the second floor to clear those areas?
14    A    I don't remember. I remember I was -- I
15  went up to the second floor, but I believe it was
16  already cleared by that point and I don't remember
17  if I ever went in the basement or not. I don't
18  recall being in the basement.
19    Q    Approximately how long did it take to
20  clear and secure the house?
21    A    I don't remember how long. It was only a
22  few minutes.
23    Q    After the house was secured -- excuse me,
24  cleared and secured, the three occupants were
25  seated on the couch in the front room on the first

Page 82

1  floor, correct?
2    A    Ms. Emily Simmons and her granddaughter
3  were seated on the front couch, as I stated before.
4  I don't remember at what point Aretha Simmons was
5  sitting on the couch with them or if she was even
6  sitting at the couch. I know all of them were
7  sitting in the front room. There may have been a
8  chair. I don't remember.
9    Q    Sure, fair enough. After the house was
10  cleared and secured was there a physical search of
11  the house that took place?
12    A    Yes.
13    Q    Were you involved in the physical search
14  of the premises at 930 North Keystone?
15    A    Not -- I guess -- I'll explain my position
16  at that point. After everything is secured, since I
17  was the affiant of the search warrant I kind of
18  stayed with the sergeant up by where the individuals
19  had been detained and, you know, just explaining to
20  Ms. Simmons what was going on and the other officers
21  were -- their task at that point was really to
22  conduct the real substance of the search itself.
23    Q    Okay, fair enough. Just to be clear. Do
24  you recall yourself personally searching any part
25  of the premises at 930 North Keystone?

Page 83

1    A    I may have searched a little bit, but I
2  don't remember anything specific.
3    Q    If you searched a little bit, would your
4  search or searches have been limited to the first
5  floor?
6    A    Yes.
7    Q    Do you have any recollection of searching
8  any of the rooms on the first floor, looking now at
9  the hand drawn floor plan that's part of Exhibit 1?
10    A    No. And I believe if I really did much
11  searching, it would have just been the front room
12  area just to make sure there was nothing in the
13  front area of the house.
14    Q    Might you have searched the dining room
15  as well, which is adjacent to the --
16    A    That's possible.
17    Q    Might you have searched that first
18  bedroom that's connected to the front room?
19    A    No. I remember looking in there and when
20  I -- I believe that's the room items were recovered,
21  but I did not search that room, no.
22    Q    Do you know which officer or officers did
23  search that room or do you recall?
24    A    I recall that -- if this is the correct
25  bedroom I'm thinking of, and I could be wrong, I

Page 84

1  recall there was a handgun and a shotgun recovered
2  from this room. I believe it was Officer Suing that
3  made those recoveries.
4    Q    Do you recall searching the other bedroom
5  that's identified?
6    A    No.
7    Q    As being on the first floor, looking at
8  the floor plan?
9    A    No.
10    Q    Do you recall who did search that
11  bedroom?
12    A    No.
13    Q    Do you recall doing any searching on any
14  other part of the first floor up there, you,
15  yourself, personally?
16    A    I don't.
17    Q    Did you personally find any drugs inside
18  the house?
19    A    No.
20    Q    Did you personally find any drug
21  paraphernalia inside the house, such as a scale or
22  scale and baggies?
23    A    Not personally, no.
24    Q    Or plastic bags?
25    A    Not personally, no.

---



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
85–88

Page 85

1    Q    Do you recall if any drugs were found
2  inside the house?
3    A    I don't believe any drugs were found
4  inside the house, no.
5    Q    Do you recall if any drug paraphernalia
6  of any kind was found inside the house?
7    A    Yes.
8    Q    What is your recollection about that?
9    A    I remember there was packaging equipment,
10  small ziplock baggies commonly used to package
11  heroin and other drugs and a digital scale
12  used -- commonly used to weigh illegal narcotics
13  were recovered.
14    Q    Where inside the house were those items
15  found?
16    A    I believe they were found on the second
17  floor of the house.
18    Q    Do you know which room they were found
19  in on the second floor, referring -- if you need
20  to -- to the hand drawn floor plan of 930 North
21  Keystone?
22    A    I don't remember where specifically,
23  according to the diagram.
24    Q    Do you remember which officer or officers
25  found the digital scale and the plastic bags?

Page 86

1    A    I don't remember.  It may have been
2  Officer Hefel.
3    Q    What makes you say Officer Hefel?
4    A    I thought I had read that in the report
5  somewhere.
6    Q    Did you personally find any drugs on the
7  person of any of the family members, Emily Simmons,
8  Aretha Simmons, Davianna Simmons, or Keith Simmons?
9    A    The only drugs that I recovered were from
10  the bag that Aretha Simmons had in her possession.
11    Q    The purse?
12    A    Correct.
13    Q    Do you know if any drugs were found on
14  the person or persons of any of the plaintiffs?
15    A    I don't believe there was.
16    Q    Now, you mentioned that there were a
17  couple of weapons found in the house and I think
18  you said they were found in the bedroom nearest to
19  the front of the house, is that correct?
20    A    Yes.
21    Q    Did you personally find those weapons?
22    A    No.
23    Q    Do you recall which officer or officers
24  found those weapons?
25    A    Officer Suing.

Page 87

1    Q    Were you with Officer Suing in the room
2  when he found those weapons?
3    A    I was not, no.  He did -- I should
4  actually qualify that.  He found them, he located
5  the items.  He then called myself in.  I saw them
6  and Officer Wrigley then recovered them.
7    Q    You said you saw them and then you --
8    A    He located them first.
9    Q    Yes.
10    A    And then called myself and Wrigley in and
11  Wrigley recovered them.
12    Q    Meaning that he physically took
13  possession of them?
14    A    Correct.
15    Q    So all three of you were in that room,
16  that front bedroom together?
17    A    At some point, yes.
18    Q    Do you know when you were brought in the
19  room had Officer Suing taken the guns out or was he
20  showing you the spot where they were stored?
21    A    I don't remember.
22    Q    Do you know where in the room they
23  were -- where in that room closest to the front of
24  the house these weapons were stored or how they
25  were stored?

Page 88

1    A    I remember the -- there was a revolver in
2  a sock, but I don't remember the specifics of where
3  each weapon was.
4    Q    Do you remember where the sock was
5  located when it was originally found by Officer
6  Suing?
7    A    Other than being in that room, no.
8    Q    How about there was also some kind of
9  shotgun, right?
10    A    Yes.
11    Q    The other gun was some kind of shotgun?
12    A    Correct.
13    Q    Do you know where Officer Suing found
14  that shotgun inside that room?
15    A    The closet.
16    Q    Do you know where in the closet?
17    A    No.
18    Q    Do you know if it was on a shelf up
19  above?
20    A    I don't.
21    Q    Did you or the other officers determine
22  who those weapons belonged to?
23    A    Mr. Simmons did, they were his.
24    Q    Did you determine if they were lawfully
25  owned and properly registered to Mr. Simmons?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
89—92

Page 89

1    A    We could not determine that.  He could not
2  provide us any information that could substantiate
3  his claim that they were his.  He did state that he
4  was going to in the future provide documentation so
5  he could get the weapons back from the evidence and
6  recovered property section.
7    Q    Do you know if he ever did that?
8    A    I don't believe he did.
9    Q    How is it that you know -- why don't you
10  think he ever did that?
11       MR. BATTLE:  Do you understand that
12  question?
13       THE WITNESS:  I do.
14       During the criminal proceeding, one of
15  Ms. Simmon's criminal defense attorneys I
16  believe asked the state's attorneys office if
17  there's a way that Mr. Simmons could retrieve
18  his weapons.  He was once again informed,
19  through the state in this case, how to retrieve
20  the weapons and after that I don't remember
21  what happened.  So he may have recovered them,
22  he may not have.  I don't remember.
23  BY MR. HOFELD:
24    Q    Did you personally find any weapons on
25  the person of any of the four plaintiffs?

Page 90

1    A    No.
2    Q    Do you know if weapons were found on the
3  person of any of the four plaintiffs?
4    A    There were not any weapons found.
5    Q    Okay, thank you.  During the course of
6  any searching of the premises that you personally
7  did, did you damage any property?
8    A    No.
9    Q    Did you damage any doors?
10    A    No.
11    Q    Tables?
12    A    No.
13    Q    Chairs?
14    A    No.
15    Q    Dressers?
16    A    No.
17    Q    Headboard or mattress?
18    A    No.
19    Q    Any ceilings?
20    A    No.
21    Q    A flat-screen TV?
22    A    No.
23    Q    Did you damage any property in that
24  second bedroom on the first floor, the one that's
25  furthest from the front of the house?

Page 91

1    A    I didn't damage any property in the house.
2    Q    Did you damage an iPad?
3    A    I didn't damage any property in the house,
4  no.
5    Q    Pardon me.  Just for the sake of the
6  record I need to ask you these questions?
7    A    No, I did not.
8    Q    Okay, thank you.  Did you damage any of
9  the children's -- the child's toys that were in the
10  house?
11    A    No.
12    Q    Do you recall seeing child's toys in any
13  of the rooms in the house?
14    A    I don't recall seeing children's toys in
15  the house.  I'm sure there were children's toys, but
16  I don't recall seeing them.
17    Q    You may have answered this, I don't
18  recall your answer.  What's your recollection of
19  where the digital scale and the plastic bags were
20  found inside the house?
21    A    On the second floor.
22    Q    Do you remember which room on the second
23  floor?
24    A    I don't.
25    Q    It wasn't you who found them?

Page 92

1    A    No.
2    Q    It was Officer Hefel I think you said?
3    A    Yes.
4    Q    Was any cash found in the house?
5    A    No.
6    Q    You personally didn't find any cash?
7    A    No.
8    Q    You're agreeing with me, right?  You
9  agree with the statement that you personally did
10  not find any cash in the house that day?
11    A    I agree with that statement.  Yes.
12    Q    Do you know whether or not any of the
13  other officers who were searching the house found
14  any cash in the house that day?
15    A    No, they did not.
16    Q    How is it that you know?  How is it that
17  you know that?
18    A    Because there was no cash inventory from
19  that house.  There was no narcotics recovered from
20  that house so no cash would have been inventoried
21  from that house.
22    Q    Did you personally find any jewelry of
23  any kind in the house?
24    A    No.
25    Q    Do you know whether any of the other

JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
93—96

Page 93

1    officers searching the house that day found any
2    jewelry in the house?
3        A    I don't know whether they would find
4    jewelry or not.
5        Q    You don't know whether they did or
6    didn't?
7        A    Well, if you mean find as in if they saw
8    jewelry, I can't -- I can't answer to whether they
9    saw it or not.
10       Q    Do you know whether any jewelry was
11   confiscated by any of the officers that day?
12       A    No.  There was no jewelry confiscated by
13   the officers.
14       Q    How is it that you know that?
15       A    There was no jewelry on the evidence
16   recovery log in our inventories.
17       Q    Do you know if any of the officers
18   confiscated any cash that day?
19       A    The only inventory money was recovered
20   from the silver purse located outside.  She had $73.
21   It was either the silver purse or Mr. McFadden's
22   person, I don't remember which.  But the only money
23   that was recovered in inventory was from the
24   outside.  That would have been the only money that
25   was inventoried in this specific case.

Page 94

1        Q    If any of the other officers found and
2    took cash, but didn't inventory it, you wouldn't
3    know that it had been taken, correct?
4        MR. BATTLE:  Objection.  It assumes facts
5    not in evidence and it's an incomplete
6    hypothetical.  You can answer.
7        THE WITNESS:  Can you repeat, counsel?
8    I'm sorry.
9        MR. HOFELD:  Yes.  No problem.
10   BY MR. HOFELD:
11       Q    If other officers found cash on the
12   premises and took possession of it, but did not
13   inventory it or declare any of the inventory, you
14   wouldn't know that it had been taken because you
15   weren't present, correct?
16       MR. BATTLE:  The same objection.
17       THE WITNESS:  Correct.
18   BY MR. HOFELD:
19       Q    The same thing for jewelry, correct?
20       MR. BATTLE:  The same objection.
21       THE WITNESS:  Correct.
22   BY MR. HOFELD:
23       Q    But you personally didn't take possession
24   of any cash that you recall?
25       A    I did not.  I know for a fact that I did

Page 95

1    not take possession of any cash from that house.
2        Q    Sure.  And you personally didn't take
3    possession of any jewelry from that house, did you?
4        A    Correct.
5        Q    Did you take any photos or video on your
6    personal cell phone at any point when you were
7    executing the search warrants at 930 North Keystone
8    on August 29th, 2013?
9        A    No.
10       Q    Do you recall sending or receiving any
11   texts about the incident?
12       A    No.
13       Q    Did you make any personal notes about the
14   events at 930 North Keystone on August 29th, 2013?
15       A    No.
16       Q    Did you make any notes that day or any
17   other time about those events?
18       A    No.
19       Q    Let's look at a few more documents, if we
20   can, in group Exhibit 1, please.  If we turn to
21   Simmons 16 in Exhibit 1.  The officers listed here
22   is the entire search team as you recall in that
23   day, with the exception of maybe I think Officers
24   Laurie and Muzupappa who are not part of the search
25   team, but were present on the scene?

