# Exhibit 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARETHA SIMMONS, for herself and on behalf of DAVIANNA SIMMONS, a minor, EMILY SIMMONS and KEITH SIMMONS, | ) ) ) ) | Case No. 1:14-cv-09042 |
| Plaintiffs, | ) ) | Hon. Matthew F. Kennelly |
| v. | ) ) | |
| THE CITY OF CHICAGO; CHICAGO POLICE OFFICERS ANTHONY M. BABICZ (Star 12652); STEVEN L. HEFEL (Star 13074); JUSTIN M. HOMER (Star 10979); SEARGENT BRIAN J. KINNANE (Star 1120); MICHAEL R. LAURIE (Star 15108); JOHN D. OKEEFE (Star 18418); MICHAEL W. SUING (Star 17006); and JOHN E. WRIGLEY (Star 7179), | ) ) ) ) ) ) ) ) ) | Jury Trial Demanded |
| Defendants. | ) | |

## EXPERT REPORT OF TIMOTHY J. LONGO, SR.

### My Qualifications

My name is Timothy J. Longo, Sr. and I have been actively involved in police practices and law enforcement since 1981. On May 1, 2016, I retired as the Chief of Police for the City of Charlottesville, Virginia. Presently, I serve as an Assistant Professor and Program Director for Public Safety Administration in the School of Continuing and Professional Studies at the University of Virginia. I also serve on the Adjunct Faculty at the University of Virginia, School of Law. In addition to my academic responsibilities and expert witness work, I serve as an independent monitor in two matters before the federal courts: United States Department of Justice v. City of Cleveland, et al and United States Department of Justice v. Los Angeles County Sheriff's Department.

With respect to the Cleveland Consent Decree, I serve as the Director of Implementation, and have been engaged in examining Use of Force policy and training, Internal Affairs and Force Investigation, and the work of the independent Office of Professional Standards. In Los Angles, my role has been narrowly focused on that portion of the Settlement Agreement pertaining to Investigative Stops, Detentions, Searches, and examining the proposed training curriculum surrounding those areas.

1

Prior to assuming command of the Charlottesville Police Department in February of 2001, I served with the Baltimore Police Department where I retired as a Police Colonel and the Chief of the Department's Technical Services Bureau. Since my retirement from Baltimore City, and during my tenure as Chief of Police in Charlottesville, I have been heavily engaged in police and law enforcement practices as a private consultant, trainer, and expert witness regarding law enforcement matters.

During my tenure in Baltimore, I matriculated through the ranks of a large municipal agency and ultimately achieved the rank of Colonel over-seeing the Technical Services Bureau. During my almost 19 year tenure with the department, I served in the following capacities; Police Cadet assigned to the Central Records and Internal Investigations Division, Patrol Officer assigned to the Central District, Plain Clothes Police Officer assigned to the Central District Vice Enforcement Unit, Police Agent assigned to the Education and Training Division as the agency's primary law instructor for basic and in-service training, Police Sergeant assigned to the Central District cell-block and later the Command Investigation Section, Police Lieutenant assigned to the Northwestern District, Detective Lieutenant assigned to the Internal Investigations Division/Special Investigations Section, Major/Director assigned to the Communications Division, Major/District Commander assigned to the Southeastern District, Chief of Staff to the Police Commissioner, and Colonel/Chief of Technical Services.

With regard to conducting and overseeing criminal investigations, my training and experience in the following operational and substantive areas of law enforcement uniquely qualify me to render an expert opinion in this regard; patrol officer, drug and vice enforcement officer, police academy instructor, patrol shift commander, internal affairs detective lieutenant, district commander of a patrol district located within a large urban city, and as the Chief of Police of a municipal law enforcement agency. As a district commander in one of Baltimore's 9 police districts, I was in a position of oversight with regard to routine and complex criminal investigations. As the Chief of Police of a municipal law enforcement agency, I frequently had occasion to oversee both routine and complex criminal investigations.

Immediately following my retirement from the Baltimore City Police Department, I served as a consultant and Project Manager for a global strategic management consulting firm, PSComm, LLC, previously located in Rockville, Maryland. During that time my principal responsibilities included managing a project within the District of Columbia Police Department. My responsibilities also included audits of the Denver Police Department's Internal Affairs Division, the Pasadena Police Department's Communications Division, and the District of Columbia Police Department's Communications Division. I resigned my position to accept an appointment as the Chief of Police in Charlottesville, Virginia on February 26, 2001.

My education includes a Bachelor of Science Degree from Towson University in Baltimore, Maryland, and a Juris Doctor Degree from the University of Baltimore, School of Law. I am currently a member in good standing of the Maryland Bar.

From approximately 1995 until 2000 I served as an adjunct faculty member at Towson University and instructed undergraduate classes in Police Administration and Conflicts in Policing. In addition to my appointed responsibilities at the University of Virginia, I have guest lectured at the University of Virginia, Darden School of Business, and the Sorensen Institute for Political Leadership.

Additionally, I have served on the adjunct faculty of the Institute for Law Enforcement Administration at the Center for American and International Law in Plano, Texas for approximately 22 years, and also the Center for the Constitution at Montpelier, the home of James Madison, where I have instructed for the last 5 years.

I am the co-author of the Virginia Search and Seizure Manual for Law Enforcement Officers, 5th Edition, published by the Lexis-Nexis Company, and I am the sole author of the 6th and 7th editions.

In addition to my practical law enforcement experience and legal education, I have instructed courses in Substantive and Procedural Criminal Law, Police Ethics, Internal Affairs, Constitutional Law, and the liabilities in Law Enforcement Operations.

My opinions in this report pertain specifically to the *Monell* period that is applicable in this case (August 29, 2008-August 29, 2013) and are provided to a reasonable degree of professional certainty within the fields of law enforcement, police activity and police administration and supervision. I have list below the documents that have been provide for my review, but recognize that there may be additional documentation provided to me at a later time. I welcome the opportunity to review additional relevant material as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

## **Materials Provided for My Review**

In preparation of my report, I have been provided with and have had the opportunity to review the following documents:

- Plaintiffs' Complaint
- Answer by Defendant City
- Answer by Defendant Officers
- The following videos:
    - WTTW interview with Mayor Emanuel on December 8, 2015

3

- o Mayor Emanuel's City Council Speech on December 9, 2015
- o WTTW interview with Sharon Fairley on January 4, 2016
- o WTTW interview with Sharon Fairley on October 18, 2016
- o The Contract: Chicago's Police Union - Fault Lines (Al Jazeera Documentary), which includes an interview with Dean Angelo, President of FOP
- SIMMONS 1-6339
- FCRL 1-3874
- "Investigation of the Chicago Police Department United States Department of Justice Civil Rights Division And United States Attorney's Office Northern District of Illinois," January 13, 2017
- Police Accountability Task Force Report, April, 2016
- Simmons-City-AS-00001 to City-AS-000681
- Simmons-City-AS-004379 through City-AS-014732
- CITY-AS-014734-CITY-AS-018175
- Plaintiff's Second Amended Rule 26(a)(1) disclosures (and any documents produced pursuant to Rule 26(a)(1))
- City's and Officers' Joint Rule 26(a) (1) disclosures (and any documents produced pursuant to Rule 26(a)(1))
- Officers' Amended Rule 26(a)(1) disclosures (and any documents produced pursuant to Rule 26(a)(1))
- City's Supplemental Rule 26(a)(1) disclosures (and any documents produced pursuant to Rule 26(a)(1))
- City's Answers to Plaintiffs' First Set of Discovery Requests
- City's Answers to Plaintiffs' Second Set of Discovery Requests
- City's Answers to Plaintiffs' Third Set of Discovery Requests
- City's Answer to Plaintiff's Fourth Set of Discovery Requests
- City's Answer to Plaintiff's Fifth set of Discovery Requests
- City's Amended Responses to Plaintiffs (1st and 2nd) Requests for Production
- City's Amended Answers to Certain Requests to Admit Within Plaintiff's Fifth Set of Discovery Requests (February 27, 2017)
- City's Second Set of Amended Answers to Certain Requests to Admit Within Plaintiff's Fifth Set of Discovery Requests (March 1, 2017)
- City's Written Answers, In Lieu of Deposition, to Certain Areas of Inquiry in Plaintiffs' Notice of FRCP 30(b)(6) Deposition (February 28, 2017)
- City's Written Answers, In Lieu of Deposition, to Certain Areas of Inquiry Relating to the Inspector General in Plaintiffs' Notice of FRCP 30(b)(6) Deposition (February 28, 2017)
- "2009-01-15-QUARTERLY-REPORT," produced by City on February 8, 2017
- "ALL NON-IPRA NO AFFIDAVIT COUNT," produced by City on February 9, 2017
- "IPRA-ANNUAL REPORT 2008-2009," produced by City on February 8, 2017
- "IPRA-ANNUAL REPORT 2009-2010," produced by City on February 8, 2017
- "IPRA-ANNUAL REPORT 2010-2012," produced by City on February 8, 2017
- "Q42016 REPORT- 20170112_FINAL," produced by City on February 8, 2017
- "IPRA STATISTICS," produced by City on February 8, 2017
- Data tables 1-12 from plaintiffs' statistical expert
- Deposition transcripts (and related exhibits) for:

- o Emily Simmons
- o Aretha Simmons
- o Keith Simmons
- o Officer O'Keefe
- o Officer Wrigley
- o Sgt. Kinnane
- o Officer Hefel
- o Officer Babicz
- o Officer Homer
- o Officer Suing
- o Officer Laurie
- o Officer Muzupappa
- o Officer Young
- o Detective Cwick
- o Commander Roussell
- o Robert Klimas, February 7, 2017
- o Robert Klimas, February 22, 2017
- o Bruce Dean
- o Stephen Beirne
- o Donald O'Neill
- o Daniel Godsel

### Questions Presented by Plaintiffs' Counsel

Plaintiffs' counsel retained me to write a report answering the following questions pertaining to the period August 29, 2008 – August 29, 2013 ("the *Monell* period" in this case), based upon my review of the discovery record and case materials provided to me:

1. Did the City of Chicago, CPD, CPD officers, BIA and IPRA have a *de facto* policy or widespread custom or practice of a Code of Silence, defined as "the tendency to ignore, deny or cover up the bad actions of a colleague or colleagues"?

2. Did the City of Chicago, CPD, CPD officers, BIA and IPRA have a *de facto* policy or widespread custom or practice of failing to properly investigate civilian allegations of police misconduct, including the use of excessive force, the failure to intervene, theft/failure to inventory and intentional damage to property?

3. Did the City of Chicago, CPD, CPD officers, BIA and IPRA have a *de facto* policy or widespread custom or practice of failing to effectively discipline police misconduct, including the use of excessive force, the failure to intervene, theft/failure to inventory and intentional damage to property?

4. Did the City of Chicago, CPD, CPD, BIA and IPRA have a *de facto* policy or widespread custom or practice of sustaining and disciplining officers less often for misconduct against African-American civilians?

5

5.      Did the City of Chicago, CPD, CPD officers, BIA and HR have a *de facto* policy or widespread custom or practice of failing to engage in effective, early, non-disciplinary intervention with officers to prevent future misconduct?

6.      Did the City of Chicago and CPD have a *de facto* policy or widespread custom or practice of failing to train officers in the proper use of force?

7.      Did the City of Chicago, CPD, CPD officers and BIA have a *de facto* policy or widespread custom or practice of failing to properly supervise officers, including in the proper use of force?

8.      For each above stated *de facto* policy, custom or practice, if it existed:  did the City, CPD, officers, BIA and IPRA have or maintain it with respect to minors or children in particular?

9.      For each *de facto* policy, custom or practice above, if it existed:  was it the cause of each plaintiff's injury on August 29, 2013?

10.      For each *de facto* policy, custom or practice above, if it existed:  was it deliberately or consciously maintained by the City, CPD, CPD officers, BIA and IPRA during the *Monell* period?

11.      Did the City, CPD, CPD officers, BIA and IPRA take affirmative steps to curb or eliminate any Code of Silence?

12.      Did the City, City, CPD, CPD officers, BIA and IPRA take affirmative steps to curb or cure any failure to properly investigate allegations of police misconduct, including excessive force, failure to intervene, theft/failure to inventory and intentional damage to property?

13.      Did the City, CPD, CPD officers, BIA and IPRA take affirmative steps to curb or cure any failure to effectively discipline officers for misconduct, including excessive force, failure to intervene, theft/failure to inventory and intentional damage to property?

14.      Did the City, City, CPD, CPD officers, BIA and HR take affirmative steps to curb or cure any failure to engage in effective, early, non-disciplinary intervention with officers to prevent future misconduct?

15.      Did the City, City, CPD, CPD officers and BIA take affirmative steps to curb or cure any failure to train officers in the proper use of force?

16.      Did the City of Chicago, CPD, CPD officers and BIA take affirmative steps to curb or cure any failure to properly supervise officers, including in the proper use of force?

17.      Did the City, CPD, BIA, IPRA take affirmative steps to curb or any of these failures, if they existed, with respect to minors or children in particular?

18.      Would a reasonable officer have been aware of deficiencies in the investigative and disciplinary systems of City, CPD, BIA and IPRA?

6

19.    Did defendant officers have reason to believe they could act toward plaintiffs with impunity, i.e., without concern that they would ever be effectively investigated or meaningfully disciplined?  If so, did that have anything to do with plaintiffs' race?

20.    What was the probability that meaningful discipline would have resulted to defendant officers from CPD's, BIA's and IPRA's accountability and disciplinary systems?

21.    Did the City, CPD, BIA and IPRA have an effective system for identifying and addressing individual officers' patterns of abuse or patterns of abuse by groups, such as police units?

I endeavor to express my opinions on each of these questions within the body of my report. I begin with a brief overview of the facts as alleged by plaintiffs and other witnesses.

## <u>Summary of Alleged Facts</u>

On August 29, 2013, the defendants, all of whom are duly sworn officers of the Chicago Police Department and on-duty at the time of this incident, executed a search warrant at 930 North Keystone Avenue in Chicago, the home of Keith and Emily Simmons. The Simmons family had lived in their home for some 30 years when this incident took place.

In addition to Keith and Emily Simmons, their adult daughter, Aretha, and her three-year-old daughter, Davianna, also lived in the home and were present at the time of the alleged misconduct that prompted this litigation.  However, Keith Simmons was not present at the time.

Based on the alleged observations of Defendant Police Officer Wrigley and the sworn affidavit testimony of Defendant Police Officer O'Keefe, a search warrant for the residence was issued by a judicial officer. In addition to a search of the home, the warrant also authorized the search of a person identified as Alonzo McFadden. It is my understanding that Mr. McFadden did not live at 930 North Keystone Avenue at the time, nor had he ever been an overnight guest at that location prior to the application and execution of the warrant authorizing the search.  The plaintiffs denied that McFadden was dealing drugs out of their home and also denied any relationship with McFadden beyond cursory greetings exchanged in their shared neighborhood.

When the officers arrived to the plaintiffs' home, Aretha was sitting outside on the porch.[1] Defendant Officer O'Keefe approached suddenly with his gun pointed at Aretha and told her to "freeze".[2]  It is undisputed that Aretha did not resist arrest in any way and did not pose any threat to any of the officers at any time.[3]

After handcuffing Aretha, O'Keefe grabbed Aretha by the neck and upper arm and pushed her face forward into the concrete porch wall so that her left eye and chest hit the concrete surface.[4]

---

[1] Aretha Simmons deposition at pages 72-73.

[2] *Id.* at page 80.

[3] *See, e.g.*, O'Keefe deposition at page 39.

[4] Aretha Simmons deposition at pages 90, 91.

O'Keefe then pushed the handcuffed Aretha into the house, shook her violently, and slammed her on a metal radiator three or four times.[5]

As Officer O'Keefe was arresting Aretha on the porch, Officer Hefel, Sergeant Kinnane, and others entered the home to "clear" it from potential danger before conducting their search.[6] The defendant officers claimed they knocked and announced their presence, which plaintiffs deny.

When the officers entered the residence, Emily was standing in her bedroom at her dresser, with Davianna standing immediately next to her.[7] Davianna had the habit of following her grandmother wherever she went.[8]

Sergeant Kinnane and Officer Hefel entered Emily's bedroom with their guns drawn and pointed, yelled "freeze!" and repeatedly told Emily to "shut up" when she asked what was happening.[9] According to Ms. Simmons, Sergeant Kinnane's loaded gun, which was dark and larger than an average handgun, initially made physical contact with Emily's head; Kinnane pointed his gun at Emily's head as he yelled at her to move into the living room.[10] It is undisputed that at no time did Emily or Davianna refuse instructions, resist officer authority, or pose any threat or danger whatsoever to any CPD officers.[11]

Simultaneously, Officer Hefel pointed his loaded rifle 4-5 inches from three-year old Davianna's chest; the rifle emitted a laser-like red light at Davianna's chest, which terrified Emily.[12] Emily pleaded with the officers to remove the gun from her granddaughter's chest; she repeatedly asked Hefel why he was pointing a gun at the child, and said "get it off of her, can't you see she doesn't have anything in her hand?!"[13] Hefel and Kinnane responded by yelling at Emily "shut up!" and refusing to lower their guns.[14] Kinnane and Hefel led Emily and Davianna to the front room at gunpoint and did not lower their guns, which were still pointed at Emily and Davianna, until after Emily and Davianna sat down on the couch.[15]

As Emily was about to sit down and before the officers lowered their guns, Aretha Simmons was pushed through the front door by Officer O'Keefe.[16] O'Keefe slammed Aretha, who was handcuffed and only weighed 90-100 pounds at the time, into the metal radiator several

---

[5] *Id.* at pages 93-94, 100.
[6] Hefel deposition at page 51.
[7] Emily Simmons deposition at pages 36-37
[8] Id. at page 33.
[9] Emily Simmons deposition at pages 36, 39, 53.
[10] Id. at pages 36; 58-60.
[11] Hefel deposition at pages 53, 55.
[12] Emily Simmons deposition at pages 185, 188.
[13] Id. at page 56.
[14] Id.
[15] Id. at pages 58-60.
[16] Id. at pages 71-72.

8

times.[17]  Davianna watched O'Keefe assault her mother and began to immediately cry.[18]  All of this occurred in Sgt. Kinnane's presence; Kinnane and other defendants did not intervene to protect Aretha or Davianna.[19]

As she was being accosted by O'Keefe, Aretha saw that Officer Hefel was pointing his rifle at her three year-old daughter and saw the red laser-light pointed at Davianna's chest.[20] Distraught, she cried: "get the gun off my baby!"[21]  Officer O'Keefe told Aretha to shut up as he repeatedly shook and slammed her body into the radiator and wall.[22]

While executing the search warrant, the officers needlessly destroyed many of plaintiffs' personal possessions, including Davianna's toys and stuffed animals.  The officers broke a TV, tore up Davianna's toys, tore up Emily's clothes, broke a box spring mattress, smashed a lava lamp, broke apart dresser drawers and the back door, and tore the insulation out of the home.[23] The officers also destroyed Davianna's Leap Frog console and her iPad tablet and popped heads off Davianna's dolls.[24]  O'Keefe seemed to derive great pleasure destroying Davianna's toys and stomping on her stuffed animals.[25]  Davianna saw Officer O'Keefe destroy her belongings and, as he did so, she tearfully asked her mother why the man was destroying her possessions.[26]  She asked: "why they breaking my toys? Why is he stepping on my doll heads? He's breaking my stuff mommy."[27]  Aretha was at a loss for words.[28]

Additionally, officers stole cologne from Emily's Avon supply, which she intended to sell, stole $700, and stole several pieces of gold jewelry, including Emily's gold wedding band.[29]

During the course of their search of the Simmons home, the officers recovered Keith Simmons's two lawfully owned and registered firearms.  When asked to do so, Keith showed Sergeant Kinnane his Firearm Owner Identification (FOID) card and claimed possession of the firearms.[30]   The officers disregarded Keith's FOID card (and in fact, Kinnane denied that Keith presented a FOID card[31]) and removed the guns from the Simmons home.  The guns have not been returned.