Page 96

1        MR. BATTLE:  Point of clarification.
2    Officer Laurie is listed.
3        MR. HOFELD:  Okay.  Pardon me.
4    BY MR. HOFELD:
5        Q    Let me just ask you.  Is this the entire
6    search team that was present at 930 North Keystone
7    on August 29, 2013?
8        A    This is excluding the uniformed Officer
9    Muzupappa and Officer Young.
10       Q    Young, okay.  Thank you.  Does this
11   search team have a -- did you often work with the
12   officers on this search team in 2013?
13       A    The officers listed here?
14       Q    Yes.
15       A    Yes.
16       Q    Was this a recurring search team?  In
17   other words, did this same team execute other
18   warrants?
19       A    Yes.
20       Q    In 2013?
21       A    Yes.
22       Q    Did this particular search team have an
23   identifying name or identifying number of some
24   kind?
25       A    Yes.

JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
97–100

Page 97

1    Q    What was that?
2    A    I have to recall -- we may have been the
3  4171 team then, but they kept changing -- they kept
4  changing our beat numbers.  I think at that time it
5  was -- I think it was 4171, but I could be wrong.
6  It could 41 -- sometimes they would put a C in front
7  of them and say 41 Charlie 71.
8    Q    Are you looking at a particular page?
9    A    I'm not, no.
10   Q    That's just from your recollection?
11   A    It doesn't have the beat on here.
12   Q    Simmons 16 doesn't have the beat number?
13   A    No.
14   Q    Did this particular search team have any
15 other identifiers besides a number or was it just
16 known as beat 1471?
17   A    Four one seven one.
18   Q    I'm sorry, four one seven one.  Beat four
19 one seven one?
20   A    Yes.  And as I stated it --
21   Q    It could have been?  I'm sorry.
22   A    There could have been a Charlie in there.
23 I'm trying to find something that has the beat.
24   Q    We'll look through some more documents
25 here.  Just let me know if you see it.

Page 98

1          Simmons 22.  This is the first page
2  of an arrest report.  Do you recognize this as the
3  arrest report, pages Simmons 22 through 26?  Do you
4  recognize this as the arrest report for Aretha
5  Simmons?
6    A    Yes.
7    Q    Did you prepare this arrest report?
8    A    Yes.
9    Q    How did you know that?
10   A    Just by looking at it.
11   Q    What, in particular, are you looking at
12 to determine that you prepared this arrest report?
13   A    I attested to the contents of the
14 narrative.
15   Q    You're listed in the arrest report as the
16 arresting officer, right?
17   A    Yes.
18   Q    And on pages 22 these are the charges.
19 These are the four specific charges that she was
20 charged with on that date or that you charged her
21 with, is that correct?
22   A    The district attorneys office charged
23 her --
24   Q    I'm sorry?
25   A    The state's attorneys office.

Page 99

1    Q    Okay, yes.  Where was the cannabis, where
2  was that found?
3    A    In the purse.
4    Q    PCS, what does that stand for?
5    A    Possession of a controlled substance.
6    Q    I'm sorry.  Was there another substance
7  besides cannabis that was found?
8    A    Heroin.
9    Q    That was in the purse?
10   A    Correct.
11   Q    Did you personally transport Aretha
12 Simmons from 930 North Keystone after she was
13 arrested and after the search was completed or was
14 that another officer?
15   A    It was another officer.
16   Q    Do you recall which one?
17   A    I don't.  It may have been the B car that
18 was there.  I don't remember.
19   Q    At 7:25, under visual check of arrestee,
20 you indicate in response to the question is there
21 obvious pain or injury, yes.  Do you recall what
22 you were referring to when you typed yes in
23 response to this question?
24   A    That wouldn't have been me asking her
25 those questions.

Page 100

1    Q    I thought you indicated that you prepared
2  the arrest report?
3    A    I did.
4    Q    Did you ask her the questions that are
5  here in the arrest report?
6        MR. BATTLE:  In that section that you're
7  talking about?
8        MR. HOFELD:  Yes.
9        THE WITNESS:  No.
10 BY MR. HOFELD:
11   Q    Do you know who did?
12   A    Specifically, no.
13   Q    Do you know what the yes response to that
14 question refers to when it indicates that there was
15 obvious pain or injury on the arrestee?
16   A    I don't because I wasn't present when she
17 was in lockup, in the female lockup.
18   Q    Do you know at what point in the process
19 these questions would have been asked of her?
20 Wouldn't it have been prior to lockup?
21   A    No.  She's -- at this point she's going
22 into female lockup.  I'm not anywhere -- we're in
23 the office.  So I guess unless you really were able
24 to walk through, you wouldn't be able to visualize,
25 but --



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
101—104

Page 101

1    Q   This arrest report was completed by the
2  Chicago -- by the employees of the Chicago Police
3  Department, right?
4    A   Correct.
5    Q   She was held in the Cook County Jail
6  after arrest?
7    A   I don't know.
8    Q   Do you know if she was taken to any
9  district police station or any other Chicago police
10  station before she was released -- put into the
11  custody of the county?
12    A   No.  She was taken to the 1st District and
13  processed.
14    Q   Since it was the police department that
15  completed this arrest report, wouldn't it have been
16  the police department that asked her these
17  questions, Simmons 25, while she was in the custody
18  of the Chicago Police Department?
19    A   Yes.  Someone is asking her questions in
20  the female lockup.
21    Q   In the police station?
22    A   Correct.  In the female processing
23  facility in the back, right when they walk into
24  lockup.
25    Q   But you don't know what the yes response

Page 102

1  to the question is there obvious pain or injury,
2  you don't know what that refers to on the person of
3  the arrestee?
4    A   No.
5    Q   The next, Simmons 27 through 31.  Is this
6  a document that you recognize?
7    A   I recognize it.
8    Q   For the record, can you identify this
9  document, please?
10    A   This looks like a detective's supplement
11  report to this investigation.
12    Q   Did you prepare this document?
13    A   No.
14    Q   You're familiar with case supplementary
15  reports because you reviewed many of them, is that
16  correct?
17    A   I wouldn't say I review detective sup
18  reports very often.  I review my own, but I'm
19  familiar with seeing what these look like.
20    Q   Earlier you testified that you prepared a
21  supplemental report of some kind in this case,
22  correct?
23    A   Correct.
24    Q   But this is not it?
25    A   This is not the one, no.

Page 103

1    Q   Then we have Simmons 32 through 36.  Is
2  this a type of document that you recognize?
3    A   Yes.
4    Q   For the record, can you identify this
5  document?
6    A   This is a case incident report.
7    Q   Did you prepare this document?
8    A   Yes.
9    Q   How is it that you know you prepared this
10  document?
11    A   Because I was the affiant and as the box
12  one officer in this report, so I would have prepared
13  this.
14    Q   You said the box one officer?
15    A   Yes.
16    Q   In this report?
17    A   Correct.
18    Q   If you look at Simmons 34, in the
19  firearms section.  There's a section for the
20  pistol, the Glock pistol.  Below that there's a
21  section for the shotgun, below that there's a
22  section for the revolver.  The sections for the
23  shotgun and the revolver indicate "owner known
24  yes."  Do you see that?
25    A   Yes.

Page 104

1    Q   You believe Mr. Simmons to be the owner
2  of those two guns, is that correct?
3    A   At the time I believed him.  He just could
4  not provide anything that showed --
5    Q   Sure, okay.  Here, if I could direct your
6  attention to the bottom of Simmons 35.  There's a
7  list of star numbers and officers and then those
8  names are followed by another number, in most cases
9  it's either 4171B, 4171C, or 4171D.  Are those the
10  beat numbers?
11    A   Correct.
12    Q   What does B, C, and D refer to?
13    A   B refers to one car, one two-man car.
14  C would refer to another two-man car, and D the same
15  thing.
16    Q   Thank you.  Real quickly, I don't want to
17  spend a lot of time on this, but real quickly the
18  next Simmons 37 through 41.  Is this a document
19  that you recognize?
20    A   Yes.
21    Q   Is this the supplementary report that you
22  prepared?
23    A   It is.
24    Q   Is that your signature and star number at
25  the bottom of each page of the five page report?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
105—108

Page 105

1   A   Yes.
2   Q   Here it indicates where it says
3   persons -- on Simmons 37, there's a line that says
4   present, not arrested, and it lists Simmons, Emily,
5   and Simmons, Keith.  Do you see that?
6   A   Yes.
7   Q   Is there a reason why the little girl
8   Davianna wasn't listed here?  Is there a reason why
9   you didn't list her here?
10   A   Not that I remember.
11   Q   By the way, do you recall when you were
12   on the -- when you had entered the house and you
13   were on the ground level floor of 930 North
14   Keystone with Officer Kinnane, do you recall
15   offering or suggesting that the little girl
16   Davianna be taken into protective custody?
17   A   No.
18   Q   You don't recall saying that?
19   A   No.
20   Q   Do you recall --
21      MR. BATTLE:  Are you asking whether he
22   said it or whether he recalls saying it?  Those
23   are two different things.
24      MR. HOFELD:  Well, I asked him both and I
25   think he answered both.

Page 106

1      MR. BATTLE:  I think you asked one, but
2   I'm just trying to clarify.
3   BY MR. HOFELD:
4   Q   Do you recall whether or not you said to
5   Officer Kinnane or any of the other officers should
6   we take Davianna into protective custody?
7   A   No, we did not -- I did not.
8   Q   You didn't say that?
9   A   No, I did not.
10   Q   Did you ever think there was any need to
11   take her into protective custody that day?
12   A   No.
13   Q   You did not think there was?
14   A   No.
15   Q   You got a double negative again.  You're
16   agreeing with me that --
17   A   I'm agreeing with you.  I didn't think
18   that there was any need to take her into protective
19   custody that day.  Mr. Simmons seemed capable to me.
20   Q   Who did --
21   A   Mr. Simmons seemed very capable to me.
22   Q   Did Emily Simmons seem capable to you of
23   taking care of Davianna Simmons?
24   A   Yes.
25   Q   Did Aretha Simmons seem capable of taking

Page 107

1   care of Davianna Simmons?
2   A   She was being placed into custody.
3   Q   Fair enough.  Is this supplementary
4   report that you authored, is this one of the
5   documents that you reviewed in preparation for your
6   deposition today?
7   A   Yes.
8   Q   You indicate on page four of your
9   supplementary report that Mrs. Simmons appeared
10   intoxicated and was shown a copy of the search
11   warrant.  Do you see that?
12   A   Yes, I do.
13   Q   First of all, are you referring to Emily
14   Simmons or Aretha Simmons here?
15   A   Emily Simmons.
16   Q   When you say she appeared intoxicated,
17   what specifically are you referring to or were you
18   referring to when you wrote that?
19   A   She had elements -- signs that she had
20   obviously been drinking.  She smelled of alcohol
21   beverages, and throughout our conversation I
22   determined she told me that she had been drinking
23   beer and hard liquor.
24   Q   She told you that?
25   A   Correct.  And there was evidence of

Page 108

1   someone having been drinking beer and hard liquor on
2   the table.
3   Q   What did you see on the table?
4   A   There was cans of beer and I don't
5   remember what specific kind of hard liquor, but
6   there was beer and liquor on the table.
7   Q   Do you remember how many cans or how many
8   bottles of hard liquor -- how many cans of beer or
9   how many bottles of hard liquor that you saw on the
10   table?
11   A   I don't remember specifically.  There was
12   at least a few.
13   Q   Do you recall any signs that Mr. Simmons
14   or Aretha Simmons had been drinking?
15   A   No.
16   Q   Do you remember who showed Emily Simmons
17   a copy of the search warrant, is that yourself or
18   Officer Kinnane or somebody else?
19   A   It would have been Sgt. Kinnane in my
20   presence.
21   Q   Sgt. Kinnane.  Thank you.  Do you recall
22   seeing him do it?
23   A   Yes.
24   Q   What did he say about the search warrant,
25   do you remember?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
109—112

Page 109

1  A  I'm sorry.  What did he say about it?
2  Q  Yes.  When he showed Emily Simmons the
3 search warrant did he say something about it?
4  A  Yes.
5  Q  What did he say, do you recall?
6  A  He gave her the customary information that
7 there was being a search warrant executed here.  He
8 showed her that a judge had signed it and the
9 address of the search warrant, the property to
10 search.
11  Q  Did Ms. Emily Simmons say anything in
12 response to his remarks about the search warrant?
13  A  I don't remember what she said.
14  Q  She did say something though?
15  A  She was talking during that time.  I don't
16 recall what she was saying, any specifics of what
17 she was saying.
18  Q  You also reference in the last paragraph
19 on 40, Simmons 40, that -- well, strike that.  I
20 don't need to ask you about that.  Thank you.
21  MR. HOFELD:  I'm conscious of the time.
22  I'm happy to continue, but I want to check in
23  with you guys and see if you want to take a
24  lunch break at some point or want to follow
25  through?