---

[17] Id. at pages 72-74; *Deposition of Aretha Simmons* at page 22.
[18] Emily Simmons deposition at page 77.
[19] Id. at pages 92-93.
[20] Aretha Simmons deposition at pages 96, 107.
[21] Emily Simmons deposition at page 93.
[22] Aretha Simmons deposition at page 107.
[23] Emily Simmons deposition at pages 112, 115, 119, 124, 126, 127-128
[24] Aretha Simmons deposition at pages 122-123, 126
[25] Aretha Simmons deposition at page 127.
[26] Id. at page 128.
[27] Id.
[28] Id.
[29] Emily Simmons deposition at pages 129-130; 133; 112-115
[30] Id. at page 106.
[31] Brian Kinnane deposition at page 123

The officers brought charges against Aretha and subsequently testified at a criminal trial in an attempt to implicate Aretha Simmons in McFadden's alleged drug dealing. At trial and during their civil depositions, the officers testified that Aretha was holding a silver purse, which was later recovered by the officers and allegedly contained cocaine and a gun.[32] None of the plaintiffs owned a silver purse, and Aretha denies seeing (or possessing) one on the porch.[33] At a bench trial, Aretha was found not guilty of all charges, while McFadden was found guilty and sentenced to 17 years in prison.[34]

Officer Hefel, who pointed his loaded rifle (allegedly equipped with the red laser-light) at Davianna, denied that his rifle was equipped with a laser or light and testified that, at the time of the incident, CPD officers were not authorized to use lasers or lights on their firearms.[35]

However, Officer Hefel's testimony may be refuted by CPD records which indicate that Hefel was in fact approved for a "mounted light qualification" on June 3, 2013, approximately three months before the incident at plaintiffs' home.[36]

Additionally, several of the defendant officers were sued by the White family for conduct very similar to the conduct alleged by plaintiffs in this case, in an incident alleged to have occurred on September 30, 2011.[37] Notably, the White family alleged that Officer Hefel, whom plaintiffs allege pointed a gun at Davianna Simmons, pointed a gun at a child, Michael White, Jr.[38] Hefel and all other defendant officers involved in both cases (many of the defendants overlapped in the two cases because the defendant officers served on a "gun team" and executed search warrants together) denied any misconduct in the *White* case, and generally denied all of plaintiffs' allegations, including excessive force against a child.[39]

At the time of their depositions, the defendant officers had a combined 97 years of experience with CPD. Despite this vast experience, each defendant officer denies ever seeing a fellow officer (1) engage in any misconduct or (2) violate any CPD policy, procedure, or oath. Each of the officers denies ever needing to intervene to stop a fellow officer's misconduct, including on August 29, 2013.

Each defendant officer also denies ever being referred to Behavioral Intervention Services ("BIS") or CPD's Personnel Concerns Program. Each defendant officer, except Kinnane and Wrigley, testified that they have never received discipline or a sustained finding in relation to a citizen complaint. Kinnane testified that his sustained complaint was ultimately reversed, as was the discipline which had been imposed at the time. He received back pay for previously-served

---

[32] O'Keefe deposition at page 37.

[33] Emily Simmons deposition at page 110; Aretha Simmons deposition at pages 111-112.

[34] Aretha Simmons deposition at page 24;
http://www.illinoiscourts.gov/R23_Orders/AppellateCourt/2017/1stDistrict/1143408_R23.pdf

[35] Hefel desposition at pages 63-64, 67.

[36] CITY-AS-4172.

[37] SIMMONS 1055-1071.

[38] *Id.*

[39] *See, e.g.*, Hefel deposition at pages 126-134.

unpaid time off, and his record wiped clean; in other words, he was "made whole" by the police department.[40] Wrigley testified that he had two sustained CRs, one for a technical violation of CPD policy and one related to a citizen complaint.[41] He appealed the sustained citizen complaint and the CPD board found that the penalty imposed was too "harsh" and reduced it.[42]

In this case, every officer on the scene at 930 Keystone Avenue on August 29, 2013, adamantly denies using any force whatsoever against Aretha Simmons.[43] All officers agree that Aretha Simmons did not resist arrest in any way and did not pose any threat to any of the officers at any time.[44] Two independent witnesses, Dorothy Guider and Rene Tirado, provided statements that corroborate plaintiffs' allegations, which contradict the officers' denials that any force was used against Aretha. These witnesses have averred that, during the course of arresting Aretha, whom all parties agree was compliant, officer O'Keefe grabbed Aretha by her neck and upper arm, lifted Aretha into the air and slammed the left side of her body and eye into the home's concrete porch, which eye became bloodshot and swollen for days.[45]

Likewise, each and every officer deposed unequivocally denies that a gun was ever pointed at Emily Simmons and three-year old, Davianna, and agree that doing so would have been unreasonable, unnecessary, and would have constituted excessive force.[46]

Additionally, the defendant officers testified under oath that they gained entry into the Simmons home by using keys found on Alonzo McFadden's person, presumably to strengthen a perceived tie between McFadden and the Simmons family.[47] This was not only denied by plaintiffs, who testified that nobody except for Emily and Keith Simmons ever possessed house keys, but objectively false: the keys were later tested by the Chicago Police Department in the presence of the parties' attorneys; none of the keys on McFadden's key chain fit into the Simmons' front door.[48] In fact, the front door was unlocked when the officers executed

---

[40] Kinnane deposition at pages 30, 35.
[41] Wrigley deposition at pages 150-151.
[42] Id. at page 162.
[43] See, e.g., O'Keefe deposition at page 44.
[44] See, e.g., Id. at page 39.
[45] SIMMONS 0008-0009; SIMMONS 0012; Aretha Simmons deposition at page 91.
[46] See, e.g., Kinnane deposition (whom plaintiffs allege pointed a gun at Emily) at pages 73, 84-85, 97, 210 and Hefel (whom plaintiffs alleged pointed a gun at Davianna) at pages 75-76, 148-150. Hefel's denial was the most adamant: "I find the question as offensive. I can't even believe you would ask that, but since you are asking I guess I have to answer that. Besides the moral implications, just the thought of that is very upsetting -- the thought alone of that is so upsetting to me that it's tough to answer this question. But absolutely of course there would never be a reason, and would I condone it or stand by for it? No, I would not." Id. at pages 148-149.
[47] See, Laurie deposition at pages 38, 45.
[48] Emily Simmons deposition at pages 81-182. The Simmons family averred in affidavits produced in February, 2017, that the locks had not been changed since the incident. SIMMONS 6102-6112.

11

their search warrant on August 29, 2013.[49]  Additionally, it is undisputed that McFadden was not arrested inside the home, but rather, he was arrested on the common street in front of the Simmons home.[50]

## Analysis

My analysis begins with an assessment of the various accountability systems that exist within the CPD, and the impediments that were in existence at the time of this incident that prevented those systems from operating effectively. This particular phase of my analysis will address the various elements related to the receipt and investigation of citizen complaints, the imposition of discipline, and the early intervention of misconduct.

The next stage of my analysis will address the existence of a Code of Silence within the CPD, and I will conclude with a brief analysis of training with respect to use of force with a focus of police contact with minors.

Determining the credibility of the parties is outside the purview of my work and thus my analysis and the opinions that I will offer are premised upon the truthfulness of the plaintiff's allegations as determined by the fact finder.

## Broken Accountability Systems

*"Police accountability systems are vital to lawful policing. In combination with effective supervision, a robust accountability system can help identify, correct, and ultimately prevent unreasonable and unnecessary use of force."*[51]

Yet, for an accountability system of any kind to be work, it must be real and it must have consequences.  *"It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens."*[52]

At every critical stage of the CPD's systems there are enormous barriers that prevent accountability and create a culture where officers who choose to do wrong, are allowed to do so without fear of punishment; barriers that discourage citizen complaints or prevent officers from reporting misconduct, barriers that prevent fair, thorough, and unbiased investigations, and even barriers to imposing discipline.[53]

### *City Has a Policy of Impeding Investigations of Misconduct*

One of the primary functions of a police agency is to investigate reports of police misconduct and to take affirmative steps to address such misconduct when its existence is

---

[49] Aretha Simmons deposition at pages 83-84.
[50] Laurie at page 33.
[51] DOJ Findings Report at page 7.
[52] Id.
[53] Police Accountability Task Force Report at page 63.

evident. *"When it fails to perform this function effectively, an obvious consequence is an increase of malfeasance since perpetrators will feel that their actions will go unpunished."[54]*

The materials that I have reviewed in preparation of my report reveal overwhelming evidence that at time of this incident, the City of Chicago and the CPD had unduly narrowed the scope of misconduct allegations that were subject to being fully investigated, and thus abdicated their affirmative duty to safeguard the Constitutional rights of the citizens of Chicago.[55] Among the ways in which they consciously and deliberately chose to do so was to enforce polices that precluded the investigation of anonymous complaints,[56] required that complainants sign a sworn affidavit,[57] failed to investigate misconduct that arose from an incident that occurred five (5) years prior to the date of the complaint, and failed to investigate misconduct after five (5) years from the date the Complaint Register Number was issued.[58]

In my opinion, these conscious and deliberate steps amounted to a *de facto* policy that impeded the administration of discipline by creating obstacles that precluded the investigation of police misconduct. Not only are these impediments problematic from the perspective of a misconduct investigation, they create the foreseeable and certain opportunity for countless complaints to go uninvestigated and countless of officers who would otherwise be in need of swift discipline or remediation to fall through the cracks only to surface in yet another tragic set of circumstances. Many of these impediments, which I believe are best characterized as obstructions, were the product of an organized- and I suppose- well thought out process. Their origin can be found in a 2004 state law provision that was largely supported by the Fraternal Order of Police,[59] and in various provisions of the Collective Bargaining Agreement By and Between the Fraternal Order of Police, Chicago Lodge No. 7 and the City of Chicago.[60] Again, they did not arise accidentally or without conscious deliberation, they resulted through the passage of law, acquiesced to by the city through collective bargaining, and were

---

[54] Clark v. City of Muskegon, 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). Also, see, Internal Affairs Conference Manual, 2017, Public Agency Training Council.

[55] A Chicago Tribune analysis of complaint of misconduct levied against Chicago police officers provides evidence for the belief that officers routinely escape adverse personnel action for their conduct, and a vast majority of the time complaints go without complete or otherwise rigorous investigation. The Tribune's analysis revealed that "*nearly 60 percent of all complaints were thrown out without being fully investigated because the alleged victims failed to sign required affidavit. What's more, investigators won't consider an officer's complaint history as part of the investigation, and many cases come down to the word of officer versus the accuser."[55]*
According to the Department of Justice, the city doesn't investigate the majority of complaints that they are required by law to investigate because those complaints lack a supporting affidavit from the complaining party. See, DOJ Findings Report at page 8 and page 50.

[56] The CBA provides exceptions for violations of state or federal criminal statutes. See, SIMMONS 3787 and 3858.

[57] Simmons 4312.

[58] Simmons 3787.

[59] Simmons 5780.

[60] Simmons 3668-3950.

13

systematically woven into the processes and procedures that guided the way in which citizen complaints were received and investigated..

According to the Bureau of Internal Affairs (hereafter, BIA), between 2008 and 2013, 15,412 citizen complaints were closed because there was no signed affidavit from the complainant.[61] The Police Accountability Task Force disclosed an analysis of a Chicago Police Department record from a four-year period ending in mid-December 2014 that concluded that fifty-eight (58) percent of the complaints filed with the Independent Police Review Authority (hereafter, IPRA) were tagged as having "no affidavit", and thus were never fully investigated.[62]

Several things happen when a complainant's signed affidavit is a prerequisite to a fair, thorough, and impartial investigation. First, such a process can have a chilling effect on the complaint process generally, and can serve to undermine the complainant's confidence in the department's willingness to examine the conduct of its own employees. Second, and equally as important, it can prevent a department from becoming fully cognizant of deviant behaviors that will in all likelihood evolve into a pattern of misconduct that will have a foreseeable risk of harm on constituents and threaten the public trust and confidence. When a municipality and its policy makers consciously and deliberately adopt such restrictive and antiquated practices, they create a tremendous disincentive to come forward with legitimate claims and, thus, keeps hidden serious police misconduct that should be investigated.[63] Not only does the behavior itself become concealed, those responsible for the behavior are emboldened.
.

In addition to the antiquated affidavit requirement, the Collective Bargaining Agreements (CBAs) advance yet additional impediments to rigorous, fair, and thorough investigations; the prohibition of most anonymous complaints and a requirement that the accused officer be informed of the name of the complainant prior to being questioned regarding the allegations set forth in the complaint.[64] In my opinion, disclosing the identity of a complaint prior to the time when it may be necessary to prepare for a disciplinary or similar due process hearing not only creates the opportunity for intimidation and retribution, but is yet another means by which a citizen may fear coming for to seek redress for officer misconduct.

Bruce Dean, who the city has offered as its most knowledgeable witness with respect to the Independent Police Review Authority (hereafter, IPRA), has testified that IPRA very infrequently investigated anonymous complaints of past misconduct.[65] He further testified that while they were not necessarily precluded from investigating complaints that were not supported by a signed affidavit, they were precluded from reaching any finding with respect to that complaint.[66] When I balance Mr. Dean's testimony in this regard against my training

---

[61] See, BIA report dated February 9, 2017, source CRMS.
[62] Police Accountability Task Force Report at page 71.
[63] DOJ Findings Report at page 50.
[64] CBA Article 6, Section 6.1, Subsections D and E.
[65] Dean deposition at pages 107-109.
[66] Id. at page 114.

and experience in this critical area of policing policy and practice, it simply makes no sense to me that a police agency would ignore allegations of misconduct even if a collective bargaining agreement or other such obstructive mechanisms preclude the reaching of a finding or the imposition of discipline. Complaints of police misconduct provide fair and certain notice to an agency of a potential problem that cannot be ignored. In this case, such problems were absolutely ignored and the consequences have been both tragic and costly. The antiquated and obstructive stumbling blocks that have been created and allowed to exist has effectively interfered with the CPD's ability to perform an important and affirmative administrative function and created a culture that sanctioned bad behavior. Frankly, how and why the City of Chicago and the CPD would stand idle and allow this to happen is a mystery to me and a disappointment as a former police executive and practitioner.

In his deposition testimony, Mr. Dean spoke of a waiver that investigators could seek in the event they were confronted with an investigation absent a signed complaint.[67] According to the DOJ, IPRA investigators interviewed during the course of the department's investigation revealed that waivers are rarely sought and are openly discouraged.[68] In fact, the option has only been used 17 times over the five years preceding the DOJ investigation.[69] I have yet to review any materials which explain the logic for making the conscious decision not to use a waiver that would allow a citizen complaint to move forward and be investigated to a logical conclusion. Not only does this threaten the integrity of the investigative process and re-inforce the level of distrust and failed confidence the public may have in such a process, it leaves wide open the opportunity that bad behavior will proceed without intervention and correction.

In addition to creating a mechanism that sets up road blocks for the department to promptly and thoroughly investigate complaints and correct wrongdoing, the City of Chicago has made a conscious and deliberate decision to allow a process to remain in place which presented a clearly foreseeable risk of harm to the citizens of Chicago by allowing a large population of officers to escape discipline and continue to engage in conduct that is contrary to their oath of office and amounts to a de-facto policy that has resulted in widespread patterns, practices, and customs that threaten the Constitutional rights of citizens and resulted in the plaintiff's injuries.

Based on the information and analysis set out above, I am of the opinion that during the Monell period in this case (August 29, 2008-August 29, 2013): (1) By consciously and deliberately creating impediments to the citizen complaint process and allowing those impediments to remain intact, the City of Chicago, CPD, BIA, and IPRA had a *de facto* policy or widespread custom of failing to properly investigate civilian allegations of police misconduct, including the use of excessive force, the failure to intervene, theft and/or failure to inventory property and intentional damage to property; (2) The City of Chicago, CPD, BIA and IPRA failed to take any affirmative steps to curb or cure any of these impediments in order that they may have properly investigated allegations of police misconduct, including

---

[67] Id. at pages 108-114.
[68] DOJ Findings Report at page 51.
[69] Id.

15

excessive force, failure to intervene, theft and/or failure to inventory and intentional damage to property; (3) Any reasonable police executive and policy maker would be profoundly aware that the failures I have described would, in fact, impede or otherwise obstruct the rigorous, thorough, fair, and unbiased investigation of police misconduct, and thus lead to a foreseeable risk of harm to others; (4) These blatant failures in the investigation of police misconduct arose through the deliberate and conscious actions of the City and its policy makers, and were allowed to continue without interruption despite their obvious consequences of allowing misconduct to go without investigation, and wrongdoers without intervention; and (5) These deficiencies and impediments were the moving force behind each plaintiff's injuries in that they effectively concealed misconduct and created an environment where the defendant officers could operate with impunity and without fear of punishment. Evidence of this can be found in the complaint histories of the defendant police officers, the extraordinary number of citizen complaints department wide, and systematic failures in accountability. On August 29, 2013, each defendant officer had a very large number of CRs in his history (see below), yet no defendant officer had ever received a sustained finding in a civilian complaint that was not ultimately reversed. In other words, it was reasonable on August 29, 2013 for defendant officers to believe that they would never be effectively investigated or found culpable of any misconduct that they might commit against plaintiffs on that date, including but not limited to the use of excessive force. In addition, at the time of their depositions the defendant officers had a combined 97 years of policing experience with the Chicago Police Department. But despite their vast experience in this very large department, each and every one of them deny ever seeing an officer engage in any form of misconduct or policy violation. Moreover, they deny ever needing to intervene to stop misconduct, including on August 29, 2013. Yet, during the *Monell* period the City of Chicago received some 22,880 complaints that were related to the types of misconduct that are the heart of this litigation (excessive force, illegal search, damage to property, failure to intervene, etc.).[70] I can't fathom what that number might be if the city removed the impediments to investigation.

Not only did the city tolerate impediments and obstructions to misconduct investigations, but, as set forth below, it allowed for the existence of a disciplinary process that rarely ever, ever resulted in any meaningful discipline and, thus, signaled to officers that it was ok to engage in misconduct with impunity and without fear of discipline. In fact, multiple problems with CPD's disciplinary system during the relevant time period made it unlikely that officers would ever be disciplined for misconduct. Defendant officers knew this before they arrived at plaintiffs' home on August 29, 2013.

<u>City Has a Policy of Failing to Investigate Misconduct</u>

It is widely known that for the most part police officers act with great autonomy. Many work alone, have minimal direct oversight as they move from call to call and location to location, make critical decisions that directly impact personal liberty, and carry immediate authority that is greater than most government officials. With such great and autonomous power, must come swift and certain accountability. The way that accountability is best administered in a police agency is through clear and consistently enforced policy, engaged

---

[70] See, Table on page 32.

supervision, rigorous and frequently reinforced training, and a strong process by which citizen complaints are received and investigated. It is clear to me from the discovery materials that the manner in which BIA and IPRA investigated complaints of misconduct was highly ineffective and further frustrated the accountability systems in place at the time of this incident.

The administrative investigations that take place within a police agency are undertaken by an element that is commonly referred to as Internal Affairs or Professional Standards.[71] In the City of Chicago there are two such elements, BIA and IPRA. Both are vital to maintaining reasonable parameters that guide the performance by officers. A common police practice is to investigate allegations of police misconduct which come to the attention of the police agency from any source provided that the allegation, if later proven true, would amount to misconduct. These systems of administrative investigations establish the environment within the involved agency for officers to know that they will, in fact, be held accountable for their actions in the field.

These important accountability systems and practices are in place to properly inform and guide officers as to what they should or should not do particularly when dealing with citizens during enforcement encounters. The supervisory practices, techniques, systems and administrative investigations are the most critical aspect of controlling, monitoring and guiding field officer performance.