Page 110

1  MR. BATTLE:  Do you have any estimate of
2  how much more you got, in terms of time?
3  (Off the record.)
4 BY MR. HOFELD:
5  Q  Officer O'Keefe, I'm going to ask you
6 some questions now about CPD policy in 2013.  Is
7 there a CPD policy governing police encounters with
8 minors, and again I'm referring to 2013?
9  MR. DIXON:  I'm going to object and just
10  make a standing objection so I don't have to
11  keep interrupting, as far as your talk
12  about -- ask the witness about CPD policy.
13  Object to the extent the witness has not been
14  designated as a 30(b)(6) witness with specific
15  knowledge of the Chicago Police Department or
16  city of Chicago policies and, therefore,
17  anything he might be asked is limited to his
18  personal knowledge.
19  MR. HOFELD:  Sure.  That's fair, Matt.
20  And I acknowledge your standing objection, and
21  I am asking the witness solely based on his
22  personal knowledge and training and experience
23  as a Chicago police officer.  Let me try to be
24  more clear.  Strike -- or withdraw that
25  question and let me ask it this way.

Page 111

1  BY MR. HOFELD:
2  Q  In 2013, to your knowledge was there a
3 Chicago Police Department policy governing police
4 encounters with minors?
5  A  I don't know.
6  Q  You don't know?
7  A  No.
8  Q  Let me ask a little bit more specific
9 question.  Was there a Chicago Police Department
10 policy in 2013 that governed the use of force
11 against minors?
12  A  I don't know.
13  Q  To your knowledge has there ever been a
14 Chicago -- as long as you've been a Chicago police
15 officer, has there ever been a Chicago Police
16 Department policy regarding officers use of force
17 against minors?
18  A  I don't know.
19  Q  When you were in the police academy did
20 you receive any training with respect to the use of
21 force or restraint with respect to minors?
22  A  I don't remember.
23  Q  A slightly different question.  In 2013,
24 was there a CPD policy regarding the use of force
25 against an adult man or woman in the presence of

Page 112

1 his or her young children?
2  A  I don't know.
3  Q  As long as you've been a police officer
4 has there ever been any policy on that subject?
5  A  I don't know.
6  Q  Did you receive any training on that
7 subject when you were in the police academy?
8  MR. BATTLE:  Which subject?
9 BY MR. HOFELD:
10  Q  On the subject of the use of force
11 against an adult in the presence of his or her
12 minor children?
13  A  I don't remember.
14  Q  In 2013 was there a CPD policy regarding
15 the proper use or display of a weapon?
16  A  I don't know.
17  Q  Let me ask you this basic question.  In
18 2013 did CPD have a policy for its officers
19 regarding the use of force?
20  A  If there's a policy regarding the use of
21 force?
22  Q  Yes.
23  A  There's a use of force module.
24  Q  Module or model?
25  A  Well, the term is module when you're in



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
113–116

---

Page 113

1 training.
2    Q    So you received training regarding the
3 proper use of force when you were in the academy,
4 is that correct?
5    A    Correct.
6    Q    Is there also a CPD use of force policy
7 that was in existence in 2013, for example?
8    A    Yes.
9    Q    Let's start with the part that
10 you -- let's start with the training, the module,
11 the use of force module.  What was that and what
12 was presented to you?
13    A    It's just a basic training, the elements
14 of the use of force.  It's a basic model of what
15 constitutes an assailant, what constitutes a
16 non-assailant.  It's just the basic module, it's not
17 anything broad.
18    Q    What do you recall being taught
19 regarding -- in the use of force module when you
20 were in training, what specifically?
21    A    Use of force tactics, handcuffing,
22 et cetera.
23    Q    Do you recall learning about the
24 circumstances under which the use of force was
25 appropriate or necessary?

---

Page 114

1    A    Yes.  Not specifics, but yes.
2    Q    Let's talk now about the CPD use of force
3 policy.  Do you have any recollection -- strike
4 that.  What were the specifics of the CPD use of
5 force policy in 2013?
6    A    I don't know.
7    Q    Do you know whether it allowed -- whether
8 it permitted the use of force against minors or
9 young children in any circumstances?
10    A    I don't know.
11    Q    Do you know whether it permitted the use
12 of force against an adult in the presence of that
13 adult's minor children in any circumstances?
14    A    I don't know.
15    Q    As a Chicago police officer, are you
16 responsible for adhering to CPD policies and
17 procedures?
18    A    Yes.
19    Q    When I refer to CPD policies and
20 procedures, do you understand me to be referring to
21 general orders, special orders, directives,
22 notices, rules, and regulations?
23    A    Correct.
24    Q    As a Chicago police officer, how often
25 are you required to -- how often, if at all, are

---

Page 115

1 you required to review police department policies
2 and procedures?
3    A    It pertains to which policies and
4 procedures that come up in training.  So I -- it's
5 regularly.  We're -- we have to undergo some type of
6 training over a vast array of different procedures.
7    Q    Since you graduated from the police
8 academy and became a Chicago police officer, how
9 often have you undergone additional training,
10 annually, more than that, less than that?
11        MR. BATTLE:  And you're talking about with
12    respect to any time?
13        MR. HOFELD:  Correct.
14        MR. BATTLE:  Go ahead.
15        THE WITNESS:  More than that.
16 BY MR. HOFELD:
17    Q    Can you give me some sense of how often
18 you've gone through additional training since you
19 became a police officer?
20    A    It's quite often.  You know, a couple
21 times a year.  A few times a year.
22    Q    Do you recall receiving additional
23 training regarding the use of force or
24 circumstances under which the use of force is
25 appropriate?

---

Page 116

1    A    I don't remember anything specifically
2 recently, no.
3    Q    Did you ever recall receiving, since the
4 time you graduated from the academy, any training
5 with respect to the use of force and minors or
6 young children?
7    A    I don't remember.
8    Q    You don't remember whether you had that
9 training or not?
10    A    Correct.
11    Q    Are you aware that in this case the
12 plaintiffs allege that an officer pointed and held
13 a gun to the chest of Davianna Simmons?  Are you
14 aware of that allegation?
15    A    Yes.
16    Q    Do you know whether in 2013 under CPD's
17 use of force policy that was allowed or not?
18    A    I'm sure it was not.
19    Q    Are you aware that in this case Aretha
20 Simmons alleges that she was grabbed and violently
21 shaken in front of her daughter Davianna Simmons?
22 Are you aware of that allegation in this case?
23    A    Yes.
24    Q    Under CPD policy in 2013, was an officer
25 permitted to grab and violently shake a parent, one

---



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
117-120

Page 117

1  who's not resisting arrest or resisting
2  instructions in front of that parent's
3  three-year-old child?
4          MR. BATTLE:  Object to the incomplete
5  hypothetical.  Go ahead and answered.
6  BY MR. HOFELD:
7      Q    If you know?
8      A    No.
9      Q    That was not permitted, is that correct?
10     A    Correct.
11     Q    Similarly, as I think you know in this
12 case, Ms. Simmons also alleges that an officer on
13 August 29th, 2013 slammed her body up against the
14 wall and up against the radiator several times.  Do
15 you know whether in 2013 CPD's use of force policy
16 permitted an officer to do that to a woman who is
17 not resisting arrest or refusing instructions in
18 front of her three-year-old child?
19     A    I'm sure it did not.
20     Q    Now I'm going to change the subject a
21 little bit and ask you under CPD's use of force
22 policy in 2013.  Was an officer allowed to grab and
23 violently shake a woman who is not resisting arrest
24 or refusing officer instructions?
25     A    If I recall correctly, that's the same

Page 118

1  question you just asked me.
2      Q    No.  Now I'm asking you -- taking the
3  little girl out of the picture and I'm just asking
4  you about the allegation --
5      A    The answer would be no.  If she's not
6  resisting arrest, no.
7      Q    Or if she's not refusing officer
8  instructions?  No?
9      A    Correct, correct.
10     Q    And if she wasn't resisting arrest and
11 not refusing instructions, then the CPD use of
12 force policy in 2013, under that policy there also
13 would be no need to -- or reason to slam her
14 against the wall, right, or that wouldn't be
15 permitted?
16     A    Correct.
17     Q    Am I correct that in 2013 CPD's use of
18 force policy also did not allow an officer to shake
19 or slam to the wall or radiator a person who had
20 already been arrested and was already handcuffed,
21 is that correct?
22         MR. BATTLE:  Again it assume facts that
23     are not in evidence, and fairly inclusive as
24     well as incomplete hypothetical.  Go ahead and
25     answer.

Page 119

1          THE WITNESS:  Correct.
2  BY MR. HOFELD:
3      Q    Under CPD policy as you understood it in
4  2013, did a police officer have a duty to intervene
5  in some way if that officer saw a fellow officer
6  point a loaded gun at close range at a
7  three-year-old child who doesn't pose an apparent
8  threat to officers?
9      A    Yes.
10     Q    Under CPD policy in 2013, did an officer
11 have a duty to in some way intervene if he or she
12 saw a fellow officer use force against an adult man
13 or a woman in the presence of that adult's young
14 child when that force wasn't necessary to affect
15 the arrest?
16     A    Yes.
17     Q    Under CPD policy in 2013, did an officer
18 have a duty to intervene in some way if that
19 officer had knowledge that a fellow officer was
20 converting cash or jewelry during a home search?
21     A    Yes.
22     Q    Or was unnecessarily damaging the
23 personal property of a resident of that house?
24     A    Yes.
25     Q    Officer O'Keefe, did you -- I need to ask

Page 120

1  you this on the record.  Did you at any point
2  during the execution of the search warrant at
3  930 North Keystone on August 29th, 2013, did you
4  intervene in any way or request any fellow officer
5  to stop acting toward the plaintiffs in a manner
6  that you thought was contrary to CPD policy?
7          MR. BATTLE:  Object to the form of the
8      question.  Do you understand what he's asking
9      you?
10         THE WITNESS:  I think, by and large, I
11     understand.
12         MR. BATTLE:  Go ahead.
13         THE WITNESS:  No.  There was no reason for
14     me to intervene in any situation that occurred.
15 BY MR. HOFELD:
16     Q    Okay, I understand.  In other words, at
17 any -- and I can be more specific.  At any time
18 during the execution of the warrant did you ask any
19 officer to stop using force against any plaintiff?
20         MR. BATTLE:  Objection, asked and
21     answered.  Go ahead and answer it.
22         THE WITNESS:  No, I did not.
23 BY MR. HOFELD:
24     Q    At any point during the execution of the
25 warrant that day did you ask any officer to stop



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
121–124

Page 121

1  committing theft?
2      A   No, I did not.
3      Q   During the course of your career, have
4  you ever witnessed a fellow officer acting in a
5  manner toward a civilian or another officer that
6  you thought was contrary to that officer's oath or
7  contrary to CPD policy or contrary to the law?
8      A   No.
9      Q   In your career, have you ever intervened
10  in any way or requested a fellow officer to stop
11  when you observed that officer acting in a manner
12  toward a civilian that you thought was contrary to
13  the officer's oath, contrary to CPD policy, or
14  contrary to the law?
15      A   I'm going to have to ask you to repeat
16  that one.
17      Q   It's very wordy.  I'm sorry.  Let me try
18  to ask it more simply.  Have you ever intervened in
19  any way when you observed or had knowledge that a
20  fellow officer was acting toward a civilian in a
21  manner that was contrary to policy, contrary to
22  law, or contrary to his oath?
23      A   No.  I've never encountered a situation
24  where I observed that.
25      Q   If I understand you correctly, then,