BIA investigates those allegations of police misconduct that are not within IPRA's jurisdiction. According to DOJ's Findings report, that constitutes approximately 70% of all police complaints. Typically, these complaints fall into four distinct categories: *"(1) criminal misconduct; (2) bribery and other forms of corruption; (3) drug or other substance abuse; and (4) driving under the influence, as well as all other operation and other violations of CPD rules."*[72]

---

[71] The internal process through which complaints of police misconduct is investigated has a rich history in American Policing and dates back to studies on police practices including the 1931 Wickersim Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals, and other similar studies since that time. These practices are embodied in model policies of nationally recognized police professional groups such as the International Association of Chiefs of Police and the Police Executive Research Forum. They have been continuously referenced in authoritative texts such as the O.W. Wilson Police Administration, a former Chicago Police Superintendent, and its many successors and the International City Management Association's texts on municipal police practices. It is extensively covered in specific training for administrative investigations by national training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), Northwestern University Police Traffic Institute (IL), Southern Police Institute (KY), and Public Agency Training Council (IN).

[72] DOJ Findings Report at page 48.

The vast majority of BIA personnel are sworn members of the CPD, headed by a civilian commander.[73] Despite the limited classification of allegations they are charged to investigate, the division is staffed with approximately 90 investigators and 4-7 civilian support personnel.[74] About 70% of their assigned cases are completed within 18 months.[75]

### IPRA Investigations

While IPRA is charged with the investigation of certain types of misconduct, it is nominally independent of the CPD and does not fall within CPD's sphere of supervision and oversight. IPRA was created in 2007 in response to concerns about how allegations of police misconduct were being investigated by the Chicago Police Department.[76] Among other allegations of misconduct, IPRA is directly responsible for administration investigations of a variety of allegations into police misconduct, to include excessive force.[77]

The IPRA Investigative Steps are set out in the organization's annual report.[78] Among those steps is an acknowledgment of a principle where I believe IPRA has fallen woefully off-mark.

*"An allegation that a Chicago Police Officer committed misconduct is a serious event for the person alleging misconduct and the officer. Both deserve a thorough, fair and timely investigation of the allegation."[79]*

Despite what IPRA affirms, I don't find their investigations to be thorough, fair, or timely. Nor do I believe that the DOJ and the Police Accountability Task Force believes that to be the case as evidenced by the examples set forth in their respective reports.

In the aftermath of the Laquan McDonald shooting, IPRA's leadership underwent change and a new Administrator was appointed and charged with the awesome challenge of overhauling the broken entity. After her appointment in late 2015, IPRA's current chief administrator, Sharon Fairley, spent her first months on the job studying the institution, its history, policies and practices.[80] In a WTTW television interview, she spoke candidly about IPRA's past institutional problems or "impediments."[81] She said that IPRA had been "tremendously under-resourced" and did not have "adequate staffing" to conduct "quality"

---

[73] Klimas deposition at pages 4 and 35.
[74] Id. at page 35.
[75] Id. at page 200.
[76] See, www.iprachicago.rog/about.
[77] Id.
[78] See, IPRA Annual Report, 2010-12, pages 34-35.
[79] Id.
[80] http://chicagotonight.wttw.com/2016/10/18/ipra-chief-police-accountability-new-oversight-agency.
[81] Id.

investigations.[82]  This meant it was "impossible" for IPRA to provide proper supervision of investigative staff, and it also resulted in the huge backlog of cases (1,100 as of the date of her interview) that impeded its ability to investigate.[83]  In his sworn deposition, Bruce Dean admitted investigations could have improved with more investigators.[84]  Training was also "minimal."[85]  In other words, the things Ms. Fairley was able to identify fairly quickly in her tenure should have been evident to the City of Chicago and was widely known by the person speaking on their behalf as their appointed witness in this matter. The only conclusion I can come to is that the city either ignored this blatant dis-service to its citizens, or lacked the technical skills to fix it and prevent Constitutional harm from coming to people like three year old Davianna Simmons and her family.

IPRA was a City of Chicago agency and instrumentality that was never institutionally independent of the politics elected officials are subject to.  Its chief administrator was appointed by the Mayor and confirmed by City Council.[86]  Every sustained finding had to be approved by the investigator's supervisor and the chief administrator.[87]  Supervisors would change or reverse the sustained findings of investigators, as occurred to former IPRA investigator Lorenzo Davis.[88]  In my experience, I find such a practice shocking. If an investigator is tasked with the responsibility of conducting a fact finding mission, uncovering evidence, and coming to conclusions about what they have discovered, absent some corrupt motive or breach of law, their findings should remain intact. If through the review process a supervisor has a different opinion as to the finding, it is my experience (and the manner in which I train others as to this issue) that the supervisor would prepare a report outlining their rationale citing to objective criteria and relevant evidence so their thoughts can be considered as the matter cycles through the review process. Evidence for why such a practice is problematic, can be found in what former IPRA Investigator Davis has alleged in a lawsuit and in the media as to what occurred when he refused to reverse his investigative findings in a shooting case from sustained to not sustained; IPRA's chief administrator Scott Ando terminated him.[89]  Assuming Mr. Davis's allegations are substantively true and his refusal to change a finding which he believed was consistent with the facts unearthed during the course of his investigation was the basis for his removal, such actions undermine IPRA's mission to ensure a thorough and fair investigation of misconduct.

Because IPRA is a civilian entity and is intended to be free of any bias in favor of the police as they go about their investigative work, one would presume that civilian personnel would largely- if not exclusively- make up the investigative staff.  However, half or all of IPRA's investigators were former law enforcement officers, including former CPD police

---

[82] Id.; Department of Justice Report at pages 71-72.

[83] Id.

[84] Dean deposition at page 37.

[85] Fairley interview; Dean deposition at pages 85-86, 87-88; Department of Justice Report at pages 69-70.

[86] Dean deposition at page 12.

[87] Id. at page 97.

[88] Dean deposition at page 230.

[89] <u>Lorenzo Davis v. City of Chicago</u>, 15 CV 7771.

officers.[90]  This has the potential of casting serious doubt upon the agency's ability to be truly independent and lends *"credence to concerns that bias pervades IPRA's findings."[91]*

Other evidence that IPRA lacks true independence is the absence of proper funding to secure outside legal counsel, so it had to rely on the office of Corporation Counsel, which/who reports to the Mayor.[92]  Moreover, the technology information database (CLEAR) that IPRA used to search complaints, write reports and store information were "not really independent" because they were owned and controlled by CPD.[93]

During 2008-2013, IPRA was unable to conduct proper investigations for multiple reasons.  IPRA's ability to conduct investigations was limited in significant ways by the collective bargaining agreements. Many of these examples have been previously cited as conscious impediments to the investigation of police misconduct. The reason that I say they were "conscious impediments" is that these are the terms agreed upon by the City of Chicago which directly influenced their ability (or inability) to effectively manage and hold accountable the personnel for whom they are responsible. For example the CBA provided that an officer could only be interviewed in an investigation if IPRA had a sworn affidavit from the complainant.[94]  If there was no affidavit, IPRA would not investigate or even assign a CR or case number.[95]  Despite the availability of a waiver or "override" procedure, Bruce Dean testified that IPRA investigated anonymous complaints only about five (5) times during the time period that is relevant to this matter.[96]  As a result, IPRA closed thousands of citizen complaints - about 40 percent per year - because the complainant did not sign an affidavit.[97]  As another example, IPRA was allowed to perform some "pattern analysis,"[98] in which investigators considered past similar allegations of misconduct as making it more likely that the current allegation of misconduct occurred, but under the CBA it could only do so if it had a pending complaint, and it could only look at complaints that were less than 5 or 7 years old.[99]  The Police Accountability Task Force Report concludes that IPRA has not used its power to do pattern analysis.[100]  Moreover, an officer cannot be charged with a false statement if there is contradictory video or audio evidence until after being provided an opportunity to review it and clarify or amend his statement.[101]

---

[90] Police Accountability Task Force Report at page 79; Dean deposition at 65 and 73.
[91] Police Accountability Task Force Report at page 79.
[92] Fairley interview; Dean deposition at page 40.
[93] Fairley interview; Dean deposition at pages 52-53, 56.
[94] Dean deposition at page 110.
[95] Id.
[96] Dean deposition at page 108.
[97] PATF Report at page 10; Department of Justice Report at page 50.
[98] Dean deposition at page 210.
[99] Id. at pages 127-128, 215, 217.
[100] Police Accountability Task Force Report at page 73.
[101] Police Accountability Task Force Report at page 72.

Finally, during recorded IPRA interviews of accused officers, the officer was allowed to go off the record to consult with or be coached his counsel and/or union representative.[102] These consultations were not reflected on the written record, which just indicates that a consultation was had.[103] An example of how this adversely impacts the integrity of an investigation is discussed later in my report.

As the data in this case show, only extremely rarely did IPRA reach a sustained finding in a complaint investigation, including excessive force complaints. During the relevant time period, in only five cases did IPRA determine that a shooting was "unjustified."[104]

When it reached a sustained finding, IPRA would recommend the initial discipline. During the relevant time period, IPRA recommended termination in only a handful of cases.[105] Suspicious of this result, Fairley engaged a large law firm to conduct an audit of all closed investigative files relating to complaints of shootings.

My review of a number of IPRA's annual reports reveal extensive back-log in investigations, few sustained findings of misconduct, and a disturbing number of cases where they conclude officers have provided false statements during the course of misconduct investigations.

Sustaining long delays in the investigative process exposes the City of Chicago and its citizens to on-going and uncorrected behavior that threatens the rights of citizens, tarnishes the badge of law abiding and committed police professionals, and continues to threaten police legitimacy in Chicago during a time when it is becoming increasingly more important.

Former Police Superintendent Garry McCarthy candidly admitted to the dysfunctional and ineffective discipline system in place within the Chicago Police Department shortly after his appointment. In fact, he found the disciplinary system in place at the time of his arrival to be confusing. He is reported to have told the Tribune, "*We've got officers who have been stripped (of police powers) for like four years. That's absurd, that's absolutely absurd.*"[106]

In addition to untimely investigations into misconduct, Bruce Dean testified that written reports prepared by involved CPD officers were often used during the course of IPRA investigations.[107] He further testified that it was entirely possible that IPRA had relied too heavily on memoranda from accused officers rather than conducting live interviews.[108] Given the very important nature of these investigations, such an admission is troubling to me and calls into question the quality of investigations conducted by IPRA.

---

[102] Id. at pages 225-226; Department of Justice Report at page 56 and 61-62.
[103] Id. at 227.
[104] Data provided by City during Dean's deposition.
[105] Dean deposition at pages 187-188.
[106] Id.
[107] Dean deposition at page 107.
[108] Id. 107.

In my opinion, when investigators rely upon a written response to a small number of questions without any additional follow-up or the securing of a properly preserved audio statement, the risk of error and the omissions of information give way to a serious flaw in the investigative process.[109] It is clear to me that Mr. Dean fully appreciates the role of IPRA, and further acknowledges that the "*overall responsibility of IPRA was to conduct thorough, fair investigations.*"[110]

The United States Department of Justice v. City of Detroit, is instructive as to how such investigations are to be conducted; *thorough and complete interviews of all witnesses and an effort to resolve material inconsistencies between statements, in person video or audio recorded interviews, and a review of all relevant evidence including circumstantial, direct, and physical.*[111]

The agreement further provides for written and signed statements of witnesses in the absence of video or audio recording.[112]

The same direction can be found in the Memorandum of Agreement by and between the United States Department of Justice and Washington, DC; *tape record or video tape witnesses and involved officers. If they refuse, prepare a written narrative to be signed.*[113]

While I recognize that the City of Chicago was not a party to either of the two agreements I have cited, I believe that they have failed to follow the guiding principles that are a product of important steps that have been taken to reshape policing, provide for reform, and ensure fair, objective, and thorough investigations of police conduct.

During their investigation, the DOJ reviewed hundreds of investigative files which revealed that "*IPRA and BIA investigations, with rare exception, suffer from entrenched investigative deficiencies and biased techniques.*"[114]

The DOJ goes on to write that a careful analysis of 400 IPRA and BIA investigations revealed a "*consistent unwillingness to probe or challenge officers' accounts of the incident, even when these accounts were inconsistent with physical evidence, credible eyewitness statements, or common sense.*"[115]

---

[109] See, Reiter, Lou, *Law Enforcement Administrative Investigations,* 3rd Edition, 2006, 11.2.
[110] Dean deposition at page 100.
[111] See, USDOJ v. Detroit, No.03-72258.
[112] Id.
[113] See, MOA by and between USDOJ and Washington, DC (June 13, 2001). Also, see, Rivers, David, and Longo, Tim: *Use of Force,* Public Agency Training Council, 2011, at page 93. During the course of an officer involved shooting investigation, all statements should be transcribed, video recorded, or handwritten by the party from whom the statement is sought.
[114] DOJ Findings Report at page 56.
[115] Id.

*"Investigators frequently failed to collect basic evidence needed for the investigations by failing to interview important witnesses-including the accused officer- and failing to collect information from other court proceedings involving the same incident."*[116]

Over the past few years, I have been retained in other matters in which the CPD has been a named defendant. During the course of my work regarding those matters, I have had the opportunity to review investigative files in the aftermath of critical events and have seen instances where evidence was either not recovered or processed in a timely fashion, video evidence was not secured in its entirety, material inconsistencies within statements were not resolved, interviews were not properly preserved, handwritten notes were not retained, and accused officers were not even interviewed. Further, in reviewing discovery materials in this case I had occasion to review an IPRA investigation into the shooting death of Chicago resident, Alfontish Cockerman in which I noted deficiencies.

<u>IPRA's Cokerman Investigation is a Representative Example of IPRA's Investigative Bias</u>

Mr. Cockerman's death arose from a tragic encounter with Officer Anthony Babicz. What made this particular investigation relevant, I suppose, is that Officer Babicz is also a named defendant in this matter. A brief summary of the facts in that case is as follows.

According to Officer Babicz, he had received information from a confidential informant that a black male by the name of "NuNu" was in possession of a black Glock .45 caliber semi-automatic pistol. This informant had been known to Officer Babicz approximately 3-6 months at the time he received this information.[117] Babiz, along with other members of the Chicago Police Department to include Sergeant Kinnane and Officer Homer, responded to the area where the armed persons was alleged to be and encountered someone fitting the description that Officer Babicz had been provided by the source. A foot chase ensued culminating in a subject later identified as Alfontish Cockerman being shot; he later died.

According to Officer Babicz, during the course of pursuing Mr. Cockerman, he (Cockerman) changed his direction of travel and began running back in the direction of the officer with a gun in his right hand.[118] Officer Babicz further told investigators that there came a time when Mr. Cockerman turned toward the officer and pointed the gun in his direction. It was at this point that the officer fired his weapon; initially once and then, four additional times.

During the course of their investigation, IPRA had occasion to interview two officers who had accompanied Babicz to the location where Mr. Cockerman was first observed. Officers Steven Vidljinovic and Osbiel Montoya testified that they, too, saw a gun in Cockerman's right hand as he turned back and ran towards Officer Babicz.[119] However,

---

[116] Id.
[117] CITY-AS-004850 (BABICZ statement to IPRA).
[118] CITY-AS-004861.
[119] CITY-AS-004785 (VIDLJINOVIC statement to IPRA) and CITY-AS-004821.

neither officer testified that they were in a possession to have observed Mr. Cockerman point the gun at Officer Babicz.

Further review of IPRA's investigative file revealed a memo prepared by Investigator Marc Addington that I believe impacts the veracity of the testimony of officers Vidljinovic and Montoya, as well as the testimony of Officer Babicz.[120]

*"At 00:9:37, a subject who appears to be a police officer with a firearm in his right hand appears from the top of the screen. The officer is wearing a baseball hat and black vest. At the same time, a subject in dark clothing appears from the bottom of the screen and runs past the same police officer. The subject runs past the left side of the officer almost hitting him. The officer turns to his left, firearm in right hand, and pursues the subject as they both disappear at the top of the screen."*[121]

Nowhere in Investigator Addington's memo, does he mention a gun in the hand of the subject who ran past the officer. At no point during their interviews with IPRA investigators are the involved officers challenged on this critical inconsistency. Furthermore, this issue was not reconciled in Officer Babicz's interview. In my experience, reconciling such inconsistencies is important during the investigative process.

Investigator Addington's memo goes on to state, *"The subject is pursued by an individual who appears to be a police officer. The officer is wearing a baseball hat, dark vest and appears to have a firearm and flashlight in his hands. The pursued subject runs a short distance before he falls to the road in front of a parked car on S. Merrill Street. Before falling, the subject appears to drop a black object to the sidewalk."*[122]

Nowhere in Investigator Addington's memo, does he mention that the video depicted Mr. Cockerman turning in the direction and pointing a gun in the direction of the officer. The question this raises, is whether Mr. Cockerman pointed a gun at Officer Babicz prior to entering the frame of the video. Unfortunately, I didn't review any material that properly raised and resolved this question aside from a media account that, once again, calls into question the competency of this important process.

*"However, the video captured by a security camera at a payday lending business on the block does not show Cockerham pointing a gun at the police. Instead, the grainy video shows an object that appears to be a gun materialize on the ground a couple of feet from where a witness Natasha Mclemore said the officer fired the shots."*[123]

---

[120] CITY-AS-004806.
[121] Id.
[122] CITY-AS-004806.
[123] SIMMONS 5517.

Turning now back to Officer Babicz's statement. The officer testified, "*And then I see him uh start to turn uh right with the handgun in his hand toward my direction. At the point I stopped uh readied my weapon fired one round and then fired more in succession.*"[124]

The exchange that follows the officer's statement focuses on a "*slight pause*" between the officer's first shot and the four that followed.[125]

> Q: "*Okay. And was there, was there a reason for the pause?*"
> A: "*No. I mean, I, I. I fired the one round. I mean no I can't give you an answer. I have no idea why I paused*".
> Q: "*All right. Was he still, after you fired the first round, could you see his actions?*"
> A: "*Yes.*"
> Q: "*And what was he doing?*"
> A: "*He started to stumble and that's when I saw the gun come outta his hand.*"

It is immediately after this response (according to the transcript), that the investigator pauses the recorder with no apparent explanation. When the recorder resumes, the investigator begins by providing a summary of what the officer previously stated and then proceeds with the following inquiry.

> Q: "*Um I guess was there, was there a reason for the pause? Or what were you observing that made you to continue discharging a firearm?*"
> A: "*Uh earlier I misspoke. When I fired the first round he still had the weapon in his hand. I, I, I paused to see if I would hit 'em and if he would have dropped it. He didn't drop it at that point, he's still turning toward my direction. That's when I, I let off four more rounds in succession. U it was boom, boom, boom, boom. And then at that point, the gun came out of his hand, fell to the sidewalk and then he stumble over in between the red Camaro and the uh black Impala.*"

The reason that I highlight this particular exchange in light of this critical officer involved shooting investigation is that it raises the question as to what discussion may have taken place at the time the recorder was paused and whether that discussion was aimed at guiding the officer's statement, thus revealing the investigative bias that is discussed in so many of those reports that call IPRA's objectivity into question. At no time during the course of Officer Babicz's interview is he ever challenged as to the apparent conflict between the surveillance video retrieved from the payday loan store located at 2132 East 71st Street, and his version of the events as articulated in his statement. The discrepancy is glaring as it fails to depict the fatal act of pointing a weapon in the direction of the officer, and thus, could reasonably call into question the legitimacy of the officer's actions.

In addition to just poor investigative practices, the DOJ cites to the issue of collusion among officers who may be involved in critical events such as officer involved shootings.

---

[124] CITY-AS-004865.
[125] CITY-AS-004865-867.