Page 122

1  during the course of your career, you've never
2  reported a fellow officer for any kind of
3  misconduct or illegal activity or any violation of
4  CPD policy, is that correct?
5      A   That's correct.
6      Q   Do you recall ever having to use force on
7  a minor?
8      A   No.
9      Q   Do you recall ever having to use force on
10  a minor's parent in the presence of that minor?
11      A   I don't recall.
12      Q   You don't recall, one way or the other?
13      A   I don't remember.
14      Q   I think I asked you this, but I need to
15  make sure so pardon me if I did ask it already.
16  When you were in the police academy, do you
17  recall receiving any training or what you were
18  trained -- what training you received when it comes
19  to using force on minors or in the presence of
20  minors?
21      A   No, I don't remember.
22      Q   Would you agree with the statement that
23  it's unnecessary or unreasonable to point a loaded
24  gun point blank at a three-year-old little girl if
25  that little girl poses no apparent danger to

Page 123

1  officers or anyone else?
2      A   Yes.
3      Q   Would you agree as a matter of best
4  practice in policing with the statement that
5  officers should avoid using force or violence
6  against a three-year-old little child when the
7  force isn't necessary?
8      A   Yes.
9      Q   Would you agree with the statement, the
10  general statement, that it's unnecessary or
11  unreasonable to point a loaded gun at an older
12  adult in the presence of his or her three-year-old
13  granddaughter if the adult is not resisting arrest,
14  doesn't pose a danger to officers, and isn't
15  refusing to follow instructions?
16      A   Yes.
17      Q   Would you agree with the statement that
18  as a matter of best practice in policing, officers
19  should avoid using force against adults in front of
20  their young children when the adult isn't resisting
21  arrest or refusing to follow instructions and
22  doesn't pose a danger to officers?
23      A   Yes.
24      Q   Would you agree with the statement that
25  it's unnecessary or unreasonable to use force

Page 124

1  against an adult in the presence of that adult's
2  three-year-old little child if the adult is already
3  handcuffed, isn't resisting arrest, and isn't
4  refusing to follow officer instructions?
5      A   Yes.
6      Q   Would you agree with the statement as a
7  matter of best practice in policing, that officers
8  should avoid using force against adults in front of
9  their young children when the adults can't resist
10  because they're already handcuffed?
11      A   Yes.
12      Q   I need to ask you about some other
13  documents.  Let's start with -- why don't we make
14  this --
15          MS. VAN DRIL:  Number two.
16          MR. HOFELD:  Yes, please.
17          (Deposition Exhibit No. 2 was
18          marked for identification.)
19  BY MR. HOFELD:
20      Q   Officer O'Keefe, I need to ask you some
21  basic questions about some complaints that were
22  filed by civilians with OPS and IPRA.
23          MR. HOFELD:  We can mark this one too as
24      three.
25          (Deposition Exhibit No. 3 was.



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

Page 125

1          marked for identification.)
2  BY MR. HOFELD:
3      Q    I'm going to ask you about the specific
4  complaints in Exhibits 2 and 3 in a moment, but let
5  me start with some general questions.
6          Officer O'Keefe, have you ever had a
7  sustained finding against you by IPRA or internal
8  affairs in connection with any civilian complaint?
9      A    No.
10     Q    Or have you ever had a sustained finding
11  against you by what used to be OPS, the Office of
12  Professional Standards, in connection with any
13  civilian complaint?
14     A    No.
15     Q    Have you ever been disciplined in any way
16  in connection with any civilian complaint filed
17  against you at any time?
18     A    No.
19     Q    Has any supervisor or superior of yours
20  ever communicated with you regarding any civilian
21  complaint against you at any time?
22         MR. BATTLE:  Point of clarification.  What
23     do you mean by communicating with him?
24         MR. HOFELD:  I intentionally mean it to be
25     that broad.

Page 126

1  BY MR. HOFELD:
2      Q    Has any superior or supervisor of yours
3  ever talked or written to you about a civilian
4  complaint that was filed with OPS or with IPRA at
5  any time since you've been a police officer?
6         MR. BATTLE:  Do you understand the
7     question?
8         THE WITNESS:  In terms of communication,
9     do you mean notifying me that I have a
10    complaint?  Is that what you mean?  If you mean
11    in the broad sense, I've been told to log onto
12    IClear and acknowledge that there's log numbers
13    that I have to answer questions to, and that's
14    probably the extent of anything that any
15    supervisor's ever discussed with me
16    regarding --
17  BY MR. HOFELD:
18     Q    I appreciate the clarification from your
19  counsel and you.  I guess what I wanted to ask is
20  and I think you've answered it.  Has any
21  supervisor, superior of yours, ever communicated
22  with you about the substance of any civilian
23  complaint against you?
24     A    No.
25     Q    Has any supervisor or superior of yours

Page 127

1  ever given you any reprimands, any warning, or any
2  advice in connection with any civilian complaint
3  filed against you?
4      A    No.
5      Q    To your knowledge have you ever had a
6  civilian complaint filed against you in which you
7  were accused of using force against a minor?
8      A    To my knowledge, no.
9      Q    Have you ever had any civilian complaint
10  made against you in which you were accused of using
11  some form of excessive force?
12     A    I don't remember.
13     Q    Have you ever had any civilian complaint
14  filed against you in which it was alleged that you
15  used excessive force against an adult man or woman
16  in the presence of minor children?
17     A    I don't remember.
18     Q    Have you ever had any civilian complaint
19  filed against you in which you were, essentially,
20  accused of theft of personal property?
21     A    I don't remember.
22     Q    Have you ever had any civilian complaint
23  filed against you in which you were accused of
24  intentionally damaging personal property?
25     A    I don't remember.

Page 128

1      Q    Have you ever had any civilian complaint
2  filed against you in which you were accused of
3  neglect of duty or a failure to intervene?
4      A    I don't remember either.
5      Q    Have you ever had any civilian complaint
6  filed against you in which you were accused of
7  improperly executing a search warrant?
8      A    I don't remember.
9      Q    Do you recall approximately how many
10  civilian complaints you had filed against you since
11  you became an officer?
12     A    No, I don't.
13     Q    Do you recall whether it was more or less
14  than five?
15     A    More than five.
16     Q    Do you recall whether it's been more or
17  less than ten?
18     A    I would guess it's more than ten.
19     Q    Do you recall whether it's more or less
20  than fifteen?
21     A    I don't know.
22     Q    Let me ask you some brief questions about
23  the documents in Exhibit 2.  First, let me -- the
24  documents in Exhibit 2 were produced to the
25  plaintiffs in this case by the city of Chicago with



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
129–132

Page 129

1  the representation that these are the face sheets,
2  as they're called, for the civilian complaints
3  filed against you during the course of your career
4  as an officer. The Bates label numbers are in the
5  bottom right, I may refer to those, the FCRL
6  numbers. Do you see those?
7      A   I do.
8      Q   I'm going go through these as quickly as
9  I can. Let's look at the face sheet, FCRL 238.
10  You see on the second page of this face sheet, FCRL
11  239, you're listed as one of the accused officers.
12  Do you see that?
13      A   I do.
14      Q   The allegation was that Anton Johnson was
15  unlawfully handcuffed, released, and then struck
16  with fist on his face, head, and body. That's the
17  summary of the allegation. Do you see that?
18      A   I do.
19      Q   Did you do that to Anton Johnson?
20      A   No.
21      Q   Did any of the officers who are listed in
22  this face sheet do that to Anton Johnson in 2005,
23  August 29th, 2005, as complained?
24      A   Not to my knowledge.
25      Q   Do you remember the incidents of

Page 130

1  August 29, 2005 involving Anton Johnson?
2      A   I only remember being a transport, being
3  one of the transport officers in this case. So
4  I didn't -- really wasn't privy to the entire
5  incident. So I do remember the incident, but
6  I don't remember much about it.
7      Q   There's also a second person who alleges
8  that she went to help Anton Johnson and that she
9  was also struck repeatedly to her body and head.
10  Do you see that allegation?
11      A   Yes, I do.
12      Q   Did you strike a second person or did you
13  see any other officer strike a second person?
14      A   No.
15      Q   You say you were only involved in
16  transport. Can you be more specific? What was
17  your --
18      A   I didn't say I was only involved in
19  transport. I said to -- the extent of what I recall
20  is I transported one of the arrestees in this
21  situation.
22      Q   Which one?
23      A   Assisted in the paperwork.
24      Q   Which arrestee?
25      A   I don't recall.

Page 131

1      MR. BATTLE: You two guys are talking over
2  each other.
3  BY MR. HOFELD:
4      Q   Do you recall which arrestee?
5      A   I don't recall.
6      Q   From where to where did you transport the
7  arrestee?
8      A   From the scene to the 10th District.
9      Q   Did you arrive on the scene with other
10  officers or did you arrive on the scene after
11  arrests had already taken place?
12      A   I don't remember.
13      Q   If you can, could you turn with me,
14  please, to FCRL 241. Do you have any recollection
15  of an incident or incidents involving a Ralph
16  Sewell that took place on or about July 18th, 2007
17  at 1400 South St. Louis Avenue in Chicago?
18      A   No.
19      Q   Do you have any recollection of being
20  present at that address on that day?
21      A   No.
22      Q   Or damaging the interior of this
23  person's -- Mr. Sewell's vehicle while searching
24  for drugs?
25      A   No.

Page 132

1      Q   Could you turn with me, please, to
2  FCRL 246 and 247?
3      MR. BATTLE: Which one do you want him to
4  look at? Starting on 246?
5      MR. HOFELD: Yes.
6  BY MR. HOFELD:
7      Q   Were you involved in an incident on or
8  about September 30th, 2007 involving a Riesha
9  Sutton and or a Roslyn Rand at 1629 South Karlov
10  Avenue in Chicago?
11      A   I don't remember.
12      Q   You don't have any recollection of being
13  present on that date or any incidents that took
14  place at that location?
15      A   I was present at 1629 South Karlov for
16  more than one search warrant in my career. So I
17  don't remember this specific, what date it was.
18      Q   Fair enough. The allegation here was
19  that officers entered the residence with a warrant
20  and ransacked the premises and damaged various
21  personal property and used a great deal of
22  profanity at family members that included children
23  as young as three. Do you recall doing any of
24  those things?
25      A   No, I do not.

JOHN D. O'KEEFE                                    July 13, 2016
SIMMONS vs CITY OF CHICAGO                         133–136

Page 133

1    Q    Where you present at any time at this
2    address?
3    A    No.
4    Q    Do you recall seeing fellow officers do
5    any of these things when you were present at any
6    time at this address?
7    A    I did not see any of my fellow officers do
8    any of these things at this address.
9    Q    Could you turn with me, please, to
10   FCRL 253 and 254, starting on 253.  Do you recall
11   incidents that took place on or about January 27th,
12   2009 at 7924 South Wolcott involving a
13   Booker Terrell?
14   A    Vaguely I do remember this case.
15   Q    What do you remember about it?
16   A    Actually, no.  I definitely remember it.
17   Mr. Booker was arrested and during the course of his
18   arrest he battered myself and at least one other
19   officer.  He was subsequently placed into custody.
20   Q    Sure.  What did he do to you and the
21   other officers specifically?
22   A    I just remember we were fighting on the
23   ground and he -- I had a cut on my face from here to
24   here.
25   Q    Oh, gee, okay.  He apparently accused you

Page 134

1    and another officer listed here of using excessive
2    force.  Do you recall any of his specific
3    allegations?
4    A    No, I don't.
5    Q    You denied you used excessive force
6    against Mr. Terrell?
7    A    Yes, I do.
8    Q    If you could turn with me, please, to
9    255, 256, face sheet at FCRL 255 and 256.  Do you
10   recall being present for any incident that took
11   place at 1314 West 15th Street, apartment number
12   403 in Chicago, on or about April 3rd, 2009,
13   involving someone by the name of Kenosha Hauf?
14   A    I can't say I remember this.
15   Q    You don't remember this one?
16   A    No.
17   Q    Do you recall entering the premises at
18   that address with a search warrant that had another
19   address on it and looking for a person who didn't
20   reside at that residence?
21   A    No, I don't.
22   Q    You also deny that you or other officers
23   destroyed any personal property at that residence,
24   is that correct?
25   A    Yes.  I don't remember this incident at