Regardless of whether the opportunity for collusion is created by a mechanism within the Collective Bargaining Agreement that allows for the passage of time between the critical event and the time in which an interview may be accomplished,[126] or occurs because officers are left with other such opportunities to compare notes, suggest plausible theories to justify their actions, or simply come up with a common narrative the existence of such opportunities poison the investigative process and results in a *de facto* policy that sanctions a Code of Silence and promotes a wide spread practice of "circling the wagons' each and every time a critical event occurs.

In support of their concerns, the DOJ recounts two events in which evidence of such collusion was present, known, and apparently condoned by the CPD.

"*The release of police cruiser video from the 2014 Laquan McDonald shooting led CPD to fire seven officers for falsifying their reports about the shooting. The officers written reports generally read the same, stating that the teenager was advancing on the officers and threatening officers with a knife. The video of the shooting appears to undercut those seven officers' accounts. Additionally, the release of body worn camera videos from the July 2016 Paul O'Neil shooting shows officers involved in the shooting speaking to each other about the incident moments after the shooting occurred. Officers can be heard discussing the facts of the incident, including confirming they all had the same perception of events. As concerning, CPD officials condone this behavior, and encourage them to have the conversations without making a record of what was said.*"[127]

Based on the information and analysis set out above, I am of the opinion that, during the period covered by *Monell* discovery in this case: (1) The City of Chicago, CPD, BIA, and IPRA had a *de facto* policy or widespread custom or practice of failing to investigate civilian allegations of police misconduct, including use of excessive force, the failure to intervene, theft and/or failure to inventory and intentional damage to property; (2) The City of Chicago, CPD, BIA, and IPRA failed to take any affirmative steps to curb or cure their *de facto* policy of failing to properly investigate allegations of police misconduct, including excessive force, failure to intervene, theft and failure to inventory and intentional damage to property; (3) The failure to properly investigate citizen complaints as evidenced by the information contained within the discovery materials, all of which were available for regular audit and review by the City and CPD, were the deliberate and conscious decision of policy makers who failed to effectively audit the data at their disposal, monitor the actions of their officers, and ensure the fair, consistent, and meaningful investigations in order that wrongdoers were not left with the belief that their bad behavior would go unnoticed and without punishment; and (4) The deliberate and conscious decision to maintain an ineffective and flawed system by which to investigate police misconduct was the driving force behind each plaintiff's injuries as evidenced by each defendant police officer's extensive complaint history, the fact that as of August 29, 2013, no defendant officer had ever had a civilian complaint against him sustained and not ultimately reversed, and the city's deficient investigative process. Each of the defendant police officers, except Kinnane and Wrigley, had never received discipline or a

---

[126] Dean deposition at page 122.
[127] DOJ Findings Report at page 58.

sustained finding in relation to a citizen complaint. Sergeant Kinnane testified that his sustained complaint was ultimately reversed, as was the discipline which had been imposed at the time. He received back pay for previously-served unpaid time off, and his record was made whole.[128] Officer Wrigley testified that he had two sustained complaints, one for a technical violation of CPD policy and the other related to a citizen complaint.[129] He appealed the citizen complaint and the CPD board found that the initial penalty was too "harsh" and reduced it.[130] These factors, coupled with the fact that CPD sustains only about 2% or less of allegations of misconduct signaled to defendant officers that misconduct would rarely be addressed in any meaningful way. While it is outside my purview to assess the credibility of the parties, it is easy to see why the defendant officers and the City may feel comfortable simply denying plaintiffs' allegations and yielding to an ineffective internal complaint and disciplinary process to sort out the truth, if any is ever conducted.

### *City Has a Policy of Failing to Discipline Misconduct*

As the Department of Justice noted, during 2011 – 2016 over 50 percent of investigations with sustained findings did not result in any discipline to the officer or resulted in insignificant discipline, such as a "violation noted" or a verbal reprimand.[131] Most recommendations for suspension are for one-day suspension.[132] Only 2 percent of all misconduct allegations resulted in any actual discipline.[133] In my opinion, that sent and sends a clear message to officers, including defendant officers, that the disciplinary process is skewed in favor of the officer and to the detriment of the complainant.

As the CPD data analyzed by plaintiffs' statistical expert in this case shows, the vast majority of complaints during the *Monell* period in this case never led to a sustained finding. Moreover, those extraordinarily small number of complaints that were sustained rarely resulted in any meaningful discipline. The practical result is that vast numbers of officers go unscathed, misconduct goes without affirmative corrective action, and officers are not only permitted to act with impunity, but they cannot but know in advance that their decisions to act take place within a system that will not seriously punish any misconduct they may choose to commit.

---

[128] Kinnane deposition at pages 30-35.
[129] Wrigley deposition at pages 150-151.
[130] Id. at page 162.
[131] Department of Justice Report at page 80.
[132] Id.
[133] Police Accountability Task Force Report at page 63.

27

Table One: Complaints[134]

| Complaint Type | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| Excessive Force (43.1) | 8,222 | 266 | 3.24% | 55 | 0.67% |
| Illegal Search (46) | 4,355 | 8 | 0.18% | 4 | 0.09% |
| Damage/Trespass to Property (47) | 267 | 2 | 0.75% | 1 | 0.37% |
| Neglect of Duty/Failure to Intervene (51) | 8,274 | 164 | 1.98% | 1 | 0.01% |
| Property Violations (52) | 1,781 | 28 | 1.57% | 1 | 0.06% |
| Unnecessary Use of/Display of Weapon (53) | 539 | 22 | 4.08% | 10 | 1.86% |

The data analysis by plaintiffs' statistical expert also reveals that initial disciplinary recommendations are frequently reduced or reversed entirely after a long and complicated path of review. The city's BIA expert, Commander Klimas, agreed with the Department of Justice's (DOJ) findings that the fact that CPD consistently overturns discipline has a negative impact on police accountability in Chicago.[135]

Table Two: Total Complaints[136]

| Item | Total CRs | Total Complaints | Sustained Complaints | Suspensions – 1-9 Days | Suspensions - 10+ Days | Terminations |
|---|---|---|---|---|---|---|
| Initial Counts | 12,078 | 22,899 | 508 | 205 | 58 | 37 |
| Final Counts | 12,078 | 22,899 | 468 | 169 | 52 | 10 |
| | | | | | | |
| Initial Rates | | | 2.22% | 0.90% | 0.25% | 0.16% |
| Final Rates | | | 2.04% | 0.74% | 0.23% | 0.04% |
| | | | | | | |
| Percent Reduction, Initial to Final | | | 7.87% | 17.56% | 10.34% | 72.97% |

---

[134] Table One data was derived from work completed by Plaintiff's statistical data expert; the data came from the Invisible Institute and from CPD in this case.

[135] Klimas deposition at pages 220-221.

[136] Table Two represents the total complaints during the *Monell* period based upon the complaint types listed in Table One. The data was prepared by Plaintiff's statistical expert and is derived from the Invisible Institute and CPD.

Understanding the complexity of the disciplinary review process helps to put the aforementioned data in context, keeping in mind that there are up to seven layers of review before discipline is final and can be administered.[137]  In my opinion each of these layers create the opportunity for interference in the effective administration of discipline and accountability. Any recommendation of discipline by IPRA or the BIA is only an initial recommendation and is subject to review.[138]  Further, under what is determined to be "command channel review," in which all supervisors of the accused officer have a chance to review and comment on the recommended discipline (without any limits on the time for their review), the initial disciplinary recommendation goes through the entire chain of command and then, finally, to the superintendent, who at the end may change it.[139]

It is also possible that a case may eventually also go to mediation or to the police board, which it is my understanding has a long history of "routinely" overturning misconduct findings and proposed discipline.[140]  The collective bargaining agreements provide officers with this arbitration procedure.[141]

During "command channel review", the first (or any) officer in the chain of command can order the entire investigation to re-start from scratch.[142]  Command channel review was highly ineffective at imposing fair discipline during the relevant time period, as the DOJ investigation found.  Commander Klimas, the head of the BIA for several years, agreed with the DOJ report and testified that the problem with command channel review was that supervisors become advocates for the officers rather than for the department and for fair discipline.[143]  In Commander Klimas' analogy, they were like "parents" who acted more like the child's "friend" than his "parent" or disciplinarian; that is to say, they were typically sympathetic to the accused officer and very likely to reduce discipline.[144]  If an officer does have to serve a suspension, he had "options" to use furlough days or paternity leave time, which would not result in loss of income.[145]

During the relevant time period, CPD did not have an objective disciplinary matrix with specified penalties for specified misconduct that gave weight to aggravating and mitigating factors. In my experience, the use of a disciplinary matrix is common in law enforcement agencies, and effective in ensuring fair and consistent discipline. As the DOJ Report noted, "investigators' disciplinary recommendations were not guided by any exacting or formal standards. Instead, the discipline recommended following a finding of misconduct was entirely up to the discretion of the

---

[137] Department of Justice Report at pages 80-81.
[138] Klimas deposition at pages 61-62.
[139] Klimas deposition at pages 61-62 and 73-74.
[140] Department of Justice Report at pages 84-85, 86-87.
[141] Police Accountability Task Force Report at pages 85, 87.
[142] Klimas deposition at page 208.
[143] Department of Justice Report at page 82; Klimas deposition at pages 215-216.
[144] Klimas deposition at page 216.
[145] Klimas deposition at pages 83-84; Department of Justice Report at page 81.

investigator and his or her supervisor."[146]  Commander Klimas agreed in part with the DOJ's (and the Police Accountability Task Force's) finding that the lack of a clear disciplinary matrix makes it more likely that an officer will engage in misconduct because he doesn't clearly know what the disciplinary result of his conduct, if any, will be.[147] In my opinion, the fatal flaws in the process thus far is that there is no objective standards from which an investigator, or even a supervisor, can formulate a disciplinary recommendation. Moreover, the absence of a matrix increases the probability that disciplinary will be inconsistently applied. There has been much work within the field of law enforcement around creating sound, effective, and fair disciplinary processes. The fact that the CPD had not progressed in that area by 2013 is remarkable to me.

Moreover, CPD officers' promotions were rarely if ever affected by their complaint or disciplinary histories.  Nor was there a requirement that disciplinary history be taken into account during performance evaluations.[148]

As the Police Accountability Task Force noted, "When case after high-profile case results in punishment that does not match the gravity of the misconduct, it sends a message that the police can act with impunity…  It also leaves those who break the rules emboldened to continue doing so."[149]

Another critic of the CPD's alleged failure to effectively implement and enforce effective accountability standards is University of Chicago Law professor, Craig Futterman. Professor Futterman and his project staff tracked over 56,000 allegations of police misconduct between March of 2011 and September of 2015. According to their findings, less than 2% of the allegations examined resulted in a sustained finding against the officers accused of the alleged misconduct.[150] Even when officers were disciplined, the punishment implemented rarely led to suspensions for more than a week.[151] Of those allegations reviewed, only 33 of the cases resulted in termination.

*"The biggest takeaway is that it appears from the data that Chicago cops are rarely punished, even when found to be culpable for the misconduct they're accused of."[152]*

In the last twenty years I have spent much time researching, studying, and instructing law enforcement personnel in the area of police ethics and accountability. There are countless reports authored by commissions empaneled in the aftermath of scathing reports and investigations of police misconduct, many which resulted in criminal prosecutions, massive civil claims, and widespread reform. One such commission was formed approximately four months after Rodney King's well documented encounter with several members of the Los Angeles Police Department (LAPD).  The Los Angeles City Council tapped a local attorney by the name of Warren Christopher to lead the team that would spend months examining the

---

[146] Department of Justice Report at page 83.

[147] Department of Justice Report at page 83; Klimas deposition at page 218.

[148] Klimas deposition at 141.

[149] At page 63.

[150] Id.

[151] Simmons 5526.

[152] Simmons 5525.

policies and practices of the Los Angeles Police Department. The "Christopher Commission", as it has come to be known, examined every aspect of the LAPD to include recruitment and training of personnel, and the internal affairs and departmental disciplinary process. During the course of their extensive work, they discovered that there was a significant number of officers in the LAPD who repetitively used excessive force against the public and persistently ignored the written guidelines of the department regarding use of force. What they found should come as no surprise; despite the huge numbers of complaints regarding excessive force, less than 2% were sustained. What I found especially interesting is that, like the CPD in this case, the information that supported the commission's findings were right under the nose of the department's leadership. Evidence of a pattern and practice of potentially excessive force was contained in the indices of the LAPD and top leadership either lacked that knowledge, sophistication, or desire to examine the data and draw conclusions from what it may mean to the citizens of their city and the department. The very same thing was true for Chicago during the *Monell* period, as the Police Accountability Task Force Report points out.[153]   The commission's comments to the city were poignant and have relevance here as well.

> "*The failure to control these officers is a management issue that is at the heart of the problem. The documents and data that we have analyzed have all been available to the department; indeed, most of this information came from that source. The LAPD's failure to analyze and act upon these revealing data evidences a significant breakdown in the management and leadership of the Department.*"[154]

The aforementioned data and cumulative evidence is indicative of a broken and ineffective disciplinary process that invites officers that conceals misconduct and fosters a culture of silence and complacency that allows wrongdoers to act without fear of punishment and with impunity.

Based on the information and analysis set out above, I am of the opinion that during the *Monell* period in this case: (1) The City of Chicago, the CPD, BIA, and IPRA had a *de facto* policy or widespread custom or practice of failing to effectively discipline police misconduct, including the use of excessive force, the failure to intervene, theft and/or failure to inventory and intentional damage to property; (2) The failures in discipline evidenced by the data and information contained within the discovery materials, all of which were available for regular audit and review by the City and CPD, were the deliberate and conscious actions of policy makers who failed to effectively audit the data at their disposal, monitor the actions of their officers, and ensure the fair, consistent, and meaningful application of discipline in order that wrongdoers were not left with the belief that their bad behavior would go unnoticed and without punishment; (3)  The low percentage of complaints which result in a sustained finding, the absence of any meaningful disciplinary action, the frequency in which discipline is lowered or reversed, and the absence of any real consequence for wrongdoing caused the defendant officers in this case to have every reason to believe, before they entered plaintiffs' home on August 29, 2013, that they would never be effectively investigated or meaningfully disciplined for anything they did to plaintiffs or their property; (4) The failures in discipline

---

[153] Police Accountability Task Force Report at page 101.
[154] Christopher Commission Report

evidenced by the data, and in particular the extensive complaint history of the defendant officers and the fact that none of them had ever disciplined, were the direct cause of each plaintiff's injuries in that defendant officers reasonably knew they could act with virtual impunity on August 29, 2013; (5) At the time of this incident the City, CPD, BIA, and IPRA had failed to take any meaningful steps to curb or otherwise correct these blatant, deliberate, and conscious failures; (6) The City of Chicago, CPD, BIA, and IPRA's failure to regularly audit and review disciplinary records and maintain an effective disciplinary system which prevented police misconduct and protected against a culture of impunity amounted to a *de facto* policy of failing to supervise officers, including in the proper use of force; and (7) These *de facto* policies of a failure to discipline and supervise were the moving force behind each of plaintiff's injuries. Evidence of this can be found in the defendant police officers' extensive complaint histories, the low percentage of sustained complaints, the non-existent history of discipline for defendant officers, CPD's failure in not identifying these officers for appropriate intervention (discussed below), and the large number of civil claims against defendant officers, coupled with no meaningful adverse consequence for them (discussed below) - many of which resulted in settlement. The defendant police officers amassed some 245 complaints of misconduct throughout their careers, and more than 20 civil cases have been filed in which one or more of them have been named as defendants. Several of those claims have been settled or were otherwise resolved in favor of the plaintiffs. Not a single allegation against any of them has resulted in final discipline.[155]  Each of the defendants deny ever being referred for Behavioral Intervention or Personnel Concern. In other words, the City of Chicago and CPD did nothing that would reasonably have prevented or deterred defendant officers from violating the Constitutional rights of Davianna Simmons and her family, despite all of the citizen complaints and civil claims.

Moreover, evidence of the department's failure to properly and effectively supervise the defendant police officers can be found in CPD's failure to monitor and frequently audit the records they had at their disposal (complaint history, use of force history, training history, civil law suits, etc.) that could reasonably alert CPD to areas of misconduct that could lead to foreseeable risks of harm if left without intervention.[156]

It has been my experience that effectively engaged and attentive supervision is one the principle ways in which to provide oversight to a workgroup and a larger organization such as the CPD. Not only does engaged supervision assist in the early indication of problem behaviors and the application of effective accountability systems, it assists in establishing an organizational culture by consistently reinforcing organizational values that resist a destructive code of silence and prevent it from taking hold.

Most immediate to this case is the failure to supervise at the most basic level as can be reflected in the acts and omissions of Sergeant Kinnane. Assuming that plaintiff's presentation of the facts in the case are deemed credible, Sergeant Kinnane failed to properly evaluate and prepare for the execution of a high risk critical task of serving a search warrant without having

---

[155] Note, both Kinnane and Wrigley's disciplinary actions were reduced or otherwise eliminated on appeal.
[156] Police Accountability Task Force Report at page 101.

done the required due diligence of determining the vulnerabilities that may have existed at the time the warrant was served, particularly the possible or likely presence of a three year old child. Further, pointing or allowing to be pointed loaded weapons at unarmed, defenseless, and non-threatening persons woefully run afoul the policies and law that is it incumbent upon a first line supervisor to safeguard and ensure strict compliance.

In its report, the Police Accountability Task Force squarely confronted the linkage between racism and the CPD: *"The linkage between racism and the CPD did not just bubble up in the aftermath of the release of the McDonald video. Racism and maltreatment at the hands of the police have been consistent complaints from communities of color for decades. And there have been many significant flashpoints over the years- the killing of Fred Hampton (1960s), the Metcalf hearings (1970s), federal court findings of a pattern and practice of discriminatory hiring (1970's), Jon Burge and his midnight crew (1970s to 1990s), widespread use of investigatory stops and frisks (2000s) and other points. False arrests, coerced confessions and wrongful convictions are also a part of this history. Lives lost and countless more damaged. These events and others mark a long, sad history of deaths, false imprisonment, physical and verbal abuse and general discontent about police actions in neighborhoods of color."* [157]

As the Task Force noted, CPD's oversight system is not immune to racial bias. *"From March 2011 through September 2015, CPDS Bureau of Internal Affairs and IPRA examined about 17,500 complaints of police misconduct with named complainants. Of those 17,500 complaints, 61% were filed by African Americans, 21% were filed by whites and 12% were filed by Hispanics. And yet, the rates of sustained cases looked very different. Of the misconduct complaints sustained, 25% were filed by African Americans, compared to 58% by whites and 15% by Hispanics. In short, allegations of police misconduct by whites 'are nine times more likely to be upheld than those by blacks and almost three times more likely than those by Hispanics."* [158]

The Tables below reflect data taken from the Invisible Institute and provide an overview of the quantity and disposition of citizen complaints in the Invisible Institute database, broken down by race of the complainants.

Invisible Institute Final Complaint Investigative and Discipline Data – All Complaint Types, 2001 through 2008 and 2011 through 2015

---

[157] Police Accountability Task Force Report at page 7.
[158] Police Accountability Task Force Report at page 40, citing, Adeshina Emmanuel & Jonah Newman, Police Misconduct Complaints by Whites More Likely to be Upheld, Chicago Reporter (Nov. 10, 2015).

Table Three: Complaints by Race[159]

| Excessive Force Victim or Complainant | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| Non-African-Americans (43.1 – 43.4) | 3,267 | 161 | 4.93% | 37 | 1.13% |
| All Races and Ages (43.1) | 8,222 | 266 | 3.24% | 55 | 0.67% |
| African-Americans (43.4) | 4,955 | 105 | 2.12% | 18 | 0.36% |
| Minors, All Races (44) | 1,063 | 32 | 3.01% | 4 | 0.38% |
| Young Children, All Races (45) | 47 | 0 | 0.00% | 0 | 0.00% |

Invisible Institute Final Complaint Investigative and Discipline Data – Excessive Force Complaints, 2001 through 2008 and 2011 through 2015.