Page 135

1    all.  I'm not saying it didn't -- I'm definitely
2    saying I never did this at this address.  I don't
3    remember this incident, period.
4    Q    If you can turn with me, please, to the
5    face sheet at FCLR 259 and 260.  Do you recall
6    being present for an incident that took place at
7    1412 South Kolin Avenue, apartment 2 ND, I guess
8    that's second floor, I'm sorry, a second floor
9    apartment in Chicago, involving a Maria Williams on
10   or about November 19, 2009?
11   A    I don't remember this either.
12   Q    You don't remember whether you or other
13   officers damaged or destroyed any personal property
14   at that apartment, correct?
15   A    I never damaged nor did I observe any of
16   my teammates or any other officers damage any
17   personal property at 1412 South Kolin.
18   Q    Could you please turn with me to FCRL 263
19   and 264, starting with 263.
20          Do you recall going to the address of
21   1528 North Massasoit Avenue in Chicago, on or about
22   January 14th, 2010, and dealing with a
23   Joyce Alexander at that address?
24   A    No, I don't.
25

Page 136

1    Q    You don't recall any incident like that?
2    A    I don't.  I don't remember this incident,
3    no.
4    Q    You also don't remember, then, damaging
5    or defacing personal property at that address,
6    correct?
7    A    That's correct, I didn't.  Nor did I
8    observe anyone pour paint or damage or deface this
9    individual's property.  However, I don't remember
10   this specific search warrant.  I don't remember the
11   specific search warrant on 1428 North Massasoit.
12   Q    Let's go, if we can, to FCRL 265 and 266.
13   Do you remember going to the residence at 1520
14   South Keeler in Chicago on or about April 15th,
15   2010 and dealing with a Mary Lynn Moody?
16   A    No.
17   Q    Or do you recall yourself or other
18   officers wrecking or trashing the residence or
19   personal property at the residence?
20   A    No, myself, nor did I observe any other
21   officers wreck and trash the residence located at
22   1520 South Keeler.
23   Q    If we can go to FCRL 268 and 268, please.
24   Do you recall going to the address of 1230 North
25   Laramie Street, apartment 1102 in Chicago, on or



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
137–140

Page 137

1  about May 11th of 2010 and dealing with an
2  Alice A. Davis?
3      A   I recall -- yes. This is the Cabrini
4  Green housing complex. This was a search warrant.
5  I do remember the search warrant.
6      Q   What do you recall -- what occurred at
7  that address on that date?
8      A   All I recall is that there's a forced
9  entry. There was quite an amount of narcotics
10  recovered. An arrest was made out of that building
11  by an individual that was not supposed to be living
12  in that apartment and that an officer was injured in
13  the entry. That's all I remember.
14      Q   Injured by another person?
15      A   No. By -- during the forced entry he
16  injured his hand.
17      Q   The summary of the complaint on the face
18  sheet indicates during the execution of a search
19  warrant the accused officers damaged two of her
20  doors, took food out of her refrigerator, and
21  threated her with arrest if she reported the
22  officers. The reporting party alleges the accused
23  officers threatened to have her children taken away
24  from her without justification. Did you say or do
25  any of those things?

Page 138

1      A   No.
2      Q   Did you see or hear fellow officers do or
3  say any of those things on that date?
4      A   No, I didn't.
5      Q   If I can direct your attention to
6  FCRL 269 and 270. Do you recall going to the
7  address of 3327 West Monroe, Second floor rear
8  apartment in Chicago, on or about May 22nd, 2011
9  and dealing with a Kathy Franklin, among others?
10      A   No, I don't.
11      Q   You don't have any recollection of this
12  incident?
13      A   I don't remember this one. No.
14      Q   The allegations against you and other
15  officers in this complaint are that they handcuffed
16  male and female relatives and damaged personal
17  property during the search. Based on the fact that
18  you don't remember doing this, I'm going to assume
19  that you don't remember either yourself or any
20  other officers doing those things?
21      A   Had I done that or had I observed any
22  officers done that I would have remembered that.
23  So, no.
24      Q   Thanks. If I can direct your attention
25  to FCRL 271 and 272, starting with 271. Do you

Page 139

1  recall going to 1924 South Troy Street in Chicago,
2  on or about August 27, 2011, and dealing with a
3  Ron Nimms?
4      A   I remember making an arrest at this
5  address, but it was not --
6      Q   It was not --
7      A   I don't remember anything other than the
8  fact that there was -- it was a block where they
9  sold a lot of drugs back then so we made numerous
10  arrests but -- numerous arrests around this address.
11  So I don't remember anything specifically other than
12  that. I remember the name Christopher jogs my
13  memory, but that's really it.
14      Q   Which names do you remember?
15      A   Christopher Nimms.
16      Q   Was that the person that you arrested?
17      A   I just said the name -- I remember the
18  name, but I don't remember if we arrested him or
19  not.
20      Q   So you don't remember if you arrested a
21  Ron Nimms?
22      A   I don't remember.
23      Q   Here the summary of the allegation in the
24  complaint is that the officer or officers entered
25  and searched without justification and damaged

Page 140

1  drywall and cut the lock off of his -- I guess
2  that's Mr. Nimms's bedroom door. Do you recall
3  doing any of those things or seeing any of your
4  fellow officers do those things?
5      A   No. I didn't do those things nor did I
6  observe any of my fellow officers do those things.
7      Q   If I can direct your attention to FCRL
8  273 and 274. Do you recall going to 1236 South
9  Kolin in Chicago on or about April 10th, 2012 and
10  dealing with a Reginald Hoskins?
11      A   No.
12      Q   So you don't recall searching and
13  ransacking his vehicle without justification or
14  seeing any of your fellow officers do that, is that
15  correct?
16      A   No.
17      Q   Is that correct?
18      A   That's correct.
19      Q   Can you turn with me, please, to
20  FCRL 277. Do you recall --
21      A   277?
22      Q   Right. Are you there?
23      A   Yes.
24      Q   By the way, let me ask you a question
25  about your star number. Your star number is



JOHN D. O'KEEFE                                         July 13, 2016
SIMMONS vs CITY OF CHICAGO                              141–144

Page 141

1   currently 18418, correct?
2      A   Correct.
3      Q   At any time was your star number 19575?
4      A   Yes.
5      Q   Besides those two star numbers, have you
6   had any other star numbers?
7      A   No.
8      Q   During the time you've been a police
9   officer for the Chicago Police Department?
10     A   No.
11     Q   When did your star number change?
12     A   It only changed briefly because the inside
13  of the star fell out, like the enamel fell out so I
14  had to bring it in.  And instead of them just gluing
15  it back in or whatever, because the piece was
16  missing, they issued me a new star, temporarily a
17  new star number which is 19575.  I had that for a
18  few months and then --
19     Q   Do you remember what year that was when
20  you had that?
21     A   It was just this past year.
22     Q   Other than that, your star number's
23  always been 18418?
24     A   Correct.
25     Q   Do you remember going to or being

Page 142

1   present at 3401 West Monroe, first floor east in
2   Chicago, Illinois, on or about July 12th, 2003?
3      A   Are you referring to CRL 277?
4      Q   Yes, I am.
5      A   I don't have --
6      Q   Can I see what you have?  Maybe we're
7   looking at a different page.  No, we're looking at
8   the same page.  We're just not looking at the same
9   place on the same page.  So let me direct your
10  attention to -- let's see.  Do you see the
11  complainant section of the --
12     A   I do.
13     Q   Sort of in the middle of the page?
14     A   Yes.
15     Q   The complainant's name is Carl Carr.  Do
16  you see that?
17     A   Yes.
18     Q   It appears that Mr. Carr's address is
19  3401 West Monroe?
20     A   Yes.  It looks like that's what it says.
21     Q   I'm asking you if you recall -- no,
22  strike that.  Never mind, I see.
23         Up above it says location of the
24  incident -- of incident.  It says 1200 South
25  Independence.  Did you see that?

Page 143

1      A   I do.
2      Q   Do you recall being at that address on
3   July 12th, 2003, for an incident that involved
4   either Erica Sanders or Carl Carr or a
5   Ronald Washington?
6      A   I remember that we made an arrest here,
7   that I was working with a field training officer,
8   Officer Carr that night.  And if I recall correctly,
9   we made an arrest that night in that general area.
10     Q   Do you recall who you arrested or whether
11  it was any of the individuals named here?
12     A   I don't remember any of their names.
13     Q   The complainant, Mr. Carr, apparently
14  complained in this complaint that he filed that two
15  officers repeatedly struck an unknown black male.
16  Do you recall doing that or seeing any fellow
17  officer of yours do that on or about that date?
18     A   I didn't do that and I don't recall seeing
19  any of my fellow officers do that on or about that
20  date.
21     Q   Can we go to the next page, please,
22  FCRL 278.  Do you recall being present for an
23  incident at 4404 South Wells on or about
24  October 30th, 2003, involving a Lupe Diaz or an
25  Afradia Fraction or an Elmery Fraction?

Page 144

1      A   I recall answering witness statements in
2   the case and I recall the incident somewhat.
3      Q   What do you recall happening?
4      A   I remember being on the scene of an arrest
5   that occurred and that was really the end of it.
6      Q   Do you recall who you arrested?
7      A   I did not make the arrest.  I was just
8   present.
9      Q   How many other officers besides you were
10  present?
11     A   There were quite a few.  I believe some
12  guy ran in there with a machine -- two guys ran in
13  there with machine guns or something like that.
14     Q   Do you recall searching the premises?
15     A   I was never inside the premises.
16     Q   Do you recall any of the officers who you
17  were with?
18     A   No.
19     Q   Let me ask you about FCRL 280.  Do you
20  recall being present at 1463 South Karlov on or
21  about November 6th, 2004 for some incident
22  involving Tenishia Thomas?
23     A   I don't.
24     Q   You don't recall searching that residence
25  about a warrant, is that correct?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
145–148

Page 145

1    A    No.  I wouldn't have searched 1463 South
2  Karlov without a search warrant.
3    Q    Let's look at the next face sheet,
4  FCRL 281.  Do you recall being present at 1501
5  South Komensky in Chicago, on or about
6  January 11th, 2006, for an incident involving an
7  Angela Jackson or an Eddy Dixon?
8    A    No.
9    Q    So you don't recall planting drugs on an
10  Eddy Dixon or seeing any fellow officers plant
11  drugs on an Eddy Dixon, is that correct?
12    A    That's correct.  I wouldn't have planted
13  drugs on Eddy Dixon or any other person.  I didn't
14  observe anybody do that either.
15    Q    Sure.  Let me turn your attention to
16  Exhibit 3, please.  We looked at this -- first, let
17  me make the representation that Exhibit 3 deals
18  with -- all of the documents in Exhibit 3 deal with
19  a single complaint.  We looked at the face sheet
20  for this complaint within Exhibit 2 already.  This
21  is the incident at 3327 West Monroe, on or about
22  May 22nd, 2011, involving a Kathy Franklin, among
23  others, where the allegation was that officers
24  entered her residence during a birthday party,
25  handcuffed male and female relatives and damaged

Page 146

1  personal property during the search.  I
2  think -- and I can't remember if you -- do you have
3  a recollection of --
4    A    I don't.
5    Q    You don't have any recollection of an
6  incident at this address at that time?
7    A    No, I don't.  I remember you telling me
8  earlier when you mentioned the 3327 West Monroe.
9  I don't remember it.
10    Q    Okay.  So you wouldn't have done any of
11  those things -- you didn't do any of those things
12  because you don't remember being there?
13    A    Correct.
14    Q    Officer O'Keefe, have you ever had any
15  civil lawsuits filed against you in your official
16  capacity as a Chicago police officer, apart from
17  this lawsuit?
18    A    Yes.
19    Q    Approximately how many cases have you had
20  filed against you as a party defendant in your
21  capacity as a Chicago police officer?
22    A    I don't remember.
23    Q    More or fewer than five?
24    A    Around five.  Maybe more.
25    Q    Do you recall generally the allegation of

Page 147

1  any of those cases?
2    A    Not every one, no.
3    Q    Which ones do you recall?  Maybe we can
4  take them one at a time.
5    A    The last federal lawsuit case I had this
6  past winter was a -- the allegation was that myself
7  and other officers damaged property while arresting
8  an individual that home invaded the plaintiff's
9  house.  I don't remember the rest of it, the
10  whole -- all the allegations.  But that was just one
11  of them that I do remember, and it was the element
12  of use of force I believe.
13    Q    I'm sorry.  I lost you there?
14    A    I believe there was an element of use of
15  force in that --
16    Q    In that case too?
17    A    Yes.
18    Q    So that's the allegation for that case.
19  Do you recall briefly the allegations in any of the
20  other civil cases that have been filed against you
21  as a Chicago police officer?
22    A    It was just one that I can recall
23  specifically, that we arrested someone falsely.
24    Q    Do you recall the names of the plaintiffs
25  in that case?