Table Four: Exc. Force by Race[160]

| Race | Excessive Force Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| White | 291 | 30 | 10.31% | 4 | 1.37% |
| Black | 1,781 | 8 | 0.45% | 2 | 0.11% |

Based on the information set out above and the analysis contained within my report, I am of the opinion that: (1) The City of Chicago, the CPD, BIA, and IPRA had a *de facto* policy or widespread custom of sustaining and disciplining officers less often for misconduct against African-American civilians; and (2) The City of Chicago, CPD, BIA, and IPRA have failed to take any steps to curb this disproportionality.

---

[159] Table Three reflects complaint data by race. Data was assembled by Plaintiff's statistical expert.
[160] Table Four reflects excessive force complaints by race. Data assembled by Plaintiff's statistical expert as supplied by the Invisible Institute and CPD.

*City Has a Policy of Failed Intervention Systems*

Complaint Histories

It has been my experience that one of the barometers used to determine the existence of behaviors that are contrary to policy, training, and law are misconduct complaints. As has been previously discussed, the CPD amasses an extraordinary number of complaints of misconduct, but rarely sustains those complaints. Further, when those complaints are sustained meaningful discipline rarely results.

In their sworn depositions, most of the defendant officers deny ever having a complaint sustained or even receiving any discipline as a result of a citizen complaint.[161] Others simply don't recall.[162] What is clear from the discovery materials is that each of the defendant police officers amassed a large number of complaints that provided fair notice to the City of Chicago and the CPD during the *Monell* period in this case of a widespread practice of misconduct. Yet, it appears that the City and the CPD did nothing to affirmatively react to such notice.

Table Five: Defendant Officer Complaints[163]

| Officer | Appointment Date | June 2016 Complaints | Total Career Complaints | Number Sustained Complaints |
|---------|------------------|----------------------|-------------------------|------------------------------|
| Anthony Babicz | 9/27/2004 | 14 | 33 | 0 |
| Steven Hefel | 5/1/2006 | 14 | 37 | 0 |
| Justin Homer | 12/5/2005 | 16 | 31 | 0 |
| Brian Kinnane | 4/30/2001 | 7 | 33 | 0 |
| Michael Laurie | 1/26/2004 | 11 | 25 | 0 |
| John Okeefe | 10/28/2002 | 7 | 31 | 0 |
| Michael Suing | 4/26/2004 | 9 | 33 | 0 |
| John Wrigley | 7/29/2002 | 6 | 22 | 2 |
|  |  |  |  |  |
|  |  |  |  |  |

With the exception of John Wrigley, not a single complaint was sustained with respect to the other defendant officers. In the case of John Wrigley and Brian Kinnane, both had prior sustained findings and disciplinary actions that were later set aside. I can't think of a greater incentive for officers to behave as though they will never fall subject to discipline or any meaningful form of intervention. I believe that the recorded complaint history of these officers

---

[161] Homer at 71, Hefel at 96-97, Suing at 99, Muzupappa at 51-52, Kinnane at 158-159, and Roussell at 23.

[162] OKeefe at 127 (also, see, 130-156), Babicz at 84-110, and Laurie at 154-177.

[163] Table Five reflects a summary of the defendant police officers' complaint histories that was produced by the City.

was simply ignored, and the city's de-facto policy of acquiescing to police misconduct despite fair notice allowed these officers and others to continue running afoul policy and law with absolute impunity.

In addition to the complaint history of the defendant police officers named in this matter, the city has provided the complaint history of several officers who have been named recently as defendants in lawsuits alleging excessive force against minors.[164]

Table Six

| Officer | Appointment Date | Feb 2017 Complaints | Total Career Complaints | Number Sustained Complaints |
|---|---|---|---|---|
| Sean Brandon | 8/7/1995 | 29 | 39 | 0 |
| Glenn Evans | 7/14/1986 | 69 | 135 | 10 |
| Kevin Fry | 9/29/2003 | 35 | 35 | 0 |
| Robert Gonzalez | 12/14/1998 | 28 | 30 | 0 |
| Darryl Hardy | 8/29/2005 | 9 | 9 | 0 |
| Jose Lopez | 2/6/1995 | 31 | 50 | 0 |
| Kerry Pozulp | 10/31/2005 | 20 | 20 | 2 |
| Frank Ramaglia | 10/13/1998 | 46 | 46 | 2 |
| Chris Skarupinski | 10/29/2007 | 12 | 12 | 0 |
| Robert Stegmiller | 7/10/1995 | 51 | 55 | 2 |
| Jason Van Dyke | 6/25/2001 | 26 | 26 | 1 |
| Darren Wright | 12/4/1995 | 10 | 14 | 0 |

The complaint history of several of these officers is shocking to me. Like the defendants in this case, the number of sustained cases is abysmal.[165] Again, the city has done nothing to even consider that this rich data may be indicative of a pattern, practice, or custom of excessive force. By their own admission, they did not commission or complete any study, audit or report within the relevant time period concerning the incidence of excessive force by CPD officers.[166] And I haven't reviewed any documentation or learned of any evidence that such a study, audit, or report had ever taken place or was otherwise contemplated.

Equally as shocking is the overwhelming existence of civil litigation that has been brought against the City of Chicago for police misconduct. Much like citizen complaints of police misconduct and incidents of force in which members of the department may become involved, civil law suits serve as an indicator that oftentimes provides fair warning that a

---

[164] Total career complaints includes data captured pre-2000 mainframe.
[165] City-As-015305-339, City-As-15302-303.
[166] Id.

particular officer or officers may be engaged in conduct that runs afoul the law, blatantly violates the constitutional rights of the citizens whom they are sworn to serve, tarnishes the reputation of law abiding members of the police service, and further deteriorates the reputation of individual officers and the department.

Below are a sampling of those suits and the nature of the claims brought against individual officers and the municipality. It is important to note, that I have not conducted any independent assessment of these claims, nor do I have any actual knowledge as to the posture of this litigation. Nonetheless, as I previously stated it is my opinion that these complaints provide fair notice to the city of a foreseeable risk of constitutional violations, and harm to the citizens of Chicago.

Table Seven: Civil Claims[167]

| Caption | Complaint | Involved Members | Resolution |
|---|---|---|---|
| Emmanuel Williams v. City of Chicago | Improper stop, search, and false testimony | O'Keefe, Wrigley, Homer, Hefel, Laurie, Suing, and Kinnane | Settled |
| Francine and Lester Williams v. City of Chicago | Chased, Tackled, and arrested w/o PC | O'Keefe, Jania, and Kubik | Settled |
| Michael White v. City of Chicago | Entered home w/o warrant and pointed a gun at him | Hefel, Homer, Laurie, Suing, and O'Keefe | Jury Verdict- not liable |
| Brazil v. City of Chicago | Improper stop, racial slurs, excessive force, struck an 11 year old in face | O'Keefe | Dismissed by Court for want of prosecution |
| Long v. City of Chicago | Unlawful stop and Excessive Force | Guzman, Turner, and Babicz | Unknown |
| | | | |
| Goodman v. City of Chicago | Unlawful detention, planting evidence, fail to render medical aid, false statements | Babicz and Homer | Homer- Dismissed Babicz- Jury Verdict of no liability |

---

[167] Table Seven reflects civil claims in which one or more of the defendant police officers have been named as provided by Plaintiff's counsel.

| | | | |
|---|---|---|---|
| Naham v. City of Chicago | Search Warrant based on false statements, excessive force | Cwick and others | Unknown |
| Curry v. City of Chicago | Unlawful stop and excessive force against a minor | Babicz and Hefel | Settled |
| Daniel v. City of Chicago | Excessive Force | Hefel, Suing, Young, Muzupappa | Settled |
| Patterson v. Hefel | Excessive Force and colluding w/others | Hefel and Laurie | Pending |
| Barnes v. City of Chicago | Unlawful arrest, Excessive Force | Hefel and Suing | Settled |
| Wallace v. Kinnane | | Kinnane | Summary Judgement Granted |
| Ware v. Laurie | | Laurie | Settled |
| Washington v. Suing | | Suing | Settled |
| Morgan v. Wrigley | | Wrigley | Dismissed |
| Reed v. Wrigley | | Wrigley | Settled |
| Cockerman v. Babicz | | Babicz | Pending |

According to the Police Accountability Task Force Report, from 2010 through 2015, the City of Chicago has handled approximately 2,000 cases involving civil rights allegations against its police officers. About 400 such cases pending against police officers at any one time. The amount of money the City pays to remove these cases is mind-blowing; over $600 million since 2004, with close to $400 million spent in the last five years alone. The report goes on to cite many of the named CPD defendants who appear frequently on the litigation and settlement lists. All of those names are familiar with the public through various means of reporting. Clearly, a portion of CPD's officers are costing the City and its taxpayer many millions of dollars each year in settlements, judgments and lost man-hours."[168]

<u>CPD's Failed EIS Systems</u>

In addition to simply paying attention to complaints and law suits, and recognizing them for the notice they provide, there were yet other systems in place within CPD during the *Monell* period that afforded them the opportunity to exercise due diligence over the monitoring of their personnel who are performing high risk and critical tasks. The Behavioral Intervention System (hereafter, BIS) is yet another means by which patterns of behavior can

---

[168] Police Accountability Task Force Report at page 98.

be detected that if left uncorrected could lead to foreseeable harm, compromise the rights of citizens, and further deteriorate the community's trust and confidence in the Chicago Police Department.

Each defendant officer denies (despite their documented CRs and civil law suits) ever being referred to Behavioral Intervention Services ("BIS") or CPD's Personnel Concerns Program (PC). Each defendant officer, except Kinnane and Wrigley, testified that they have never received discipline or a sustained finding in relation to a citizen complaint. As was mentioned, Kinnane testified that his sustained complaint was ultimately reversed, as was the discipline which had been imposed at the time. He received back pay for previously-served unpaid time off, and his record wiped clean; in other words, he was "made whole" by the police department.[169] Wrigley testified that he had two sustained CRs, one for a technical violation of CPD policy and one related to a citizen complaint.[170] He appealed the sustained citizen complaint and the CPD board found that the penalty imposed was too "harsh" and reduced it.[171]

In an effort to offer some historical context to BIS that may assist the fact finder in understanding the importance of this critical aspect of an effective accountability system, it's important to note that BIS is akin to the Early Warning systems that evolved during the 1980's. Systems such as these have since become part of virtually every consent judgment or settlement agreement by and between the United States Department of Justice and those cities that have become subject to judicial oversight. The manner in which the Chicago Police Department utilizes behavioral intervention strategies is set out in Employee Resource E-06-05. While not a part of the Chicago Police Departments normal disciplinary process, the system is designed to provide intervention to those members who may be acting contrary to the goals of the department.[172] The departmental directive which guides the administration of the system places the responsibility on command and supervisory personnel to effectively monitor the performance of subordinate personnel. Moreover, the directive sets out very specific criteria that command staff, BIA, IPRA, and the Human Resource Director may consider in determining whether a member is suitable for enrollment in the process. In my opinion, the criteria established by the department has hampered its' ability to effectively intervene and interrupt behaviors that could adversely impact an officer's career, place the department and the city at risk of exposure, and threaten the safety and well-being of the citizens of Chicago by allowing behaviors to continue that have a foreseeable risk of constitutional harm. One obvious trigger that is missing from the criteria used to identify problematic behavior is civil litigation. There is overwhelming support for the conclusion that the city of Chicago is crippling under litigation arising from allegations of police misconduct. The costs associated with those cases that have concluded by agreed upon settlement or by judgment of the court is staggering. Further, the sheer number of cases involving the defendant police officers should have triggered some intervention aimed at interrupting the behaviors that were the substance of these complaints. The fact that no one within the Chicago Police

---

[169] *Deposition of Kinnane* at pages 30, 35.
[170] *Deposition of Wrigley* at pages 150-151.
[171] *Id.* at page 162.
[172] FCRL 003862.

Department was considering such clear notice of a problem when assessing the need to use the intervention systems that had put in place, such as BIS, is startling to me.

It was standard practice during 2008-2013 for police agencies to have well-functioning Early Intervention System (hereafter, EIS) that relied on a range of data indicators to effectively identify officers who had or may have behavioral problems that could be addressed and resolved through early intervention. In fact, such systems have been part of my audits, teaching, and monitoring activities for many years. As the Department of Justice Report stated, "[a] well-designed EIS would allow CPD to track officer conduct, proactively assess risk for future problematic behavior, and intervene when necessary to improve behavior through non-disciplinary corrective action, such as additional training, counseling, or other supportive programs."[173]

The purpose of CPD's three early intervention systems - "non-disciplinary interventions," Behavioral Intervention Systems (BIS) and Personnel Concerns Program (PC) - was to be able to identify officers who have engaged in bad behavior or who have the potential for bad behavior and correct or prevent that behavior in the future.[174] The Non-disciplinary interventions program was for relatively minor infractions, such as foul language or disrespect, while BIS was intended as a chance to correct more serious problems, and PC was the "final option" for officers involved in the most serious transgressions, such as sustained excessive force charges, domestic violence, or five or more sustained misconduct investigations in the last five years.[175] Regardless of what the intent behind these systems may have been, they failed and the likelihood that vast numbers of problem officers stayed under the radar screen is highly probable in my estimation. A number of the defendant officers in this case, and several connected with other high-profile tragedies provide overwhelming support that these systems failed, and failed miserably.

During 2008 – 2013, CPD was limited in its ability to identify problem officers by the collective bargaining agreements, which only allowed it to consider the most recent five years' worth of officer's complaint history and to only take into account *sustained* complaints.[176] If CPD considered a complaint that was not sustained, the officer could "grieve" the issue to the union.[177] CPD also did not consider the number of CRs against an officer when determining whether enroll the officer in BIS or PC; nor the number of CRs, or complaints, for excessive force or for any type of allegation.[178] Two incidents involving children as alleged victims or complainants would not rise to the level of intervention.[179] CPD also did not consider whether civil lawsuits had been filed against the officer or the number of lawsuits filed against a team

---

[173] Justice Department Report at page 111.
[174] Donald O'Neill deposition at pages 38, 50; Department of Justice Report at page 113.
[175] Donald O'Neill deposition at pages 122-123; Department of Justice Report at page 113.
[176] Donald O'Neill deposition at pages 41-42, 144-147, 178.
[177] Donald O'Neill deposition at page 178.
[178] Donald O'Neill deposition at page 57.
[179] Donald O'Neill deposition at page 93.

of officers.[180] CPD also did not consider and/or simply did not collect a number of other data points that might have been helpful to identifying problematic officers.[181]

Most problematic – and the reason why CPD's EIS programs were ineffective – was that there was no CPD employee whose job it was to proactively look at complaint histories or other data to identify officers to refer to BIS or PC. I can't imagine the value of having any system without also having a designated person of authority whose responsibility it is to manage and monitor such a system, report emerging patterns and trends, and take immediate steps for remediation and intervention. In my 35 years of policing, I have rarely seen such a blatant disregard for such a critical management tool.

Recommendations for BIS and PC were supposed to come from officers' supervisors, and CPD depended on the supervisors to make these referrals, but CPD's former director of Human Resources, Donald O'Neill, the city's authorized witness in his case, testified that CPD has no records to indicate whether or not the supervisors actually reviewed the quarterly reports that BIA sent them with lists of potentially eligible officers, as they were supposed to; apparently, they were not required to indicate that they had, in fact, review them.[182] As the Department of Justice put it, "there are no quality checks to ensure that the appropriate officers are actually being referred."[183] In my opinion, not only are there no quality checks, there is no substantive evidence that the CPD did anything with the data to interrupt bad behavior and identify personnel who were running afoul CPD policy and law. Once again, fair notice was consciously and systemically ignored. The consequence of doing so allowed for misconduct to become wide-spread and officers who chose to do wrong did so with impunity.

Donald O'Neill, who also met with Department of Justice investigators several times, admitted making the statement that is quoted at the top of page 114 of DOJ's report. Mr. O'Neill agreed with DOJ's conclusion that if a recommendation for intervention was not made up the chain by a supervisor, it "falls through the cracks," and the officer will never be enrolled.[184] The Department of Justice found that "Leadership at CPD does not enforce the BIS and PCP policies; consequently, BIA, IPRA, and the chain of command do not take seriously their obligation to identify and refer problematic officers."[185] I could not agree more with that assessment. Not only does it underscore a broken accountability mechanism, but provides support for a conscious disregard of information that leads to a foreseeable risk of harm as it did in this case.

Consequently, as Donald O'Neill conceded, during the relevant time period in this case the numbers of officers enrolled in BIS and PC declined dramatically, going from 105 in 2007 to 1 in 2013.[186] Mr. O'Neill could offer no explanation for this decline, though

---

[180] Donald O'Neill deposition at pages 92-93, 144-147.

[181] Donald O'Neill deposition at pages 213-217; also see generally Stephen Beirne deposition.

[182] Donald O'Neill deposition at page 102.

[183] Department of Justice Report at page 113.

[184] Donald O'Neill deposition at page 205; Department of Justice Report at page 114.

[185] Department of Justice Report at page 114.

[186] Donald O'Neill deposition at pages 181-185.

according to the Department of Justice the simple reason is the programs are not getting the appropriate amount of referrals.[187] The Police Accountability Task Force relates that, after CPD performed a manual review to identify officers who were eligible for the programs, the police union grieved this process, with the result that CPD took out of the programs all of the officers that it had put in.[188]

It has been my experience that in order to garner and sustain public trust and confidence, police agencies must have adequate safeguards in place to protect the integrity of the internal investigative process and ensure that police/and citizen relationships are not jeopardized by an atmosphere of mistrust. This is especially the case in areas of alleged misconduct, and particularly police use of force. I believe that police departments benefit greatly from a comprehensive review and analysis of each use of force incident in which their officers may be involved. Such analysis and review assists the department in determining the most appropriate polices regarding use of force for a given department and community.[189]

In fact, such comprehensive reviews of force incidents may help officers and their agencies discern "*patterns in the incidents or officer behaviors that have important implications for the development of policies that reduce use of force incidents.*"[190] Such recommendations have been legal mandates included in a number of Memorandums of Agreement and Consent Decrees arising from patterns and practices of unconstitutional conduct by police departments who have found themselves the subject of judicial intervention to cure constitutional harms. The reason this particular recommendation exists is to help the department identify patterns of behavior before such patterns develop into unconstitutional patterns and practices which expose the department and its membership to liability in state and federal court, result in further breakdown of police and community relations, and also results in the violations of citizen's rights under the constitutions of federal and state laws.

Much work has been done around the study of systems like Behavioral Intervention and the concept of early intervention models. In fact, when effectively deployed early intervention models can have a dramatic effect on reducing both poor performance and citizen complaints.[191]

In 2003, the Los Angeles County Sheriff's Department implemented a Strategic Management program aimed at reducing litigation costs by expediting those cases with merit in favor of the litigant (complainant), thoroughly investigating those cases deemed to be without merit, and systematically addressing behavioral and procedural issues that were

---

[187] Donald O'Neill deposition at page 185; Department of Justice Report at page 114.

[188] Police Accountability Task Force Report at page 100.

[189] *Principles of Good Policing: Avoiding Violence Between Police and Citizens,* United States Department of Justice, Community Relations Service, Revised September 2003, page 35.

[190] Id. at page 36.

[191] Prenzler, Tim:*Police Corruption: Preventing Misconduct and Maintaining Integrity,* citing Walker, et al (2001) at page 122.

identified through a careful analysis of these cases. The results were more than favorable in reducing both cases and costly litigation.[192]

In my opinion, the City of Chicago and its police department ignored an opportunity to more fully develop and utilize data systems at their disposal that could assist in the monitoring and tracking of high risk critical tasks, as the Police Accountability Rask Force noted.[193] Clearly in this case, there were citizen complaints, law suits, and a wealth of data that provided notice of an unconstitutional pattern and practice for which the city and its police department should have focused their attention. The obvious consequence of consciously choosing not to pay attention to such a choice is the life altering injuries suffered by a three year old child litigation, and a sea of other tragic cases which has resulted in millions and millions of tax dollars.