Page 148

1    A    I don't.
2    Q    Do you recall the names -- do you recall
3  any of the specific allegations besides false
4  arrest?
5    A    The one -- the false arrest.  I believe
6  the individuals stated that we had planted drugs on
7  him, illegal drugs.
8    Q    Who were the other officer defendants in
9  that case?
10    A    I don't remember.  It was when I was on a
11  TAC team and I don't remember specifically what
12  other officers would have been.
13    Q    I'm sorry.  I didn't hear you.  You were
14  on?
15    A    It was when I was working the 10th
16  District.
17    Q    What was the outcome of that case?
18    A    It went to trial and the plaintiff lost.
19    Q    Was that case filed in federal or state
20  court?
21    A    Federal court.
22    Q    How about the case with the allegation of
23  damaged property, when you were pursuing someone
24  into somebody's residence, what was the outcome of
25  that case?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
149–152

Page 149

1    A    The plaintiff lost.
2    Q    Was that a federal or state case?
3    A    Federal.
4    Q    Do you recall any other civil lawsuits in
5    which you were accused of --
6    A    Nothing specific, no.  But I know there's
7    more than that.
8         (Deposition Exhibit No. 4 was
9              marked for identification.)
10   BY MR. HOFELD:
11   Q    We have Exhibit 4.  Exhibit 4 is a
12   collection of civil complaints in cases where you
13   were named as a defendant.  I'm just going to ask
14   you some brief questions about each one?
15   A    Sure.
16   Q    Starting with the first one, Brazil and
17   Johnson, the first two named plaintiffs.  Do you
18   see that?
19   A    Yes, I do.
20   Q    We already talked about the complaint,
21   the civilian complaint filed by Anton Johnson, and
22   I think that you denied striking him, is that
23   correct?
24   A    That's correct.
25   Q    The allegation in this complaint is also

Page 150

1    that Shantadia Brazil, Angela Johnson, Welsie
2    Johnson, and Sabrina Johnson, were also struck by
3    officers on the face, head, and body.  Do you deny
4    striking them?
5    A    Yes.
6    Q    Do you deny seeing any of your fellow
7    officers strike any of them?
8    A    Yes.
9    Q    Do you deny seeing any of your fellow
10   officers strike Anton Johnson?
11   A    Yes.
12   Q    Sabrina Johnson according to this
13   complaint was an eleven-year-old minor and was
14   struck by the defendant officers.  I take it that
15   you deny striking her, is that correct?
16   A    Correct.
17   Q    Do you deny seeing any of your fellow
18   officers strike Sabrina Johnson?
19   A    I did not see them strike Sabrina Johnson.
20   Q    What was the outcome of this lawsuit, if
21   you recall?
22   A    I believe -- I don't remember.  I don't
23   know what happened with this case, to be honest.
24   Q    Did you give a deposition in this case?
25   A    I don't believe so, but I may have.

Page 151

1    Q    I believe you testified earlier that you
2    recall giving a total of three depositions in civil
3    cases.  Do I have that right?
4    A    I believe I stated that it was at least
5    three.
6    Q    At least three?
7    A    Correct.
8    Q    This may have been one of the cases in
9    which you gave a deposition, this Brazil Johnson
10   case?
11   A    As I stated, counsel, I don't believe I
12   gave a deposition in this case, but it's possible.
13   This was filed quite a long time ago.  I don't even
14   know what happened with this case.
15   Q    Sure.  I want to ask you next about the
16   allegations in the White versus yourself and other
17   defendant officers case, Michael White and other
18   plaintiffs?
19   A    Yes.
20   Q    Do you recall the allegations in this
21   case?
22   A    This is the same case where I mentioned
23   the Whites claimed that we ransacked their house and
24   that there was excessive force against one of the
25   officers or excessive force against one of the

Page 152

1    officers.
2    Q    Against one of the officers or one of the
3    plaintiffs?
4    A    Against one of the officers.
5    Q    Is this the case where you and other
6    officers were pursuing a suspect?
7    A    Yes.
8    Q    Into the residence?
9    A    Correct.
10   Q    You said the outcome of this case was a
11   defense verdict?
12   A    Correct.
13   Q    Did you give a deposition in this case?
14   A    Yes.
15   Q    The allegation in paragraph 23 of this
16   complaint is that you and other officers pointed
17   guns at the heads of Linda White and her minor son
18   when they tried to leave through the front door,
19   and that Michael White's mother apparently shouted,
20   "Don't shoot her."  I assume that you deny that
21   those events occurred?
22   A    Yes.
23   Q    You deny seeing any of your fellow
24   officers point a gun at the head of a minor, is
25   that correct?



Page 153

1    A    That's correct.
2    Q    Let me ask you about the last
3  complaint -- excuse me, the second to the last
4  complaint in the exhibit.  It's Francine and Lester
5  Williams versus Officer John O'Keefe and other
6  officers and the city of Chicago.  Do you recall
7  the allegations in this case?
8    A    I do now.  Yes.
9    Q    The allegation is that you tackled
10  Lester Williams to the ground and injured him.  Do
11  you deny doing that?
12    A    Yes.
13    Q    Do you deny seeing any of your fellow
14  officers do that?
15    A    Yes, I do.
16    Q    Did you give a deposition in this case?
17    A    No.
18    Q    Do you recall the outcome of this case?
19    A    No, I don't.
20    Q    Let me ask you about the last complaint
21  in Exhibit 4.  The complaint is Emmanuel Williams,
22  plaintiff, versus the City of Chicago, John D.
23  O'Keefe and other officers.
24         MR. BATTLE:  Just for the record, this is
25  a pending matter.  It has not been closed yet,

Page 154

1  and judging by the nature of the allegation of
2  the questions that you've asked thus far, we're
3  not going to assert the attorney-client
4  privilege.  However, anything beyond what
5  you're talking about now, he probably is going
6  to need to assert privilege since it's pending.
7         MR. HOFELD:  That's fine.  I don't think
8  I'm asking him any questions that go to the
9  privilege.  Thanks, Ken.
10  BY MR. HOFELD:
11    Q    Do you recall the allegations in this
12  case?
13    A    Yes.
14    Q    What in your understanding are the
15  allegations against you and other officers in this
16  case?
17    A    I believe it's false arrest.
18    Q    Paragraph 19 and 20 on page three of the
19  complaint, defendant officers charged plaintiff
20  with ten felony criminal offenses for possession of
21  the guns and drugs they found inside the apartment.
22  The defendant officers wrote false reports
23  concerning the circumstances that led to
24  plaintiff's arrest and defendant officers recovery
25  of the illegal contraband.  I assume that you deny

Page 155

1  as to yourself that those allegations are true, is
2  that correct?
3    A    That's correct.
4    Q    And you deny that any of your fellow
5  officers did the things they're accused of in this
6  lawsuit, is that correct?
7    A    That's correct.
8    Q    Have you given a deposition yet in this
9  case?
10    A    No.
11    Q    Is your deposition in this case
12  scheduled?
13    A    No.
14    Q    Apart from the complaints that we looked
15  at so far, the civil complaints that we've looked
16  at so far in Exhibit 4, are there any other civil
17  lawsuits that have been filed against you in your
18  capacity as a police officer?
19    A    Not that I can remember.
20    Q    Let me go back for a second to the
21  Francine and Lester Williams complaint -- actually,
22  no.  I'm sorry.  I don't want to do that.  I want
23  to go to the Michael White complaint.
24         Your fellow officers in this case are
25  some of the same fellow officers in this case,

Page 156

1  namely Steven Hefel, Justin Homer, Michael Laurie,
2  Michael Suing.  How long have you worked with those
3  officers?
4    A    I worked with those officers for around
5  four years at least.
6    Q    Four years back in time from today you
7  mean?  You're saying since at least 2012 you've
8  worked with them?
9    A    No.  From -- during this time period from
10  maybe '09 to '13.  I'm not sure, I don't remember
11  specifically.
12    Q    But you think you worked with them for
13  approximately four years?
14    A    Correct.
15    Q    It was roughly during the time frame of
16  '09 to '13?
17    A    Roughly.
18    Q    Do you still work with any of them today?
19    A    No.
20    Q    Did you work with any of these officers
21  before 2009?
22    A    I may have been off by a little bit, so it
23  may have been -- but looking through this, not that
24  I remember.
25    Q    Then if you look at the Williams



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
157–160

Page 157

1  complaint which is the pending case, your fellow
2  defendants in that lawsuit are also some of the
3  same defendants in this case, namely Officer
4  Wrigley, Office Homer, Officer Hefel, Officer
5  Laurie, Officer Suing, and Sgt. Kinnane.  Do you
6  see that?
7      A  I do.
8      Q  The allegations in this case pertain to
9  November of 2013.  Were you working with those
10 officers at that time?
11     A  Yes.
12     Q  When did you stop working with these
13 officers?
14     A  I believe it was September or August of
15 '14.
16     Q  I believe you said this group of officers
17 was known as beat 471, is that correct?
18     A  No.  4171.
19     Q  For some reason I keep messing that
20 number up, 4171.  The officers that were in group
21 4171, as of the date of the incident in this case,
22 August 29, 2013, that same group of officers has
23 been a part of beat 4171 for at least the period
24 2009 to 2013, correct?
25     A  Roughly, yes.

Page 158

1      Q  Or it could have been 2014, because you
2  said that you stopped working with --
3      A  I did.  I left -- I mean some of those
4  individuals may or are probably still on
5  that -- those teams.
6      Q  Working together on that team?
7      A  Yes.  And then -- maybe the beat number's
8  the same, but I don't know for sure.  But, yes,
9  there's still a few of those guys still working
10 together I think.
11         MR. HOFELD:  If we can take a short
12     bathroom break and we'll come back and I can
13     finish up.  Is that all right?
14         MR. BATTLE:  Okay.
15         (Recess.)
16 BY MR. HOFELD:
17     Q  Officer O'Keefe, have you ever been a
18 party in any administrative proceeding such as
19 before the police board?
20     A  No.
21     Q  Have you ever been a party in any other
22 administrative proceeding that you can recall?
23     A  No.
24     Q  Have you ever participated in Chicago
25 Police Department's Personnel Concerns Program?

Page 159

1      A  No.
2      Q  Or in its Behavioral Interventional
3  System or BIS?
4      A  No.
5      Q  Have you ever participated in the
6  department's Behavioral Alert System?
7      A  No.
8      Q  Have you ever participated in any earlier
9  intervention or counseling?
10     A  No.
11     Q  Have you ever participated in any
12 programs dealing with officer behavior toward
13 civilians?
14     A  No.
15     Q  Have you ever been referred to any of
16 these programs within the department?
17     A  No.
18     Q  Has anyone ever recommended to you that
19 you participate in any of these programs or
20 programs like these?
21     A  No.
22     Q  Can you tell me what the Personnel
23 Concerns Program is?  Are you aware of it?
24     A  Is it still in existence?
25     Q  That's something that you would be in a

Page 160

1  better position to know than I would?
2         MR. DIXON:  I would just make a quick
3     objection.  He's not a representative of the
4     department and, therefore, he can't speak to
5     any particular programs that are in existence
6     or have been instituted or anything like that.
7     Go ahead and ask your question.
8         MR. HOFELD:  Sure.
9  BY MR. HOFELD:
10     Q  I'm asking you based on your personal
11 knowledge, did the Personnel Concerns Program exist
12 at one time at the police department?
13     A  Yes.
14     Q  When are you aware that it last existed?
15     A  I don't know, several years ago.  I just
16 remember there was someone in the unit that was or
17 in the district that was -- they were talking about
18 personnel concerns.
19     Q  I'm sorry.  I couldn't hear you.
20     A  There was an officer on the lodge I
21 remember that they put on personnel concern and that
22 was years ago and I didn't even know what it meant.
23 I mean that's the extent of what I know, that they
24 had to go to some kind of training.
25     Q  Officers who are referred to the



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
161-164

Page 161

1  Personnel Concerns Program had to go to some kind
2  of training?
3      A    From the best that I can recollect.  I
4  knew very -- that's the extent of my knowledge.
5      Q    Did you know what the training consisted
6  of generally?
7      A    No.
8      Q    Did you know why officers were selected
9  for that program?
10     A    No.
11     Q    Do you know anything about BIS or the
12  Behavioral Intervention System?
13         MR. DIXON:  The same objection as to the
14     PCP program.  He's not a representative of the
15     department.  He's not designated as a 30(b)(6)
16     witness that has knowledge of these particular
17     programs.  Go ahead, Officer.
18         MR. BATTLE:  I'll join.
19  BY MR. HOFELD:
20     Q    You understand I'm asking you about your
21  personal knowledge?
22     A    Correct.
23     Q    As a Chicago police officer for the last
24  14 years or so, correct?
25     A    Yes.