As have been repeatedly stated in my opinion, and throughout the DOJ and Police Accountability Task Force Reports, and is supported by the evidence in this matter, CPD accountability systems failed to work in any meaningful way. Barriers to investigations arose and were allowed to remain in place, investigations that went forth were conducted in ways that were less than comprehensive and often bias, significant complaint histories and civil litigation was ignored as a potential indicator of unconstitutional patterns and practices, and the City of Chicago took no steps whatsoever-despite fair notice of a problem- to dig into the data and figure out what went wrong. The City of Chicago has admitted that it did not commission or complete any study, audit or report to determine to what extent CPD's use of force policy was being complied with by officers, [194] did not commission or complete any study, audit or report between 2008-2013 concerning the incidence of use of force by CPD officers,[195] did not commission or complete any study, audit or report between 2008-2013 concerning the incidence of excessive force by CPD officers, [196] and did not commission or complete any study or report within the relevant time period concerning evidence of excessive force against children by CPD officers.[197]

Based on the information and analysis set out above, I am of the opinion that during the period August 29, 2008 – August 29, 2013: (1) The City of Chicago and the CPD had a *de facto* policy or widespread custom of failing to engage in effective, early, non-disciplinary intervention with officers to prevent future misconduct, as is evidenced by the fact the none of the defendant police officers, all of whom had extensive compliant histories and numerous civil lawsuits, were ever subject to behavioral intervention or personnel concerns despite their complaint history and having been repeatedly named as defendants in civil rights litigation; (2) The City of Chicago and CPD's *de facto* policy or widespread custom of failing to engage in effective, early, non-disciplinary intervention allowed officers to act without official correction and with impunity, as is evidenced by the volume of citizen complaints, civil

---

[192] Id. citing Jones and Mathers, 2006, at page 126.
[193] Police Accountability Task Force Report at page 101.
[194] City's Second Set of Amended Answers, Fifth Set of Discovery Requests.
[195] City's Amended Answers, Fifth Set of Discovery Requests.
[196] Id.
[197] Id.

litigation, and costly settlements and judgments; (3) Any reasonable police executive or policy maker would have known that failing to engage in an effective, early, non-disciplinary intervention program would lead to a foreseeable risk of harm; and (4) The City of Chicago and CPD's failure to maintain an effective and early intervention system was the moving force behind each plaintiff's injuries. The defendant officers in this matter had amassed a large number of complaints against them as of August 29, 2013, approximately 245 cumulatively. Defendant officer Hefel in particular had been accused of pointing a gun at another minor just two years before he entered plaintiffs' home. As noted above, other officers who have also been accused of force against minors racked up more than 470 complaints. The cost of civil suits are beyond what our community should reasonably endure, more than 130 million just in those that have settled. And not one of the defendants have ever been the subject of behavioral intervention, despite their complaint history and despite having been named in civil suits which have alleged, among other things, Constitutional violations. Had officer Hefel, officer O'Keefe and other defendant officers been identified by CPD as candidates for early intervention and placed in BIS or PC, it is much less likely they would have used excessive force against plaintiffs on August 29, 2013.

### *CPD Had a Policy of a Code of Silence that the City Condoned*

Police departments are paramilitary organizations with a strict code of conduct. Within that code of conduct is a universal standard that requires that all members of the department tell the truth during the course of their official duties and responsibilities. This standard applies whether the officer is testifying in court, preparing official records and documentation, or participating in an Internal Affairs Investigation. The failure to abide by those standards may destroy public confidence in the officer's ability to effectively carry out their official duties and responsibilities. Furthermore, the affect that untruthfulness may have on a law enforcement officer's ability to testify in a court of law and withstand scrutiny as to their honesty and credibility is well established in law.[198]

Unquestionably, law enforcement officers hold a unique and highly responsible place in government. Their value to both the community and to society depends on an officer's "integrity, especially on the officer's judgment, competence, and honesty. Where those traits are found to be lacking, the officer is of little value, even of negative value, to the community."[199] Of great importance, is management's ability to effectively deal with the issue of dishonesty within the workforce. Their unwillingness or inability to effectively address such behavior through policy and the disciplinary process has an adverse impact on law enforcement operations.

Attorney Carl Milazzo, emphasized this point during an address to the IACP Legal Advisor's Section in November of 2000. "Police officers are in an occupation unlike any other because they testify under oath as a job requirement, and they testify frequently. Thus, once

---

[198] Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); Kyles v. Whitley, 514 U.S. 419 (1995); and State v. Laurie, 139 N.H. 325, 653 A.2d 549 (1995).

[199] *Michael Scott,* (1999) *A Police Officer's Bill of Rights: A Needed Protection for Cops?* Controversial Issues in Policing, James D. Sewell, Allyn and Bacon, pg. 53.

character and credibility has been destroyed, the officer is tainted forever. If the number of impeachable officers multiply, or are concentrated in high profile investigative positions, then a department could be literally crippled from investigating crime. The decision to retain rather than terminate an impeachable officer will eventually reflect upon the management decision to retain, rather than terminate the untruthful officer. All eyes will rotate to the chief executive, and not to the officer. This is a problem that should not sneak up on anyone, it can be anticipated and is susceptible to proactive management initiative."[200]

Professor Elliot Specter furthers expands upon these principles in an article written for the Police Chief Magazine in May of 2008. In this article, Professor Specter takes a position in clear support of a public policy that authorizes the termination of police officers who engage in dishonesty. He wrote, "The societal benefits of creating a public policy of police honesty are enormous. If all parties in the criminal justice system believe that a police officer would not lie at risk of losing their careers, issues of credibility regarding police will be greatly reduced, leading to more successful prosecutions, a reduced number of constitutional violations, and fewer liability cases and losses."[201]

A brief history of the Code of Silence in American policing may be useful for a fact finder in determining its existence within a given set of facts, such as those before the court in this matter. In 1936, police administration expert August Vollmer wrote that *It's unwritten law in police departments that police officers must never testify against their brother officer."*[202]

In 1991, the Christopher Commission, which arose from the controversial incident involving Rodney King's interaction with members of the Los Angeles Police Department, stated that the "*code of silence*" was "…perhaps the greatest single barrier to the effective investigation and adjudication of complaints." The Christopher Commission also found that less than 2% of excessive force complaints were sustained; the process was skewed by the code of silence.

The senseless and brutal beating of Abner Louima in August of 1997 inside the New York City Police Department's 70th Precinct house further emphasizes the destructive nature of the code of silence. During the course of that trial, attorney Barry Scheck told America that Louima's case was not about money damages to make whole a man who had been brutally beaten. Rather, it was about penetrating a code of silence that exists amongst police officers and creates an environment where good cops are silenced out of fear of retaliation from within.

A *"code of silence"* refers to affirmative acts or omissions by an agency or its' membership which insulate and protect its employees from accountability and criticism. The

---

[200] *Carl Milazzo (2000): The Untruthful Officer: A Proactive Management Approach,* IACP Legal Advisor's Section, Annual Conference, San Diego, California.

[201] Police Chief Magazine, Chiefs Counsel: *Should Police Officers Who Lie be Terminated as a matter of Public Policy?,* Elliot Spector, Associate Professor, University of Connecticut, May, 2008.

[202] August Vollmer served on President Herbert Hoover's Wickersham Commission.

45

presence of a Code of Silence within an organization will typically present itself in a variety of different ways: (1) Officers who are comfortable engaging in misconduct in the presence of other officers without fear of being compromised or complained about; (2) Through repeated acts of misconduct that go unreported or without any remedial action whatsoever; (3) Through the lack of any complaints initiated or otherwise investigated by supervisors; (4) Through acts of retaliation within the ranks when someone defies the code; (5) When officers are behaving contrary to reasonable practices at the "critical moment" when the act of misconduct transpires; (6) When the situation should have alerted a reasonable officer and focused their attention on the wrong that was taking place, yet when asked, nobody seen or heard a thing; (7) When the incident was so obvious that officers would have had to shut their eyes and ears not to have been aware of the wrong that was taking place; (8) When asked, officers avoid, rather than deny, their response is simply "I don't recall."; (9) When the development of cliques begin to form within the organization; and (10) When officers specifically request not to work with specific officers or units.[203]

The mere presence of any one or more of these factors should not bring one to the affirmative conclusion that a Code of Silence exists, rather such things may be symptomatic of other dysfunctions within the organization such as poor leadership and accountability, a failure to supervise, and an overall sense of complacency and an acceptance of mediocrity. Nonetheless, I am of the opinion that law enforcement leadership is well served by implementing policy that specifically defines the Code of Silence, expressly prohibits its existence within the organization, and has swift and certain consequences when officers are found to have been engaging in this destructive behavior. In my review of the policies provided, I did not see any mention of the Code of Silence within the provisions of the department's code of conduct, the affirmative duty of others to report it, and prohibition against such behavior, or a description of any consequences that may result if one is found to have engaged in such an egregious act.

When law enforcement officers of any rank are permitted to insulate the actions of an individual or individuals in an effort to cover up acts of misconduct and mitigate any risk of exposure to the organization, such actions run afoul the oath of honor taken by law enforcement officers, the Law Enforcement Officers Code of Ethics, the policies and training to which law enforcement officers are mandated to comply, generally accepted policing practices, and established law. Whether or not that occurred within the context of this matter is for the fact finder to determine. Nonetheless, there is evidence that points to this cancer-like culture having existed within the ranks of the Chicago Police Department at the time of this incident.

A graphic example of how the Code of Silence is being allowed to impact the CPD comes from a significant omission in the long series of police corruption and criminal behavior by numerous members of the CPD. Yet in all of these high profile, serious cases of police misconduct the internal investigations never seem to go up the chain of command of the involved criminal officers. These types of systematic and organized criminal behavior that

---

[203] Internal Affairs Conference Manual, PATC, 2017.

has played out over the years should not have escaped the oversight or direct participation by their immediate supervisors and managers.

CPD's Code of Silence

Based on my review of the evidence, I do not believe that there is any serious dispute that a Code of Silence existed within the CPD during the *Monell* period in this case. The strongest admission that a Code of Silence existed within the Chicago Police Department comes from the City of Chicago's highest elected public official. In a televised speech to the Chicago City Council on December 9, 2015 and in a televised interview the night before the speech, the Mayor of the City Chicago admitted that CPD and its officers have had a "long-standing" Code of Silence.[204] As the Mayor defined it in his speech, the Code of Silence "is the tendency to ignore, deny, or in some cases cover-up the bad actions of a colleague or colleagues."[205] Based on my extensive experience and training in this area, I believe the Mayor has properly described this cancer like culture that existed within the CPD.

In his speech to City Council, and ultimately to the people of Chicago, the Mayor talked about the harm that this Code of Silence has caused to the community over time.[206] He admitted the City's failures in protecting citizens from police misconduct.[207] He agreed that "police officers with repeated and multiple citizen complaints of excessive force have yet to face any meaningful disciplinary action."[208] He asked, rhetorically, "Out of hundreds of police shootings in the last eight years, only a handful of them have led to any charges?"[209] He admitted the need to "reestablish the integrity and independence [IPRA] was originally designed to have."[210] The Mayor did not qualify his statement; he did not say it was a partial Code of Silence or only applied to certain cases; he said that "this isn't the first shooting where maybe there hasn't been honest reporting by officers who were there,"[211] that we have "allow[ed] a code of silence to exist within our own police department,"[212] that "a culture of permissiveness exists" with respect to officer misconduct[213], that "supervision and leadership in the police department and the oversight agencies that were in place failed" to prevent the

---

[204] Mayor Rahm Emanuel's December 9, 2015 speech to Chicago City Council (prepared remarks) at page 6, Simmons 5894; https://www.youtube.com/watch?v=faKylPM__sA at video 1 21:10-23:01 and Simmons 4123-4126.

[205] Mayor's speech at page 6.

[206] Mayor's speech at page 6 video 1 at 21:10-23:01.

[207] Mayor's speech at page 5; video 1 at 17:47-18:20.

[208] Mayor's speech at page 1; video 1 at 17:47-18:20.

[209] Mayor's speech at page 1; video 1 at 17:47-18:20.

[210] Mayor's speech at page 5; video 1 at 17:47-18:20.

[211] Video 1; http://chicagoist.com/2015/12/09/rahm_gives-preview-of-city-council.php; Police Accountability Task Force Report at page 69.

[212] Mayor's speech at page 6; video 1 at 21:10_23:01.

[213] Video 2 at 14:25-15:00.

shooting of Laquan McDonald,[214] and he asserted the need for "nothing less than complete and total reform of the system and the culture that it breeds…."[215]

The Mayor is not the only prominent official who has admitted to the existence of a CPD Code of Silence. The head of Chicago's main police union, the Fraternal Order of Police - Lodge 7, Mr. D'Angelo, said recently, "there's a code of silence everywhere, everybody has it… so why should the [Chicago Police] be any different."[216] Actually, two reasons come to mind: the Constitution of the United States and the Law Enforcement Officers Code of Ethics.

In the discovery materials I reviewed in preparation of my report, I discovered other sources of evidence of a Code of Silence during the relevant period. In 2012, a federal jury rendered a verdict against the City of Chicago because it concluded that in 2007 the City "had a persistent widespread custom or practice" of a Code of Silence and/or a failure to investigate and discipline police misconduct (or both) "that was the moving force behind" the officer's beating of a plaintiff.[217] The judge in the case had earlier found enough evidence of a Code of Silence within CPD to deny the City's request for summary judgment.[218]

I believe that the judge's decision and the jury's verdict are important because of the notice they provided to the City officials about the existence of a Code of Silence. Commander Klimas, on what steps the City took to eliminate any Code of Silence, testified that the City and its attorneys were aware of the court's ruling and the jury's verdict at the time they were rendered in 2012.[219] The City understood that the jury found that a widespread custom and practice of a code of silence or a failure to investigate and discipline or both was the "moving force" behind plaintiff's injury.[220] He further testified that, other than requesting what came to be known as "the Safer report," the Mayor's office did not take any executive, administrative or legislative actions to curb or eliminate a Code of Silence within CPD in response to the jury's verdict in *Obryka*.[221] The Mayor did not order any review or study to determine whether a code of silence existed within the CPD.[222] The Mayor did not publically discuss a Code of Silence or acknowledge that a Code of Silence existed.[223]

I have reviewed "the Safer report" and the recommendations made with respect to discouraging misconduct before it even come to fruition. One of the areas specifically addressed is the Code of Silence. The report specifically recommends that "*discipline guidelines should make clear that any officer found to have deliberately concealed or failed*

---

[214] Mayor's speech at page 1; video 1 at 2:04-2:17.
[215] Video 1 at 2:50-3:04.
[216] Video, Simmons 6146.
[217] Simmons 6114, 6115-6127.
[218] *Obrycka v. City of Chicago*, 2012 U. S. Dist. LEXIS 22818 (N. D. Ill. Feb. 23, 2012).
[219] Klimas deposition at page 19, 20, 21, 27, 28, 29.
[220] Klimas deposition at page 26.
[221] Robert Klimas deposition at page 59.
[222] Robert Klimas deposition at page 60.
[223] Robert Klimas deposition at pages 60-61.

*to disclose information about a fellow officer's non-ministerial acts of misconduct will be dismissed."[224]*

The report goes on the state, "*By putting on notice that any officer who intentionally deceives investigators or deliberately withholds information to cover up for a fellow officer runs the risk of sacrificing his job, we believe that the Department will incentivize officers to be forthcoming during investigations, rather than to hide behind an actual or perceived 'code of silence'".*[225]

I have not seen any evidence that CPD had amended their disciplinary guidelines to reflect this language. Nor am I aware of any changes CPD or IPRA implemented with respect to the investigation or disciplinary systems that effectively addressed Code of Silence.

In addition, Commander Klimas testified that, in response to the jury's decision in *Obrycka*, the Chicago City Council did not take any legislative or administrative actions to eliminate or curb a Code of Silence within the CPD.[226] No member of City Council introduced legislation whose purpose was to curb or eliminate a Code of Silence within CPD.[227] No Committee held hearings to determine whether a Code of Silence existed.[228]

In the same vein, the Chicago City Council records produced in this case – agendas and minutes of the Finance, Budget, Police and Fire (later Public Safety) Committees, and joint committees - contain no record of the Council having taken any action, legislative or pursuant to oversight function, to address a Code of Silence within CPD despite having been provided notice by the court's findings and the jury's verdict.[229]

Nor did CPD take significant action to eliminate the Code of Silence. Commander Klimas testified that, in response to the jury's decision in *Obrycka*, the CPD did not take any actions to eliminate or curb a Code of Silence among CPD officers.[230] BIA and CPD did not take any steps to increase enforcement of alleged Rule 14 violations.[231] There was no mission to increase enforcement.[232] The IPRA ordinance was not amended to mandate Rule 14 investigations; they remained discretionary.[233] CPD and IPRA did not add a system for ensuring that disciplinary findings bearing on credibility would get to the State's Attorney's Office and criminal defendants.[234] CPD and IPRA did not add a mechanism for collecting

---

[224] Safer Report at page 4. SIMMONS 3956.
[225] Id.
[226] Robert Klimas deposition at page 61.
[227] Robert Klimas deposition at page 62.
[228] Id.
[229] CITY-AS-4204-4378, CITY-AS-12656-12815, CITY-AS-12817-14729.
[230] Robert Klimas deposition at pages 63, 65.
[231] Robert Klimas deposition at page 96.
[232] Id.
[233] Robert Klimas deposition at pages 107-109.
[234] Robert Klimas deposition at page 99-100, 104.

information about instances in which judges found officers to be lying or not credible.[235]  Nor did CPD add a mechanism for officers to make misconduct complaints anonymously.[236]  Nor did BIA or IPRA expand its use of "pattern analysis."[237]  No changes were made to CPD's non-disciplinary intervention programs, including BIS and PC.[238]

Commander Klimas also testified that no changes were made to make IPRA more independent from the CPD, the Mayor's office or City Council.[239]  For example, the City did not take any actions to require IPRA or BIA to investigate allegations against defendant officers at the point when a civil rights case was filed or at the point when a verdict was rendered against them.[240]

To his credit, Commander Klimas did testify that, after the *Obrycka* verdict, the Mayor ordered a review of CPD's disciplinary system and procedures, which later resulted in "the Safer Report."[241]  It appears that this was the only major affirmative step (i.e. a study) that was taken in response to the jury's verdict.[242]

Commander Klimas testified about other minor actions that were taken.  At the time the verdict was rendered, BIA was in the process of re-writing General Order 93-03, which deals with BIA investigations; he testified that a clarification was added that investigations did not have to be conducted in sequential steps but could not definitively say if this resulted in more effective investigations.[243]

Commander Klimas testified that, before the *Obrcyka* verdict, CPD had introduced a course on police legitimacy and procedural justice.[244]  Also, a few months before the verdict was rendered, in June or July, 2012, the City began renegotiating the FOP collective bargaining agreement; the negotiations were heightened by the *Obrycka* verdict, but there was no agreement until 2014.[245]  Commander Klimas testified that the new agreement limited officers with sustained complaints to pursuing one path to an appeal disciplinary findings, instead of having three, and that this reform resulted in less delay in discipline.[246]

---

[235] Robert Klimas deposition at 100-102, 105, 110.
[236] Robert Klimas deposition at 113.
[237] Robert Klimas deposition at page 114.
[238] Robert Klimas deposition at page 119.
[239] Robert Klimas deposition at page 120.
[240] Robert Klimas deposition at pages 126-129.
[241] Robert Klimas deposition at pages 31-32, 166.
[242] Robert Klimas deposition at page 37.
[243] Robert Klimas deposition at pages 32, 40-42, 56.
[244] Robert Klimas deposition at page 36.
[245] Robert Klimas deposition at page 34.
[246] Robert Klimas deposition at pages 34-35, 38-40.