Page 162

1      Q    You've been an officer since 2002?
2      A    Correct.
3      Q    Are you familiar with something called a
4  Behavioral Intervention System or BIS?
5      A    I do remember it.  Yes.
6      Q    What do you recall about it?
7      A    The only thing I remember about it was
8  there was a list of officers that were on it and
9  that it had something to do with I thought their log
10  numbers, but other than that I don't know.
11     Q    Do you know why they're on that list?
12     A    No.
13     Q    Do you know what the purpose of the BIS
14  was?
15     A    No.
16     Q    Do you know whether it still exists?
17     A    I don't.
18     Q    You don't know whether the Personnel
19  Concerns Programs still exists, is that correct?
20     A    That's correct.
21     Q    Are you or were you familiar with
22  something called a Behavioral Alert System at CPD?
23     A    No.
24     Q    Are you or were you aware of something
25  called Early Intervention Counseling at CPD?

Page 163

1      A    No.
2      Q    Are you aware or were you aware of any
3  other program that existed to address officer
4  behavior towards civilians or alleged behavior
5  towards civilians such as excessive force?
6      A    No.  I'm not aware of any other program.
7      Q    Have you ever been aware of any other
8  program other than the ones we've already
9  mentioned?
10     A    I can't remember, no.
11     Q    Do you recall yourself undergoing tests
12  for fitness of duty?
13     A    No.
14     Q    You don't recall ever undergoing any
15  tests for fitness of duty, either at the time you
16  first became an officer or subsequently?
17     A    Well, yes.  I do recall at the time when I
18  first became an officer, yes.
19     Q    What did that test or those tests consist
20  of?
21     A    I don't remember, counsel.  That was over
22  15 years ago.
23     Q    Fair enough.  And you haven't had to
24  retake any of those fitness of duty tests since you
25  first became an officer, correct?

Page 164

1      A    Not that I can remember, no.
2      Q    Did the fitness of duty test, do you
3  recall if it included a physical component, in
4  other words, a physical test?
5      A    Yes.
6      Q    To test your physical ability?
7      A    Yes.
8      Q    Do you recall if it included a
9  psychological component, in other words, testing
10  your mental fitness and your mental health to be a
11  police officer?
12     A    Yes.
13     Q    It did include that?
14     A    Yes.
15     Q    How was the testing done, was it in the
16  form of an interview?
17     A    I remember that there was a large scale
18  written out -- part of a written out examination.
19  But after that, I don't remember all the -- what
20  else was involved.
21     Q    So you don't recall whether or not there
22  was a one-on-one interview?
23     A    As far as mental health?
24     Q    Yes.
25     A    I don't remember.



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
165–168

Page 165

1    Q    But you do recall that there is a
2    component of a written examination that dealt with
3    mental health and mental fitness to be a Chicago
4    police officer?
5    A    Psychological, yes.
6    Q    Psychological?
7    A    Yes.
8    Q    Were they multiple choice questions?
9    A    It may have been a combination of both,
10   but I don't remember.
11   Q    A combination of multiple choice and what
12   else?
13   A    And maybe short answer.  I can't remember
14   specifics of the test.
15   Q    Is that the only one you've ever taken,
16   the only psychological evaluative test that you've
17   taken since you became a police officer?
18   A    I don't remember.
19   Q    You don't remember taking any others?
20   A    No.
21   Q    Okay.  I have to ask you these, for the
22   record.  Have you ever been arrested?
23   A    When I was a juvenile I may have been
24   arrested.  Yes.
25   Q    When you say juvenile, how old were you?

Page 166

1    A    I don't remember, sixteen.  I don't
2    remember.
3    Q    What were you ever arrested for?
4    A    Possession of alcohol by a minor.
5    Q    Was anybody charged as a result of that
6    arrest?
7    A    I don't remember what happened to it in
8    court.
9    Q    Besides that have you ever been arrested?
10   A    No.
11   Q    Or charged with any crime, whether
12   misdemeanor or a felony?
13   A    No.
14   Q    How have your performance reviews been
15   since the time you became a police officer?
16   A    From what I've seen they've been good.
17   Q    Has any performance review indicated that
18   you need improvement in any area?
19   A    Not that I remember.
20   Q    Have you ever received a bonus?
21   A    The department doesn't operated in that
22   fashion.
23   Q    Officers aren't ever eligible to receive
24   any bonuses?
25   A    No.

Page 167

1    Q    Have you ever been diagnosed with any
2    mental or personality disorder of any kind?
3    A    No.
4    Q    In 2013 were you taking any prescription
5    medications?
6    A    No.
7    Q    Did you use energy drinks?
8    A    I don't remember if I did or not.
9    Q    Did you use any caffeine products?
10   A    At times.
11   Q    Which products?  What type of product?
12   Coffee or something else?  Pills?
13   A    No.  Once in a while an energy drink or a
14   diet soda of some sort.
15   Q    What kind of energy drink did you use in
16   2015?
17   A    I don't remember.
18   Q    You don't remember if it was Red Bull or
19   something else?
20   A    It could have been Red Bull or Monster.
21   Q    What was the second one?
22   A    Red bull or Monster, one of the two.
23   Q    Do you recall if you had any energy
24   drinks on August 29th, 2015, before you went to the
25   Simmons home?

Page 168

1    A    No, I don't recall.
2    Q    You don't recall, one way or the other?
3    A    No.
4    Q    In 2013 did you have the belief that the
5    city of Chicago doesn't pay you enough?
6    A    No.
7    Q    Do you have that belief today?
8    A    No.
9    Q    For the record, I need to ask you this.
10   Did you have any knowledge that on August 29th,
11   2013 officers brought plastic bags or the digital
12   scale or anything else with them to the house at
13   930 North keystone and planted it?
14   A    No.  That didn't happen.
15   Q    Fair enough.  You didn't do that, right?
16   A    No.
17   Q    You don't have any knowledge that any
18   other officers who were with you when executing the
19   warrant did that, correct?
20   A    Correct.
21   Q    You didn't see them do it, right?
22   A    Correct.
23   Q    You mentioned that you worked for Hudson
24   Services?
25   A    Correct.



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
169–172

Page 169

1    Q    For a couple of years?
2    A    Yes.
3    Q    Why did you stop working for Hudson
4    Services?
5    A    I think I just got too busy.
6    Q    Did you voluntarily leave or were you
7    terminated?
8    A    I voluntarily left.
9    Q    Did you assume another part-time job
10   after you left Hudson Services?
11   A    No.
12   Q    Do you have a part-time job today?
13   A    No.
14   Q    Is the last time you held a part-time
15   job, in addition to your full-time job as a Chicago
16   police officer, in other words when you worked with
17   Hudson?
18   A    Yes.
19        MR. HOFELD:  If you don't mind, let me
20   confer with my co-counsel real quick, see if
21   there is anything else.
22        (Recess.)
23        MR. HOFELD:  I want to show you -- we can
24   mark this as an exhibit.  We can mark this
25   as --

Page 170

1        MS. VAN DRIL:  Al, actually those photos
2    are in Exhibit No. 1, the bottom right
3    photograph copy.
4        MR. HOFELD:  I'd like to use the color.
5        MS. VAN DRIL:  Okay.  We can mark those as
6    Exhibit No. 5.
7        MR. HOFELD:  Let's do that.
8        (Deposition Exhibit No. 5 was.
9         marked for identification.)
10   BY MR. HOFELD:
11   Q    Officer O'Keefe, I'm going to show you
12   what's been marked as Exhibit 5.  These were
13   produced to us in this case by the city of Chicago,
14   I think with the representation that these were
15   photos that were taken at the plaintiff's home and
16   property on Keystone on August 29, 2013.  Just take
17   a moment and look through them first and then I'll
18   just ask you a few questions about them.
19        Thank you, that's fine.  You can keep
20   them.  I'll just keep them here.  Let's just -- I
21   want you to be able to see them.  First of all, do
22   you recognize the photographs in Exhibit 5?
23   A    Some of them and some of them I don't.
24   Q    Did you take photographs of the premises
25   on Keystone on August 29th, 2013?

Page 171

1    A    I myself did not.  No.
2    Q    Do you know if another officer did?
3    A    I'm sure another officer did.  I believe
4    it was Officer Wrigley, but I can't say for certain.
5    Q    Now, do you recognize some of these
6    photos here on Exhibit 5 as fairly and accurately
7    depicting parts of the premises on Keystone?
8    A    Yes.
9    Q    Let me ask in particular about -- let me
10   ask you about this one.  Do you recognize FCRL 1302
11   as a photograph of the front entrance of the
12   premises?
13   A    Yes.
14   Q    Do you recognize FCRL 1305 as being any
15   particular bedroom within the premises?
16   A    No.
17   Q    Or 1307 as being any particular bedroom?
18   A    No.
19   Q    Can you identify which bedroom this is?
20   A    No, I can't.
21   Q    Let me ask you about FCRL 1294.  Can you
22   identify which room in the premises this is?
23   A    No.
24   Q    How about the very first one in Exhibit
25   FCRL 1293.  Is this a shot -- is this a photograph

Page 172

1    of the first floor of the premises taken from the
2    front of the house looking toward the back?
3    A    That I believe is a photograph of the
4    second floor of the address.
5    Q    Okay, thank you.  Is this a photograph on
6    the second floor from the front looking towards the
7    back?
8    A    I can't say for certain.
9    Q    FCRL 1295, is this in the basement?
10   A    That's a basement.  But as I stated
11   earlier, I don't remember being in the basement
12   so -- but obviously it is a basement.
13   Q    So you don't remember -- this is a
14   basement of the premises?
15   A    The only way I would know is through the
16   search warrant pics that we -- which obviously these
17   are them so --
18   Q    These are the search warrant photographs?
19   A    I'm assuming they are.
20   Q    FCRL 1296, do you know what this
21   photograph depicts?
22   A    A shotgun with -- it looks like a box of
23   diapers underneath it.
24   Q    Is this the shotgun that was recovered
25   from the house?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
173—176

Page 173

1    A    It appears so.
2    Q    And is this -- do you know if this
3    shotgun -- do you know if the photograph depicts
4    the shotgun in the location where it was found in
5    the house?
6    A    I believe it does.
7    Q    Do you know which level of the house this
8    photograph depicts?  Is this the first floor or the
9    basement or --
10   A    The shotgun was recovered from the first
11   floor so the first floor.
12   Q    Could this be the basement depicted in
13   this photograph?
14   A    I don't believe so.
15   Q    Is it your testimony that the keys that
16   McFadden supposedly had to the house were keys to
17   the front door of the house?
18   A    He possessed the key to the front door of
19   the house, yes.
20   Q    At the time he was arrested?
21   A    Correct.
22   Q    What does this photograph depict, FCRL
23   1300?
24   A    It's the packaging used to package in many
25   cases heroin and cannabis, and that was the

Page 174

1    packaging that was recovered that day on the second
2    floor.
3    Q    But I don't think I asked you if you
4    recognize which particular --
5    A    You did, unless it's a different room.  I
6    don't recognize any of the bedrooms.  They all look
7    the same.
8    Q    Okay.  Fair enough.
9    A    They all have the same --
10        MR. HOFELD:  I don't think I have any
11   further questions at this time.
12        MR. DIXON:  Real quick.
13             EXAMINATION
14   BY MR. DIXON:
15   Q    I just want to follow up very briefly on
16   the subjects that we covered.  First, Officer, are
17   you aware that if a civilian makes a complaint
18   against you and that some part of that complaint
19   results in any sustained finding, that you can be
20   subject to discipline as a result?
21   A    Yes.
22   Q    And that if that were to happen, you were
23   to be disciplined, that discipline could depending
24   on the severity of the conduct sustained result in
25   even the loss of your job?

Page 175

1    A    Correct.
2    Q    Next I want to follow up on you were
3    discussing with counsel being told by a supervisor
4    that you needed to log into IClear to acknowledge a
5    log number and potentially answer questions.  Do
6    you remember that?
7    A    Yes.
8    Q    I want to clarify that a little bit and
9    ask if by that you mean a supervisor instructed you
10   that or let you know that a civilian complaint had
11   been filed against you, that there was an
12   investigation of that complaint that was underway
13   and that you needed to at that time communicate
14   with personnel who were handling that
15   investigation?
16   A    Yes.
17        MR. HOFELD:  Late objection.  Compound and
18   confusing.
19        MR. DIXON:  Sure.
20   BY MR. DIXON:
21   Q    Officer, are you aware of any situation
22   in which your direct supervisor might be
23   responsible for at least the initial investigation
24   or initiation of a complaint against you?
25   A    Yes.