Commander Klimas also testified that, in response to the jury's decision in *Obrycka*, IPRA did not take any actions to eliminate or curb a Code of Silence among CPD officers.[247] Nor did any other agency or department of municipal government.[248]

Very important, as Commander Klimas testified, the City also did not, in response to the jury's verdict in *Obrycka*, seek or make any changes to the provisions of the 2007 collective bargaining agreement that supported or reinforced a Code of Silence when it negotiated the July 1, 2012 collective bargaining agreement.[249]  As noted, negotiations continued well past that date, and the agreement was not completed and signed until 2014.For instance, in the 2012 agreement the City did not seek or get any change in 6.1(g), which prohibited officers, including whistleblowers, from being given any financial or other reward for reporting misconduct of fellow officers.[250]

Nor did the City seek or get any change to the affidavit requirement or the waiver/"override" procedure that would have made it possible or easier for BIA and IPRA to investigate complaints that lack a signed affidavit from the complainant.[251]  It did not seek to eliminate the affidavit requirement or the required burden of proof for a waiver.[252] It did not seek or get any change to the requirement that an officer be given the complainant's name before being questioned by BIA or IPRA.[253]  It did not seek or get any change to the prohibition against BIA and IPRA investigating – without first getting the Superintendent's permission - complaints that were more than five years-old.[254]  Similarly, it did not seek or get any change to the prohibition in Article 8.4 against investigators in any way using a sustained penalty against an officer after a five- or seven-year (for excessive force) period.[255]  The City also did not seek or obtain any change to the agreement's provision in 8.4 that requires the destruction of most disciplinary files after five years,[256] nor did it seek or obtain any change to the agreement's provision that officers involved in a shooting cannot be required to provide a statement to IPRA sooner than 24 hours after the incident.[257]

Remarkably, the City also allowed new provisions into the 2012 collective bargaining agreement that further supported or facilitated the Code of Silence.  The main example is paragraph M on page 5 of the 2012 agreement.[258]  For the first time, IPRA and BIA were prohibited from charging officers with Rule 14 violations, based on video or audio, without

---

[247] Robert Klimas deposition at page 66.
[248] Robert Klimas deposition at pages 66-67.
[249] Robert Klimas deposition at pages 67-
[250] Robert Klimas deposition at pages 70-72.
[251] Robert Klimas deposition at pages 72-74.
[252] Id.
[253] Robert Klimas deposition at pages 77-78.
[254] Robert Klimas deposition at pages 79-80.
[255] Robert Klimas deposition at pages 80-85.
[256] Robert Klimas deposition at pages 86-87.
[257] Robert Klimas deposition at pages 91-93.
[258] Simmons 3788.

giving the officer an opportunity to review the video or audio before making a subsequent statement.[259]

According Commander Klimas, CPD adopted some of the recommendations from the Safer report.[260]  One was adopting a disciplinary matrix, which was not actually implemented until February 1, 2017.[261]  Another was adopting body-worn cameras, which was done in 2015.[262]  Another was farming out less serious investigations from BIA to the districts and units, so that BIA could focus on more serious complaints.[263]  Another was permitting BIA and IPRA interview officers earlier in an investigation.[264]  More training was provided to field training officers, but Commander Klimas did not have evidence that this resulted in less misconduct.[265]  BIA and IPRA increased their staff somewhat, which sped up the completion of investigations.[266] [267]

However, many important recommendations of the Safer Report were never adopted by CPD.[268]  In my opinion, there's no indication that any of the reforms that were adopted, all of which were relatively minor, resulted in any eliminating or curbing of either the Code of Silence (assuming that any of the Safer Report recommendations were even addressed to the Code of Silence, which I doubt) or in improving CPD's investigative or disciplinary systems. The Safer Report and the few reforms that followed were not sufficient to change the systemic failures that plagued CPD's disciplinary system during the *Monell* period. I believe that the City was aware of this fact at the time. I believe this conclusion is required by the overwhelming evidence summarized above and below.

In my view, the complaint and disciplinary data produced by CPD in this case, along with the CPD data available through the Invisible Institute, illustrate the result of the Code of Silence.  The data show that the number of complaints that were sustained by the BIA or IPRA in this period is infinitesimal, the number of officers on whom significant discipline was imposed by CPD was even smaller, and the number of times final discipline was reduced or eliminated entirely by CPD is very high.

Moreover, both the Task Force on Police Accountability investigation and the U. S. Department of Justice investigation, both of which were based on interviews with CPD

---

[259] Robert Klimas deposition at pages 74-77.
[260] Robert Klimas deposition at page 44.
[261] Robert Klimas deposition at pages 130-133
[262] Robert Klimas deposition at pages 143-143.
[263] Robert Klimas deposition at pages 44-45.
[264] Robert Klimas deposition at page 46-47.
[265] Robert Klimas deposition at page 48, 162.
[266] Robert Klimas deposition at pages 48-54.
[267] Robert Klimas deposition at pages 33, 35-36.
[268] Robert Klimas deposition at pages 134, 136, 138, 140-141, 142, 146-147, 153.

52

officers and members, reviews of investigative files and CPD data, concluded, that CPD has had a long-term Code of Silence.[269]

Another source of evidence that I believe fosters a culture of silence is the Collective Bargaining Agreements or CBAs. These provisions of the CBAs take the form of CPD rules and policies. During the relevant time period in this case, the City and officers operated under the 2007 – 2012 collective bargaining agreement and the 2012 – 2017 collective bargaining agreement. The two agreements contained essentially the same provisions.

The CBAs state that disciplinary proceedings cannot be brought against an officer unless they are based on complaints accompanied by a signed affidavit from the complainant.[270] It is my opinion that this requirement has a chilling effect on the citizen complaint process and prevents people from bringing complaints and prevents thousands that are brought without affidavit from ever being investigated. Without a signed affidavit, there is no investigation, and the affidavit "override" procedure is used so rarely that it is meaningless.[271] Regardless of what is intended at the bargaining table when these provisions and agreed upon by the City, the very real and practical effect of such policies is that they insulate- in fact protect- wrongdoers from potential consequence and allows them to go about their way with impunity.

In fact, the CBAs expressly prohibit the CPD from rewarding officers who come forward as whistleblowers to report misconduct.[272] In my 35 years of experience in active law enforcement I know of no professional or societal value that is advanced by such a provision. In my teachings, I adamantly reinforce an officer's duty to intervene on behalf of another when that person's Constitutional rights are being deprived by the actions of another police officer. As a policy maker, such direction was clearly articulated in the policies that I legislated to guide the work of officers under my command. In addition, I clearly and unequivocally spelled out what a Code of Silence is, what it does to the culture of a police agency and its relationship with the citizens they serve, and I strongly stated that it would not be tolerated and its existence would be dealt in a swift and certain manner.

In addition, the CBAs virtually prohibit anonymous complaints.[273] The CBAs state that the accused officer must be notified of the complainant's name before he or she can be questioned.[274] Police officers have no method of reporting misconduct confidentially.[275]

---

[269] Police Accountability Task Force Report at pages 69-74; U. S. Department of Justice Report at pages 75-77.
[270] CBA, Article 6.10.
[271] CBAs, Article 7; Police Accountability Task Force Report at page 71.
[272] CBA, Article 6.1G.
[273] CBA, Article 6.1 D.
[274] CBA, Article 6.1 E.
[275] Police Accountability Task Force Report at page 74.

The CBAs also prohibit CPD and IPRA from investigating complaints that are more than five years old, without getting the Superintendent's permission.[276] The CBAs also provide that, in some instances where there is a sustained finding, but it did not result in significant discipline, the information cannot be used against the officer and must be removed from the officer's record in a few years.[277] The CBAs also require the destruction of most officer disciplinary files after five years.[278]

Moreover, according to the Department of Justice investigators, CPD and IPRA do not enforce Rule 14 violations.[279] CPD's Rule 14 prohibits officers from making false statements. IPRA has the discretion to investigate or not investigate apparent Rule 14 violations that are incidental to an ongoing investigation and rarely exercises it.[280] During the relevant time period in this case, IPRA leadership prohibited investigators from initiating Rule 14 investigations without obtaining approval from the IPRA Chief Administrator and often denied such requests.[281] During 2012 – 2017, there were only 98 Rule 14 charges that were sustained.[282] There was no system in place to ensure that officer disciplinary findings bearing on credibility, including Rule 14 findings, would be provided to the State's Attorney's Office or to criminal defendants.[283] Frankly, this is shocking to me. Police officers are one of the most important fact witnesses within the criminal justice process. Their reputations for truthfulness must remain beyond reproach. There are strong public policies reasons to require police officers to be truthful in every aspect of their official duties and responsibilities. In my more than 20 years of training Internal Affairs Investigators and providing legal instruction to law enforcement officers across America, I have be  relentless in underscoring the need to ensure that those who fail to be truthful in the course of their official duties and responsibilities be held accountable for their actions and that sustained findings of untruthfulness be brought to the attention of the prosecuting authority in order that they may do their due diligence in assessing impeachment evidence.

Despite the overwhelming amount of evidence available to them during the relevant time period in this case, the City failed to take sufficient actions to curb or eliminate the Code of Silence that existed.

As discussed elsewhere in my report, BIA and IPRA have not engaged in proactive efforts to identify officers whose records suggest repeated instances of misconduct or bias or to identify broader patterns or practices of misconduct within CPD.  Information from outside lawsuits is simply not used.  IPRA has the power to examine patterns of complaints when

---

[276] CBA, Article 6.1D.
[277] CBA, Article 8.4.
[278] CBA, Article 8.4.
[279] DOJ Report at pages 75-77.
[280] DOJ Report at page 75.
[281] DOJ Report at pages 75-76.
[282] DOJ Report at page 75.
[283] DOJ Report at page 75.

investigating police conduct but, according to the Police Accountability Task Force, has never exercised it.[284]  BIA's power in this regard is limited or non-existent.

In this case, every officer on the scene at 930 Keystone Avenue on August 29, 2013, adamantly denies using any force whatsoever against Aretha Simmons. Yet, two independent witnesses provided statements that, in fact, she was pushed and slammed by officers. Likewise, each and every officer deposed unequivocally denies that a gun was ever pointed at Emily Simmons and three-year old Davianna. The defendant officers' adamant denials are consistent with the Code of Silence.  If a fact finder were to determine those denials to be false, I am of the opinion that those officers acted contrary to their oath of office, a subscribed code of ethics, established law, and generally accepted policing practices. It has been my experience that when police officers are comfortable concealing the wrong doing of others, and providing false statements for the very purpose of doing so there exists a very dangerous culture in the organization that both promotes and accepts a code of silence.

As the Department of Justice Report indicated, the natural result of the Code of Silence is that "officers do not believe there is much to lose by lying."[285]  In addition, it is my opinion that, if officers know from experience that if they commit misconduct, including using excessive force, they will not be seriously investigated or disciplined then there is nothing to deter them from continuing to commit misconduct when it suits them.  They know they can act with impunity.

Another area that I believe relates to the Code of Silence and provides evidence for its existence is the failure to intervene. In their complaint and sworn deposition testimony, the plaintiffs' describe a level of force that is contrary to CPD policy and law. Each of the officers deposed acknowledge that such a level of force against someone who was not a threat and not resisting is unreasonable. Sergeant Kinnane is clear in his deposition testimony that an officer cannot point a gun at someone who is not a threat.[286] He further stated that departmental policy would not allow an officer to grab or shake a person who is not resisting and particularly if that person is in front of their child.[287] And he agrees that an officer would have a duty to intervene when a fellow officer pointed a gun at a harmless child.[288]

Often a component of the Code of Silence is police officers' failure or refusal to intervene in fellow officers' misconduct.  In this case, it is undisputed that Aretha, Davianna and Emily Simmons were not threats to the officers on the scene. They were not armed, they did not resist, and by all accounts, including defendant officers' accounts, they followed the direction they were given. If one were to find the plaintiff's complaint and sworn deposition testimony credible and conclude that what they described took place without intervention from defendant officers, then I am of the opinion that other officers on the scene who were not engaging in the manhandling of an unarmed and handcuffed woman, but had knowledge that

---

[284] Police Accountability Task Force Report at page 73.
[285] Department of Justice Report at page 75.
[286] Kinnane deposition page 134.
[287287] Id. at 135.
[288] Id. at 137.

it was taking place, breached a duty to intervene and acted contrary to departmental policy and law. I am further of the opinion that officers on the scene who were not otherwise engaged in the pointing of loaded firearms at a helpless three-year-old child and her grandmother, but had knowledge that it was taking place, had an absolute duty to intervene and their failure to do so was contrary to departmental policy and law.

The duty of a law enforcement officer to intervene on behalf of a citizen whose constitutional rights are being violated by other law enforcement officers is clearly established law.[289] Further, such a duty is consistent with generally accepted policing practices.[290] The failure to intervene is consistent with and often an indicator of a Code of Silence.

As has been previously stated, the defendant police officers have a cumulative 97 years of service with the Chicago Police Department, and despite the widespread reports, citizen complaints, and a sea of civil judgments and settled claims of excessive force at the hand of Chicago Police Officers, not one them has observed another officer using excessive force against a citizen, and not one of them reports ever having to intervene when the Constitutional rights of another were being violated. It is not for me to assess the credibility of the defendants. Yet, the evidence is overwhelming and is supported by an admission of the city's highest elected official; a Code of Silence exists within the Chicago Police Department and so does a culture where those who choose to run afoul the law can do so without fear of intervention or punishment.

Based on the information and analysis set out above, I am of the opinion that during August 29, 2008 – August 29, 2013: (1) The City of Chicago, CPD, CPD Officers, BIA, and IPRA had a *de facto* policy or widespread custom or practice of a Code of Silence, defined as "*the tendency to ignore, deny or cover up the bad actions of a colleague or colleagues,*" as is evidenced by the Mayor's unequivocal admission, a flawed system of investigation and discipline that concealed misconduct and allowed wrongdoers to act with impunity, and countless examples of untruthfulness and criminality that blatantly occurred in the presence of others; (2) The City of Chicago, CPD, BIA, and IPRA's failure to take steps to curb or otherwise cure the Code of Silence despite being placed on notice and acknowledging its existence was a conscious and deliberate choice; (3) The City of Chicago, the CPD and IPRA fostered an organizational climate that embraced a Code of Silence that made the defendant police officers reasonably believe they could act towards the plaintiffs with impunity; and (4) The City of Chicago and the CPD's deliberate and conscious choice to accept and tolerate a Code of Silence and their failure to take steps to curb or otherwise cure the Code of Silence, despite being repeatedly placed on fair notice of its existence, was the moving force behind each plaintiff's injuries in this case, as explained above in this section; if there had not been a rigid Code of Silence in effect on August 29, 2013, it is more likely that some officers would have intervened and/or would have corroborated at least portions of plaintiffs' account of officer misconduct. Among the various indicators that may well signal the existence of a

---

[289] Mick v. Brewer, 76 F.3d 1127 (10th Cir. 1996). Also, See, Ensley v Soper, 142 F.3d 1402 (11th Cir. 1998), Priester v City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000), and
[290] *Duty of Officer to Intervene When Observing Excessive Force,* by Jack Ryan, J.D., LLRMI, 2006.

Code of Silence, there are many that exist in this case and are evident in the materials that I have reviewed: inadequate administrative investigations, failure to discipline, no misconduct for false and misleading statements, and failing to intervene and report the misconduct of others. In my opinion, any reasonable officer in the CPD during 2008 – 2013 would have been aware of the systemic deficiencies in the administrative process and the discipline system that is coupled with the culture of silence that is unlikely to change. Those who, like defendant officers, chose, during 2008-2013, to engage in misconduct did so with the reasonable belief that their deeds would go undiscovered and uninvestigated or investigated in such a deficient manner or subjected to such delay in resolution that they would escape accountability.

### *City Has a Policy of Failing to Train*

In preparation of my report, I reviewed the Chicago Police Department's policies that were in effect at the time of this incident pertaining to use of force,[291] preparation of a Tactical Response Report,[292] and the execution of a search warrant.[293] Nowhere within the body of those policies is the manner in which officers engage a child or a minor delineated in any fashion despite what the policing profession has come to learn about the impact of such potentially violent encounters may have on children.

According to a 2012 Attorney General's National Task Force Report which focused on children exposed to violence, the level of trauma youth experience burdens the United States with astronomical costs and places a financial burden on public systems, to include the police.[294] It has been my experience that such trauma occurs as a result of actions that take place in the home, in schools, on the streets, and sometimes as a result of police enforcement actions that either directly impact a child or happen in the child's presence.

According to Sergeant Brian Kinnane, the use of force model is for all ages; there is no specific consideration for children.[295] Having reviewed the department's policy, I would agree that the sergeant's understanding of the continuum is correct. However, evolving law enforcement practices consider the presence or likely presence of children when preparing to carry out a high risk tactical operation. In my opinion this not only something that should be firmly rooted in policy, but embedded in training around use of force and warrant execution. These integral points are underscored in training carried out in the law enforcement agencies around the country. The fact that none of the defendant officers noted with great emphasis the necessity to consider the presence of children in both pre-raid and raid execution is disturbing to me.  It also provides support for the belief that it is something that is not reflected in the policy that guides their work, or the training in which they rely to ensure that their work is carried out safely and effectively.

---

[291] G03-02-01, G03-02-07, G03-02-04, G03-02-06, and G03-02-02.
[292] G03-02-05.
[293] S04-19.
[294] http://www.justice.gov/defendingchildhood/cev-rpt-full.pdf
[295] KINNANE deposition at page 130-132.

Strategies for Youth, a national training provider for law enforcement agencies and other entities that provide services to youth has been in existence since 2009. The training they provide to law enforcement, and the model policies they recommend, underscore the importance of reducing the trauma that results when children are present during high risk *enforcement* activities, to include the arrest of a parent as well as any resultant use of force that may transpire in the course of that arrest. The horrifying facts asserted by the plaintiff's reveal significant acts of violence inflicted upon and carried out in the presence of three-year Davianna Simmons.

"*While much law enforcement work takes place in traumatic situations, many officers are not trained to recognize signs and symptoms of trauma. Law enforcement agencies should provide officers with appropriate training. Specifically, officers should understand the ways trauma manifests in children, the impact of trauma on brain development and behavior, and the importance of de-escalation in limiting trauma.*"[296]

As previously set out in my report, Aretha Simmons's initial encounter with the Officer O'Keefe resulted in being grabbed Aretha by the neck and upper arm and pushed face forward into the concrete porch wall so that her left eye and chest hit the concrete.[297] Despite O'Keefe's denial, this particular allegation is supported by two independent witnesses. Once taken inside the house, Davianna watched her handcuffed mother being manhandled, shaken violently, and slammed into a metal radiator three or four times.[298] Again, these allegations are denied by each and every officer who was inside the home at the time. The impact of those observations on a three-year old child has been well researched and is an integral part of the training curriculum previously mentioned and the studies featured in the 2009 Attorney General's Report.

According to the National Center for Children Exposed to Violence at the Yale Child Study Center, violence that occurs in the presence of a child could manifest itself in the following ways: sleep disturbance, separation anxiety, hypervigilance, physical complaints, irritability, emotional upset, regression, withdraw, blunted emotions, distractibility, and changes in play.