Page 176

1    Q    Would that be, for example, a situation
2    where an event occurs on the street and an
3    individual asks to see a supervisor regarding your
4    conduct?
5    A    Yes.
6    Q    And in that situation your supervisor
7    would be the one to respond and initially
8    investigate what occurred?
9    A    Correct.
10   Q    Then are you aware that this would be a
11   possibility that that supervising officer might
12   initiate a further complaint against you in some
13   cases?
14   A    Yes.
15   Q    Has that particular situation ever
16   happened to you?
17   A    Not that I remember.
18        MR. DIXON:  That's all for my follow up.
19        MR. HOFELD:  I have some follow up to your
20   follow up, but Ken.
21             EXAMINATION
22   BY MR. BATTLE:
23   Q    Let's talk real quickly about this whole
24   not unannounced issue.  I want you to clarify for
25   me in a particular situation where you served a



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
177–180

1  search warrant such as this, what did you do as far
2  as the not unannounced in this situation?
3      MR. HOFELD:  Objection, asked and
4  answered.
5      THE WITNESS:  As we approached the porch
6  area where Ms. Simmons was sitting, at least
7  myself whose already on a Chicago police search
8  warrant, and then after Ms Simmons had been
9  detained, at least myself and I remember
10  hearing other officers yelling "Chicago police
11  search warrant" as we made our way into the
12  residence.
13 BY MR. BATTLE:
14  Q   So when you're walking up the walkway?
15  A   Yes.
16  Q   You're inside of the wrought iron fence
17  walking up the walkway?
18  A   Correct.
19  Q   And you're yelling "police, police,
20  search warrant"?
21  A   Yes.
22  Q   Is that to --
23  A   To Ms. Simmons.
24  Q   Then when you get to the door, are you
25  yelling "police, search warrant," knocking on the

1  door?
2      A   Yeah.  Someone would have been banging on
3  the door and then we would have entered and I
4  recall, like I said before, at least myself and
5  hearing officers yelling Chicago police search
6  warrant, which is really customary --
7  Q   That's when you entered though?
8  A   Yes.
9  Q   So once you entered, you did the knock on
10  the door, Chicago police, Chicago police, you don't
11  get a response, you enter the residence?
12  A   Correct.
13  Q   You enter the residence, you see people?
14  A   Yes.
15  Q   And you're telling them what?
16  A   Chicago police, search warrant.
17  Q   Who had the search warrant in their hand
18  at that time?
19  A   Sgt. Kinnane would have had it in his
20  possession.  He probably would have it in his pocket
21  or something like that or, you know, somewhere
22  accessible, and he would take it out and show it to
23  the people.
24  Q   You were asked questions about the arrest
25  report, do you remember that?

1  A   Yes.
2  Q   You were asked questions about entries
3  that were made by the lockup keeper, do you
4  remember that?
5  A   Yes.
6  Q   Can you explain to us whether or not
7  everything that's on this police report was written
8  by you?
9  A   It was not.
10      MR. HOFELD:  Just objection, compound.
11 BY MR. BATTLE:
12  Q   Can you explain to us with respect to the
13  information related to the lockup of Aretha
14  Simmons, where would that information have come
15  from?
16  A   The female officer processing her in the
17  female central detention.
18  Q   Is that at the police station?
19  A   Yes.
20  Q   Can you just clarify for me a couple of
21  things with respect to the actual search warrant.
22  You obtained a search warrant to search the
23  premises at 930 North Keystone, correct?
24  A   Correct.
25  Q   You were supposed to seize the following

1  items which you anticipated being at that premises.
2  Can you tell me what the items were that you
3  thought may be present?
4  A   One 9 millimeter blue steel Glock
5  semiautomatic pistol and any other illegal firearms.
6  Q   When you were speaking earlier about a
7  number of complaints registers or CRs that were
8  logged against you, you indicated that you didn't
9  remember that particular CR, at times you would say
10  that, correct?
11  A   Yes.
12  Q   Now, in those particular CRs you were
13  alleged of wrongdoing.  For instance, you were
14  alleged of damaging property in certain runs and
15  you were alleged of excessive force in others,
16  correct?
17  A   Yes.
18  Q   Are you saying you don't remember doing
19  those activities or are you saying that those
20  activities never happened?
21  A   Those activities never happened.
22      MR. BATTLE:  That's all I have.
23  Go ahead, Al.
24      REEXAMINATION
25



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
181–184

Page 181

1 BY MR. HOFELD:
2    Q   I have just a couple -- few questions.
3 During the break, prior to Mr. Dixon and Mr. Battle
4 asking you questions, did you have a chance to
5 confer with them and talk with them in the hallway?
6    A   Briefly, yes.
7    Q   Mr. Dixon asked you if you were aware
8 that you could lose your job if there were
9 sustained civilian complaints against you.  Do you
10 recall that question?
11    A   Yes, I do.
12    Q   Are you also aware that it's a very rare
13 instance where an officer loses his job because of
14 a sustained complaint?
15       MR. DIXON:  Objection, calls for
16    speculation.  Go ahead and answered, Officer.
17       THE WITNESS:  I'm aware that it occurs.
18    I'm not sure how often it occurs.
19 BY MR. HOFELD:
20    Q   When was the last time you heard of an
21 officer losing his or her job because OPS sustained
22 a complaint against him or her?
23    A   I don't pay that much attention to the
24 news these days so I don't know.
25    Q   Well, how about in the last 12 years,

Page 182

1 since you've been a police officer.  Can you recall
2 the last time -- can you recall the last time you
3 heard of an officer losing his or her job because
4 of a sustained OPS or IPRA complaint against him or
5 her?
6    A   I'm sure there have been cases, but I
7 can't think of any, off the top of my head, that
8 would have resulted from that.  I don't know.
9    Q   You can't think of any case?  No?
10    A   I don't follow other officers sustained CR
11 numbers or follow any other officers CR numbers
12 aside from my own, to be honest.  So I don't really
13 delve into what someone -- what another police
14 officer may or may not be relieved of their duty
15 for.
16    Q   Do you read the newspapers or watch the
17 TV news?
18    A   Not often.
19    Q   During the last 12 years have you read
20 the newspapers or watched the TV news?
21    A   At times.
22    Q   Do you engage in talk with fellow
23 officers about current things happening in the
24 department?
25    A   At times.

Page 183

1    Q   Can you remember the name of a single
2 officer who was -- who you heard was terminated
3 because he or she had a sustained IPRA or OPS
4 civilian complaint against him or her?
5       MR. BATTLE:  Just a quick objection for
6    asked and answered.  Go ahead and answer, if
7    you can.
8       THE WITNESS:  There was a few back when I
9    worked in the 10th District that were fired, at
10    least two.  And, then, I believe there was
11    someone in lockup when I worked in nine that
12    was fired.
13 BY MR. HOFELD:
14    Q   Do you remember the names of any of those
15 officers?
16    A   In ten it was female, her name was Sharon.
17 I don't remember her last name.  And the other one
18 was a male.  He's a taller guy.  I don't remember
19 his name either.
20    Q   Do you remember when this was?
21    A   In the last several years.
22    Q   I'm sorry.  You said you were at District
23 10 during what period of time?
24    A   I start there in 2002.
25    Q   And were there until what year?

Page 184

1    A   I want to say 2008, 2009.
2    Q   I'm sorry.  You said District 9?
3    A   Briefly, yes.
4    Q   When were you there again?
5    A   That would have been in '03.
6    Q   Briefly in '03?
7    A   Correct.
8    Q   Can you name a single officer who's ever
9 been -- who's ever actually been disciplined in any
10 way because they've had a sustained IPRA or OPS
11 complaint against them?
12       MR. DIXON:  Objection to relevance of
13    whether or not he can name someone.  Go ahead
14    and answered, Officer.
15       MR. BATTLE:  My objection was going to be
16    asked and answered.  We keep going over the
17    same thing.  Go ahead and answer again.
18       THE WITNESS:  You're asking me if I have
19    ever heard of an officer that had a sustained
20    that took --
21 BY MR. HOFELD:
22    Q   No.  Let me rephrase it.  Are you aware
23 of an officer actually being disciplined as the
24 result of a sustained IPRA complaint is a rare
25 occurrence?



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
185—188

Page 185

1    A   Am I aware that it's a rare occurrence?
2    Q   Yes.
3        MR. DIXON:  Objection to characterization
4    of rare occurrence.  Go ahead, Officer.
5        THE WITNESS:  I am not aware of that, no.
6    BY MR. HOFELD:
7    Q   When was the last time you recall hearing
8    that it occurred?
9    A   As I stated before, counsel, I don't pay
10   attention to anyone else's CR history and really
11   to be honest my own.  And even that I don't
12   really -- obviously, clearly, I don't know.  I don't
13   recall much of it.
14   Q   So can you recall a single name or case
15   where an officer was disciplined in some way
16   because there was a sustained -- there was a
17   sustained finding in connection with an IPRA or OPS
18   complaint?
19   A   The only one that comes to mind is the
20   officer that struck the individual at the hospital
21   years ago that worked in the 11th District and I
22   believe he was fired and may have been charged, but
23   I don't remember the specifics of it.
24   Q   Do you recall the name of that officer?
25   A   I don't remember his name.  I know it was

Page 186

1    in the news at the time.  But like I said, it
2    very -- I follow that stuff very little.
3    Q   Do you recall the names of any other
4    officers or cases?
5    A   No.
6    Q   Who were disciplined in any way because
7    they had a finding sustained against them in
8    connection with a civilian complaint or is that the
9    only one?
10   A   That's the only one I recall offhand.  And
11   as I stated, I don't really pay that much attention
12   to it.
13       MR. HOFELD:  Fair enough.  I don't think I
14   have any further questions.
15       MR. DIXON:  I have nothing further.
16       MR. BATTLE:  Show signature is reserved.
17       (The deposition concluded at 2:50 p.m.

18
19
20
21
22
23
24
25

Page 187

1    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
2        COUNTY DEPARTMENT - LAW DIVISION
3    ARETHA SIMMONS, et al.,   )
4        Plaintiffs,           )
5    v.                        )   Case No. 1:14-cv-09042
6    THE CITY OF CHICAGO,      )
7    ET AL.,                   )
8        Defendants.           )
9        I, JOHN D. O'KEEFE, being first duly sworn,
10   on oath, say that I am the deponent in the aforesaid
11   deposition, that I have read the foregoing
12   transcript of my deposition taken July 13, 2016,
13   consisting of pages 1 through 189 inclusive, taken
14   at the aforesaid time and place and that the
15   foregoing is a true and correct transcript of my
16   testimony so given.
17
18                JOHN D. O'KEEFE Deponent
19   SUBSCRIBED AND SWORN TO
20   before me this _____ day
21   of _____ 2017.
22   _____
23   Notary Public
24
25

Page 188

1        C E R T I F I C A T E
2        I, DAVID J. DEMSKI, Certified Shorthand
3    Reporter, in and for the County of Cook, State of
4    Illinois, do hereby certify that on the 13th day of
5    July 2017 the deposition of the witness JOHN D.
6    O'KEEFE, called by the defense, was taken before me,
7    reported stenographically and was thereafter reduced
8    to typewriting through computer-aided transcription.
9        The said witness, JOHN D. O'KEEFE, was first
10   duly sworn to tell the truth, the whole truth, and
11   nothing but the truth and was examined upon oral
12   interrogatories.
13       I further certify that the foregoing is a true,
14   accurate, and complete record of the questions asked
15   of and answers made by the said witness, at the time
16   and place hereinabove referred to.
17       The signature of the witness was not waived by
18   agreement.
19       Witness my official signature as Notary Public,
20   in and for Cook County, Illinois on this 31st day of
21   January, 2017.
22                        David Demski
23                David J. Demski
24                CSR# 084-004386
25



JOHN D. O'KEEFE
SIMMONS vs CITY OF CHICAGO

July 13, 2016
189—191

Page 189

1    Reference No.: 508126

2

3    Case:  SIMMONS vs CITY OF CHICAGO

4

        DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that

6    I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the

7    same has been read to me, and the same is
     true and accurate, save and except for

8    changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET

9    hereof, with the understanding that I offer
     these changes as if still under oath.

10

11   _____

12          John D. O'Keefe

13

14          NOTARIZATION OF CHANGES

15              (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____

Page 190

1    Reference No.: 508126

     Case:  SIMMONS vs CITY OF CHICAGO

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   John D. O'Keefe

Page 191

1    Reference No.: 508126

     Case:  SIMMONS vs CITY OF CHICAGO

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   John D. O'Keefe