The plaintiffs have further asserted that when the officers entered the residence, Emily Simmons was standing in her bedroom at her dresser, with Davianna standing immediately next to her.[299] Sergeant Kinnane and Officer Hefel entered Emily's bedroom with their guns drawn and pointed, yelled "freeze!" and repeatedly told Emily to "shut up" when she asked what was happening.[300] According to Ms. Simmons, Sergeant Kinnane's loaded gun, which was dark and larger than an average handgun, initially made physical contact with Emily's head; Kinnane

---

[296] Thurau, Lisa: *First, Do No Harm: Model Practices for Law Enforcement Agencies When Arresting Parents in the Presence of Children* at page 5, citing https://www.bja.gov/Publications/IACP-SafeguardingChildren.pdf.
[297] *Deposition of Aretha Simmons* at pages 90, 91.
[298] *Id.* at pages 93-94, 100.
[299] *Deposition of Emily Simmons* at pages 36-37
[300] *Deposition of Emily Simmons* at pages 36, 39, 53.

pointed his gun at Emily's head as he yelled at her to move into the living room.[301] It is undisputed that at no time did Emily or Davianna refuse instructions, resist officer authority, or pose any threat or danger whatsoever to any CPD officers.[302]

Simultaneously, Officer Hefel pointed his loaded rifle 4-5 inches from three-year old Davianna's chest; the rifle emitted a laser-like red light at Davianna's chest, which terrified Emily.[303] Emily pleaded with the officers to remove the gun from her granddaughter's chest; she repeatedly asked Hefel why he was pointing a gun at the child, and said "get it off of her, can't you see she doesn't have anything in her hand?!"[304] Hefel and Kinnane responded by yelling at Emily "shut up!" and refusing to lower their guns.[305] Kinnane and Hefel led Emily and Davianna to the front room at gunpoint and did not lower their guns, which were still pointed at Emily and Davianna, until after Emily and Davianna sat down on the couch.[306]

As Aretha was being accosted by O'Keefe, she saw that Hefel was pointing his rifle at her three year-old daughter and saw the red laser-light pointed at Davianna's chest.[307] Distraught, she cried: "get the gun off my baby!"[308] O'Keefe told Aretha to shut up as he repeatedly shook and slammed her body into the radiator and wall.[309]

While executing the search warrant, the officers needlessly destroyed many of plaintiffs' personal possessions, including Davianna's toys and stuffed animals. The officers broke a TV, tore up Davianna's toys, tore up Emily's clothes, broke a box spring mattress, smashed a lava lamp, broke apart dresser drawers and the back door, and tore the insulation out of the home.[310] The officers also destroyed Davianna's Leap Frog console and her iPad tablet and popped heads off Davianna's dolls.[311] O'Keefe seemed to derive great pleasure destroying Davianna's toys and stomping on her stuffed animals.[312] Davianna saw O'Keefe destroy her belongings and, as he did so, she tearfully asked her mother why the man was destroying her possessions.[313] She asked: "why they breaking my toys? Why is he stepping on my doll heads? He's breaking my stuff mommy."[314] Aretha was at a loss for words.[315]

---

[301] *Id.* at pages 36; 58-60.
[302] *Deposition of Hefel* at pages 53, 55
[303] *Deposition of Emily Simmons* at pages 185, 188.
[304] *Id.* at page 56.
[305] *Id.*
[306] *Id.* at pages 58-60.
[307] *Deposition of Aretha Simmons* at pages 96, 107.
[308] *Id.*; *Deposition of Emily Simmons* at page 93.
[309] *Deposition of Aretha Simmons* at page 107.
[310] *Deposition of Emily Simmons* at pages 112, 115, 119, 124, 126, 127-128
[311] *Deposition of Aretha Simmons* at pages 122-123, 126
[312] *Deposition of Aretha Simmons* at page 127
[313] *Id.* at page 128.
[314] *Id.*
[315] *Id.*

59

All of the defendant officers agree that Aretha Simmons did not resist arrest in any way and did not pose any threat to any of the officers at any time.[316] Likewise, each and every officer deposed unequivocally denies that a gun was ever pointed at Emily Simmons and three-year old, Davianna, and agree that doing so would have been unreasonable, unnecessary, and would have constituted excessive force.[317]

The International Association of Chiefs of Police, in conjunction with the Bureau of Justice Assistance, provide the following guidance.

*"When officers are planning a raid or execute an arrest or search warrant, they should conduct pre-deployment checklists to ascertain whether children are present and, if so, how many children are in the home, their likely location at the time of the planned action and their proximity to officers who may use force to enter the home, determine whether the planned action can be scheduled to avoid observation by children, and vigilantly avoid aiming weapons at children."[318]*

In 2014, the San Francisco Police Department incorporated the following language into departmental policy.

*"When planning an arrest or search warrant, officers shall consider the ages and likely location of children when determining the time, place, and logistics of executing the arrest and/or search warrant."[319]*

I have reviewed no documentation whatsoever that would lead me to conclude that the CPD had instructed or otherwise required the defendant police officers to consider the presence of three year old, Davianna, at the time they chose to execute the search warrant at 930 North Keystone Avenue on August 29, 2013. This guidance is clearly absent from departmental policy and training, and its consideration was not revealed in the deposition testimony offered by the defendant police officers.

In my review of the discovery materials, specifically FCRL 947-1033, I had occasion to review the training records of the following officers: James Roussell, Brian Kinnane, Anthony Babicz, Michael Laurie, Steven Hefel, Justin Homer, Wiloetta Muzupappa, John O'Keefe, Michael Suing, and John Wrigley. I focused my attention on topics that pertained to use of force, search and seizure, and procedural justice.

---

[316] *See, e.g., id.* at page 39.

[317] *See, e.g., Depositions of Kinnane (whom plaintiffs allege pointed a gun at Emily)* at pages 73, 84-85, 97, 210 and *Hefel (whom plaintiffs alleged pointed a gun at Davianna)* at pages 75-76, 148-150. Hefel's denial was the most adamant: "I find the question as offensive. I can't even believe you would ask that, but since you are asking I guess I have to answer that. Besides the moral implications, just the thought of that is very upsetting -- the thought alone of that is so upsetting to me that it's tough to answer this question. But absolutely of course there would never be a reason, and would I condone it or stand by for it? No, I would not." *Id.* at pages 148-149.

[318] Id. at page 13, citing, https://bja.gov/Publications/IACP-SafeguardingChildren.pdf.

[319] San Francisco Police Department General Order DGO7.04 (III) (D).

The following is a snap-shot of those relevant courses revealed within the records, and whether the instruction took place online, in a classroom setting, or in self-instruction mode where the involved officer would submit a written paper that presumably pertained to the topic.

Table Eight: Defendant Officer Training History[320]

| Officer | Appointment Date | Course of Study | Date of Course | How Presented |
|---------|------------------|-----------------|----------------|---------------|
| Anthony Babicz | 9/27/2004 | Use of Force Accidental Discharge Controlling Resistors Use of Force Aero. Projectile Search/Seizure Use of Force Use of Force Use of Force Semi-Auto Wpn. Firearms Con. Carry | 7/5/06 8/8/06 2/19/07 5/27/09 6/27/09 7/2/09 10/19/12 3/27/13 4/29/13 5/13/13 3/18/15 | Classroom Classroom Classroom Online Online Classroom Online Online Online Classroom Online |
| Steven Hefel | 5/1/2006 | Exc. Delerium Use of Force Search/Seizure G8/NATO Use of Force Semi-Auto Wpn. Firearms Con. Carry | 4/24/09 5/27/09 7/2/09 1/16/12 3/29/13 5/22/13 3/24/15 | Online Online Classroom Self-Taught Online Classroom Online |
| Justin Homer | 12/5/2005 | Use of Force Use of Force | 7/25/06 8/6/06 2/19/07 | Classroom Classroom Classroom |

---

[320] Table Eight reflects the defendant officers training history as it pertains to use of force and search and seizure. It does not reflect their entire training history.

| | | Controlling Resistors Carbine | 3/20/09 5/28/09 | Classroom Online |
|---|---|---|---|---|
| | | Use of Force | 7/2/09 | Classroom |
| | | Search/Seizure | 7/27/09 | Online |
| | | Aerosole Projectile | 8/25/09 | Classroom |
| | | Firearms | 2/12/10 | Classroom |
| | | Carbine | 12/13/11 | Self-Taught |
| | | Field Force | 7/22/13 | Classroom |
| | | Procedural Justice | 3/18/14 | Online |
| | | Firearms Concealed Carry | 10/28/14 | Online |
| | | Use of Force | | |
| Brian Kinnane | 4/30/2001 | MISSING | | |
| Michael Laurie | 1/26/2004 | Use of Force | 7/25/06 | Online |
| | | Use of Force | 8/6/06 | Classroom |
| | | Use of Force | 3/29/09 | Online |
| | | Search and Seizure | 7/2/09 | Classroom |
| | | Field Force | 12/13/11 | Self-Taught |
| | | G8/NATO | 2/27/12 | Self-Taught |
| | | Use of Force | 4/30/13 | Online |
| | | Procedural Justice | 9/25/13 | Classroom |
| John O'Keefe | 10/28/2002 | Mobile Strike Force | 12/11/08 | Classroom |
| | | Search Warrants | 2/10/09 | Classroom |
| | | Use of Force Officer Safety Rescue Reality Based Training and Decision Making | 3/31-4/15/09 | Classroom |
| | | Search/Seizure | 7/2/09 | Classroom |
| | | Mobile Field Force | 12/13/11 | Self-Taught |
| | | | 3/18/14 | Classroom |

| | | Firearms Concealed Carry | | |
|---|---|---|---|---|
| Michael Suing | 4/26/2004 | Bias-Based Policing | 10/10/05 | Classroom |
| | | Impact Weapons | 6/19/06 | Classroom |
| | | Use of Force | 8/6/06 | Classroom |
| | | Accidental Discharge | 8/8/06 | Classroom |
| | | Chemical Agents | 6/8/09 | Classroom |
| | | Choke Holds | 6/12/09 | Classroom |
| | | Aerosole Projectiles | 6/27/09 | Online |
| | | Search/Seizure | 7/2/09 | Online |
| | | Use of Force | 12/3/13 | Online |
| | | Firearms Concealed Carry | 3/18/14 | Online |
| John Wrigley | 7/29/2002 | Search Warrants | 10/22/09 | Classroom |
| | | Use of Force | 6/8/11 | Online |
| | | G8/NATO | 11/11/12 | Self-Taught |
| | | Firearms Concealed Carry | 3/18/14 | Online |
| | | Use of Force | 3/18/14 | Online |
| Michael Laurie | | Use of Force | 7/25/06 | Online |
| | | Use of Force | 8/6/06 | Classroom |
| | | Use of Force | 3/29/09 | Online |
| | | Search/Seizure | 7/2/09 | Classroom |
| | | Mobile Field Force | 12/13/11 | Self-Taught |
| | | G8/NATO | 2/27/12 | Self-Taught |
| | | Use of Force | 4/13/13 | Online |
| | | Procedural Justice | 9/25/13 | Classroom |
| Wioletta Muzupappa | | Baton | 3/14/06 | Classroom |
| | | Chemical Agents | 4/14/09 | Classroom |
| | | | 4/17/09 | Classroom |

| | | | | |
|---|---|---|---|---|
| | | Use of Force (Chokeholds and Exc. Delerium | 5/28/09 | Online |
| | | Use of Force | 7/2/09 | Classroom |
| | | Search/Seizure | 6/17/12 | Classroom |
| | | Procedural Justice | 3/24/14 | Online |
| | | Firearms | | |
| | | Concealed Carry | | |
| James Roussell | | Taser | 7/6/06 | Classroom |
| | | Choke Holds | 5/8/09 | Classroom |
| | | Aersole Projectile | 7/2/09 | Online |
| | | Search/Seizure | 12/23/09 | Online |
| | | Taser Familiarization | 9/3/10 | Classroom |
| | | Search/Seizure | 8/20/10 | Classroom |
| | | Use of Force | 3/21/11 | Online |
| | | G9/NATO | 3/14/12 | Classroom |
| | | Use of Force | 5/14/13 | Online |
| | | Taser X26 | 9/24/14 | Classroom |

During the course of their sworn depositions, the defendant officers were asked about the training they may have had with regard to use of force. Remarkably, they had little recollection of what the training may have consisted of, nor could they articulate the content with any degree of specificity. For example, John O'Keefe had absolutely no recollection of any recent training pertaining to use of force, nor does he recall ever receiving use of force training with respect to minors.[321] Michael Laurie did not recall use of force training "on-line", but his training records indicate him taking such a course at least three-times. In my opinion, the mere fact that these officers had difficulty recalling whether they received such training, or the content of such training, causes me to question the manner in which the material was presented.

It has been my experience that when a police agency fails to properly train officers for recurring tasks that officers may face, it runs the risk of acting in a manner that is contrary to generally accepted policing practice, and thus, may well expose the department and the municipality to potential problems due to their failure to train, especially where the lack of such training or poor training foreseeably leads to a constitutional violation.[322]

---

[321] O'KEEFE deposition at page 111, and pages 115-116.

[322] See, City of Canton v. Harris, 489 U.S. 378 (1989), and Legal Guide for Law Enforcement, Law Enforcement Liability and Risk Management Institute, Jack Ryan, 2010.

*"The need to train officers in the constitutional limits on the use of deadly force can be said to be so obvious, that failure to do so could be properly characterized as deliberate indifference to constitutional rights."*[323]

It has been my experience that the manner in which training is carries out in a police agency is as important as the content that may exist within the training curriculum. While I recognize that using a web-based approach to push out new information, refresh a student's memory as to old information, and test memory for whether or not information was understood and retained can be efficient measuring tool, I believe that many aspects of policing, such as how and when to use force and the manner in which the government intrudes into the homes of its constituents, have a certain amount of critical and practical decision making elements that best lends itself to a scenario based approach.

An example of this can be found in the Consent Decree which sets out the requirements aimed at reforming policing in the City of Cleveland. Among the requirements around use of force training, the Consent Decree specifically requires, *"role-playing scenarios and interactive exercises that illustrate proper use of force decision making, including training on the importance of peer intervention."*[324]

Moreover, authoritative works examining the area of instructional design seems to also suggest the value in how content translates into learning; *"understanding is about wise performance-transfer and use of big ideas- not mere recall."*[325]

'*Students must practice the new ideas in simplified drill or exercise form, and they must apply those discreet skills or moves in a more complex and fluid performance- a movement back in forth between part and whole, between scaffolded coaching and trial and error in performance."*[326]

It is clear to me having reviewed Commander Daniel Godsel's sworn deposition that much of the training that takes place within the Chicago Police Department takes place on-line and through roll-call style training that oftentimes involves streaming video.[327] It is further clear that scenario-based training, the kind of training that I believe is best suited for the development of sound critical and practical decision making is not required by the Chicago Police Department.[328] In fact, in my review of the defendant police officer training records provided to me, I saw only one instance where the terms "reality" or "scenario" based training was specifically mentioned.[329]

While I believe that roll-call training is an important means by which to reinforce existing knowledge and educate on new and emerging areas that impact an officer's work, it must be

---

[323] See, <u>City of Canton v. Harris,</u> 489 U.S. at 390, footnote 10.
[324] CLEVELAND CONSENT DECREE at ¶ 84 (c).
[325] Wiggins and McTighe: *Understanding by Design, 2nd Ed.,* page 250.
[326] Id. at pages 251-251.
[327] GODSEL deposition at pages 43-47.
[328] Id. at page 47.
[329] O'KEEFE's training records at FCRL001007-1015.

accompanied with the rigorous practical exercises to ensure both understanding and proper application. I also believe that if a department makes an affirmative decision to rely on roll training as a mechanism by which information is transmitted to an officer, there must be a way in which to ensure that the information transmitted was properly understood.

According to Commander Godsel, it is the primary responsibility of the sergeant and/or lieutenant conducting the roll call training to reinforce the training and ensure its understanding.[330] However, the Commander freely admits that he has no way of knowing whether that in fact occurs. Nor was the Commander aware that such materials are ever formally evaluated or tested to measure comprehension.[331]

In my experience, one way in which to ensure compliance to departmental policies and directives is to conduct an internal audit. Commander Godsel testified that such audits are in fact conducted to ensure that streaming video is being shown at roll calls. Yet, he is not aware of any consequences that may have resulted where the audit revealed non-compliance.[332]

In my review, I have found that CPD did not train officers regarding the impact of the use of force on children or on how to avoid such uses of force. In this case, Commander Godsel testified that, during the relevant period, officers were not provided with any training regarding the use of force in the presence of minors.[333] In particular, CPD did not train officers to avoid the use of force or unnecessary force against children or against parents in the presence of their children.[334] It did not train officers, for example, to refrain from unnecessarily pointing guns at them.[335] Further, Godsel testified that, during the relevant period, officers were not trained on how take precautions with the use of force on or in the presence of young children, including the impact of pointing guns at children or in their presence and how officers should not do so.[336] In general, CPD did not train or sensitize officers regarding the impact on children of officers' use of force on children or against children's parents in the children's presence.[337] The new police legitimacy course that Commander Godsel talked at some length about did not have a component that addressed the needs or sensitivities of minors or young children.[338]

Finally, it does not appear that CPD's early intervention systems were seriously geared toward addressing or correcting the behavior of officers accused of using excessive force. During the relevant period, neither City nor CPD made any change to officer training as the result of the conclusions of any audit or study of the effectiveness of CPD's early intervention systems in reducing the incidence of excessive force.[339] And, in particular, neither the City nor CPD made

---

[330] Id. at page 50.
[331] Id.
[332] Id. at page 52.
[333] Daniel Godsel deposition at page 21.
[334] City's answer to plaintiffs' requests for admission 67-71.
[335] City's answer to plaintiffs' request for admission 72.
[336] Daniel Godsel deposition at pages 22, 27.
[337] City's answer to plaintiffs' request to admit 65 and 66.
[338] Daniel Godsel deposition at page 17.
[339] City's answer to plaintiffs' request to admit 33 and 34.

any change to officer training as the result of the conclusions of any audit or study of the incidence of excessive force against children or the incidence of the use of force against a child's parent in the child's presence.[340]

Based on the information and analysis set out above, I am of the opinion that during the Monell period in this case: (1) The City of Chicago and the CPD had a *de facto* policy or widespread custom or practice of failing to train officers in the proper use of force with respect to minors and children in particular; the City of Chicago and the CPD also had a *de facto* policy or widespread custom or practice of failing to train in the proper use of force generally, as is evidenced in the defendant officers' training history, their testimony of not being able to recall the training content (or in some cases, the timeframes), their complaint histories regarding allegations of excessive force, and CPD's complete failure to take any steps to audit for the use of force and the use of excessive force; (3) The City of Chicago and CPD failed to take affirmative steps to curb or cure any failures to train officers in the proper use of force with respect to minors and children in particular; and (4) The City of Chicago and CPD's failure to train officers in the proper use of force with respect to minors and children in particular was the moving force behind Davianna Simmons injuries. I have reviewed no evidence that the defendant officers ever received any use of force training or training related to the execution of search warrants that alerted them to the special considerations to be contemplated when children are present during such a high risk enforcement activity. Defendant officers and other CPD personnel have been the subject of complaints or litigation as the result of use of force against minors. This collective body of notice was sufficient in my opinion to warrant training related this obvious and critical need. Further, I believe that the defendant officers' complete lack of training regarding the effect of violence on children caused them to perform in the manner they have been alleged toward three-year-old Davianna, Davianna's mother in the child's presence, and towards Davianna's toys, stuffed animals and possessions in her room. Assuming that the facts in this case are deemed credible by the fact finder, they reveal acts of considerable and unnecessary violence that would have the likelihood of traumatizing a small child such as Davianna. These acts included the pushing, shoving, and manhandling of a restrained mother, petite in size, the pointing of loaded weapons at an unarmed and defenseless child and her grandmother, and the needless destruction of personal property.

At this stage of my review, I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool I will assure that they are made available on a timely basis for review, if requested, prior to their use.

My fees for professional services in this case are a flat fee of $8,500. My fee for depositions and trial appearances is $2500 per day plus travel and lodging expenses.

---

[340] City's answer to plaintiffs' request to admit 38, 39, 48.

This report is signed under penalty of perjury on this 13th day of March, 2017 in the City of Charlottesville, Va.


/s/ Timothy J. Longo, Sr.